CARMEN J. LAWRENCE
MICHAEL J. RIVERA
MICHAEL B. DE LEEUW
NAZAR ALTUN
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
Michael.deLeeuw@friedfrank.com

ATTORNEYS FOR DEFENDANT
    KENNETH G. HOWLING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | 08 Civ. 02979 (LAK) |
| | : | ECF CASE |
| - against - | : | |
| | : | |
| BIOVAIL CORPORATION, EUGENE N. MELNYK, BRIAN CROMBIE, JOHN MISZUK and KENNETH G. HOWLING, | : | |
| | : | |
| Defendants. | : | |
| | : | |

-------------------------------------------------------------------- x

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KENNETH G. HOWLING'S MOTION TO DISMISS THE SECOND CLAIM IN THE COMPLAINT

---

TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ..................................................................................3

ARGUMENT ....................................................................................................10

I.     MR. HOWLING'S ACTIONS, AS ALLEGED, DO NOT CONSTITUTE
A PRIMARY VIOLATION OF SECTION 10(b) AND RULE 10b-5 .............................11

     A.      The Bright Line Test ..................................................................11

     B.      The October 3rd Press Release...........................................................13

     C.      The October 3rd Analyst Call ...............................................................16

     D.      The October 8th Press Release...........................................................16

     E.      The October Road Show .......................................................................18

II.     THE SEC HAS FAILED TO PLEAD SPECIFIC FACTS THAT GIVE RISE
TO A STRONG INFERENCE THAT MR. HOWLING ACTED WITH SCIENTER ....19

     A.      Conclusory Allegations Regarding Scienter do Not Raise a Strong Inference of
Scienter...........................................................................................20

     B.      The SEC Does Not Allege that Mr. Howling had the Motive and Opportunity
to Commit Fraud ...................................................................................21

     C.      There is No Factual Basis Alleged to Support a Strong Inference of
Conscious Misbehavior or Recklessness ................................................21

     D.      The Crombie Draft Does Not Raise a Strong Inference of Scienter.....................22

     E.      The Analyst Report and Distributor Email do Not Raise a Strong Inference of
Scienter ...........................................................................................23

III.    THE COMPLAINT DOES NOT MEET THE PARTICULARITY
REQUIREMENT OF RULE 9(b)..................................................................25

IV.    THE SEC'S TAG-ALONG AIDING AND ABETTING CLAIM ALSO FAILS............26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re AES Corp. Sec. Litig.*,
   825 F. Supp. 578 (S.D.N.Y. 1993) ............................................................... 5

*ATSI Committee, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ....................................................................... 19

*Atkins v. Apollo Real Estate Advisors, LP*,
   No. 05 Civ. 4365, 2008 WL 1926684 (E.D.N.Y. April 30, 2008) ............................. 26

*In re Bayou Hedge Fund Litig.*,
   534 F. Supp. 2d 405 (S.D.N.Y. 2007) ........................................................... 10

*Bell Atlantic Corp. v. Twombly*,
   127 S. Ct. 1955 (2007) ..................................................................... 10, 26

*Borochoff v. GlaxoSmithKline, PLC*,
   No. 07 Civ. 5574, 2008 WL 2073421, 5-7 (S.D.N.Y. May 9, 2008) ......................... 17

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) ........................................................... 25

*In re Carter-Wallace, Inc. Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000) .................................................................. 21, 25

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164, 114 S. Ct. 1439 (1994) ..................................................... 11, 12

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ....................................................................... 5

*City of Philadelphia v. Fleming Companies, Inc.*,
   264 F.3d 1245 (10th Cir. 2001) .................................................................. 24

*Copland v. Grumet*,
   88 F. Supp. 2d 326 (D.N.J. 1999) ............................................................... 14

*Davidoff v. Farina*,
   No. 04 Civ. 7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ............................. 25

*Decker v. Massey-Ferguson, Ltd.*,
   681 F.2d 111 (2d Cir. 1982) .................................................................................. 28

*Filler v. Hanvit Bank*,
   156 Fed. Appx. 413 (2d Cir. 2005) ........................................................................ 11

*In re Global Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004) ................................................................... 15

*Grandon v. Merrill Lynch & Co.*,
   147 F.3d 184 (2d Cir. 1998) .................................................................................. 10

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ............................................................................ 10, 21

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) .................................................................................... 3

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .................................................................................. 20

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005) ................................................................... 12

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ............................................................................ 10, 25

*SEC v. Boling*,
   No. 06 Civ. 1329, 2007 WL 2059744 (D.D.C. July 13, 2007) .................................. 19

*SEC v. Cedric Kushner Promotions, Inc.*,
   417 F. Supp. 2d 326 (S.D.N.Y. 2006) ............................................................ *passim*

*S.E.C. v. Collins & Aikman Corp.*,
   524 F. Supp. 2d 477 (S.D.N.Y. 2007) ................................................................... 19

*SEC v. Goldsworthy*,
   No. 06 Civ. 10012, 2007 WL 4730345 (D. Mass. Dec. 4, 2007) .............................. 19

*SEC v. KPMG LLP*,
   412 F. Supp. 2d 349 (S.D.N.Y. 2006) .............................................................. 15, 19

*SEC v. Lowy*,
    396 F. Supp. 2d 225 (E.D.N.Y. 2003)................................................................ 23, 24

*SEC v. Lucent Technologies, Inc.*,
    363 F. Supp. 2d 708 (D.N.J. 2005) ..................................................................... 11, 18

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ............................................................................... 21

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris
    Companies*,
    75 F.3d 801 (2d Cir. 1996)....................................................................................... 5

*In re Scholastic Corp. Security Litigation*,
    252 F.3d 63 (2d Cir. 2001).................................................................................... 12

*Shapiro v. Cantor*,
    123 F.3d 717 (2d Cir. 1997)....................................................................... 11, 12, 16

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994).............................................................................. 20, 27

*In re Sotheby's Holdings, Inc.*,
    No. 00 Civ. 1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) .............................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (June 21, 2007)......................................................................... 19, 25

*Winkler v. NRD Mining, Ltd.*,
    198 F.R.D. 355 (E.D.N.Y. 2000) ................................................................. 14, 15, 17

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998)........................................................... 11, 12, 16, 18


## FEDERAL STATUTES

17 C.F.R. § 240.10b-5 ......................................................................................... *passim*

Fed. R. Civ. P. 9(b)............................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1, 30

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)............... *passim*

## STATE STATUTES

N.Y. Bus. Corp. Law § 715(h) (McKinney 2008) ............................................................. 24

## OTHER AUTHORITIES

PRINCIPLES OF CORPORATE GOVERNANCE:  ANALYSIS AND RECOMMENDATIONS § 4.02 (1994)……………………………………………………………………………………….24

v

Defendant Kenneth G. Howling respectfully submits this memorandum of law in support

of his Motion to Dismiss the second claim in the Complaint pursuant to Fed. R. Civ. P. 12(b)(6)

and Fed. R. Civ. P. 9(b).

## PRELIMINARY STATEMENT

This case arises out of an over four year investigation by the U.S. Securities and

Exchange Commission (the "SEC") into accounting practices at Biovail Corporation ("Biovail"

or the "Company"), a Canadian pharmaceutical company whose stock is traded on the New York

and Toronto Stock Exchanges. *See* Compl. ¶ 1. In its sweeping Complaint, the SEC claims that

Biovail and the individual defendants engaged in "chronic fraudulent conduct – including

financial reporting fraud and other intentional misrepresentations" and asserts a total of ten

claims for relief. *See* Compl. ¶¶ 1, 148-187. Despite the broad scope of the Complaint, and the

extensive discovery that the SEC has already conducted, Kenneth G. Howling, who at all

relevant times served as the head of investor relations at Biovail, is alleged only to have played a

minor and peripheral role in just one set of events described in the entire Complaint—

misstatements and omissions regarding the impact on Biovail's third quarter 2003 revenue of a

shipment of the drug Wellbutrin XL (the "Shipment") that was involved in an October 1, 2003,

fatal truck accident (the "Accident").[1] These alleged misstatements and omissions were

allegedly made in press releases issued by Biovail on October 3rd and 8th, during a conference

call with analysts on October 3rd, and during a corporate road show in mid-October. Mr.

Howling is not alleged to have played any role in the alleged misrepresentations regarding the

---

[1]  The Complaint alleges that the relevant distribution agreement called for title to pass upon delivery to the
Distributor (and not upon shipment). Compl. ¶ 22. Consequently, the Complaint alleges that the Accident
could not have had any impact on Biovail's third quarter because the Shipment could not have reached the
Distributor before the end of the quarter. Compl. ¶ 23.

value of the Shipment; nor is Mr. Howling alleged to have played a role in any of the other nine claims described in the Complaint.

The SEC acknowledges that Mr. Howling—from the beginning—relied on the information given to him by Biovail's founder, Chief Executive Officer, and Chairman of the Board, Eugene Melnyk, and by Biovail's Chief Financial Officer, Brian Crombie. Compl. ¶ 30. The allegations in the Complaint are consistent with Mr. Howling being a scrivener— regurgitating information that he received from others into press releases and scripts.

Under the Second Circuit's "bright line" test, the allegations against Mr. Howling, taken as true, simply do not add up to a primary violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The Complaint does not adequately attribute a single misstatement (or omission) to Mr. Howling; it does not allege that any investors or analysts attributed any of the alleged misstatements or omissions to Mr. Howling; it does not allege that Mr. Howling had the independent authority to issue press releases on behalf of Biovail; and it does not allege that Mr. Howling had or acquired any independent knowledge about the relevant terms of the distribution agreement or its accounting or financial reporting implications at the time of the alleged misstatements or omissions. On these allegations, Mr. Howling cannot be liable for a primary violation of the securities laws.

The Complaint also fails to allege that Mr. Howling acted with the scienter necessary to support a securities fraud claim. The SEC blithely asserts that Mr. Howling "knew or recklessly disregarded," the fact that the Accident had no impact on third quarter revenues. Compl. ¶ 34, 43. But conclusory and boilerplate allegations such as these are insufficient to plead the strong inference of scienter required in this Circuit. The SEC has failed to plead that

2

Mr. Howling had the motive and opportunity to commit fraud and has failed to plead facts that would give rise to a strong inference of conscious misbehavior or recklessness on the part of Mr. Howling.

The SEC also fails to plead its allegations of fraud with the particularity demanded by Rule 9(b) of the Federal Rules of Civil Procedure. This is most apparent with respect to the SEC's allegations concerning a series of presentations between October 10 and 15, 2003, "in New York, Boston and other cities" intended to provide investors with a full update on Biovail's product portfolio and pipeline and to quell concerns about lingering negative rumors concerning the Accident (the "October Road Show"). The Complaint does not allege the "who, what, when, where, and how" necessary to plead a fraud claim. Rather, the SEC improperly lumps the defendants and the meetings together in an undifferentiated mess.

Mr. Howling is nothing more than an afterthought in the Complaint, and all claims against him should be dismissed.

## STATEMENT OF FACTS[2]

### *Kenneth G. Howling*

Mr. Howling is a United States citizen and a resident of Toronto, Ontario. At the time of the relevant events, Mr. Howling was Biovail's Vice President of Finance and Corporate Affairs. Compl. ¶ 16. In this role, Mr. Howling had responsibility for Biovail's corporate communications with investors, including press releases. *Id.* It is not alleged that he had the authority to issue press releases on his own without approval from his superiors. It is also not

---

[2]    This Statement of Facts is drawn from (1) the Complaint and (2) documents incorporated by reference in the Complaint, which are properly considered on this motion. The documents are annexed to the accompanying declaration of Nazar Altun, dated June 20, 2008 ("Altun Decl."). All well-pleaded facts are assumed to be true only for purposes of this motion. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 165 (2d Cir. 2005).

alleged that Mr. Howling had *any* financial reporting or accounting responsibilities during the relevant period.

### Eugene N. Melnyk

Defendant Eugene Melnyk is a Canadian citizen and a resident of St. Philip, Barbados. Mr. Melnyk was the founder of Biovail, and during the relevant time period, he was Biovail's Chief Executive Officer and Chairman of the Company's board of directors. Compl. ¶ 13. At all times during the relevant time period, Mr. Melnyk was Mr. Howling's superior.

### Brian Crombie

Defendant Brian Crombie is a Canadian citizen and a resident of Mississauga, Ontario. During the relevant time period, Mr. Crombie was Biovail's Chief Financial Officer. At all times during the relevant time period, Mr. Crombie was senior to Mr. Howling.

### The Accident

On September 30, 2003, a truck carrying a shipment of the drug Wellbutrin XL departed a Biovail warehouse in Canada destined for a major international pharmaceutical company in North Carolina that distributed the product (the "Distributor"). Compl. ¶ 17. On October 1, the truck was involved in a fatal multi-vehicle accident near Chicago. *Id.* The value of the Shipment was approximately $5,000,000. Compl. ¶ 32.

### The October 3rd Press Release

On October 3, 2003, Biovail issued a press release (the "October 3rd Press Release") that informed investors that the Company would miss its revenue guidance for the third quarter due, in large part, to "the loss of revenue and income associated with a significant in-transit shipment loss of Wellbutrin XL as a result of a traffic accident." October 3rd Press Release, Altun Decl.,

4

Ex. B.[3]  According to the Complaint, "[Mr.] Howling drafted the release based on information he received from the others," including Messrs. Melnyk and Crombie.  Compl. ¶ 30.  Mr. Howling also received an initial draft of a press release prepared by Mr. Crombie (the "Crombie Draft").  Compl. ¶ 30-31; *see also* Crombie Draft, Altun Decl., Ex. C.

The SEC alleges that the Crombie Draft "set forth the actual delivery term (*i.e.*, F.O.B. Destination) and stated correctly that the revenue from the product involved in the truck accident could not be recognized in the third quarter."  Compl. ¶ 30.  This is a selective, incomplete, and misleading characterization.  After describing the Accident in detail, the next paragraph in the Crombie Draft, in fact, states:

> The Biovail product [involved in the Accident] was a material amount of Bupropian [the active ingredient in Wellbutrin XL] being shipped to Biovail's licensee.  This product must be returned to Biovail's manufacturing plant in Manitoba Canada to ensure it is still within specifications.  Since the supply agreement between Biovail and its licensee stipulates FOB the licensee's warehouse, the revenue on this product cannot be recognized in Q3 2003.  The product, either the existing shipment once approved, or replacement shipment will be shipped within ten days.  However ***this replacement shipment and its associated revenue will now be recognized in Q4 not Q3***.

Crombie Draft, Altun Decl., Ex. C at 2 (emphasis added).

---

[3]     The Second Circuit permits incorporation of documents into motions to dismiss when (1) the documents are explicitly referred to in the complaint, (2) the documents establish essential elements of the claim, and (3) the plaintiff has actual notice of the contents of the documents.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-55 (2d Cir. 2002); *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 584-85 (S.D.N.Y. 1993).  In this case, the Complaint repeatedly quotes the October 3rd and October 8th Press Releases, and explicitly refers to the Crombie Draft (together, the "Incorporated Documents").  *See* Compl. ¶¶ 27-30, 42-44.  *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801, 808-09 (2d Cir. 1996) (holding that the court could consider the entire text of press releases, wire service reports, newspaper articles, and annual company reports on a motion to dismiss where the plaintiffs selectively quoted alleged misstatements from those documents in the complaint).  Moreover, the SEC clearly seeks to use the Incorporated Documents to prove that Mr. Howling violated Section 10(b) and Rule 10b-5.  Finally, the SEC cannot dispute that it has actual notice of the Incorporated Documents because the SEC has had copies of these documents for well over one year and has used them throughout the course of its investigation.  Therefore, Mr. Howling should be permitted to attach the Incorporated Documents to his motion to dismiss.

Contrary to the SEC's conclusory allegation, the Crombie Draft did not serve to inform Mr. Howling that the Shipment never could have been recognized as revenue in the third quarter. Rather, the clear implication of the Crombie Draft is that the revenue from the Shipment was originally going to be recognized in the third quarter, not the fourth quarter. Read in context, even the truncated language that the SEC quotes— "[s]ince the supply agreement between Biovail and its licensee stipulates FOB the licensee's warehouse, the revenue on this product cannot be recognized in Q3, 2003" —which follows a paragraph that contains a detailed description of the Accident, implies that, because of the Accident *and* the delivery terms, the revenue from the Shipment could not be recognized in the third quarter, *i.e.*, but for the Accident it could have been recognized in the third quarter. *Id.* That implication is confirmed by the Crombie Draft's concluding statement that "this replacement shipment and its associated revenue will ***now*** be recognized in Q4 ***not*** Q3." *Id.* (emphasis added).[4]

According to the Complaint, Mr. Crombie also provided Mr. Howling with false information regarding the valuation of the Shipment. Compl. ¶ 32. This false information was included in the October 3rd Press Release. *Compl.* ¶¶ 32-33. The Complaint further alleges that Messrs. Melnyk and Crombie (and Biovail) knew or recklessly disregarded the fact that the valuation in the October 3rd Press Release was wrong. Compl. ¶ 33. The SEC, however, does not allege that Mr. Howling had any knowledge *at all* that the statements in the press release regarding the value of the Shipment were false. In addition to providing Mr. Howling with the information necessary to draft the press release, Messrs. Melnyk and Crombie were themselves involved in the drafting process and reviewed and approved the final version of the press release prior to its publication. Compl. ¶¶ 27-33. The SEC seeks to hold Mr. Howling liable for

---

[4]    The shipping term is not even mentioned in the October 3rd Press Release.

6

assisting in the preparation of the October 3rd Press Release when he simply took information
that he received from his superiors and inserted it into the press release. Compl. ¶ 30.

### The October 3rd Analyst Call

Later on October 3, Messrs. Melnyk, Crombie, and Howling participated in a conference
call with analysts to discuss the Company's third quarter financial results (the "October 3rd
Analyst Call"). Compl. ¶ 34. The SEC alleges that Messrs. Melnyk and Crombie made
misrepresentations during the call. Compl. ¶¶ 34-37. Specifically, each separately stated that the
Accident would have a negative impact on Biovail's third quarter revenues, and Crombie
"referred to the value of the shipment as '$15 million to $20 million' – three to four times the
actual revenue value" of the Shipment. Compl. ¶¶ 34-36.

The SEC does not attribute any statements made during the October 3rd Analyst Call to
Mr. Howling, but appears to allege that because he was present while statements were made by
others he is liable for fraud. *See* Compl. ¶¶ 33-37. The SEC apparently bases this claim, in part,
on the allegation that Mr. Howling allegedly helped prepare a script for the October 3rd Analyst
Call—despite the fact that the Complaint does not allege that the script itself contained any
misrepresentations or omissions. Compl. ¶ 37.

### The October 8th Press Release

On October 8, 2003, Biovail issued another press release (the "October 8th Press
Release") announcing the recovery and saleability of the Shipment and "reconfirm[ed] that the
sales value" of the Shipment was within the "previously stated guidance." Compl. ¶ 42. The
October 8th Press Release was drafted and dictated by Mr. Melnyk. *Id.* Mr. Howling merely
"reviewed and edited" the press release. *Id.* Mr. Howling's "editing" consisted of adding four
words to the press release that are unrelated to the issues in this Action. *See* Draft October 8th
Press Release, Altun Decl., Ex. D (Mr. Howling added the words "which included bulk tablets"

7

to the first sentence that confirmed Biovail's recovery of the product involved in the Accident). Indeed, the October 8th Press Release made no representations whatsoever regarding Biovail's ability or inability to recognize revenue from the Shipment. The SEC also seeks to hold Mr. Howling accountable for fraud because the October 8th Press Release was issued "by Howling's office [Biovail's investor relations department that was responsible for issuing press releases] under his supervision and his name appears on it as the contact person."[5] Compl. ¶ 42.

According to the Complaint, shortly before the October 8th Press Release was issued, Mr. Howling received an email from an employee at the Distributor stating that the Distributor believed that title to the Shipment passed to the Distributor upon delivery (not upon shipment). Compl. ¶ 41. Mr. Howling immediately forwarded the email to Messrs. Melnyk and Crombie to ensure that the issue was properly handled. *Id.* The Complaint also alleges that Mr. Howling received an analyst's report on October 8 that questioned "Biovail's valuation of the product lost due to the accident as well as the Company's assertion of when title to the product transferred." Compl. ¶ 38. Mr. Howling forwarded the report to Messrs. Melnyk and Crombie, and suggested "that someone in finance draft responses to the issues raised." Compl. ¶ 39.

The SEC alleges that Mr. Howling engaged in a material omission by personally failing to ensure that the October 8th Press Release disclosed that the Accident had no impact on Biovail's third quarter. Compl. ¶ 43. Given that the Complaint concedes that Mr. Howling played only a minor and secondary role in reviewing and editing drafts of the October 8th Press Release, Compl. ¶ 42, the SEC appears to be trying to hold Mr. Howling liable for this material omission based solely on the allegation that he should have definitively concluded from the

---

[5]    Nearly all corporate press releases list the name of an investor relations officer as a contact person for questions from analysts and investors. Under the theory advanced by the SEC in this case, investor relations officers could be held liable for misstatements or omissions just because they were listed as a contact person in a corporate press release. Such a theory is wildly over-inclusive and in clear violation of the Second Circuit's "bright line" test. *See* Section I, *infra.*

8

analyst's report and the Distributor's email that the Accident had no impact on Biovail's third quarter revenue recognition associated with Wellbutrin XL, Compl. ¶¶ 39, 41, contrary to what the CEO and CFO of the Company had told him.

### *The October Road Show*

Between October 10 and 15, 2003, Biovail scheduled a series of presentations "in New York, Boston and other cities" to provide investors with a full update on Biovail's product portfolio and pipeline and to quell concerns about the lingering negative rumors concerning the Accident. Compl. ¶¶ 45-46. The Complaint's allegations with respect to the October Road Show lump Messrs. Melnyk, Crombie, and Howling together, making it impossible to determine exactly who allegedly did what. For example, the SEC does not allege that Mr. Howling spoke during the October Road Show nor does it allege what specific presentations Mr. Howling attended, who attended those presentations, and who said what to whom. *See* Compl. ¶¶ 45-47. Indeed, it is unclear what exactly the SEC seeks to hold Mr. Howling liable for with respect to the October Road Show, other than attending (but not speaking at) an unspecified number of presentations.

### ARGUMENT[6]

On March 24, 2008, the SEC filed its 55-page, ten claim Complaint against Biovail, Mr.

Melnyk, Mr. Crombie, John Miszuk, and Mr. Howling. Altun Decl. Ex A. While the vast bulk

of the Complaint has nothing at all to do with Mr. Howling, the SEC claims that he violated

Section 10(b) and Rule 10b-5 by allegedly participating in the making of materially false and

misleading disclosures stemming from the Accident. The SEC has also charged Mr. Howling

with aiding and abetting Biovail's violations of Section 10(b) and Rule 10b-5 relating to the

same allegedly false and misleading statements.

In order to state a claim under Section 10(b) and Rule 10b-5, the SEC must plead that:

"(1) [the defendant] made a material misrepresentation or a material omission as to which he had

a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the

purchase or sale of securities." *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326,

331 (S.D.N.Y. 2006) (*citing SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).

The SEC's securities fraud claim against Mr. Howling is fatally deficient on several

grounds. First, the facts, as alleged in the Complaint, do not give rise to a primary violation of

Section 10(b). Section I, *infra*. Second, the SEC fails to plead specific facts giving rise to a

strong inference that Mr. Howling acted with scienter. Section II, *infra*. Likewise, the

---

[6] In considering a motion to dismiss under Rule 12(b)(6), courts must accept as true all allegations
in the complaint and draw all reasonable inferences in favor of the plaintiff. *Rombach v. Chang*, 355 F.3d
164, 169 (2d Cir. 2004). However, the complaint must be dismissed where the plaintiffs fail to nudge their
claims across the line from conceivable to plausible. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955,
1964-1965 (2007); *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405 (S.D.N.Y. 2007) ("a
plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and
conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal citations
omitted). When a plaintiff's allegations, however true, fail to state a claim, courts do not hesitate to dismiss
such claims under Rule 12(b)(6). *See Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("A plaintiff
cannot base securities fraud claims on speculation and conclusory allegations"); *Grandon v. Merrill Lynch
& Co.*, 147 F.3d 184, 193-94 (2d cir. 1998) ("[C]onclusory allegations that defendant's conduct was
fraudulent or deceptive are not enough.").

Complaint fails to plead its allegations of fraud with the specificity required by Rule 9(b) of the Federal Rules. Section III, *infra*. <u>Finally</u>, the SEC's Section 10(b) aiding and abetting claim is deficient because it fails to plead facts demonstrating that Mr. Howling knew about Biovail's alleged primary violation, or that he provided substantial assistance to Biovail in connection with that violation. Section IV, *infra*. These failures require the dismissal of the fraud claim brought against Mr. Howling.

## I.    MR. HOWLING'S ACTIONS, AS ALLEGED, DO NOT CONSTITUTE A PRIMARY VIOLATION OF SECTION 10(b) AND RULE 10b-5

### *The Bright Line Test*

In the wake of *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439 (1994), the Second Circuit adopted what has come to be called the "bright line" test for determining whether a party can be held liable for a primary violation of Section 10(b) and Rule 10(b)(5). *See generally Wright v. Ernst & Young LLP*, 152 F.3d 169, 174-5 (2d Cir. 1998). Under the "bright line" test, "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting . . . ." *Id.* at 175 (quoting *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997)).[7] *See also Filler v. Hanvit Bank*, 156 Fed. Appx. 413, 415 (2d Cir. 2005) ("[T]his Court adopted a 'bright line' test for determining when secondary actors may be held primarily liable. Under the 'bright line' test, a defendant must actually make a false or misleading statement in order to be liable under Section 10(b).").

---

[7]    Courts in this Circuit and elsewhere have applied the "bright line" test to litigations arising out of SEC enforcement actions. *See, e.g.*, *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006) (applying the "bright line" test, and holding that a corporate director could not be held primarily liable under Section 10(b) and Rule 10b-5 for providing back-up documentation to the company's outside auditors and reviewing certain sections of the disclosure documents that related to the back-up documentation); *SEC v. Lucent Technologies, Inc.*, 363 F. Supp. 2d 708, 724 (D.N.J. 2005) (dismissing the SEC's complaint under the "bright line" test because the alleged misstatement, Lucent's reported revenue, was not attributed to the defendant).

11

The "bright line" test applies with equal force regardless of whether a defendant is a company outsider or a corporate insider. *See, e.g., SEC v. Cedric Kushner Promotions, Inc.,* 417 F. Supp. 2d at 333 ("The SEC attempts to distinguish *Wright* from the present case on the basis that *Wright* involved a company outsider—i.e., auditors, whereas, in the present case, [the defendant] was an insider, a public company director. This argument is unpersuasive. Nothing in *Wright* suggests that its holding is limited to a particular class of defendants.").[8]

The allegations regarding Mr. Howling's role in Biovail's communications with analysts and investors about the Accident flunk the "bright line" test. The Complaint clearly fails to attribute the alleged material misstatements (and omissions) to Mr. Howling.[9] Indeed, even if the SEC could allege the requisite scienter, which it cannot, it could still not attribute the

---

[8] Relying in part on *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001), the SEC has previously argued—to no avail—that the "bright line" test articulated in *Wright* is no longer good law. *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 513 n.203 (S.D.N.Y. 2005) (Kaplan, J.) ("The plaintiffs' attempt to avoid the bright line attribution rule do not avail. They cite *In re Scholastic Corp. Sec. Litig.* . . . but the relevant discussion in that case—which does not cite *Central Bank, Wright v. Ernst & Young LLP* . . . or *Shapiro v. Cantor*, . . . addressed only whether the complaint properly attributed relevant misrepresentations to a particular defendant. *In re Scholastic Corp.* did not question, let alone purport to set aside, the attribution rule set forth in Wright and Shapiro."); *see also Cedric Kushner,* 417 F. Supp.2d at 333 ("Regarding the *Scholastic* decision, whatever that decision means regarding Second Circuit doctrine, the salient fact for present purposes is that there is nothing in that decision which can possibly provide grounds for holding [the defendant] primarily liable in the present case.").

In addition, *Scholastic* is readily distinguishable from the facts here on many grounds. In *Scholastic* the individual defendant, Marchuk, was alleged to have sold 80% of his stock during the class period while possessing negative non-public information about the company. *In re Scholastic Corp.*, 252 F.3d at 67. In addition, the SEC alleged that Marchuk had access to and monitored confidential internal data, and that he prepared a "Director's Book" each month that went to each director and analyzed the relevant trends in the business. *Id.* at 70, 71. In stark contrast, the SEC does not allege that Mr. Howling had access to confidential information that would have enabled him to independently evaluate the accuracy of the information he received from others and then incorporated into the October 3rd Press Release. Moreover, unlike *Scholastic*, the SEC does not allege that Mr. Howling traded in Biovail stock during the relevant period, because he did not.

[9] *See, e.g.,* Compl. ¶¶ 30 ("Beginning on October 2, Melnyk, Crombie, and Howling worked together on drafting . . . ."); 34 ("Later on October 3, Melnyk, Crombie, and Howling participated in a conference call . . . ."); 37 ("Howling participated in the conference call on October 3 and helped prepare the script for it."); 42 ("Melnyk dictated the October 8 press release, which both Crombie and Howling reviewed and edited prior to its issuance.") (emphasis added).

statements to Mr. Howling, and the allegations in the Complaint would, at best, support a claim for secondary liability. The Complaint simply does not adequately allege that Mr. Howling committed a primary violation of Section 10(b) and Rule 10b-5.

### The October 3rd Press Release

According to the Complaint, "Mr. Howling drafted the release based on information he received from others," including Messrs. Melnyk (Biovail's founder, CEO and Chairman of the Board) and Crombie (Biovail's CFO). Compl. ¶ 30. There are absolutely no allegations that Mr. Howling had any independent knowledge of the facts allegedly misrepresented in the October 3rd Press Release. The Complaint does not allege that Mr. Howling: (1) had an understanding of (or even had access to) Biovail's distribution agreement with the Distributor; (2) had an understanding of the revenue recognition consequences of the shipping term, in the distribution agreement, or the accident; or (3) had an independent duty to verify information that was provided to him by Biovail's CEO and CFO. Indeed, it is not even alleged that Mr. Howling had the independent authority to issue press releases on behalf of the Company. In fact, the SEC concedes that the October 3rd Press Release was "reviewed and edited by Melnyk and Crombie" prior to being issued by the Company. Compl. ¶ 31. The SEC's allegations are entirely consistent with Mr. Howling being merely a scrivener.

The SEC also does not allege that Mr. Howling had any knowledge about the misrepresentations regarding the value of the Shipment. Throughout the Complaint, all of the false statements regarding the value of the Shipment (in the October 3rd Press Release and elsewhere) are attributed exclusively to Biovail and to Messrs. Crombie and Melnyk.

While peripheral to the analysis of whether Mr. Howling can be held primarily liable for violating Section 10(b) and Rule 10b-5, the SEC alleges that Mr. Howling received the Crombie Draft on October 2, 2003, and that it "set forth the actual delivery term (*i.e.*, F.O.B.

13

destination) and stated correctly that the revenue from the product involved in the truck accident could not be recognized in the third quarter." Compl. ¶ 30. The SEC's "spin" on the Crombie Draft is inconsistent with the document itself. The Crombie Draft clearly implies that, but for the Accident, the revenue from the Shipment would have been recognized in the third quarter ("this replacement shipment and its associated revenue will *now* be recognized in Q4 *not* Q3") (emphasis added). Altun Decl., Ex. C at 2. Given the clear implications in the Crombie Draft, it is a stretch to imply that Mr. Howling gained any independent knowledge that would have caused him to question the appropriateness of the Company's CFO taking the position that the revenue associated with the Shipment could have been recognized in the third quarter but for the Accident.[10]

Without any involvement in, or responsibility for, the relevant accounting decisions, Mr. Howling's role merely involved gathering information presented to him by others and regurgitating it in press release form—actions that cannot rise to the level of a primary violation of Section 10(b). *See Cedric Kushner*, 417 F. Supp. 2d at 334 (holding that no primary liability existed because defendant played a "background role" in the preparation of the allegedly fraudulent document); *see also Copland v. Grumet*, 88 F. Supp. 2d 326, 332 (D.N.J. 1999) (applying Second Circuit precedent and holding that an officer defendant's alleged participation in the making of fraudulent representations "cannot be considered the equivalent of making the false statements themselves.").

The fact that Mr. Howling's name appears on the October 3rd Press Release, Compl. ¶ 30, does not convert the Company's statement into his own. *See Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355, 365 (E.D.N.Y. 2000) (dismissing a private Section 10(b) claim

---

[10] It is also ironic that the SEC demands that Mr. Howling should have relied on the only statement by Mr. Crombie in the entire Complaint that the SEC alleges was not fraudulent.

14

against a public relations company despite the fact that the public relations company's name was printed on the top of a press release that allegedly contained material misstatements). In *Winkler,* the court rejected a Section 10(b) claim against a public relations company executive despite the fact that the public relations company's name was printed on top of a press release that allegedly contained material misstatements (the executive also helped draft the press release and disseminated it to the media). *Id.* at 364-65. The court found it significant that none of the statements in the press release were attributed to the public relations executive, and that the plaintiff never presented evidence showing that investors attributed the alleged misstatements in the press release to him, as opposed to the company. *Id.* at 365.

Mr. Howling's name is listed on the release as a "contact person" in typical press release boilerplate, but he is not held out to be the author of the release. Moreover, the SEC does not allege that a single investor or analyst attributed any of the statements in the October 3rd Press Release to Mr. Howling. *Id.* (dismissing plaintiff's Section 10(b) claim, in part, because the plaintiff failed to offer any evidence that anyone "ever understood the press release or annual report to constitute a statement" by the public relations company or the executive); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 374-75 (S.D.N.Y. 2006) (dismissing the SEC's primary Section 10(b) and Rule 10b-5 claims against a concurring audit partner because he could not be considered the source of KPMG's alleged misstatement because he was not primarily responsible for conducting the audit); *cf. In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 334 (S.D.N.Y. 2004) ("[Arthur] Andersen's role as GC's auditor was thus well known to investors, who could easily have relied on the accounting firm's involvement in making any public financial reports, even where a particular statement was not publicly attributed to it. Moreover, Andersen's aggressive marketing of the novel accounting strategies . . . raises an inference that

15

sophisticated investors would have known of Andersen's role in creating the reporting practices behind GC's false statements.").

The SEC has failed to allege that Mr. Howling committed a primary violation of the securities laws with regard to the October 3rd Press Release. Mr. Howling's actions, as alleged, do not pass the "bright line" test; *i.e.*, the alleged fraudulent statements are simply not attributable to Mr. Howling. *See Wright*, 152 F.3d at 175.

### The October 3rd Analyst Call

Similarly, the fact that on October 3, Mr. Howling "participated in a conference call with analysts," Compl. ¶ 34, and "helped prepare" a script in preparation for the conference call, Compl. ¶ 37, does not rise to the level of a primary violation of Section 10(b) and Rule 10b-5. *See Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997) (noting that "[a]llegations of 'assisting,' 'participating in,' 'complicity in,' and similar synonyms used throughout the complaint" fail to state a cause of action for primary liability under Section 10(b) and Rule 10b-5). The Complaint does not allege that Mr. Howling spoke during this conference call nor does it allege that the allegedly fraudulent statements made by Messrs. Melnyk and Crombie were based in any way on the "script" allegedly prepared by Mr. Howling or that the script itself was misleading; like the October 3rd Press Release, Mr. Howling prepared the alleged script based on information he received from others.

### The October 8th Press Release

The language in the October 8th Press Release also cannot be, and has not been, attributed to Mr. Howling. The SEC concedes that Mr. Melnyk was the primary author of the October 8th Press Release and that Mr. Howling's involvement was limited to reviewing and editing the press release prior to its issuance. Compl. ¶ 42. Such limited involvement cannot amount to a primary violation of the securities laws. *See Wright*, 152 F.3d at 175-76; *Cedric*

16

*Kushner*, 417 F. Supp. 2d at 333-34. The fact that Mr. Howling "reviewed and edited" the October 8th Press Release prior to its issuance—adding four words that are unrelated to the alleged misrepresentations or omissions—and the fact that his name appears on the release as a "contact person," Compl. ¶ 42, are not legally sufficient to attribute the alleged misrepresentation or omissions to Mr. Howling. *Winkler*, 198 F.R.D. at 365. The SEC does not allege that Mr. Howling added the allegedly fraudulent language regarding the value of the Shipment to the release, nor does it allege that any investors or analysts attributed such language to Mr. Howling.[11]

Furthermore, Mr. Howling cannot be held liable for failing to disclose that there may have been a disagreement regarding Biovail's interpretation of the distribution agreement because the information provided to him by the Distributor was not verified as being accurate. Indeed, Mr. Howling immediately forwarded the Distributor's email to Messrs. Melnyk and Crombie. *See Borochoff v. GlaxoSmithKline, PLC*, No. 07 Civ. 5574, 2008 WL 2073421, *5-7 (S.D.N.Y. May 9, 2008) (dismissing plaintiffs' claim that defendants failed to disclose negative laboratory test results because such results were inconclusive and thus defendants had no duty to disclose them). Having no independent knowledge of the terms of the distribution agreement, Mr. Howling reasonably relied on his superiors, Messrs. Melnyk and Crombie, to verify the Distributor's statement and assess its impact, if any, on the Company's position on revenue recognition. The Complaint does not allege that Mr. Howling received any such verification or accounting assessment. Moreover, even if Mr. Howling had reason to believe that the

---

[11]   To the extent that the Complaint implicitly charges Mr. Howling with omissions for failing to disclose that he received the email from the Distributor on October 8, Mr. Howling cannot be held primarily liable for such an omission because the October 8th Press Release was not attributed to him. *Id.* at 364 (holding that defendants could not be held primarily liable for allegedly omitting material information from a press release where the press release was not attributed to the defendants).

17

Distributor's interpretation of the distribution agreement was accurate, he lacked the authority to accept it as fact and include it in the October 8th Press Release.

### The October Road Show

The SEC's allegations regarding the October Road Show do not come close to pleading a primary violation of Section 10(b) and Rule 10b-5 against Mr. Howling. The SEC alleges that Messrs. Crombie, Melnyk, and Howling embarked on the October Road Show, but does not attribute any of the alleged misstatements made during the October Road Show to Mr. Howling. Indeed, the Complaint is entirely silent as to which executive attended which event and who said what to whom.

The SEC's allegation that a slide show presentation used during the October Road Show contained material misrepresentations regarding the Accident's impact on Biovail's third quarter 2003 revenue is insufficient to allege a primary violation of the securities laws by Mr. Howling. The Complaint fails to attribute a single misrepresentation to Mr. Howling. While insufficient under the "bright line" test, the Complaint even fails to plead that Mr. Howling prepared or assisted in preparing the allegedly fraudulent slides that were used during the October Road Show. Because the Complaint fails to allege that Mr. Howling made any of the alleged material misstatements, Mr. Howling cannot be held primarily liable for such misrepresentations under the "bright line" test. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998); *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006); *SEC v. Lucent Technologies, Inc.*, 363 F. Supp. 2d 708, 724 (D.N.J. 2005).

Again, to the extent the Complaint implicitly charges Mr. Howling with failing to disclose that Biovail's interpretation of the distribution agreement may have been incorrect, the SEC (1) fails to attribute any of the statements or omissions made during the October Road Show

18

to Mr. Howling and (2) fails to allege that Mr. Howling in fact had knowledge of the correct terms of the distribution agreement. The Complaint does not set forth a claim that Mr. Howling committed a primary violation under Section 10(b) and Rule 10b-5, and thus the second claim must be dismissed.

## II.    THE SEC HAS FAILED TO PLEAD SPECIFIC FACTS THAT GIVE RISE TO A STRONG INFERENCE THAT MR. HOWLING ACTED WITH SCIENTER

To state a securities fraud claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts that give rise to a strong inference of scienter. *See ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *S.E.C. v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 488 (S.D.N.Y. 2007) ("the SEC is subject to Rule 9(b) and must therefore plead a 'strong inference' of scienter.").

To plead a strong inference of scienter, the SEC must *either* allege facts that show that the defendants had motive and opportunity to commit fraud *or* allege facts that constitute strong circumstantial evidence of conscious or reckless misbehavior. *See ATSI Comm., Inc.*, 493 F.3d at 99; *KPMG*, 412 F. Supp. 2d at 378 (applying the same factors to an SEC enforcement action). Moreover, in order to plead a "strong inference" of scienter sufficient to withstand a motion to dismiss, the inference of "scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2502 (June 21, 2007). This heightened pleading standard—imposed by Rule 9(b) and derived from the Second Circuit's scienter pleading standard—applies with equal force to claims brought by the SEC. [12]

---

[12]    While the Court in *Tellabs* was interpreting the pleading standard for a Section 10(b) claim specifically under the PSLRA, several district courts have applied the Court's holding to SEC enforcement actions. *See, e.g., SEC v. Boling*, No. 06 Civ 1329, 2007 WL 2059744 (D.D.C. July 13, 2007); *SEC v. Goldsworthy*, No 06 Civ 10012, 2007 WL 4730345 (D. Mass. Dec. 4, 2007); *but see SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 488 (S.D.N.Y. 2007) ("It is unclear whether district courts must now find that the

A.    ***Conclusory Allegations Regarding Scienter do Not Raise a Strong Inference of Scienter***

The SEC cannot plead an inference of scienter by simply coupling factual statements with conclusory allegations of fraudulent intent. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[plaintiff's] frequent conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b). We have held in the context of securities fraud claims that such allegations are '*so broad and conclusory as to be meaningless.*'") (emphasis added).

Yet that is exactly what the SEC attempts to do in this case; the Complaint is replete with this type of allegation: "Melnyk, Crombie, Howling, and Biovail *knew or recklessly disregarded* that these statements by Melnyk were materially false and misleading," Compl. ¶ 34; "In fact, as Melnyk, Crombie, and Howling *knew or recklessly disregarded*, title to the product would change only upon arrival at the Distributor's facility in the United States," Compl. ¶ 35; "Even though Melnyk, Crombie, Howling, and Biovail *knew or recklessly disregarded* that the truck accident had no impact on third quarter revenue, the October 8 press release was silent on the subject," Compl. ¶ 43; "At the time of these misstatements [during the October Road Show], Melnyk, Crombie, Howling, and Biovail all *knew or deliberately disregarded* that the statements attributing part of the third quarter revenue shortfall to the truck accident were

---

inference of scienter raised in actions not governed by the PSLRA, but governed by Rule 9(b), be at least as compelling as any other inference. I need not reach this thorny (albeit interesting) issue, however, because I find that even under this heightened standard, the SEC has pled scienter."). Because the PSLRA did not change the heightened pleading standard for scienter in the Second Circuit and given that the pleading standard clearly applies to all plaintiffs, including the SEC, allegations of scienter by the SEC should necessarily be at least as compelling as any opposing inferences. *See Novak v. Kasaks*, 216 F.3d 300, 310 ("We conclude that the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the with particularity requirement).").

materially false and misleading." Compl. ¶ 47. These allegations, without more, do not raise a strong inference of scienter.

B.    *The SEC Does Not Allege that Mr. Howling had the Motive and Opportunity to Commit Fraud*

The SEC has not even attempted to plead that Mr. Howling had the motive and opportunity to commit fraud. There are no allegations that Mr. Howling sold any Biovail stock or attempted to realize any benefit whatsoever from the alleged misstatements or omissions. Under the SEC's theory, Mr. Howling must have committed fraud "for the sheer joy of it." *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992).

C.    *There is No Factual Basis Alleged to Support a Strong Inference of Conscious Misbehavior or Recklessness*

The Complaint is devoid of facts that demonstrate circumstantial evidence of conscious misbehavior or recklessness. Reckless misbehavior is conduct that is "highly unreasonable and which represents *an extreme departure from the standards of ordinary care* to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (emphasis added) (affirming the dismissal of a complaint for failure to plead scienter through reckless disregard). Where, as here, "motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142.

The few allegations that the SEC appears to use to support its claim that Mr. Howling acted knowingly or with recklessness are clearly insufficient. The SEC's allegations appear to be: the existence of the Crombie Draft, Compl. ¶ 30; the October 8th analyst report that questioned the value of the Shipment and the shipping terms in the Distribution Agreement, Compl. ¶ 38; and the alleged email from a representative of the Distributor to Mr. Howling, Compl. ¶ 41.

21

D.    *The Crombie Draft Does Not Raise a Strong Inference of Scienter*

The SEC alleges that Mr. Howling relied on information received from others in drafting the October 3rd Press Release, including the Crombie Draft. Compl. ¶ 30. The SEC further alleges that the Crombie Draft correctly "set forth the actual delivery term (*i.e.*, F.O.B. Destination) and stated correctly that the revenue from the product involved in the truck accident could not be recognized in the third quarter." Compl. ¶ 30. The Crombie Draft clearly suggests—contrary to the SEC's allegation—that, but for the Accident, the revenues from the Shipment would have been recognized in the third quarter, not the fourth quarter. *See* Crombie Draft, Altun Decl., Ex C ("this replacement shipment and its associated revenue will *now* be recognized in Q4 *not* Q3") (emphasis added). In the Crombie Draft, the revenue recognition timing is the key element of the press release, not the shipping term itself.

The Crombie Draft is therefore not a "smoking gun" evidencing that Mr. Howling had fraudulent intent—far from it. It is a statement by the CFO of Biovail about the revenue recognition consequences of the Accident—the same CFO who, along with the CEO, allegedly provided Mr. Howling with the information to be inserted into the October 3rd Press Release.

Furthermore, the SEC does not allege that Mr. Howling ever appreciated the significance of the shipping term "F.O.B. Destination" or that he ever even read or focused on that language in the Crombie Draft given the short time period in which the October 3rd Press Release was assembled. Nor does the SEC allege that Mr. Howling had independent access to any other information, such as the relevant distribution agreement, that would have permitted him to independently assess the description of the shipping term in the Crombie Draft or the revenue recognition accounting position taken by the CFO. Indeed, the Complaint has no allegations that support the SEC's theory that Mr. Howling had reason to know or suspect that the October 3rd Press Release contained any misrepresentations relating to the Accident.

The circumstantial allegations regarding the Crombie Draft are clearly insufficient to raise a strong inference of knowledge or recklessness on behalf of Mr. Howling. *See In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601 at *7, (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their . . . executive positions are insufficient to plead scienter.").

E.    ***The Analyst Report and Distributor Email do not Raise a Strong Inference of Scienter***

The SEC alleges that on October 8, 2003, a research analyst issued a report that questioned the value of the Shipment, and Biovail's assertion of when title to the Shipment transferred. Compl. ¶ 38.  The SEC notes that Mr. Howling "promptly forwarded to Melnyk and Crombie the portion of the Report questioning the value of the shipment." Compl. ¶39.  The Complaint further alleges that Mr. Howling received other questions from analysts regarding the value of the Shipment. Compl. ¶ 40.  Also, according to the Complaint, on October 8, an employee of the Distributor is alleged to have called and emailed Mr. Howling with the correct shipping term in the distribution agreement. Compl. ¶ 41.  The SEC acknowledges that Mr. Howling immediately forwarded this email as well to Messrs. Melnyk and Crombie. *Id.*

These allegations, much like the allegations regarding the Crombie Draft, fail to demonstrate that Mr. Howling acted intentionally or recklessly. *See SEC v. Lowy*, 396 F. Supp. 2d 225, 244 (E.D.N.Y. 2003) (holding that certain "red flag" documents did not constitute evidence of reckless or conscious misbehavior where the defendant shared the "red flag" documents with his superiors).  The fact that an analyst issued a report questioning some of Biovail's statements concerning the Accident is unremarkable; analysts are in the business of asking probing questions and writing reports.  Moreover, the fact that Mr. Howling immediately

forwarded the report to his superiors—Messrs. Melnyk and Crombie—with the suggestion that "someone in finance draft responses to the issues raised" evidences Mr. Howling's commitment to full disclosure and his unfamiliarity with the issues raised in the report. Compl. ¶ 39. *See Lowy* at 244.

It is, of course, reasonable for a subordinate employee to rely on the representations made by his superiors.[13] Mr. Howling appropriately elevated the concerns expressed by the analysts and the Distributor to Messrs. Melnyk and Crombie, who had the authority to confirm the Distributor's interpretation of the agreement and to take any necessary actions. Moreover, it is clear from the Complaint that Mr. Howling did not even draft the October 8th Press Release. He reviewed the October 8th Press Release confident that his supervisors were aware of the potential issue and were looking into it. Compl. ¶ 42. Indeed, the more pressing issue, and the subject of the October 8th Press Release, was the valuation of the Shipment, an issue about which—even according to the SEC—Mr. Howling knew nothing.

Far from presenting circumstantial evidence sufficient to raise a "strong inference" of scienter, the Complaint raises the considerably more compelling inference that Mr. Howling did not attach any significance to the mention of the shipping term in the Crombie Draft,[14] and that he relied on his superiors, Messrs. Melnyk and Crombie, for information

---

[13]    *See* PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 4.02 (1994) ("In performing his or her duties and functions, a director or officer who acts in good faith, and reasonably believes that reliance is warranted, is entitled to rely on information, opinions, reports, statements . . . prepared, presented, made or preformed by . . . one or more directors officers, or employees of the corporation . . . ."); *see also* N.Y. Bus. Corp. Law § 715(h) (McKinney 2008) ("In performing his duties, an officer shall be entitled to rely on information, opinions, reports or statements including financial statements and other financial data, in each case prepared or presented by . . . one or more other officers or employees of the corporation . . . whom the officer believes to be reliable and competent in the matters presented.").

[14]    In omissions cases like this one, courts must consider whether a defendant appreciated the materiality of the undisclosed information in deciding whether the defendant acted with scienter. *See, e.g., City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1263-1264 (10th Cir. 2001) (holding that the

regarding the value of the Shipment, the resolution of questions about the distribution agreement, and the proper revenue recognition decision for the third quarter. These allegations are clearly insufficient to support a strong inference of scienter under the Second Circuit's standard. *See In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510. This Court should dismiss the Complaint against Mr. Howling for failure to raise a "strong inference" of scienter.

## III.    THE COMPLAINT DOES NOT MEET THE PARTICULARITY REQUIREMENT OF RULE 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure requires that fraud be pled with particularity. *See* Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity."). In order to state a claim for fraud under Section 10(b), the SEC must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004); *see Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501 at *14 (S.D.N.Y. Aug. 22, 2005) (dismissing claim for lack of a particularity; "Plaintiffs provide no guidance as to what the alleged false statements were, who made them and when [or] why they were false when made").

The Complaint's "Second Claim for Relief" charges Mr. Howling with primary and secondary (aiding and abetting) violations of Section 10(b) without specifying the extent to

---

plaintiffs' allegations were "not sufficient to imply [the defendants'] knowledge of the specific fact of materiality" of the pending litigation to investors). "[T]he important issue in this case is *not* whether Defendants knew the underlying facts [of the litigation], but whether Defendants knew that not disclosing [the litigation] posed substantial likelihood of misleading a reasonable investor." *Id.* (emphasis in original). *See also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 549 (S.D.N.Y. 2004) ("Plaintiffs must plead facts showing that the Defendants knew or were reckless in not knowing that omissions were material at the time the filings were made...."). Even if Mr. Howling learned the correct shipping term, it is not alleged that he understood the revenue recognition consequences of the Accident and therefore understood the materiality of the alleged misstatement.

which Mr. Howling is purportedly responsible for each alleged misstatement or omission. Compl. ¶¶ 154-58. Consequently, it is impossible to determine whether the SEC seeks to hold Mr. Howling liable as a primary violator and/or an aider and abettor with respect to any of the alleged misstatements. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. at 1964 (holding that Fed. R. Civ. P. 8(a) requires plaintiffs, at a minimum, to give defendants fair notice of the claims being asserted against them).

These deficiencies are most glaring with respect to the October Road Show. The Complaint alleges that the October Road Show "included slides that repeated falsely that the truck accident's impact on Biovail's third quarter 2003 revenue was $10 to $20 million. In addition to the slides, the executives at the [October] Road Show provided commentary reiterating the false statements in the October 3 press release." Compl. ¶ 47.

These allegations improperly lump all of the defendants together. *See Atkins v. Apollo Real Estate Advisors, LP*, No. 05 Civ. 4365, 2008 WL 1926684 (E.D.N.Y. April 30, 2008) ("in cases involving multiple defendants, Rule 9(b) requires that the pleading identify the nature of each defendant's participation in the alleged fraud."). Any claims regarding anything that was alleged to have been said or omitted during the October Road Show must be dismissed.

## IV.    THE SEC'S TAG-ALONG AIDING AND ABETTING CLAIM ALSO FAILS

Finally, to the extent that the SEC charges Mr. Howling with aiding and abetting securities fraud, those claims must be also be dismissed. In order to state a claim for aiding and abetting a violation of Section 10(b) or Rule 10b-5, the SEC must plead: (1) a primary violation of Section 10(b) and Rule 10b-5; (2) that the secondary actor knew of the primary violation; and (3) that the secondary actor substantially assisted in that primary violation. *See SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d at 334.

As noted above, the SEC fails to allege (other than through conclusory allegations) that Mr. Howling knew of the primary violation. *See id.* (dismissing the SEC's aiding and abetting claim because the SEC failed to "make the slightest showing that [the executive] was involved with any of the subject . . . which turned out to be falsely presented."); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (holding that conclusory allegations of knowledge are insufficient to state a claim under Section 10(b) or Rule 10b-5).

As described in detail above, the Complaint fails to allege facts that would raise a strong inference that Mr. Howling knew the correct shipping term and its significance for revenue recognition purposes. The Complaint alleges that Mr. Howling relied on the information given to him by Messrs. Crombie and Melnyk in drafting the October 3rd Press Release, and does not allege that Mr. Howling had independent knowledge of the shipping term or its significance. Nor are there any facts in the Complaint that show that Mr. Howling later developed an understanding of the shipping term and its impact on Biovail's revenue recognition.

Again, the SEC's reliance on the fact that Mr. Howling received the Crombie Draft does not give rise to a strong inference of knowledge or recklessness. Indeed, the Crombie Draft is consistent with the October 3rd Press Release—*i.e.*, it implies that, but for the Accident, the revenue from the Shipment would have been recognized in the third, rather than in the fourth, quarter, which is consistent with the statements contained in the October 3rd Press Release. Moreover, the Complaint does not allege that Mr. Howling understood the significance of the shipping term in the Crombie Draft or that he even read it—notably, the shipping term did not end up in the final October 3rd Press Release.

27

Similarly, the Complaint places great weight on an allegation that the Distributor's employee sent an email to Mr. Howling purporting to correct Biovail's previous statements concerning the shipping term. This allegation also falls short of sufficiently alleging knowledge because Mr. Howling, who was relying on the CEO and CFO for information, immediately elevated the information to them and had a perfect right to rely on what his superiors told him. *See Lowy*, 396 F. Supp. 2d at 244. Compl. ¶ 41.

Moreover, the Complaint fails to allege that Mr. Howling substantially participated in the alleged fraud. *See Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d at 335-36 (dismissing the SEC's aiding and abetting claim, and holding that "[i]n alleging the requisite substantial assistance by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm on which the primary liability is predicated." (citing *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62-63 (2d Cir. 1985)). Here, the Complaint alleges nothing more than a minor role by Mr. Howling. This is especially true with respect to the allegations concerning the October 8th Press Release and the October Road Show. For example, the Complaint concedes that Mr. Melnyk drafted the October 8th Press Release by himself, and that Mr. Howling's involvement was limited to editing it. Compl. ¶ 42. Indeed, Mr. Howling added only four words that were unrelated to the alleged misrepresentations.[15]

---

[15] The Complaint also completely fails to show how Mr. Howling substantially participated in the October Road Show. Compl. ¶ 46. Instead, the Complaint relies on conclusory allegations that are inadequate to plead aiding and abetting. *See Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 119 (2d Cir. 1982) (dismissing aiding and abetting claim and holding that allegations charging that "the defendants participated in, or knowingly or with reckless disregard for the truth lent material assistance . . . [or] played an active role in the preparation and dissemination of the false and misleading information" were inadequate).

Because the SEC has failed to adequately plead that Mr. Howling had knowledge of the primary violation or that he substantially participated in the alleged fraud, the Complaint's aiding and abetting claim against Mr. Howling should be dismissed.

## CONCLUSION

For all of the foregoing reasons, defendant Kenneth G. Howling respectfully requests that the second claim in the Complaint be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b).

DATED:  JUNE 20, 2008

/S/ Michael B. de Leeuw
Carmen J. Lawrence
Michael J. Rivera
Michael B. de Leeuw
Nazar Altun
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
Michael.deLeeuw@friedfrank.com

Attorneys for Defendant
   Kenneth G. Howling

7020268

30

CERTIFICATE OF SERVICE

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that on June 23, 2008 I caused to be served upon the following, by Federal Express, a true copy of the attached Memorandum of Law in Support of Defendant Kenneth G. Howling's Motion to Dismiss the Second Claim in the Complaint, dated June 20, 2008:

Dennis B. Auerbach, Esq.
Covington & Burling, LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
*Counsel to Defendant Eugene Melnyk*

Shawn Chen, Esq.
Cleary, Gottlieb, Steen & Hamilton, LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
*Counsel to Defendant Brian Crombie*

Todd Brody, Esq.
Securities and Exchange Commission
3 World Financial Center
New York, New York 10281
*Plaintiff*

Dated:    New York, New York
          June 23, 2008

                                          _____
                                          Joshua Roth