UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                                          Plaintiff,

                    -against-

BIOVAIL CORPORATION, EUGENE MELNYK, BRIAN
CROMBIE, JOHN MISZUK AND KENNETH HOWLING,

                                          Defendants.

08-CV-02979 (LAK)

**DECLARATION OF
BRUCE A. HILER**

BRUCE A. HILER, under penalty of perjury, declares as follows:

1.      I am a member of the law firm of Cadwalader, Wickersham & Taft LLP,
counsel for Defendant John Miszuk ("Defendant") in the above-captioned matter. I submit this
declaration in support of Defendant's Motion to Dismiss the Complaint filed in this action by the
Securities and Exchange Commission on March 24, 2008 (the "Complaint").

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Complaint.

3.      Attached hereto as Exhibit 2A is a true and correct copy of the July 8,
2003 email correspondence between Defendant, the Controller for Biovail Corporation's Barbados
subsidiary, Biovail Laboratories, Inc. ("BLI") and Biovail Corporation's Senior Director of Legal
Accounting, referenced in Defendant John Miszuk's Memorandum of Law in Support of His
Motion to Dismiss the Securities and Exchange Commission's Complaint, which was provided
to Defendant by Biovail Corporation.

4.      Attached hereto as Exhibit 2B is a true and correct copy of July 7 - 10,
2003 email correspondence between Defendant, the Controller for Biovail Corporation's Barbados

subsidiary, BLI, and Biovail Corporation's Senior Director of Legal Accounting, referenced in Defendant John Miszuk's Memorandum of Law in Support of His Motion to Dismiss the Securities and Exchange Commission's Complaint, which was provided to Defendant by Biovail Corporation.

5.      Attached hereto as Exhibit 3 is a true and correct copy of Biovail Corporation's Press Release, *"Biovail Provides Guidance on 2003 Third Quarter Results"* (Oct. 3, 2003) as it appears on Biovail Corporation's website.

6.      Attached hereto as Exhibit 4 is a true and correct copy of Deutsche Bank Analyst Report, *Biovail Corporation – Q4: Another EPS Shortfall – and Biovail Lowers the Bar, Again* (Mar. 4, 2004).

7.      Attached hereto as Exhibit 5 is a true and correct copy of CIBC World Markets Analyst Report, *Biovail Corporation – 4Q03 Falls Short; Lowering Rating to Reflect Unfavorable Near-Term Reward/Risk* (Mar. 3, 2004).

Dated:  June 23, 2008

Bruce A. Hiler (BH 0432)
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Telephone:      212-504-6000
Facsimile:      212-504-6666

Attorneys for Defendant John Miszuk





**MARK K. SCHONFELD**
**REGIONAL DIRECTOR**
**Attorneys for Plaintiff**
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-1120


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| -against- | : 08 Civ. ____ |
| | : ECF CASE |
| BIOVAIL CORPORATION, | : |
| EUGENE N. MELNYK, | : |
| BRIAN CROMBIE, | : |
| JOHN MISZUK, and | : COMPLAINT |
| KENNETH G. HOWLING, | : |
| | : |
| Defendants. | : |
| | : |

---

Plaintiff Securities and Exchange Commission, for its Complaint against

Defendants Biovail Corporation ("Biovail" or the "Company"), Eugene N. Melnyk, Brian

Crombie, John Miszuk and Kenneth G. Howling (collectively, "Defendants"), alleges as follows:

<u>SUMMARY OF ALLEGATIONS</u>

1.       This case involves chronic fraudulent conduct – including financial reporting

fraud and other intentional public misrepresentations – by Biovail Corporation, a Canadian

1

pharmaceutical company whose common stock is traded on the New York and Toronto stock exchanges. Obsessed with meeting quarterly and annual earnings guidance, Biovail's executives repeatedly overstated earnings and hid losses in order to deceive investors and create the appearance of achieving that goal. And, when it ultimately became impossible to continue to conceal the Company's poor performance, Biovail actively misled investors and analysts as to its cause. This corrupt strategy was employed by Biovail's most senior officers: Eugene Melnyk, former chairman and chief executive officer; Brian Crombie, former chief financial officer; John Miszuk, vice president, controller, and assistant secretary; and Kenneth G. Howling, current chief financial officer and former vice president of finance and corporate affairs.

2.      The financial reporting fraud involves three accounting schemes that affected reporting periods from 2001 to 2003. They are: (1) a transaction through which Biovail, over several reporting periods in 2001 and 2002, improperly moved off its financial statements and onto the financial statements of a special purpose entity known as Pharmatech the expenses incurred in the research and development of some of Biovail's products that totaled approximately $47 million through September 30, 2002 and related liabilities that exceeded approximately $51 million through that date; (2) a fictitious bill and hold transaction that Biovail concocted to record approximately $8 million in revenue in the second quarter of 2003; and (3) the intentional misstatement of foreign exchange losses that caused Biovail's second quarter 2003 loss to be understated by about $3.9 million.

3.      In addition, in October 2003, Biovail intentionally and falsely attributed nearly half of its failure to meet its third quarter 2003 earnings guidance to a truck accident involving a shipment of Biovail's product, Wellbutrin XL. Biovail intentionally misstated both the effect of

2

the accident on Biovail's third quarter earnings as well as the value of the product involved in the truck accident. The accident, in fact, had no effect on third quarter earnings.

4.      ·Each of Biovail's fraudulent accounting schemes had a material effect on Biovail's financial statements for the relevant quarters and years and was engineered by Biovail's senior management in order to manage Biovail's earnings.  In effecting these schemes, Biovail management also intentionally deceived its auditors as to the true nature of the transactions. The truck accident misstatements were intended to and did mislead analysts and the investing public concerning the significance of Biovail's failure to meet its own earnings guidance.

5.      Biovail's then-chairman and chief executive, Eugene Melnyk, also violated share ownership disclosure provisions by failing to identify in his Schedule 13D filings his beneficial ownership of Biovail shares held by several trusts he settled in the late 1990s.  Melnyk transferred the Biovail shares from his personal holdings to the trusts.  However, because Melnyk continued to exercise both investment and trading authority over the shares in the trusts, Melnyk remained a beneficial owner of the securities and was under a legal obligation to disclose that ownership and material changes to it.

## VIOLATIONS

6.      By virtue of the foregoing conduct:

    a.      Biovail, directly or indirectly, singly or in concert, has engaged in acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b) 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the

3

Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C.

§§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5,

12b-20, 13a-1, and 13a-16, and Rule 302(b) of Regulation S-T [17 C.F.R.

§§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-16, and 232.302(b)].

b.      Melnyk, Crombie, Miszuk, and Howling, directly or indirectly, singly or

in concert, have engaged in acts, practices, and courses of business that

constitute violations of Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

c.      Crombie, directly or indirectly, singly or in concert, has engaged in acts,

practices, and courses of business that constitute violations of Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)].

d.      Melnyk, directly or indirectly, singly or in concert, has engaged in acts,

practices, and courses of business that constitute violations of Section

13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and

13d-2 [17 C.F.R. §§ 240.13d-1 and 240.13d-2].

e.      Crombie and Miszuk, directly or indirectly, singly or in concert, have

engaged in acts, practices, and courses of business that constitute

violations of Section 13(b)(5) of the Exchange Act [15 U.S.C.

§ 78m(b)(5)] and Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and

240.13b2-2].

f.    Crombie, directly or indirectly, singly or in concert, has engaged in acts,

practices, and courses of business that constitute violations of Rule 13a-14

[17 C.F.R. § 240.13a-14].

g.    By virtue of the conduct described herein, Crombie and Miszuk are also

each liable, pursuant to Section 20(e) of the Exchange Act, as an aider and

abettor of Biovail's violations of Sections 10(b), 13(a), 13(b)(2)(A) and

13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a),

78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1 and 13a-

16 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-16].

## JURISDICTION AND VENUE

7.    The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange

Act [15 U.S.C. § 78u(d)(1)] seeking to restrain and permanently enjoin Biovail, Melnyk,

Crombie, Miszuk, and Howling from engaging in the acts, practices, and courses of business

alleged herein.  The Commission also seeks a final judgment:

a.    ordering Biovail, Melnyk, Crombie, Miszuk, and Howling to disgorge any

ill-gotten gains and to pay prejudgment interest thereon;

b.    ordering Biovail and Crombie to pay civil money penalties pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

c.    ordering Biovail, Melnyk, Crombie, Miszuk, and Howling to pay civil

money penalties pursuant to Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)]; and

5

d.    permanently barring Melnyk, Crombie, Miszuk, and Howling from acting

as an officer or director of any issuer that has a class of securities

registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or

that is required to file reports pursuant to Section 15(d) of the Exchange

Act [15 U.S.C. § 78o(d)].

8.    This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C.

§§ 78u(e) and 78aa].

9.    Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v]

because a registered offering of Biovail's securities took place in, among other places, the

Southern District of New York.  Venue is proper under Section 27 of the Exchange Act

[15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business

alleged in this Complaint took place in the Southern District of New York.

10.    Biovail and Crombie, directly or indirectly, singly or in concert, have made use

of means or instruments of transportation or communication in interstate commerce, or of the

mails, in connection with the transactions, acts, practices, and courses of business alleged in this

Complaint.

11.    Biovail, Melnyk, Crombie, Miszuk, and Howling, directly or indirectly, singly or

in concert, have made use of the means and instrumentalities of interstate commerce, or of the

mails, or of a facility of a national securities exchange, in connection with the transactions, acts,

practices, and courses of business alleged in this Complaint.

6

## THE DEFENDANTS

12.    **Biovail Corporation,** a foreign private issuer, is a pharmaceutical company incorporated under the laws of Ontario, Canada.  Its headquarters are in Mississauga, Ontario, and it has facilities in the United States, Canada, Ireland, and Puerto Rico.  As a foreign private issuer, Biovail files annual reports on Form 20-F and furnishes interim financial statements to the Commission on Form 6-K.  During the relevant time period, Biovail included in its annual and interim reports financial statements purportedly prepared in accordance with both U.S. and Canadian generally accepted accounting principles.  Since 2006, Biovail has been providing financial statements prepared only in accordance with U.S. generally accepted accounting principles ("U.S. GAAP").

13.    **Eugene Melnyk**, age 48, is a Canadian citizen and a resident of St. Philip, Barbados.  Melnyk is the founder of Biovail and served as its chairman and as a director from March 1994 through June 2007.  From December 2001 to October 2004, Melnyk also was Biovail's chief executive officer.  Melnyk resigned as a director and chairman of Biovail effective June 30, 2007.

14.    **Brian Crombie**, age 47, is a Canadian citizen and a resident of Mississauga, Ontario.  He was Biovail's chief financial officer from May 2000 to August 2004.  In August 2004, Crombie was removed as chief financial officer and became Biovail's senior vice president for strategic development.  As of May 2007, Crombie no longer holds any position with the Company.

7

15.    **John Miszuk**, age 54, is a Canadian citizen and a resident of Mississauga, Ontario. He was in 2003, and is now, a vice president, controller, and assistant secretary of Biovail.

16.    **Kenneth G. Howling**, age 49, is a U.S. citizen and a resident of Toronto, Ontario. On December 6, 2006, the Company announced Howling's promotion to his current position of senior vice-president and chief financial officer. He also was the Company's chief financial officer from 1997 to 2000. From 2000 to 2003, he was Biovail's vice president of finance, and in 2003 he assumed additional responsibilities for external communications to investors and analysts when his title changed to vice president, finance and corporate affairs. He is a certified public accountant licensed in New Jersey, but is not a Canadian chartered accountant.

## FACTS

### A.    Misrepresentations Concerning the October 2003 Truck Accident

17.    On September 30, 2003, a truck carrying a shipment of a Biovail product, Wellbutrin XL, left Biovail's Steinbach, Manitoba, plant bound for the North Carolina facility of a major international pharmaceutical company that distributed the product (the "Distributor"). On October 1, 2003, while en route to North Carolina, the truck was involved in a multi-vehicle traffic accident on a highway in Illinois.

18.    The value of the product on the truck that was involved in the accident was about $5 million.

19.    Biovail, Melnyk, Crombie, and Howling issued two press releases and made numerous other public statements declaring that the loss of revenue and income associated with the truck accident contributed significantly to Biovail's substantial revenue shortfall for the third

8

quarter of 2003 in the amount of $10 million to $20 million, or about 23% to 38% of the total announced revenue shortfall for the quarter.

20.    The press releases and other repeated public statements were materially false and misleading. The truck accident had no impact on Biovail's financial results for the quarter, as Biovail, Melnyk, Crombie, and Howling knew or recklessly disregarded. In addition, in the press releases and other public statements, Biovail, Melnyk, and Crombie grossly overstated the revenue value of the shipment involved in the truck accident.

### The Truck Accident Had No Impact on Biovail's Third Quarter Revenues

21.    Under U.S. GAAP, revenue may be recognized on the sale of a product like Wellbutrin XL when, among other things, delivery of the product by the seller to the buyer has occurred.

22.    Pursuant to Biovail's agreement with the Distributor, all deliveries of Wellbutrin XL were subject to the term "F.O.B., [the Distributor's] facilities in the U.S.A. (freight collect)." This "F.O.B. Destination" delivery term meant that delivery occurred – and Biovail's revenue recognition would have been appropriate – only when the product reached the Distributor's facilities in the United States.

23.    Under the FOB Destination shipping term – the term actually in effect – the truck accident had no impact on Biovail's third quarter financial results because the truck left Manitoba on September 30, which was too late for it to reach the Distributor's North Carolina facility prior to the end of the quarter. Under those circumstances, Biovail could not have recognized revenue resulting from the shipment regardless of the accident.

9

24.    The deliberate misrepresentations by Melnyk, Crombie, Howling, and Biovail were based on the false premise that the delivery term was "F.O.B. Biovail," pursuant to which delivery would have occurred – and Biovail could have recognized the revenue from the sale – at the time the product left Biovail's facility.

25.    However, even if the shipping term were FOB Biovail, the truck accident would have had no impact on Biovail's third quarter financial results because the title to the product – and the risk associated with the accident –would have passed to the Distributor as soon as the truck left Biovail's Manitoba plant.  Under those circumstances, Biovail could have recognized revenue resulting from the shipment regardless of the accident.

26.    Nevertheless, Melnyk, Crombie, Howling, and Biovail repeatedly and falsely attributed the Company's third quarter revenue shortfall to the truck accident.

The October 3 Press Release and Conference Call

27.    On October 3, 2003, Biovail issued a press release announcing that its third quarter 2003 "revenues [would] be below previously issued guidance and will be in the range of $215 million to $235 million and earnings per share of $0.35 to $0.45."  The revenues were below the guidance the Company had issued in February 2003 by about $45 million to $65 million and the earnings per share range were below the February estimate by $0.23 at both ends of the range. This was the first time that Biovail had ever failed to meet its quarterly guidance.

28.    The October 3 release falsely attributed a significant part of the revenue shortfall to the truck accident: "Contributing significantly to this unfavorable variance was the loss of revenue and income associated with a significant in-transit shipment loss of Wellbutrin XL as a

10

result of a traffic accident." This statement was materially false and misleading, as Melnyk, Crombie, Howling, and Biovail knew or recklessly disregarded.

29.     The October 3 press release also grossly overstated the revenue value of the Wellbutrin XL shipment involved in the accident: "Revenue associated with this shipment is in the range of $10 to $20 million." This statement was materially false and misleading, as Melnyk, Crombie, and Biovail knew or recklessly disregarded.

30.     The October 3 press release was issued by Howling's office under his supervision and his name appears on it as the contact person. Beginning on October 2, Melnyk, Crombie, and Howling worked together on drafting the materially false and misleading October 3 press release. Howling drafted the release based on information he received from the others, including an initial draft press release that Crombie had prepared earlier in the day on October 2 and forwarded to both Melnyk and Howling. Crombie's initial draft set forth the actual delivery term (*i.e.,* F.O.B. Destination) and stated correctly that the revenue from the product involved in the truck accident could not be recognized in the third quarter.

31.     Despite the correct statements in Crombie's initial draft, the October 3 release prepared by Howling, reviewed and edited by Melnyk and Crombie, and issued by the Company was false and misleading in that it stated that the truck accident contributed significantly to the third quarter revenue shortfall.

32.     Although Crombie knew that the true value of the product on the truck involved in the accident was approximately $5 million, he provided Howling with a falsely inflated valuation of $10 to $20 million for Howling to include in the press release.

11

33.     Melnyk, Crombie, and Biovail knew or recklessly disregarded that the statement in the October 3 press release concerning the value of the product involved in the truck accident was materially false and misleading.

34.     Later on October 3, Melnyk, Crombie, and Howling participated in a conference call with analysts in which Melnyk falsely stated: "This accident will have a negative financial impact on Biovail's third quarter revenues." Melnyk later in the call said again, "It is a third quarter item." Melnyk, Crombie, Howling, and Biovail knew or recklessly disregarded that these statements by Melnyk were materially false and misleading.

35.     On the same conference call, Crombie falsely said, "The unfortunate incident . . . will have a material negative effect on Biovail's third quarter revenue and earnings." He also falsely told the analysts on the call, "Our contract with [the Distributor] has title change in Manitoba when it leaves our shipping dock." In fact, as Melnyk, Crombie, and Howling knew or recklessly disregarded, title to the product would change only upon arrival at the Distributor's facility in the United States, and therefore Biovail could not have recognized third quarter revenue on the shipment even if the accident had not occurred.

36.     On the same call, Crombie referred to the value of the shipment as "$15 million to $20 million" – three to four times the actual revenue value. He also noted, "As a result of this accident, Biovail currently estimates that its total third quarter revenues from Wellbutrin XL will now be below $10 million." Melnyk, Crombie, and Biovail knew or recklessly disregarded that these statements were materially false and misleading.

37.     Howling participated in the conference call on October 3, 2003 and helped prepare the script for it. Although he knew or recklessly disregarded that the truck accident had

12

no impact on the Biovail's third quarter financial results, he remained silent during the call and did not correct any of the materially false and misleading statements that Melnyk and Crombie made during the call claiming that the accident did have such an impact.

The October 8 Press Release

38.    On October 8, 2003, an investment bank research analyst issued a research report with a Biovail sell rating (the "Report"). In the Report, the analyst questioned both Biovail's valuation of the product lost due to the accident as well as the Company's assertion of when title to the product transferred.

39.    . Howling received a copy of the Report on October 8 and he promptly forwarded to Melnyk and Crombie the portion of the Report questioning the value of the shipment involved in the truck accident, suggesting that someone in finance draft responses to the issues raised. Soon after, Howling forwarded the entire Report to Melnyk and Crombie.

40.    Following circulation of the Report, other research analysts asked Howling many questions about the quantity of product on the truck, the value of that product, and the wide range of value Biovail had given on October 3.

41.    Also on October 8, an employee at the Distributor called and emailed Howling in order to correct some of the misstatements in the October 3 press release and conference call. The email, which Howling forwarded to Melnyk and Crombie, said that Biovail's conference call statement on when title to the product passed to the Distributor was "an incorrect statement, as the [agreement between Biovail and the Distributor] provides that title to and risk of loss with respect to the product would not have passed to [the Distributor] until the product was delivered to [the Distributor's] facility in the U.S.A."

13

42.    Hours later – while under fire from analysts and investors as a result of the Report – Biovail issued a second press release that announced the recovery and salability of the product involved in the accident and "re-confirm[ed] that the sales value of these goods is within previously stated guidance." Melnyk dictated the October 8 press release, which both Crombie and Howling reviewed and edited prior to its issuance. The October 8 press release was issued by Howling's office under his supervision and his name appears on it as the contact person.

43.    The October 8 press release was deliberately and materially false and misleading. Even though Melnyk, Crombie, Howling, and Biovail all knew or recklessly disregarded that the truck accident had no impact on third quarter revenues, the October 8 press release was silent on that subject. This was a material omission.

44.    Moreover, Melnyk, Crombie, and Biovail knew or recklessly disregarded that the statement in the October 8 press release reconfirming the October 3 guidance concerning the value of the product involved in the accident was materially false and misleading because they knew that the value in the October 3 press release was deliberately overstated.

October 10-15 Road Show

45.    In the days immediately following October 8, there was a perception inside Biovail that management's credibility had been attacked by the Report on October 8. Biovail wanted to address these credibility concerns and other issues with investors, including any questions about Biovail's ability to meet anticipated market demand for Wellbutrin XL.

46.    To this end, on October 10, 13, 14, and 15, 2003, Biovail executives Melnyk, Crombie, and Howling conducted a road show in New York, Boston, and other cities to meet

14

with market analysts and investors. During the road show, the Biovail executives talked about, among other things, the matters discussed in the Company's October 3, 2003 press release.

47.      The road show presentation included slides that repeated falsely that the truck accident's impact on Biovail's third quarter 2003 revenue was $10 to $20 million. In addition to the slides, the executives at the road show provided commentary reiterating the false statements in the October 3 press release. At the time of these misstatements, Melnyk, Crombie, Howling, and Biovail all knew or deliberately disregarded that the statements attributing part of the third quarter revenue shortfall to the truck accident were materially false and misleading. Melnyk, Crombie, and Biovail also knew or recklessly disregarded that the road show statements concerning the value of the product on the truck were materially false and misleading.

### The Misstatements Were Never Fully Corrected

48.      On March 3, 2004, in its annual earnings release Biovail finally acknowledged that the revenue associated with the product involved in the truck accident was only about $5 million rather than the $10 to $20 million previously stated on October 3, 2003. Even this release, however, did not acknowledge that the truck accident had no impact on Biovail's third quarter revenues.

**B.      Material Misstatements Related to Pharmatech**

49.      In mid-2001, Biovail sought to increase net income by removing from its books the research and development costs associated with a key mid-term product pipeline. To achieve this goal, Biovail created a special purpose entity, Pharmaceutical Technologies Corp. (known as Pharmatech), to carry those costs.

15

50.     And despite the fact that research and development costs were expected to be in the tens of millions of dollars, with some estimates as high as $120 million, Pharmatech's sole shareholder, whom Biovail secured, invested only $1 million in the company, of which $350,000 was immediately refundable as a fee.

51.     Biovail secured financing for Pharmatech from its own lender (the "Bank"), based on Crombie's assurances that, if at any time the Bank chose not to renew the Pharmatech financing, Biovail would likely purchase Pharmatech and retire the debt.

52.     Crombie and Biovail deliberately and fraudulently orchestrated the Pharmatech arrangement as a means fraudulently to avoid recording on Biovail's books and records and reporting on its financial statements the expenses and liabilities related to the research and development of certain Biovail products. Crombie knew, and told the Bank, that it was probable that Biovail would repay Pharmatech's debt to the Bank when it first came due after one year, regardless of the outcome of the research and development at that point, if the Bank did not renew the financing. Crombie and Biovail understood that under those circumstances U.S. GAAP required Biovail to record Pharmatech's expenses and liabilities related to Pharmatech's research and development of the products and to include them on its own financial statements.

53.     Nevertheless, Crombie and Biovail deliberately did not recognize and record Pharmatech's liabilities or charge its research development costs to expense as incurred on Biovail's books and records and did not include them on Biovail's financial statements. Instead, Crombie intentionally misled Biovail's auditors as to the true nature of the arrangement in order to secure from the auditors an opinion letter supporting Biovail's accounting for the arrangement.

16

The Applicable Accounting Principles

54.     The applicable U.S. GAAP guidance in Statement of Financial Accounting

Standards No. 68, *Research and Development Arrangements* ("SFAS 68"), provides that an

enterprise that is a party to a research and development arrangement that allows it to obtain the

results of research and development funded partially or entirely by others must estimate and

recognize the liability on its own books and records if the enterprise is obligated to repay any of

the funds provided by the other parties, regardless of the outcome of the research and

development.   Under such circumstances, SFAS 68 also requires the enterprise to charge the

research and development costs to expense as incurred.

55.     Even in the absence of a written agreement or contract requiring repayment by the

enterprise, SFAS 68 sets forth a presumption that the enterprise has an obligation to repay the

other parties if surrounding conditions suggest that it is probable that the enterprise will repay

any of the funds regardless of the outcome of the research and development.  That presumption

can be overcome only by substantial evidence to the contrary.  "Probable" in this context means

that repayment is likely.

56.     SFAS 68 provides examples of circumstances under which there is a presumption

of a repayment obligation, including, among others, that the enterprise has indicated an intent to

repay all or a portion of the funds provided regardless of the outcome of the research and

development.

The Agreements Between Biovail and Pharmatech

57.     Pharmatech was incorporated in Barbados on June 29, 2001 and, on the same day,

it entered into a Product Development and Royalty Agreement with Biovail's Barbados

17

subsidiary, Biovail Laboratories, Inc. In this agreement, Pharmatech agreed to pay all the costs

and expenses required to obtain regulatory approval of certain products in Biovail's midterm

product pipeline, and Biovail granted Pharmatech a license to use the technologies necessary to

develop the products.

58.    Biovail also agreed to pay Pharmatech a royalty calculated as a percentage of the

net sales of each successfully developed and approved product. Although the royalty payments

would continue for ten years after each product's launch, Biovail could terminate the royalty

obligation at any time upon thirty days notice and instead pay a contractually specified amount

that increased over time depending on the date of the termination notice.

59.    In a related Advisory Agreement, Biovail also agreed to guide Pharmatech in the

development of the products.

60.    The products included in the Pharmatech portfolio were those that could be

launched within two to five years. The intention was to improve on drugs that were already in

the market by providing new drug delivery formulations that could enhance effectiveness and

increase patient compliance.

61.    Several of the products were being developed to use controlled release technology

that allowed for the gradual and predictable release of active ingredients over twelve or twenty

four hours. Other products were to use the FlashDose drug delivery system, in which the product

dissolves rapidly on the user's tongue.

62.    Biovail had obtained the FlashDose technology in November 1999 by acquiring

another pharmaceutical company for approximately $250 million. That purchase was a

significant acquisition and both the FlashDose and controlled release technologies were

important to Biovail. Although in June 2001, it was not certain that the FlashDose or controlled release technologies could be combined effectively and safely with any of the products in the Pharmatech portfolio, Biovail told the Bank that the products comprised its key mid-term product pipeline.

63.    In connection with the agreement with Pharmatech, Biovail also entered into a Share Option Agreement with Pharmatech's sole stockholder. This agreement permitted Biovail to purchase all of the stockholder's Pharmatech shares at any time until December 31, 2006, in exchange for a fixed purchase price that ranged from $1.25 million to $5 million depending on the date Biovail exercised the share purchase option.

Pharmatech's Agreement with the Bank

64.    Although Pharmatech agreed to pay the costs of developing the products, it had little working capital with which to do so. The sole stockholder's capital investment was just $1 million and the new company had no sources of revenue and no assets other than the potential future royalty payments and the license from Biovail to use the FlashDose and controlled release technologies in developing the products.

65.    To address this problem Crombie approached several potential lenders but ultimately only the Bank agreed to provide financing. Since the 1990's the Bank had served as Biovail's primary lender extending hundreds of millions of dollars in financing to Biovail through a credit facility.

66.    In a June 29, 2001 agreement, the Bank agreed to extend credit to Pharmatech in the maximum aggregate amount of $60 million for 364 days, at which time the outstanding debt would become due and payable. Pharmatech, however, could seek a 364-day extension of the

credit facility, which the Bank could grant or deny in its discretion.  As collateral, Pharmatech

granted the Bank a security interest in the Product Development and Royalty Agreement,

including the potential future royalty payments and the license to use the crucial technology to

develop the products.  In the event of default, the Bank would also have the right to assign

Pharmatech's rights under the agreement to a third party, including the right to continue

development of the products using the FlashDose and controlled release technologies.

   67.  In connection with the financing, Biovail provided a comfort letter addressed to

the Bank stating that, if Biovail exercised its share purchase option, Biovail would arrange to

repay in full on or before June 30, 2004 any outstanding balance then due.  Thus, the probability

that Biovail would repay Pharmatech's debt to the Bank turned on the likelihood that Biovail

would exercise its share purchase option if the Bank did not renew the loan after one year.

   68.  Crombie made clear to the Bank during the discussions about financing that

Biovail probably would repay the Bank regardless of the outcome of the product development.

Specifically, Crombie told the Bank that:  (1) Biovail had a compelling business incentive to

acquire Pharmatech and repay the loan because Biovail would want the royalties from any

successfully developed products; (2) in any event, Biovail did not want its competitors acquiring

access to the license to use the FlashDose (which Biovail had paid $250 million to acquire) or

controlled release technologies that Biovail had assigned to Pharmatech; and (3) the Bank had an

effective "annual put" to Biovail, meaning that, when the credit facility came up for review after

one year, if the Bank declined to extend the financing, the Bank could expect Biovail to acquire

Pharmatech and repay the indebtedness.

The Auditors' Opinion Letter

69.    In connection with the Pharmatech transaction, Biovail obtained from its auditors an opinion letter concerning the accounting implications of the transaction.  Among other things, the opinion letter analyzed the deal in light of SFAS 68.   The letter contains a table summarizing in one column the factors specified in SFAS 68 and in a parallel column the information Crombie provided to the auditors on each of those factors.  Crombie knew that the auditors would rely upon that factual information in issuing their opinion, and they did rely on it.

70.    Specifically, in order to secure the opinion letter from Biovail's auditors, Crombie made the following misstatements to the auditors:

- Crombie told the auditors that Biovail's management did not believe that it was probable that Biovail would repay the amounts being advanced and that the funding provided by others should not be recorded as a liability.

- Crombie told the auditors that Biovail had not provided any explicit or implicit undertakings to any parties involved in the transaction to repay all or a portion of the funds provided.

- Crombie told the auditors that Biovail's management did not currently believe that it was probable that it would choose to purchase the common shares of Pharmatech rather than incur any penalty.

71.    Crombie's statements to the auditors were materially false and misleading. Crombie also omitted to tell the accountants what he was contemporaneously telling the Bank. In particular, Crombie failed to tell the auditors that he had told the Bank that in the event of a Pharmatech default, Biovail would have a compelling business incentive to exercise its option to acquire Pharmatech and repay the indebtedness to the Bank.  Crombie also did not tell the auditors that he had told the Bank that the annual loan renewal mechanism was effectively an "annual put" to Biovail.  Similarly, Crombie did not tell the auditors that he had told the Bank

that Biovail would not want to see the technology license in which the Bank had taken a security

interest fall into the hands of Biovail's competitors. These were material omissions.

### Biovail's Purchase of Pharmatech When the Bank Did Not Renew the Financing

72.     At the conclusion of the initial year of financing, in June 2002, the Bank extended

Pharmatech's financing but only for six more months, until December 31, 2002. As early as

October 2002, Biovail management began to conclude that the Bank would neither renew the

credit facility on December 31, 2002 nor increase its limit. Finally, on December 24, 2002,

Crombie learned definitively that the Bank would not extend any additional funds to Pharmatech.

73.     Three days later, Biovail sent a letter notifying the Pharmatech stockholder that

Biovail intended to exercise the purchase option. Consistent with the "put" representations

Crombie had made to the Bank, Biovail bought Pharmatech when the Bank decided not to extend

additional financing, and repaid the Bank in full. Biovail's actions confirm that the Company's

intention always was to exercise its purchase option and repay the Bank if the credit facility was

not extended.

### False and Misleading Public Filings

74.     Biovail's interim financial statements for the quarter ended September 30, 2001

and for the nine months ended September 30, 2001 were furnished to the Commission on Form

6-K on November 13, 2001. Biovail's interim financial statements for the quarter ended

March 31, 2002 were furnished to the Commission on Form 6-K on May 30, 2002. Biovail's

interim financial statements for the quarter ended June 30, 2002 were furnished to the

Commission on Form 6-K on August 29, 2002. On that date Crombie signed a certification

stating the Form 6-K report "fairly presents, in all material respects, the financial condition and

22

results of operations of the Company." Crombie and Biovail knew, or recklessly disregarded, that this representation was materially false and misleading.

75.    Biovail's interim financial statements for the quarter ended September 30, 2002 were furnished to the Commission on Form 6-K on November 25, 2002. On that date Crombie signed a certification stating the Form 6-K report "fairly presents, in all material respects, the financial condition and results of operations of the Company." Crombie and Biovail knew, or recklessly disregarded, that this representation was materially false and misleading.

76.    Biovail's annual report for the year ended December 31, 2001 was signed by Crombie and filed with the Commission on Form 20-F on May 17, 2002. Biovail's annual report for the year ended December 31, 2002 was signed by Crombie and filed with the Commission on May 20, 2003. On that date, Crombie also signed a certification stating that the Form 20-F report "fairly presents, in all material respects, the financial condition and results of operations of the Company." Crombie and Biovail knew, or recklessly disregarded, that this representation was materially false and misleading.

77.    As a direct result of Crombie's and Biovail's intentional failure to record on Biovail's books and records a total of approximately $47 million in Pharmatech's expenses and more than approximately $51 million in liabilities related to the research and development through September 30, 2002, Biovail's financial statements were materially misstated. In addition, during the fourth quarter of 2002, Biovail did not charge to expense as incurred more than $10 million in additional Pharmatech expenses and did not timely recognize and record on Biovail's books and records additional related liabilities that Pharmatech incurred during that quarter.

23

78.    Specifically, Biovail's financial reports were materially false and misleading in that they did not include Pharmatech's research and development expenses, causing: (1) net income to be overstated by approximately 50% in the third quarter 2001, 32% in the 2001 annual financial statements, 15% in the first quarter 2002, 18% in the second quarter 2002, and 16% in the third quarter 2002, and understated by approximately 17% in the 2002 annual financial statements; and (2) net income excluding certain charges to be overstated by approximately 25% in the third quarter 2001, 12% in the 2001 annual financial statements, 16% in the third quarter 2002, and 17% in the 2002 annual financial statements.

79.    Biovail's balance sheets included in the financial reports also were materially false and misleading because they did not include Pharmatech's liability to the Bank, causing Biovail's total liabilities to be understated by approximately 2% in the third quarter 2001, 11% at year-end 2001, 5% in the first quarter 2002, 5% in the second quarter 2002, and 7% in the third quarter 2002.

80.    Crombie and Biovail knew, or recklessly disregarded, that the financial statements identified above were materially false and misleading.

81.    During the period when Biovail's financial statements were intentionally and materially misstated as a result of the Pharmatech fraud, Biovail conducted a registered offering in which it sold 12.5 million of its common shares and raised gross proceeds of approximately $587.5 million. The prospectus supplement for this offering, filed on November 15, 2001, incorporated by reference Biovail's intentionally and materially false and misleading financial statements for the nine months ended September 30, 2001 furnished to the Commission on the Company's Form 6-K dated November 13, 2001.

24

82.    Crombie and Biovail knew, or recklessly disregarded, that Biovail's materially

false and misleading financial statements for the nine months ended September 30, 2001 were

incorporated by reference into the prospectus supplement dated November 15, 2001.

## C.    A Sham Bill and Hold Transaction in June 2003

83.    In the second quarter of 2003, both product revenue and total revenue were below

even the low end of Biovail's previously issued guidance for the quarter, and the Company was

in danger of missing earnings expectations for the first time in its history. Rather than

acknowledge its poor performance that quarter, Crombie, Miszuk, and Biovail fraudulently and

improperly recognized and recorded approximately $8 million in additional revenue from a

phony sale of Wellbutrin XL, a drug that analysts considered crucial to the Company's health.

As a result, for the quarter ended June 30, 2003, Biovail's net loss was intentionally and

materially understated by approximately 80% in its interim financial statements that Biovail

furnished to the Commission on Form 6-K on August 29, 2003.

Biovail's Wellbutrin XL Agreement

84.    Through subsidiaries, Biovail and the Distributor entered into a Development,

License and CoPromotion Agreement in 2001. Pursuant to the agreement, and subject to FDA

approval, Biovail was to manufacture Wellbutrin XL and sell it to the Distributor, which would

distribute the product to third-party purchasers. The agreement required Biovail to produce

Wellbutrin XL to be used for two purposes: (1) as sample product that Biovail would deliver in

bulk to the Distributor and that the Distributor would package and distribute to physicians as a

promotional tool; and (2) as trade product that Biovail would package in bottles labeled in

accordance with the FDA's requirements and that the Distributor would sell at a commercial price upon FDA approval.

85.     As modified in December 2002, the agreement provided different prices for the differing dosages of sample product and trade product. Biovail sold sample pills to the Distributor at fixed prices per tablet, effectively at cost and, at the start of the product launch, at a loss. Biovail's Wellbutrin XL revenues for trade product were tied to the Distributor's net revenues from its sales to third parties. The agreement provided that Biovail would invoice trade product shipped to the Distributor at a fixed percentage of the Distributor's estimated net sales revenues and the invoicing percentage would rise as the Distributor's actual net sales increased over time. To the extent that the Distributor's estimate of its net sales revenues was different from the actual net sales revenue, the agreement contemplated a quarterly reconciliation process.

86.     The FDA issued a letter on June 26, 2003 stating that Wellbutrin XL was "approvable," which meant that the FDA required further information before the new drug application could be approved. Among other things, the FDA's June 26 letter requested revised draft labeling for the product. The FDA did not finally approve Wellbutrin XL until August 29, 2003.

        Biovail's Need to Generate Trade Product Revenue in June 2003

87.     On February 7, 2003 Biovail published earnings guidance for its fiscal year 2003. It projected second quarter earnings per share between $0.43 and $0.50, third quarter earnings per share between $0.58 and $0.68, and annual sales of Wellbutrin XL of between $75 million and $150 million.

88.     Wellbutrin XL was a key component of these earnings projections. It was widely expected that Wellbutrin XL would be the most significant product launch in the Company's history. The product, however, could not launch until it received FDA approval. When, by early June 2003, the FDA still had not yet approved Wellbutrin XL, Biovail executives became concerned because it was clear that Biovail would not meet its second quarter earnings projections unless it sold Wellbutrin XL trade product by June 30.

89.     Although Biovail needed to produce prior to approval enough Wellbutrin XL trade product to enable the Distributor to launch the product promptly, it was risky to manufacture too many pills before the FDA had determined as part of the approval process what the product's shelf life would be because the Distributor could return stale pills to Biovail. Sample product, however, because it would be given away rather than sold, could be distributed up until expiration.

90.     In April and May 2003 the Distributor submitted purchase orders for the delivery of Wellbutrin XL sample pills in June and for delivery of trade product (contingent on FDA approval of the trade product packaging) in July.

91.     There were two reasons why the Distributor sought delivery of sample pills before trade pills: (1) under the agreement, the Distributor was responsible for packaging sample pills and wanted sufficient quantities on hand early so it could prepare for the launch; and (2) there was a risk that trade pills could expire unused if they were produced too early.

92.     By the middle of June 2003, Biovail had not filled the Distributor's pending orders for sample product. At the time, Biovail was experiencing manufacturing problems and, as a result, was unable to manufacture sufficient quantities to fill the sample orders. In addition,

27

filling sample orders generated no income for Biovail. If Biovail had invoiced and shipped the inventory as samples during June, it would have sustained a loss because the cost of goods sold exceeded the contractual sample prices.

Crombie's Demand for a Trade Product Order in June

93.    Even though Crombie knew about the production problems, he complained in a June 19, 2003 letter to the Distributor that Biovail needed the Distributor to place an order for trade product for June delivery "so that Biovail could be assured that it could book the revenue associated with those shipments [of trade product] in Q2 of 2003." He proposed in his letter to sell to the Distributor as trade product "all of our current production" of Wellbutrin XL.

94.    The Distributor acquiesced in Crombie's demand for a June order for trade product in view of Biovail's threat to turn its manufacturing capacity to other products, since that could have caused a delay in the Wellbutrin XL launch.

95.    On June 20, 2003, the Distributor placed an order for 27.1 million tablets of trade product. Since FDA approval was still pending, Biovail could not label the product so the Distributor agreed to let Biovail hold the product awaiting FDA approval and packaging. Although Biovail had not manufactured enough pills to meet the order, Biovail purported to earmark the entire then-existing inventory of Wellbutrin XL in its warehouse, approximately 18 million pills, to fill this "bill and hold" order.

96.    On June 30, 2003, Biovail invoiced the Distributor approximately $8 million for the product, and recorded a sale at a price that was slightly reduced from the usual trade prices to reflect that the packaging would not be done – or invoiced – until after FDA approval. The

parties did not agree, however, on a fixed schedule for delivery of the product because the date

of FDA approval was not yet known.

Applicable Accounting Principles

97.    Under U.S. GAAP, revenue may be recognized when it is realized or realizable

and earned.  Among other things, this requires that the seller's price to the buyer be fixed or

determinable.  With respect to the sale of a product like Wellbutrin XL, revenue may be

recognized when delivery of the product by the seller to the buyer has occurred.

98.    A legitimate bill and hold transaction permits revenue recognition absent delivery

provided the following additional criteria under U.S. GAAP are met:

> (a)    The risk of ownership must have passed to the buyer;
>
> (b)    The customer must have made a fixed commitment to purchase the goods, preferably reflected in written documentation;
>
> (c)    The buyer, not the seller, must request that the transaction be on a bill and hold basis. The buyer must have a substantial business purpose for ordering the goods on a bill and hold basis;
>
> (d)    There must be a fixed schedule for delivery of the goods. The date for delivery must be reasonable and must be consistent with the buyer's business purpose (e.g., storage periods are customary in the industry);
>
> (e)    The seller must not have retained any specific performance obligations such that the earnings process is not complete;
>
> (f)    The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and
>
> (g)    The goods must be complete and ready for shipment.

99.    The U.S. GAAP requirements for revenue recognition in general, including the

fixed price requirement, and the additional requirements for a legitimate bill and hold

transaction, are summarized in Staff Accounting Bulletin No. 101 - *Revenue Recognition in Financial Statements,* which both Crombie and Miszuk reviewed at the time.

100.    Although the bill and hold transaction was not genuine, one requirement in particular that was plainly and deliberately flouted was the requirement that the ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders.  Indeed, the goods supposedly sold in the sham bill and hold transaction and segregated in the warehouse on June 30, were very soon thereafter designated by Miszuk and Crombie to fill the Distributor's pending orders for sample product and were shipped with new invoices at different and much lower prices – the sample prices.

The Pills Switch

101.    Although no one knew prior to FDA approval what the expiration date for trade product would be, Crombie and Miszuk knew in June that all of the tablets then in Biovail's inventory – which were supposedly sold to the Distributor in the purported bill and hold transaction – were already at that time too old for trade use.  To avoid potential returns of such stale pills by the Distributor, and in an attempt to fill the Distributor's orders for sample pills that had been pending since April, Crombie and Miszuk, no later than mid-July – before the close of Biovail's second quarter books – designated for shipment to the Distributor as sample product under sample invoices at the lower sample prices the very same pills that Biovail supposedly had designated and segregated for the purported on June 30 bill and hold transaction and for which Biovail had invoiced the Distributor at the higher contractual trade prices.

102.    Crombie and Miszuk then invented a rationale by which Biovail purportedly could still recognize the trade sale revenue in the second quarter.  They decided to replace the

30

pills that would now be shipped as sample pills at the lower sample prices with newer pills that would now become the subject of the June 30 sale. However, as of June 30, replacement pills did not exist because they had not yet been manufactured.

103.    Crombie's and Miszuk's scheme was promptly implemented. By July 18 Biovail sent the Distributor various schedules showing that Biovail intended to ship to the Distributor under sample invoices and at the lower sample prices the very same pills that were the subject of the June 30 trade sale invoices at the higher, trade prices.

104.    Crombie and Miszuk made their decision without conferring with Biovail's outside auditors and without telling them that the June 30 sale was a bill and hold transaction. Instead, Crombie and Miszuk led the auditors to understand that a trade shipment had actually occurred on June 30, which was not true. Miszuk also falsely told the auditors in connection with their quarterly review that pricing on the June 30 trade product sale was fixed even after he and Crombie had decided to ship the same pills supposedly sold in that transaction to the Distributor at the lower sample prices.

105.    Moreover, in mid-July, when Miszuk and Crombie designated for shipment the purportedly segregated goods to fill the sample orders, Biovail still had not yet manufactured the additional pills that supposedly would replace them for the June 30 trade product sale. Thus, there were not sufficient pills in existence to apply to that sale once Crombie and Miszuk designated the purportedly segregated goods for shipment to fill the pending orders for sample pills.

31

Intentionally and Materially False and Misleading Public Statements

106.    In late July, Biovail closed its books on the second quarter still recognizing improperly the approximately $8 million in revenue in connection with the June 30 trade product sale.  On July 29, 2003, Biovail issued an earnings release for the quarter ended June 30, 2003 that both Crombie and Miszuk reviewed before its issuance.  On the same day, Biovail conducted a conference call with analysts to discuss the Company's financial results for the second quarter.

107.    When Biovail closed its books for the quarter ended June 30, 2003 and when the Company announced its second quarter results on July 29, 2003, Crombie, Miszuk, and Biovail knew, or recklessly disregarded, that the requirements under U.S. GAAP for revenue recognition for a bill and hold transaction were not satisfied with respect to the Wellbutrin XL trade product sale transaction that purportedly occurred on June 30, 2003.  Specifically, Crombie, Miszuk, and Biovail knew, or recklessly disregarded, among other things, that:  (a) as of June 30, 2003 there was no fixed schedule for delivery of the goods; (b) the Distributor had not agreed to pay the higher prices for trade product if it was shipped and used as sample product; (c) the pills supposedly segregated for the June 30, 2003 trade sale comprised all of Biovail's Wellbutrin XL tablets as of June 30, 2003; and (e) no, or insufficient quantities of, other pills were existing, manufactured, and available as of June 30 or when Biovail's second quarter books were closed in July to replace the supposedly segregated pills once Crombie and Miszuk designated them for shipment to the Distributor to fill the Distributor's other pending orders for sample product at the lower sample prices.

32

108.    As a direct result of the improper recognition of revenue on the phony bill and hold transaction, the July 29, 2003 earnings release was intentionally and materially false and misleading. Specifically, the earnings release understated the Company's net loss for the quarter by approximately 80% and overstated the company's net income (excluding acquired R&D) for the quarter by about 5%.

109.    Biovail's announced earnings appeared to meet its earnings guidance for the second quarter.

110.    Crombie participated in the conference call on July 29, 2003, during which Howling said, "Additionally, in the second-quarter 2003, approximately $8 million of Wellbutrin XL was supplied to [the Distributor]." Although Crombie knew or recklessly disregarded at the time of the conference call that the requirements under U.S. GAAP for revenue recognition for the purported bill and hold transaction were not satisfied, he omitted to correct Howling's misstatement.

111.    During August, after the Distributor began receiving the shipments of sample product, the Distributor notified Biovail that, because the August sample invoices identified the same tablets that were associated with the June 30 trade invoices, the Distributor would not process the June 30 trade invoices at that time. This message was forwarded to Crombie and Miszuk on August 14, 2003.

112.    By no later than August 29, 2003, Miszuk, Crombie, and Biovail knew or recklessly disregarded, among other things, that during August the Distributor had refused to process the June 30 invoices for the trade product sale because Biovail was shipping the same pills under sample invoices at the lower sample prices.

113.    Nevertheless, on August 29, 2003, the Company furnished to the Commission on Form 6-K Biovail's second quarter financial statements that were intentionally and materially false and misleading.  Specifically, as a direct result of the improper recognition of revenue on the phony bill and hold transaction, the Company's net loss was understated by approximately 80%.

114.    Miszuk signed this Form 6-K and Crombie also signed a statement that the Form 6-K report "fairly presents, in all material respects, the financial condition and results of operations of the Company."    At this time, Crombie, Miszuk, and Biovail knew, or recklessly disregarded that the financial statements, and Crombie's statement, were intentionally and materially false and misleading because the revenue recognition on the purported June 30 trade product sale included in the second quarter financial statements was not in accordance with U.S. GAAP.

115.    The next business day, on September 1, 2003, Biovail issued two credit memos to the Distributor voiding the two unpaid June 30 trade invoices.

116.    On May 14, 2004, Biovail furnished to the Commission on Form 6-K/A restated financial statements for the quarter ended June 30, 2003.  This restatement corrected material misstatements resulting from the previously unrecorded and unreported foreign exchange loss discussed below.  But in this 2004 amendment, Biovail continued to reflect the approximately $8 million in revenue and about $4 million in earnings from the phony June 30 bill and hold transaction, causing the restated financial statements to understate net loss by about 45%. Miszuk signed this Form 6-K/A and Crombie also signed a statement that the Form 6-K/A report "fairly presents, in all material respects, the financial condition and results of operations of the

34

Company." At that time, Crombie, Miszuk, and Biovail knew or recklessly disregarded that the

financial statements, and Crombie's statement, were materially false and misleading because the

revenue recognition on the purported June 30 trade product sale included in the second quarter

financial statements was not in accordance with U.S. GAAP.

117.    Biovail's annual report for the year ended December 31, 2003 was signed by

Crombie and filed with the Commission on May 14, 2004.  This report presents restated second

quarter results as they appear in the Form 6-K/A furnished to the Commission the same day, and

like that Form 6-K/A, these restated results continued to reflect the approximately $8 million in

revenue and about $4 million in earnings from the phony June 30 bill and hold transaction,

causing the restated financial results for the second quarter of 2003 set forth in the Form 20-F to

understate net loss by about 45%.  On May 14, 2003, Crombie also signed a certification stating,

among other things, that, based on Crombie's knowledge: (1) 'this [Form 20-F] report does not

contain any untrue statement of a material fact or omit to state a material fact necessary to make

the statements made, in light of the circumstances under which such statements were made, not

misleading with respect to the period covered by this report;" and (2) "the financial statements,

and other financial information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of the company as of, and for, the

periods presented in this report[.]"  At this time, Crombie, Miszuk, and Biovail knew or

recklessly disregarded that the Form 20-F, and Crombie's statement, were materially false and

misleading because the revenue recognition on the purported June 30 trade product sale and

included in the second quarter financial statements was not in accordance with U.S. GAAP.

35

Crombie's and Miszuk's Deception of Biovail's Auditors

118.    Not only did Biovail, Crombie, and Miszuk not seek advice and guidance from Biovail's auditors concerning whether the bill and hold accounting was proper, but Crombie and Miszuk also made material misstatements and omissions about the June trade order to the auditors in connection with both the second quarter review and the 2003 annual audit.

119.    In connection with the quarterly review, by July 22, Miszuk told the auditors that pricing was fixed on the June trade order even though, by July 18, he and Crombie already had designated for shipment as sample pills – at the lower sample prices – the pills purportedly segregated for the bill and hold sale.

120.    Also during the quarterly review, Crombie discussed with the auditors their request for a confirmation about fixed pricing. In their communications with Crombie and Miszuk during this time, the auditors referred to the June transaction as a "shipment," showing their belief that actual delivery had occurred. Neither Crombie nor Miszuk corrected this misunderstanding. Similarly, neither Crombie nor Miszuk told the accountants in July that they had decided to use the pills originally identified on the "bill and hold" invoices to fill the Distributor's sample orders at the lower sample prices. They also did not tell the accountants that Biovail did not have sufficient product on hand to fill both the trade order and the outstanding sample orders, or even that the Company had treated the June trade product sale as a bill and hold transaction.

121.    Miszuk and Crombie similarly failed to tell the auditors during August that the Distributor was refusing to pay the June invoices because Biovail had shipped to the Distributor the very same pills under sample invoices, that the available pills were aged and best used as

36

samples to avoid returns, and that the Distributor did not agree to pay trade prices if it used the pills as sample product. Crombie also falsely told the auditors in February 2004 during the year-end audit that the Distributor's non-payment of the invoices in connection with the June 2003 transaction was part of a larger problem involving the Distributor's failure to pay Biovail's invoices and had nothing to do with the specific bill and hold transaction.

122.    Miszuk made additional misrepresentations in the management report, a report circulated to Biovail executives and auditors which purported to provide an overview of the Company's quarterly financial performance, including both narrative and financial statements. Prior to the circulation of the management report to Biovail's auditors on July 25 and 30, 2003, Miszuk reviewed and approved the content of the report, which he knew the auditors used as part of their review process. By including approximately $8 million in revenue associated with the purported June 30 trade product sale, Biovail's July 25 and 30, 2003 second quarter 2003 management reports were materially false in two ways: (1) they overstated income and (2) both falsely asserted that "[a]ll figures contained in [the] report [were] in accordance with U.S. GAAP."

123.    Only when the auditors again sought information concerning the transaction in January and February 2004 in connection with the year-end audit —after discovering the credit memos that reversed the June 2003 transaction — did the accountants first learn that Biovail had recorded the June 30 transaction as a bill and hold. Even then, neither Miszuk nor Crombie told the auditors that Biovail had shipped and invoiced as sample product in August the pills supposedly segregated for the bill and hold transaction in June.

37

124.    Crombie and Miszuk also misled the auditors in early 2004 about the true reason for the September 1, 2003 credit memos. They told them that Biovail had credited out the old invoices so that it could issue new invoices that included packaging costs. The truth was that the Distributor had refused to pay the June 30 invoices and two sets of invoices could not have duplicate lot numbers on them.

**D.    Material Misstatements Concerning Unrecognized Foreign Exchange Loss**

125.    Concurrent with its improper attempt to record unearned revenue through the sham bill and hold transaction, Biovail also sought to conceal its weak second quarter 2003 performance by intentionally failing to record in the second quarter of 2003 approximately $3.9 million in additional losses due to foreign currency fluctuations.

126.    In December 2002 Biovail's Barbados subsidiary acquired from the Wellbutrin XL Distributor the Canadian rights to two pharmaceutical products. Biovail paid a portion of the consideration in cash and borrowed the balance from the Distributor. Although the currency for the transaction was Canadian dollars, Biovail's functional currency is the U.S. dollar, and Biovail reports its financial results in U.S. dollars.

127.    The U.S. GAAP guidance applicable to the translation of foreign currency statements is Statement of Financial Accounting Standards No. 52, *Foreign Currency Translation,* which provides: "All elements of financial statements shall be translated by using a current exchange rate. For assets and liabilities, the exchange rate at the balance sheet dates shall be used." Consistent with this guidance, in its 2002 year-end financial statements filed with the Commission on Form 20-F on May 21, 2003, Biovail correctly reported the outstanding loan obligation in U.S. dollars by applying the then-current exchange rate.

128.    On March 31, 2003, the date of Biovail's first quarter balance sheet, the Canadian

dollar had strengthened against the U.S. dollar since December 31, 2002. Instead of applying the

exchange rate current as of March 31 to translate the outstanding balance due on the loan from

Canadian to U.S. dollars, Biovail translated the outstanding balance using the same exchange

rate that it had applied in its financial statements for the year ended December 31, 2002. As a

result, Biovail's financial statements for the first quarter of 2003, furnished to the Commission

on Form 6-K on May 30, 2003, overstated net income by about 9%.

129.    In Biovail's financial statements for the second quarter of 2003, the Company

repeated the error it had made in the first quarter and again translated the remaining balance into

U.S. dollars using the same exchange rate that Biovail had applied in its annual financial

statements for the year ended December 31, 2002. This time, however, the error was not

inadvertent.

130.    On July 8, 2003, early in the quarterly closing process, the controller for the

Barbados subsidiary and Biovail's senior director of legal accounting, both chartered accountants

who reported to Miszuk, told Miszuk that the remaining outstanding balance should be adjusted

to reflect the June 30 exchange rate and that doing so would generate an additional cumulative

foreign exchange loss of approximately $9 million.

131.    Nevertheless, Miszuk and Biovail did not record the additional foreign exchange

loss, whose recognition Miszuk knew, or recklessly disregarded, would negatively affect

Biovail's second quarter financial results and require a restatement of the first quarter financial

statements – something Miszuk did not want to do.

39

132.    As a result, Biovail's interim financial statements for the quarter ended June 30, 2003, furnished to the Commission on Form 6-K on August 29, 2003, were materially misstated, intentionally or recklessly.  Specifically, for the three-month period ended June 30, 2003, the Company's net loss was understated by about 80%, or approximately $3.9 million, and for the six-month period ended June 30, 2003, the Company's net income was overstated by 18%, or approximately $9.3 million.  Although Miszuk knew about or recklessly disregarded the exchange rate translation error, he nevertheless signed this Form 6-K.

133.    Miszuk also reviewed the July 25 and July 30 management reports and approved them for circulation to, among others, the Company's outside auditors during their second quarter review.  These reports present results for both the three months and six months ended June 30, 2003.  As a result of Biovail's failure to record correctly the foreign exchange loss, the three-month period is misstated in the reports by about $3.9 million and the six-month period, which includes the misstatement for the quarter ended March 31, 2003, is misstated by approximately $9.3 million.  These reports also asserted falsely that all figures were in accordance with U.S. GAAP.  Miszuk knew, or recklessly disregarded, that the financial statements in the management reports as well as that representation were materially false and misleading.

134.    The problem continued into the third quarter of 2003 and resulted in an understatement of quarterly net income of about $3.1 million, or 19%.  For the nine months ended September 30, 2003, the resulting cumulative overstatement of net income was approximately $6.2 million (the $9.3 million overstatement for the first two quarters less $3.1 million understatement in the third quarter), or about 9%.

40

135.    In its March 3, 2004 year-end and fourth quarter 2003 earnings release, Biovail announced that, "in the course of preparing its financial statements for the fourth quarter and the full year 2003, the Company determined that U.S. GAAP requires that the Canadian dollar liability be translated at current rates." The release did not state that Miszuk and Biovail had learned about the issue the previous July.

136.    On May 14, 2004, Biovail furnished to the Commission, on three Forms 6-K/A, its restated interim financial statements for the first, second, and third quarters of 2003. The restatements show that, as a result of the failure to record properly the foreign exchange loss, Biovail's net income was overstated by about 9% for the first quarter, its net loss was understated by 80% for the second quarter, and its net income was understated by about 19% for the third quarter.

137.    Like the March 3 earnings release, each Form 6-K/A contained a statement implying that the error was discovered during the 2003 annual audit: "During the course of the preparation of its annual consolidated financial statements, the Company determined that it had applied an inappropriate exchange rate to a Canadian dollar denominated long-term obligation." Miszuk had learned about the problem much earlier, in July 2003, but on May 14, 2004 he nevertheless signed each of these Forms 6-K/A, which Biovail furnished to the Commission the same day.

138.    The cumulative impact of the misstated foreign exchange loss and the improperly recognized bill and hold revenue was a total understatement of net loss in the second quarter 2003 financial statements by approximately 89%.

**E.      Melnyk Failed to Disclose his Full Biovail Share Ownership**

139.     As a holder of greater than 5% of Biovail's outstanding shares, Melnyk was under a legal obligation to make certain public disclosures concerning his stock ownership under Section 13(d) of the Exchange Act and related rules.  On September 23, 1996, Melnyk settled four Cayman Island trusts and funded the trusts with Biovail shares that were previously held by him personally, directly or indirectly.  The Biovail shares transferred to the trusts represented approximately 19% of the outstanding shares of Biovail at that time.  Melnyk continued to exercise control over the Biovail shares in the trusts.  Nevertheless, he did not include in his public filings pursuant to Section 13(d) of the Exchange Act and related rules any mention of his beneficial ownership of the Biovail shares in the trusts.

Melnyk Had a Beneficial Interest in the Shares Held in the Trusts

140.     By 2003, the four trusts' holdings constituted just under eight percent of the Biovail common shares outstanding and approximately 30 percent of Melnyk's total Biovail holdings.  Each of the four trusts had a "protector."

141.     The controller of Biovail's Barbados subsidiary was separately paid by Melnyk to assist him with issues concerning the trusts, and assumed the role of protector of one of the trusts beginning in 2002.  She also was a liaison between Melnyk and the trustees of all four trusts as well as the account representatives on the trusts' brokerage accounts.  She conferred with Melnyk regularly about the trusts, including their transactions in Biovail securities.

142.     Although the trust documents provide that trustees and the protective committees have investment power over trust assets, including the Biovail shares, Melnyk continued to make decisions concerning both the trusts and the shares they held.

143.   Melnyk decided where the brokerage accounts for the trusts would be held – and hence where the Biovail stock would be held – and how that Biovail stock would be voted in Company elections.  Melnyk similarly directed when and how the trusts would buy and sell Biovail stock.

144.   In addition, Melnyk caused the trustees to sell Biovail stock to fund over $100 million in loans to him from the trusts that he has never repaid.  Melnyk knew or should have known that his requests for loans in certain circumstances could reasonably be expected to trigger sales by the trusts of Biovail securities.

145.   Melnyk was aware of trading by the trusts in Biovail securities and he could, as a practical matter, exercise control over it and could have stopped it if he wished.

Melnyk Did Not Disclose His Ownership of the Trust Shares in any of his Filings Pursuant to Section 13(d) of the Exchange Act

146.   As beneficial owner of more than 5% of the Biovail shares outstanding, Melnyk filed his first Schedule 13-D with the Commission on March 30, 1994.  He has since filed twenty three amended Schedules 13-D through January 17, 2007.  In none of these filings did he disclose his beneficial interest in the Biovail shares held by the trusts, or any material increases or decreases in the trusts' holdings.

F.    **Biovail's Violations of Rule 302(b) of Regulation S-T**

147.   Biovail electronically filed with the Commission certain annual reports on Forms 20-F.  The Commission staff requested the Company to furnish to the staff manually signed signature pages or other documents in which the signatories to such electronic filings

43

acknowledged or otherwise adopted their signatures that appear in typed form within the electronic filings. The Company has not complied with that request and is unable to do so.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

148.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 147.

149.    Crombie and Biovail, directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails, directly and indirectly, have employed or are employing devices, schemes and artifices to defraud.

150.    Crombie and Biovail, singly or in concert, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails, directly and indirectly, have obtained or are obtaining money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and have engaged or are engaging in transactions, practices or courses of business which have operated or would operate as a fraud and deceit upon investors.

151.    Crombie and Biovail, directly or indirectly, singly or in concert, in the offer and sale of securities described herein, have made untrue statements of material fact, or have omitted to state material facts. Among other things, the materially misleading statements or omissions pertained to Pharmatech's expenses and liabilities related to the research and development of certain Biovail products that Crombie and Biovail intentionally did not include on Biovail's

44

interim financial statements for the period ended September 30, 2001, which Biovail

incorporated by reference into the prospectus supplement dated November 15, 2001.

152.    Crombie and Biovail knew or were reckless in not knowing of the activities

described above.

153.    By reason of the foregoing, Crombie and Biovail have violated, and unless

enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of and Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5

154.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 147.

155.    Defendants, singly or in concert, in connection with the purchase and sale of

securities, directly or indirectly, by the use of the means and instrumentalities of interstate

commerce or of the mails, have employed or are employing devices, schemes and artifices to

defraud; have made or are making untrue statements of material fact and have omitted or are

omitting to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and have engaged or are engaging

in acts, practices and courses of business which have operated or would operate as a fraud and

deceit upon investors, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Rule 10b-5 [17 C.F.R. § 240.10b-5].

156.    Defendants knew or were reckless in not knowing of the activities described

above.

157.    By reason of the foregoing, Defendants have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5)].

158.    By reason of the foregoing, Melnyk, Crombie, Miszuk, and Howling aided and abetted Biovail's violations of, and unless enjoined will again aid and abet violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Section 13(b)(5) of the Exchange Act

159.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 147.

160.    Crombie and Miszuk, directly or indirectly, singly or in concert, knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified, directly or indirectly, or caused to be falsified books, records and accounts of Biovail that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

161.    By reason of the foregoing, Crombie and Miszuk have violated, and unless enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

### FOURTH CLAIM FOR RELIEF
### Violations of Rule 13b2-1 of the Exchange Act

162.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 147.

46

163.    Crombie and Miszuk, directly or indirectly, singly or in concert, falsified or caused to be falsified the books, records, and accounts of Biovail that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

164.    By reason of the foregoing, Crombie and Miszuk have violated, and unless enjoined will again violate, Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

**FIFTH CLAIM FOR RELIEF**
**Violations of Rule 13b2-2 of the Exchange Act**

165.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 147.

166.    Crombie and Miszuk were officers of Biovail at all relevant times.

167.    As described above, Crombie and Miszuk, directly or indirectly, singly or in concert, made or caused to be made materially false or misleading statements, or omitted to state or caused another person to omit to state material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to an accountant, in connection with (i) audits, reviews and examinations of the financial statements of Biovail required to be made pursuant to Commission regulations, and (ii) the preparation and filing by Biovail of documents and reports required to be filed with the Commission.

168.    By reason of the foregoing, Crombie and Miszuk have violated, and unless enjoined will again violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## SIXTH CLAIM FOR RELIEF
### Violations of and Aiding and Abetting Violations of Section 13(a)
### of the Exchange Act and Rules 12b-20, 13a-1, and 13a-16

169.   The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 147.

170.   Biovail did not file with the Commission such financial reports as the Commission has prescribed, and Biovail did not include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, in violation of Section 13(a) and of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-16].

171.   By reason of the foregoing, Biovail violated, and Crombie and Miszuk have aided and abetted Biovail's violations of, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-16].

## SEVENTH CLAIM FOR RELIEF
### Violations of and Aiding and Abetting Violations
### of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

172.   The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 147.

173.   Biovail did not:

     a.   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and

48

b.    devise and maintain a system of internal accounting controls sufficient to

provide reasonable assurances that:

    i.    transactions were executed in accordance with management's

general or specific authorization;

    ii.    transactions were recorded as necessary to permit preparation of

financial statements in conformity with generally accepted

accounting principles or any other criteria applicable to such

statements, and to maintain accountability for assets;

    iii.    access to assets was permitted only in accordance with

management's general or specific authorization; and

    iv.    the recorded accountability for assets was compared with the

existing assets at reasonable intervals and appropriate action was

taken with respect to any differences, in violation of Sections

13(b)(2)(A) and 13(B)(2)(B) of the Exchange Act [15 U.S.C.

§§ 78m(b)(2)(A) and 78m(b)(2)(B)].

174.    By reason of the foregoing, Biovail violated, and Crombie and Miszuk have aided

and abetted Biovail's violations of, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

[15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### EIGHTH CLAIM FOR RELIEF
### Violations of Rule 13a-14

175.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 147.

176.    Crombie knew or recklessly disregarded that his certifications of Biovail's 2002 and 2003 Forms 20-F were materially false and misleading.

177.    By reason of the foregoing, Crombie has violated, and unless enjoined will again violate, Rule 13a-14 [17 C.F.R. § 240.13a-14].

### NINTH CLAIM FOR RELIEF
#### Violations of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2

178.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 147.

179.    The common stock of Biovail at all relevant times was registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l].

180.    Pursuant to Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§ 240.13d-1 and 240.13d-2], persons who are directly or indirectly the beneficial owners of more than five percent of the outstanding shares of a class of voting equity securities registered under the Exchange Act are required to file a Schedule 13D within ten days of the date on which their ownership exceeds five percent, and to notify the issuer and the Commission of any material increases or decreases in the percentage of beneficial ownership by filing an amended Schedule 13D. The Schedule 13D filing requirement applies both to individuals and to two or more persons who act as a group for the purpose of acquiring, holding, or disposing of securities of an issuer.

181.    As described above, Melnyk was at all relevant times a beneficial owner of more than 5 percent of Biovail's shares. In addition to the shares that he held in his own name, as a

result of his investment and voting authority over the shares held in the trusts, he also was a beneficial owner of those Biovail shares.

182.    Melnyk and the trusts also were sufficiently interrelated that they constituted a group for the purposes of the Section 13(d) and the Schedule 13D filing requirement.

183.    Accordingly, Melnyk was under an obligation to file with the Commission true and accurate reports with respect to his ownership of the Biovail shares held by the trusts and any material increases or decreases in the percentage of such ownership, pursuant to Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§ 240.13d-1 and 240.13d-2]. He did not do so.

184.    By reason of the foregoing, Melnyk violated and, unless enjoined, will again violate Section 13(d) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.13d-1 and 240.13d-2].

## TENTH CLAIM FOR RELIEF
### Violations of Rule 302(b) of Regulation S-T

185.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 147.

186.    Biovail did not retain and has not produced to the Commission staff upon request manually signed signature pages or other documents authenticating, acknowledging, or otherwise adopting the signatures that appear in typed form within its electronic filings on Form 20-F.

187.    By reason of the foregoing, Biovail has violated, and unless enjoined will again violate, Rule 302(b) of Regulation S-T [17 C.F.R. § 232.302(b)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Crombie and Biovail, their agents, servants, employees, and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### II.

Permanently enjoining Melnyk, Crombie, Miszuk, Howling, and Biovail, their agents, servants, employees, and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5) [17 C.F.R. § 240.10b-5], and Melnyk, Crombie, Miszuk, and Howling from aiding or abetting future violations of Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### III.

Permanently enjoining Biovail, its agents, servants, employees, and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them from future violations of Sections 13(a) and 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-16] and Rule 302(b) of Regulation S-T [17 C.F.R. § 232.302(b)].

## IV.

Permanently enjoining Crombie and Miszuk, their agents, servants, employees, and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them from future violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(5)] and Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2], and from aiding and abetting future violations of Sections 13(a) and 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-16].

## V.

Permanently enjoining Crombie, his agents, servants, employees, and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them from future violations of Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

## VI.

Permanently enjoining Melnyk, his agents, servants, employees, and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them from future violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§ 240.13d-1 and 240.13d-2].

## VII.

Ordering Biovail, Melnyk, Crombie, Miszuk, and Howling to disgorge any ill-gotten gains from the conduct alleged herein and to pay prejudgment interest thereon.

## VIII.

Imposing civil penalties upon Biovail and Crombie pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and upon Biovail, Melnyk, Crombie, Miszuk, and Howling pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IX.

Permanently barring Crombie, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Melnyk, Crombie, Miszuk, and Howling, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## X.

Granting such other and further relief as to this Court seems just and proper.

Dated:  New York, New York
        March 2⁄, 2008

<br>

                                  Mark K. Schonfeld
                                  Regional Director
                                  Attorneys for Plaintiff
                                  SECURITIES AND EXCHANGE
                                  COMMISSION
                                  3 World Financial Center
                                  New York, NY  10281-1022
                                  (212) 336-1020

Of Counsel:

Andrew M. Calamari
Robert J. Keyes
Todd D. Brody
Celeste A. Chase
Catherine Smith

| | |
|---|---|
| From: | John Miszuk |
| Sent: | Tuesday, July 08, 2003 5:13 PM |
| To: | Peter McLean; Arlene Fong |
| Subject: | RE: Payments made in June per contracts |

can we discuss this on thursday can I see some analysis on this

-----Original Message-----
From:        Peter McLean
Sent:        Tuesday, July 08, 2003 1:11 PM
To:          Arlene Fong; John Miszuk
Subject:     RE: Payments made in June per contracts

Arlene,

Yes, the difference should be recorded as a realized FX loss. Additionally, shouldn't the remaining loan balance be adjusted to reflect the FX rate in effect at June 30th? I believe it should (even though this was missed at March 31st), which would result in an additional FX loss of approx. $9.2 million in Q2 - something tells me the boys aren't going to like that.

Peter

-----Original Message-----
From:        Arlene Fong
Sent:        Tuesday, July 08, 2003 11:58 AM
To:          Peter McLean; John Miszuk
Subject:     RE: Payments made in June per contracts

Thanks Pete.

With regards to item 1 below, using actual exchange rates the US equivalent is $20,168,067.23 (versus the $17,494,929 per your Prod Rights Valuation schedule for Bupropion Canada).

Please confirm that the difference of US$2,673,138.23 should be recorded in a/c 8010, Realized For Ex Loss.

Arlene

-----Original Message-----
From:        Peter McLean
Sent:        Tuesday, July 08, 2003 11:38 AM
To:          Arlene Fong; John Miszuk
Subject:     RE: Payments made in June per contracts

Hi Arlene,

The Ativan valuation is not complete. Record the actual BLI payments made to product rights and we will adjust on consolidation. As for 4 and 5, I was not even aware of either of these transactions. I would just park the payment for 4 in product rights and the accrual for 5 in investments until the Molson boys decide to share the details of these deals with us.

Peter

-----Original Message-----
From:        Arlene Fong
Sent:        Tuesday, July 08, 2003 11:19 AM
To:          Peter McLean; John Miszuk
Subject:     FW: Payments made in June per contracts

1

FOIA Confidential Treatment Requested

BVF 155000

EX. 184

**Importance:**    High

Hi Pete/John

As you know our reports are due tomorrow. We still have some o/s entries to put through BLI......can you assist?

Do you have any further info relating to entries 2-5 noted below?

2.3. Do you have the valuation from E&Y (re:AWPI products-ativan and Isordil) or will this be a late consolidation entry?

4. Should we record the $33mm as product rights? Do you have a copy of the agreement or any additional info that we should be aware of? Amort period? Is this the full amount for the purchase of the prod right-gen prilosec?

5. Should we record this as a long term or short term investment in a joint venture? Is this to be record at cost only? Do you have a copy of the agreement or any additional info that we should be aware of?

Any assistance will be appreciated!

Thanks

Arlene

-----Original Message-----
**From:**      Neil Titus
**Sent:**      Tuesday, July 08, 2003 10:38 AM
**To:**        Arlene Fong
**Cc:**        John McCleery; Chris Humphrey
**Subject:**   RE: Payments made in June per contracts
**Importance:** High

Hi Arlene

I have discussed the payments 2-5 below with Chris Bovaird and he has advised as follows. The first payment is to be treated as per Peter Maclean's PV schedule.

1. This payment is a reduction to the current portion of the long term obligation re Wellbutrin CDN.
2.,3. These payments together form part of the purchase price and are to be recorded under Product Rights. The 2 remaining payments under the Manufacturing and Supply Agreement are to discounted and recorded as Product Rigts. E&Y is currently working on the exact calculation.
4. This payment relates to the acquisition of Product Rights to Generic Prilosec
5. This relates to the investment in a joint venture.

Regards
Neil

-----Original Message-----
**From:**      Arlene Fong
**Sent:**      Monday, July 07, 2003 4:34 PM
**To:**        Neil Titus
**Cc:**        John McCleery; Chris Humphrey
**Subject:**   Payments made in June per contracts
**Importance:** High

Hi Neil

In June the following payments were made in compliance with BLI contracts:

2

FOIA Confidential Treatment Requested

BVF 155001

1. June 2nd CAD$27,600,000 to GSK as per Article 8.1(b) of the Rights agreement dated Dec 1, 2002
2. June 2nd US$9,150,000 to AWPI as per section 5.2 Man & Supply Agreement
3. June 2nd US$130,000,000 to Wyeth as per section 2.1 of the Asset Purchase Agreement
4. June 30th US$33,000,000 to The Phama Pass Liquidating Account
5. June 30th US$30,060,000 to Pharma Pass LLC (actual transfer date was July 2nd)

Please provide a summary identifying the accounting treatment for each item, along with copies of any relevant documentation confirming same.  (We need this ASAP as f/s's are due Wed)

Let me know if you have any questions.

Thanks

Arlene


Arlene Fong, CA
Controller
Biovail Laboratories Inc.
Chelston Park, Building 2, Gr Fl
Collymore Rock, St. Michael, Barbados, WI
Phone 246-437-7080
Fax 246-437-7085

The information contained in this e-mail message may be privileged and confidential information and is intended only for the use of the individual and/or entity identified in the address of this message. If the reader of this message is not the intended recipient, or an employee or agent responsible to deliver it to the intended recipient, you are hereby requested not to distribute or copy this communication. If you have received this communication in error, please notify us immediately by calling us collect at (246)437-7080, or by so advising us by return e-mail. In this circumstance, we request that you delete the original message from your system.

FOIA Confidential Treatment Requested

BVF 155002

| From: | Peter McLean |
|---|---|
| Sent: | Thursday, July 10, 2003 6:02 PM |
| To: | Arlene Fong; John Miszuk |
| Subject: | RE: Payments made in June per contracts |

Arlene,

Submit without booking the additional exchange loss - John and I still need to review the issue.

Pete

   -----Original Message-----

| From: | Arlene Fong |
|---|---|
| Sent: | Thursday, July 10, 2003 12:57 PM |
| To: | Peter McLean; John Miszuk |
| Subject: | RE: Payments made in June per contracts |

Any decisions on this?  Are we to book the additional exchange loss?

   -----Original Message-----

| From: | Peter McLean |
|---|---|
| Sent: | Tuesday, July 08, 2003 1:17 PM |
| To: | Arlene Fong; John Miszuk |
| Subject: | RE: Payments made in June per contracts |

Yes, let's talk to John on Thursday.  In the meantime, can you confirm that BLI is paying GSK in Canadian dollars.

   -----Original Message-----

| From: | Arlene Fong |
|---|---|
| Sent: | Tuesday, July 08, 2003 1:16 PM |
| To: | Peter McLean; John Miszuk |
| Subject: | RE: Payments made in June per contracts |

Yes, I would agree that we should book the addition amount....should I wait till we discuss with John?

   -----Original Message-----

| From: | Peter McLean |
|---|---|
| Sent: | Tuesday, July 08, 2003 1:11 PM |
| To: | Arlene Fong; John Miszuk |
| Subject: | RE: Payments made in June per contracts |

Arlene,

Yes, the difference should be recorded as a realized FX loss.  Additionally, shouldn't the remaining loan balance be adjusted to reflect the FX rate in effect at June 30th?  I believe it should (even though this was missed at March 31st), which would result in an additional FX loss of approx. $9.2 million in Q2 - something tells me the boys aren't going to like that.

Peter

   -----Original Message-----

| From: | Arlene Fong |
|---|---|
| Sent: | Tuesday, July 08, 2003 11:58 AM |
| To: | Peter McLean; John Miszuk |
| Subject: | RE: Payments made in June per contracts |

Thanks Pete.

With regards to item 1 below, using actual exchange rates the US equivalent is $20,168,067.23 (versus the $17,494,929 per your Prod Rights Valuation schedule for Bupropion Canada).

Please confirm that the difference of US$2,673,138.23 should be recorded in a/c 8010, Realized For Ex Loss.

FOIA Confidential Treatment Requested                                              BVF 155070

Arlene

-----Original Message-----
**From:**      Peter McLean
**Sent:**      Tuesday, July 08, 2003 11:38 AM
**To:**        Arlene Fong; John Miszuk
**Subject:**   RE: Payments made in June per contracts

Hi Arlene,

The Ativan valuation is not complete.  Record the actual BLI payments made to product rights and we will adjust on consolidation.  As for 4 and 5, I was not even aware of either of these transactions.  I would just park the payment for 4 in product rights and the accrual for 5 in investments until the Molson boys decide to share the details of these deals with us.

Peter

-----Original Message-----
**From:**        Arlene Fong
**Sent:**        Tuesday, July 08, 2003 11:19 AM
**To:**          Peter McLean; John Miszuk
**Subject:**     FW: Payments made in June per contracts
**Importance:**  High

Hi Pete/John

As you know our reports are due tomorrow.  We still have some o/s entries to put through BLI......can you assist?

Do you have any further info relating to entries 2-5 noted below?

2.3. Do you have the valuation from E&Y (re:AWPI products-ativan and Isordil) or will this be a late consolidation entry?

4. Should we record the $33mm as product rights?  Do you have a copy of the agreement or any additional info that we should be aware of?  Amort period?  Is this the full amount for the purchase of the prod right-gen prilosec?

5. Should we record this as a long term or short term investment in a joint venture?  Is this to be record at cost only?  Do you have a copy of the agreement or any additional info that we should be aware of?

Any assistance will be appreciated!

Thanks

Arlene

-----Original Message-----
**From:**        Neil Titus
**Sent:**        Tuesday, July 08, 2003 10:38 AM
**To:**          Arlene Fong
**Cc:**          John McCleery; Chris Humphrey
**Subject:**     RE: Payments made in June per contracts
**Importance:**  High

Hi Arlene

I have discussed the payments 2-5 below with Chris Bovaird and he has advised as follows.  The first payment is to be treated as per Peter Maclean's PV schedule.

1. This payment is a reduction to the current portion of the long term obligation re Wellbutrin CDN.

2

FOIA Confidential Treatment Requested                                                    BVF 155071

2.,3. These payments together form part of the purchase price and are to be recorded under Product Rights. The 2 remaining payments under the Manufacturing and Supply Agreement are to discounted and recorded as Product Rigts. E&Y is currently working on the exact calculation.
4. This payment relates to the acquisition of Product Rights to Generic Prilosec
5. This relates to the investment in a joint venture.

Regards
Neil


-----Original Message-----
| | |
|---|---|
| From: | Arlene Fong |
| Sent: | Monday, July 07, 2003 4:34 PM |
| To: | Neil Titus |
| Cc: | John McCleery; Chris Humphrey |
| Subject: | Payments made in June per contracts |
| Importance: | High |

Hi Neil

In June the following payments were made in compliance with BLI contracts:

1. June 2nd CAD$27,600,000 to GSK as per Article 8.1(b) of the Rights agreement dated Dec 1, 2002
2. June 2nd US$9,150,000 to AWPI as per section 5.2 Man & Supply Agreement
3. June 2nd US$130,000,000 to Wyeth as per section 2.1 of the Asset Purchase Agreement
4. June 30th US$33,000,000 to The Phama Pass Liquidating Account
5. June 30th US$30,060,000 to Pharma Pass LLC (actual transfer date was July 2nd)

Please provide a summary identifying the accounting treatment for each item, along with copies of any relevant documentation confirming same. (We need this ASAP as f/s's are due Wed)

Let me know if you have any questions.

Thanks

Arlene


Arlene Fong, CA
Controller
Biovail Laboratories Inc.
Chelston Park, Building 2, Gr Fl
Collymore Rock, St. Michael, Barbados, WI
Phone 246-437-7080
Fax 246-437-7085

The information contained in this e-mail message may be privileged and confidential information and is intended only for the use of the individual and/or entity identified in the address of this message. If the reader of this message is not the intended recipient, or an employee or agent responsible to deliver it to the intended recipient, you are hereby requested not to distribute or copy this communication. If you have received this communication in error, please notify us immediately by calling us collect at (246)437-7080, or by so advising us by return e-mail. In this circumstance, we request that you delete the original message from your system.

3

FOIA Confidential Treatment Requested

BVF 155072



SITE MAP  |  CONTACT US

HOME     ABOUT BIOVAIL     INVESTOR RELATIONS     PRODUCTS     DRUG-DELIVERY TECHNOLOGIES

CAREERS

## Investor Relations



| Financials |
| --- |
| Stock Watch |
| Earnings Estimate |
| Fundamentals |
| Trading Statistics * |
| Ratios * |
| Balance Sheet Highlights * |
| Cash Flow Highlights * |
| Income Statement Highlights * |
| Shareholder Reports |
| Webcasts |
| Regulatory Filings |
| **Product Pipeline** |
| **About Biovail** |
| The Company |
| Business Strategy |
| Affiliated Companies |
| Corporate Governance |
| Press Room |
| Contact Us |
| **Investor Contact** |
| Analysts |
| Request Investor Information |
| **Corporate Fact Sheet** |
| **2006 Annual Report** |

**Biovail Provides Guidance on 2003 Third Quarter Results**

TORONTO--(BUSINESS WIRE)--Oct. 3, 2003--Biovail Corporation (NYSE:BVF)(TSX:BVF) announced today that while it has not completed a final compilation and analysis of its 2003 third quarter, preliminary results indicate that revenues will be below previously issued guidance and will be in the range of $215 million to $235 million and earnings per share of $0.35 to $0.45 for the three months ended September 30, 2003. Contributing significantly to this unfavorable variance was the loss of revenue and income associated with a significant in-transit shipment loss of Wellbutrin XL as a result of a traffic accident.

After leaving Biovail's Steinbach, Manitoba manufacturing facility on September 30, 2003, a truck carrying a material shipment of Wellbutrin XL was involved in a multi-vehicle traffic accident at approximately 4 p.m. eastern standard time October 1, 2003 near Chicago, Illinois. While this product may still be salable in the future, it must first be returned for inspection to Biovail's manufacturing facility in Manitoba to ensure it is still within acceptable specifications. Revenue associated with this shipment is in the range of $10 to $20 million. The manufacturing cost value of this shipment was fully insured.

As a result of numerous recent inquiries, Biovail also comments on two additional items associated with third quarter income.

Biovail has an economic interest in the gross profits derived from the sales of a generic version of omeprazole. The distributor of this generic omeprazole product has announced that it will provide significant price reductions on a retroactive basis to wholesalers. This distributor has also indicated that it will be lowering its financial guidance for this product given lower pricing and for competitive reasons. Biovail's second half 2003 financial guidance assumed that additional competition for generic omeprazole would seriously erode the financial benefit to the Company's interest in the gross profits of this product. However, since Biovail shares in a percentage of the gross profit of this product, significant credits issued by the distributor during the third quarter 2003 could have a negative effect on Biovail's participating interest of up to $15 million in net income. As well, it can be anticipated that there could be a fourth quarter 2003 negative income impact of $15 to $20 million.

During the third quarter 2003, Biovail was working with Aventis, the supplier of branded Cardizem CD product, to alleviate a back order position that existed at the end of June 2003. Considerable progress was made in this regard during the third quarter 2003 and additional shipments from Aventis were received in Q3 however, further shipments, which had been anticipated prior to September 30, 2003 arrived immediately following quarter-end. As a result, these additional shipments will not be included in third quarter

### Tools

INVESTMENT CALCULATOR

EMAIL ALERTS
Alert me on....     Go!

### Resources

2008 Management Proxy Circular

Q1-08 Earnings

2006 Annual Report

**Corporate Fact Sheet**

.IMPORTANT: Income Tax Information for Canadian Resident Shareholders

Download Adobe Acrobat Reader

### Events

2003 revenue as expected but will favorably impact fourth quarter 2003 revenue. During third quarter 2003, approximately half of the June 30, 2003 back order position was alleviated however, due to continued strong sales of Cardizem CD 360 mg and new orders for this dosage strength, backorders have increased to approximately $18 million as at September 30, 2003. We will continue to work with Aventis to rectify this situation expeditiously.

Biovail management it will host a conference call and webcast on Friday, October 3rd, 2003 at 10:30 a.m. EST for company executives to discuss 2003 third quarter earnings guidance. Following the discussion, Biovail executives will address inquiries from investment analysts.

A live webcast of this call will be available through the Investor Relations section of the Biovail web site, www.biovail.com . Alternately, please dial 1-800-884-5695 (North America.) or 1-617-786-2960 for International callers, with passcode 29341981, to access the conference call. A replay of the conference call will be available until 7:00 p.m. EST on Friday, October 10th, 2003 by dialing 1-888-286-8010 (North America) or 1-617-801-6888 for International callers, using access code, 45094403.

Biovail Corporation is an international full-service pharmaceutical company, engaged in the formulation, clinical testing, registration, manufacture, sale and promotion of pharmaceutical products utilizing advanced drug delivery technologies.

For further information, please contact Ken Howling at 905-286-3000 or send inquiries to ir@biovail.com.

"Safe Harbor" statement under the Private Securities Litigation Reform Act of 1995.

To the extent any statements made in this release contain information that is not historical, these statements are essentially forward looking and are subject to risks and uncertainties, including the difficulty of predicting FDA approvals, acceptance and demand for new pharmaceutical products, the impact of competitive products and pricing, new product development and launch, reliance on key strategic alliances, availability of raw materials, the regulatory environment, fluctuations in operating results and other risks detailed from time to time in the company's filings with the Securities and Exchange Commission.

CONTACT: Biovail Corporation
        Ken Howling, 905-286-3000

SOURCE: Biovail Corporation

© 2007 Biovail Corporation - All Rights Reserved (BIO113B0602)

**PRIVACY POLICY** | **DISCLAIMERS**

Deutsche Bank Securities Inc.

US

Pharmaceuticals/Specialty



March 4, 2004

# Biovail Corporation

Q4: Another EPS Shortfall - and Biovail Lowers the Bar, Again

Rating

## Hold

Price at 3/3/04

## US$ 18.60

Target Price

## US$ 19

Exchange: Ticker

## NYSE: BVF

| FY: (Dec.) | 1Q | 2Q | 3Q | 4Q | FY EPS | FY P/E | CY EPS | CY P/E | Rev MM |
|---|---|---|---|---|---|---|---|---|---|
| EPS (US$): | | | | | | | | | |
| 2003A | $0.39 | $0.47 | $0.22 | $0.15 | $1.23 | 15.1x | $1.23 | 15.1x | $823.7 |
| 2004E | 0.15 | 0.26 | 0.37 | 0.51 | 1.29 | 14.4 | 1.29 | 14.4 | 876.2 |
| Old 2004E | NE | NE | NE | NE | 2.10 | | 2.10 | | 990.0 |
| 2005E | NE | NE | NE | NE | 1.55 | 12.0 | 1.55 | 12.0 | 981.4 |
| Source: Deutsche Bank Securities estimates and company data | | | | | | | | | |

| | | | |
|---|---|---|---|
| 52-Week Range: | $51-$16 | ROE: | 22% |
| Shares Outstanding: (MM) | 160.43 | Div./Yield: | $0.00/0.00% |
| Market Cap: (MM) | $2,983.92 | 3-5 Yr. Grth. Rate: | 20% |
| Float: (MM) | 0.00 | CY 04 P/E-to-Grth: | 0.7x |
| Avg. Daily Volume: | 1,660.54 | | |

- Biovail reported Q4 EPS of $0.15, excluding certain one-time items, versus our estimate of $0.34, primarily due to much lower-than-expected pharmaceutical revenues ($84M lower than our forecast).

- On the heels of dramatically lowering guidance last quarter, management took the opportunity to lower the bar again - on more conservative sales expectations and heightened investments in its business. While we like management's focus on building a sustainable, long-term pharmaceutical growth business, execution remains a concern.

- Therefore, we remain cautious on Biovail's outlook and are taking a "wait and see" approach toward the ability to drive prescription growth for the company's core, promoted products. Our new 2004 revenue and EPS estimates are $876M and $1.29, respectively, versus our prior forecasts of $980M and $2.10.

- While the company's shares appear very inexpensive - trading at 14.4x our revised 2004 EPS estimate and 12.0x our revised 2005 EPS estimate - and partner GSK continues to achieve very impressive conversion of its $1.5 billion Wellbutrin franchise to Biovail's once-daily product, we are maintaining our HOLD rating, given the uncertainty surrounding the ongoing informal SEC inquiry and the continued poor transparency in the company's base business. Target price being lowered to $19 from $25.

**David M. Steinberg**
415-617-3296
david.m.steinberg@db.com

**Rhett E. Brown, CFA**
415-617-4233
rhett.e.brown@db.com

**Edward Y. Chung**
415-617-3301
edward.y.chung@db.com

**David A. Raksin**
415-617-3239
david.raksin@db.com

Deutsche Bank does and seeks to do business with companies covered in its research reports. Thus, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report.
Investors should consider this report as only a single factor in making their investment decision.
DISCLOSURES AND ANALYST CERTIFICATIONS ARE LOCATED AT THE END OF THE TEXT OF THIS RESEARCH

March 4, 2004                    Deutsche Bank Securities Inc.                    Deutsche Bank 

Yesterday, Biovail reported operating 4Q03 EPS of $0.15 (versus $0.60), excluding a number of one-time items, versus our estimate of $0.34. The principal reason for this shortfall was significantly lower-than-expected pharmaceutical revenues, which were $84.3 million lower than our forecast at $168.3 million.

## More One-time Items - $120 Million Worth

The one-time items this quarter, with net charges totaling $120 million, were again dominated by significant write-down of assets ($45 million related to Rondec and Cedax), acquired R&D charges ($22 million), and restructuring costs ($4.4 million). Biovail also took a one-time hit of $61 million on the elimination of royalty obligations related to the discontinuation its co-promotion agreement with Reliant. We are, however, not including $20 million in returns provision among the one-time items, as we view it as ongoing operating expense. In all, the one-time items this quarter had a negative EPS impact of $0.75, leading to a loss per share of $0.60 for Biovail on a U.S. GAAP basis.

Total revenues were $199.7 million, representing a decrease of 16% year-over-year.

## Lowering the Bar Part II - with More Conservative Sale Expectations and Even Greater Investments in Sales and Marketing

With respect to the all-important outlook, management appears to have taken the opportunity of much diminished investor expectations to further lower the bar for 2004. We note that 2004 estimates were already lowered on October 30 to $2.10 from previous guidance. This new outlook primarily reflects the following:

1) improved outlook for the launch of Wellbutrin XL by partner GlaxoSmithKline (roughly 20%-25% higher than prior guidance),

2) lowered expectations of the company's legacy brands and generic portfolio (approximately 16%-24% lower than prior guidance), which continue to experience declines in demand, and

3) management's commitment to increase investments in the company's sales and marketing infrastructure in order to achieve longer term organic growth from its core, promoted products. As for the sales and marketing, Biovail now anticipates adding two new specialty sales forces (63 representatives each) - one targeting cardiologists and nephrologists, the other focusing on dermatologists and OB/GYN's - with the hopes of gaining increased penetration among specialists for Cardizem LA, Teveten, and Zovirax Cream.

Based on these assumptions and new initiatives, the company now projects revenues in the range of $800 million-$940 million and EPS in the range of $1.35-$1.70, versus our prior estimates of $980 million and $2.10, respectively. On the expense side (including the new sales force additions), SG&A is now projected to be in the range of $300-$350 million, versus our

March 4, 2004          Deutsche Bank Securities Inc.                    Deutsche Bank 

previous estimate of $262 million. Management views this new guidance, which excludes one-time charges, as conservative.

While we like management's focus on building a sustainable, long-term pharmaceutical growth business, questions have increased surrounding their execution, particularly in light of yet another lowering of expectations. Therefore, we remain cautious on Biovail's outlook and are taking a "wait and see" attitude in management's ability to drive prescription growth for the company's core, promoted products, which continue to experience "sluggish" prescription trends. This is in addition to the other reason for our neutral rating - the ongoing SEC investigation.

### New Estimates

Accordingly, we have revised our quarterly EPS estimates as follows: $0.15 (versus our prior estimate of $0.34) for Q1, $0.26 (versus our prior estimate of $0.46) for Q2, $0.37 (versus our prior estimate of $0.57) for Q3, and $0.51 (versus our prior estimate of $0.72) for Q4. For 2004, we are now projecting EPS of $1.29 on revenues of $876 million.

### Valuation and Outlook

While the company's shares appear very inexpensive - trading at 14.4x our revised 2004 EPS estimate and 12.0x our revised 2005 EPS estimate - and partner GSK continues to achieve significant conversion of its $1.5 billion Wellbutrin franchise to Biovail's once-daily product, we are maintaining our HOLD rating, given the uncertainty surrounding the ongoing informal SEC inquiry and the continued poor transparency in the company's base business.

Our new 12-month price target is $19 (from $25), representing 12.5x our new 2005 EPS estimate of $1.55 (a 60% discount to a group of comparable specialty pharmaceutical companies). Potential risks to this target being achieved include a quick resolution to the SEC investigation and a significant turnaround in Rx trends.

The views expressed in this report accurately reflect the personal views of the undersigned lead analyst(s) about the subject issuer and the securities of the issuer. In addition, the undersigned lead analyst(s) has not and will not receive any compensation for providing a specific recommendation or view in this report. David M. Steinberg.

**For disclosures pertaining to recommendations or estimates made on securities other than the primary subject of this research, please visit our global disclosure look-up page on our website at http://equities.research.db.com.**

**Additional information available on request**

March 4, 2004          **Deutsche Bank Securities Inc.**                Deutsche Bank 

The information and opinions in this report were prepared by Deutsche Bank AG or one of its affiliates (collectively "Deutsche Bank"). The information herein is believed by Deutsche Bank to be reliable and has been obtained from public sources believed to be reliable, but Deutsche Bank makes no representation as to the accuracy or completeness of such information.

Deutsche Bank may engage in securities transactions in a manner inconsistent with this research report and with respect to securities covered by this report, will sell to or buy from customers on a principal basis. Disclosures of conflicts of interest, if any, are discussed at the end of the text of this report or on the Deutsche Bank website at http://equities.research.db.com.

Opinions, estimates and projections in this report constitute the current judgement of the author as of the date of this report. They do not necessarily reflect the opinions of Deutsche Bank and are subject to change without notice. Deutsche Bank has no obligation to update, modify or amend this report or to otherwise notify a reader thereof in the event that any matter stated herein, or any opinion, projection, forecast or estimate set forth herein, changes or subsequently becomes inaccurate, or if research on the subject company is withdrawn. Prices and availability of financial instruments also are subject to change without notice. This report is provided for informational purposes only. It is not to be construed as an offer to buy or sell or a solicitation of an offer to buy or sell any financial instruments or to participate in any particular trading strategy in any jurisdiction. The financial instruments discussed in this report may not be suitable for all investors and investors must make their own investment decisions using their own independent advisors as they believe necessary and based upon their specific financial situations and investment objectives. If a financial instrument is denominated in a currency other than an investor's currency, a change in exchange rates may adversely affect the price or value of, or the income derived from, the financial instrument, and such investor effectively assumes currency risk. In addition, income from an investment may fluctuate and the price or value of financial instruments described in this report, either directly or indirectly, may rise or fall. Furthermore, past performance is not necessarily indicative of future results.

Unless governing law provides otherwise, all transactions should be executed through the Deutsche Bank entity in the investor's home jurisdiction. In the U.S. this report is approved and/or distributed by Deutsche Bank Securities Inc., a member of the NYSE, the NASD, NFA and SIPC. In the United Kingdom this report is approved and/or communicated by Deutsche Bank AG London, a member of the London Stock Exchange. This report is distributed in Hong Kong by Deutsche Bank AG, Hong Kong Branch, in Korea by Deutsche Securities Korea Co. and in Singapore by Deutsche Bank AG, Singapore Branch. In Japan this report is approved and/or distributed by Deutsche Securities Limited, Tokyo Branch. **Additional information relative to securities, other financial products or issuers discussed in this report is available upon request.** This report may not be reproduced, distributed or published by any person for any purpose without Deutsche Bank's prior written consent. Please cite source when quoting.

March 4, 2004                        **Deutsche Bank Securities Inc.**                        Deutsche Bank

Copyright (c) 2004  Deutsche Bank AG

Deutsche Bank Securities Inc.

60 Wall Street

New York, NY 10005

(1)212 250 2500

---

## *Disclosures*

**Additional information is available upon request**.

Deutsche Bank and/or its affiliate(s) owns one  percent or more of any class of common equity securities of the following companie(s): Biovail Corporation.

Deutsche Bank and/or its affiliate(s) was a member of a syndicate which has underwritten, within the last five years, the last offering of the following companie(s): Biovail Corporation.

Deutsche Bank and/or its affiliate(s) holds a trading position, as that term is defined by German law, in shares of the company whose securities are subject of the research: Biovail Corporation.

March 4, 2004                     **Deutsche Bank Securities Inc.**                     Deutsche Bank 

## Historical Recommendations and Target Price: Biovail Corporation (BVF)

*(as of 3/3/2004)*



Previous Recommendations

Strong Buy
Buy
Market Perform
Underperform
Not Rated
Suspended Rating

Current Recommendations

Buy
Hold
Sell
Not Rated
Suspended Rating

*New Recommendation Structure as of September 9, 2002

| | |
|---|---|
| 1. 10/26/2001: Rating Initiated Strong Buy, Target Price Change $65.00 | 5. 10/30/2003: , Target Price Change $31.00 |
| 2. 3/19/2002: Strong Buy, Target Price Change $67.00 | 6. 11/21/2003: Downgrade to Hold, Target Price Change $21.00 |
| 3. 10/30/2002: , Target Price Change $57.00 | 7. 1/22/2004: Hold, Target Price Change $25.00 |
| 4. 10/6/2003: , Target Price Change $47.00 | 8. 3/3/2004: Hold, Target Price Change $19.00 |

## Rating Key

**Buy:** Total return expected to appreciate 10% or more over a 12-month period

**Hold:** Total return expected to be between 10% to −10% over a 12-month period

**Sell:** Total return expected to depreciate 10% or more over a 12-month period

## Rating Dispersion and Banking Relationships



North American Universe

## Deutsche Bank Equity Sales Offices, Americas

| | | | |
|---|---|---|---|
| **Deutsche Bank Securities Inc.**<br>3414 Peachtree Road, N.E.<br>Suite 660<br>Atlanta, GA 30326<br>(404) 442 6835 | **Deutsche Bank Securities Inc.**<br>1 South Street<br>Baltimore, MD 21202<br>(410) 727 1700 | **Deutsche Bank Securities Inc.**<br>225 Franklin Street 25th Floor<br>Boston, MA 02110<br>(617) 988 8600 | **Deutsche Bank Securities Inc.**<br>222 West Adams Street<br>Suite 1900<br>Chicago, IL 60606<br>(312) 424 6000 |
| **Deutsche Bank Securities Inc.**<br>60 Wall Street<br>New York, NY 10005<br>(212) 250 2500 | **Deutsche Bank Securities Inc.**<br>101 California Street<br>46th Floor<br>San Francisco, CA 94111<br>(415) 617 2800 | **Deutsche Bank Securities Inc.**<br>3033 East First Avenue<br>Suite 303, Third Floor<br>Denver, CO 80206<br>(303) 394 6800 | **Deutsche Bank Securities Limited**<br>222 Bay Street, Suite 1100<br>P.O. Box 64<br>Toronto-Dominion Centre<br>Toronto, Ontario M5K 1E7<br>(416) 682 8000 |
| **Deutsche Bank Securities Limited.**<br>999, de Maisonneuve Blvd., West<br>Suite 825<br>Montreal, QC H3A 3L4<br>(514) 875 2252 | **Deutsche Bank**<br>Correctora de Valores<br>Rua Alexandre Dumas 2200<br>CEP 04717-910 São Paulo<br>SP Brazil<br>(5511) 5189 5000 | **Deutsche Bank SA - Mexico**<br>Edificio Torre Esmeralda<br>Blvd. Manuel Avila Camacho<br>No. 40, Piso 17,<br>Col. Lomas de Chapultepec,<br>11000 Mexico, DF<br>(525) 201 8000 | **Deutsche Bank SA - Argentina**<br>Tucuman 1, 14th Floor<br>C1049AAA<br>Buenos Aires, Argentina<br>(5411) 459 02968 |
| **Deutsche Securities Corredores de Bolsa Ltda**<br>El Bosque 130, Las Condes<br>Santiago, Chile<br>(562) 337 7700 | | | |

## Deutsche Bank Equity Sales Offices, International

| | | | |
|---|---|---|---|
| **Deutsche Bank AG**<br>Taunusanlage 12<br>3rd Floor<br>Frankfurt, Germany 60325<br>(49) 69 9103 7597 | **Deutsche Bank AG Geneva**<br>7, Rue Du Rhone, 1st Floor<br>Geneva, Switzerland, 1204<br>(41) 22 319 4000 | **Deutsche Bank AG London**<br>1 Great Winchester Street<br>London EC2N 2EQ<br>United Kingdom<br>(44) 207 545 4900 | **Deutsche Bank AG Paris**<br>3, Avenue de Friedland<br>75008 Paris, France<br>(33) 1 5375 2446 |
| **Deutsche Securities Australia Limited**<br>Level 19, Grosvenor Place<br>225 George Street<br>Sydney, NSW 2000 Australia<br>(61) 2 9258 1234 | **Deutsche Securities Limited, Tokyo**<br>2-11-1 Nagatacho, 20th Floor<br>Sanno Park Tower<br>Chiyodu-ku, Tokyo 100-6171<br>(813) 5401 6990 | **Deutsche Bank AG Zurich**<br>Bahnhofquai 9-11<br>CH-8023 Zurich, Switzerland<br>(411) 224 7979 | **Deutsche Bank AG**<br>Via G. Guisan 6<br>6902 Lugano, Switzerland<br>(4191) 803 4000 |



## Additional information available on request

The information and opinions in this report were prepared by Deutsche Bank AG or one of its affiliates (collectively "Deutsche Bank"). The information herein is believed by Deutsche Bank to be reliable and has been obtained from public sources believed to be reliable, but Deutsche Bank makes no representation as to the accuracy or completeness of such information.

Deutsche Bank may engage in securities transactions in a manner inconsistent with this research report and with respect to securities covered by this report, will sell to or buy from customers on a principal basis. Disclosures of conflicts of interest, if any, are discussed at the end of the text of this report or on the Deutsche Bank website at http://equities.research.db.com.

Opinions, estimates and projections in this report constitute the current judgement of the author as of the date of this report. They do not necessarily reflect the opinions of Deutsche Bank and are subject to change without notice. Deutsche Bank has no obligation to update, modify or amend this report or to otherwise notify a reader thereof in the event that any matter stated herein, or any opinion, projection, forecast or estimate set forth herein, changes or subsequently becomes inaccurate, or if research on the subject company is withdrawn. Prices and availability of financial instruments also are subject to change without notice. This report is provided for informational purposes only. It is not to be construed as an offer to buy or sell or a solicitation of an offer to buy or sell any financial instruments or to participate in any particular trading strategy in any jurisdiction. The financial instruments discussed in this report may not be suitable for all investors and investors must make their own investment decisions using their own independent advisors as they believe necessary and based upon their specific financial situations and investment objectives. If a financial instrument is denominated in a currency other than an investor's currency, a change in exchange rates may adversely affect the price or value of, or the income derived from, the financial instrument, and such investor effectively assumes currency risk. In addition, income from an investment may fluctuate and the price or value of financial instruments described in this report, either directly or indirectly, may rise or fall. Furthermore, past performance is not necessarily indicative of future results.

Unless governing law provides otherwise, all transactions should be executed through the Deutsche Bank entity in the investor's home jurisdiction. In the U.S. this report is approved and/or distributed by Deutsche Bank Securities Inc., a member of the NYSE, the NASD, NFA and SIPC. In the United Kingdom this report is approved and/or communicated by Deutsche Bank AG London, a member of the London Stock Exchange. This report is distributed in Hong Kong by Deutsche Bank AG, Hong Kong Branch, in Korea by Deutsche Securities Korea Co. and in Singapore by Deutsche Bank AG, Singapore Branch. In Japan this report is approved and/or distributed by Deutsche Securities Limited, Tokyo Branch. **Additional information relative to securities, other financial products or issuers discussed in this report is available upon request.** This report may not be reproduced, distributed or published by any person for any purpose without Deutsche Bank's prior written consent. Please cite source when quoting.

Copyright © 2004 Deutsche Bank AG

20020909-FCSGL-US



# CIBC World Markets

**Equity Research**
**Change in Recommendation**

March 3, 2004

Specialty Pharmaceuticals

**Company Rating:**

## Sector Underperformer

**Sector Weighting:**

## Overweight

| | |
|---|---|
| 12-18 mo. Price Target | $22.00 |
| BVF-NYSE (3/3/04) | $18.53 |
| Key Indices: | NYSE |

| | |
|---|---|
| 3-5-Yr. EPS Gr. Rate (E): | 20.0% |
| 52-week Range | $16.51-$51.30 |
| Shares Outstanding | 159.0M |
| Float | 123.0M Shrs |
| Avg. Daily Trading Vol. | 1,600,000 |
| Market Capitalization | $2,946.3M |
| Dividend/Div Yield | Nil / Nil |
| Fiscal Year Ends | December |
| Book Value | $5.76 per Shr |
| 2004 ROE (E) | NM |
| LT Debt | $496.3M |
| Preferred | Nil |
| Common Equity | $916.60M |
| Convertible Available | No |

| Earnings per Share | Prev | Current |
|---|---|---|
| 2003 | | $1.28A |
| 2004 | $2.07E | $1.41E |
| 2005 | $2.49E | $1.81E |
| **P/E** | | |
| 2003 | | 14.5x |
| 2004 | 9.0x | 13.1x |
| 2005 | 7.4x | 10.2x |

# Biovail Corporation

## 4Q03 Falls Short; Lowering Rating To Reflect Unfavorable Near-Term Reward/Risk

- 4Q03 top line results again fell short across nearly every key segment. Despite favorable new product dynamics, management's bet on Wellbutrin XL has increased and revised '04 revenue guidance does not appear to fully capture potential shortfalls in other key promoted or partnered products.

- Product sales of $168.3MM (including $20.0MM reserve) fell short of guidance of $225MM-$250MM. EPS, ex one-time items, came in at $0.27 vs. our $0.32, at the low end of guidance ($0.25-$0.40) largely due to less-than-forecast expenses.

- BVF is now characterizing '04 as an investment year and has cut '04 EPS guidance to $1.35-$1.70 from $2.00-$2.20. Despite 4Q03 shortfalls, product sales guidance was lowered less than 10%. Our '04-'05 EPS are being lowered to $1.41 and $1.81 from $2.07 and $2.49 respectively.

- Despite depressed valuation, we do not believe shares fully discount further execution missteps or top line shortfalls in '04. Lowering rating to SU from SP, as of 3/3/04, based on further deterioration in reward/risk profile. Believe upside is limited to $22 with potential downside to $14-$15.

### Stock Price Performance



Biovail Corporation (BVF)

Source: Reuters

*All Figures in US dollars, unless otherwise stated.*

04-26413 © 2004

**Company Description**
Biovail Corp. is a Canadian-based specialty pharmaceutical company.

www.biovail.com

**Elliot Wilbur, CFA**
1 (212) 667-7599
Elliot.Wilbur@us.cibc.com

**Colleen J. Lahey**
1 (212) 667-8309
Colleen.Lahey@us.cibc.com

**Lennox Gibbs**
1 (416) 594-7289
Lennox.Gibbs@cibc.ca

See "Legal Disclaimer" and "Important Disclosure Footnotes" sections at the end of this report for important disclosures, including potential conflicts of interest.
See "Price Target Calculation" and "Key Risks to Price Target" sections at the end of this report, where applicable.

Find CIBC research on Bloomberg, firstcall, multex.com, and cibcwm.com

CIBC World Markets Inc., P.O. Box 500, 161 Bay Street, BCE Place, Toronto, Canada M5J 2S8   +1-416-594 7000
CIBC World Markets Corp., 417 Fifth Avenue, New York, New York 10016-2204  +1-212-667 7000  +1-800-999 6726

# Price Target Calculation

We are establishing a 12-18 month share price objective of $22 assuming BVF shares can command a multiple of 12.5X our revised '05 EPS.  Our target multiple assumption is based on the premise that BVF shares can command a P/E multiple at the upper end of what we regard as the trough multiple range for specialty pharmaceutical companies of 8.0X-12.0X forward EPS.  Continued execution on driving accelerating uptake of key promoted products and delivery of Wellbutrin XL sales consistent with current guidance could propel significant near-term multiple expansion.  In light of continued execution missteps and shortfalls relative to prior guidance and above average regulatory risk, we believe shares will continue to trade at trough multiples in the short-term.

# Key Risks to Price Target

Risks to our investment thesis include: continued successful launches of Cardizem LA and Wellbutrin XL; greater-than-anticipated declines in the company's non-core product franchises and regulatory risk stemming from ongoing SEC and OIG inquiries.  Even if none of the above risks materialize, price targets may still not be realized as a result of events pertaining to systematic events in the pharmaceutical industry including third party reimbursement and pricing pressures, further consolidation of the pharmaceutical industry distribution channels, increasing generic competition for product market share and consequential lower pricing. Any of these risks, as well as other unforeseen, could prevent the stock from attaining our published price target.

**Exhibit 1.**

# Biovail

Quarterly Consolidated Statements of Income ($ in Millions, Except Per Share Data)

|  | 1Q | 2Q | 3Q | 4Q | 2003 | 1QE | 2QE | 3QE | 4QE | 2004E | 2005E |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Mar-03 | Jun-03 | Sep-03 | Dec-03 |  | Mar-04 | Jun-04 | Sep-04 | Dec-04 |  |  |
| Biovail Pharma USA | 78.0 | 108.0 | 136.5 | 119.3 | 441.8 | 122.5 | 147.5 | 175.0 | 202.5 | 647.5 | 807.5 |
| Biovail Pharma Canada | 13.0 | 24.7 | 23.1 | 23.0 | 83.8 | 23.5 | 25.0 | 27.0 | 29.0 | 104.5 | 115.0 |
| Generic Products | 35.9 | 25.0 | 20.4 | 26.0 | 107.3 | 20.5 | 32.5 | 33.0 | 32.5 | 118.5 | 110.0 |
| **Total Product Sales** | **126.9** | **157.7** | **180.0** | **168.3** | **632.9** | **166.5** | **205.0** | **235.0** | **264.0** | **870.5** | **1,032.5** |
| Research & Development | 2.6 | 3.7 | 4.5 | 3.4 | 14.2 | 3.8 | 3.8 | 3.8 | 3.8 | 15.0 | 15.0 |
| Co-Promotion Income | 17.5 | 10.0 | 2.0 | 2.0 | 31.5 | 2.5 | 2.5 | 2.5 | 2.5 | 10.0 | 8.0 |
| Royalty & Licensing | 44.4 | 45.9 | 28.8 | 26.0 | 145.1 | 3.5 | 3.5 | 3.5 | 3.5 | 14.0 | 25.0 |
| **Total Revenue** | **191.4** | **217.3** | **215.3** | **199.7** | **823.7** | **176.3** | **214.8** | **244.8** | **273.8** | **909.5** | **1,075.5** |
| Cost Of Sales | 37.4 | 11.3 | 40.1 | 50.6 | 139.5 | 41.6 | 51.3 | 50.5 | 55.4 | 198.8 | 232.3 |
| **Gross Profit** | **154.0** | **206.0** | **175.2** | **149.1** | **684.2** | **134.6** | **163.5** | **194.2** | **218.3** | **710.7** | **843.2** |
| Research & Product Development | 18.0 | 21.8 | 20.6 | 26.1 | 86.6 | 19.0 | 22.0 | 19.0 | 20.5 | 80.5 | 112.5 |
| Selling, General & Administrative | 46.2 | 56.9 | 73.6 | 66.3 | 243.0 | 67.5 | 75.0 | 78.5 | 79.5 | 300.5 | 335.0 |
| Amortization | 40.5 | 45.9 | 28.2 | 26.2 | 140.9 | 18.5 | 18.0 | 16.0 | 15.0 | 67.5 | 60.0 |
| Other | (24.8) | - | - | - | (24.8) | - | - | - | - | - | - |
| **Operating Income (Loss)** | **74.0** | **81.3** | **52.8** | **30.4** | **238.5** | **29.6** | **48.5** | **80.7** | **103.3** | **262.2** | **335.7** |
| Interest Expense (Income), Net | 6.4 | 1.7 | 15.3 | 9.1 | 32.6 | 7.5 | 6.5 | 5.5 | 5.0 | 24.5 | 22.0 |
| Extraordinary Items | - | - | - | - | - | - | - | - | - | - | - |
| **Income (Loss) Before Income Taxes** | **67.6** | **79.6** | **37.5** | **21.3** | **206.0** | **22.1** | **42.0** | **75.2** | **98.3** | **237.7** | **313.7** |
| Provision For Income Taxes | 4.7 | 4.8 | 3.0 | (12.0) | 0.4 | 1.1 | 2.1 | 3.8 | 4.9 | 11.9 | 22.0 |
| *Effective Tax Rate %* | *6.9%* | *6.0%* | *7.9%* | *-* | *0.2%* | *5.0%* | *5.0%* | *5.0%* | *5.0%* | *5.0%* | *7.0%* |
| **Net Income (Loss)** | **63.0** | **74.8** | **34.5** | **33.3** | **205.6** | **21.0** | **39.9** | **71.5** | **93.4** | **225.8** | **291.7** |
| Weighted Average Shares (Fully Diluted`) | 159.5 | 160.4 | 160.4 | 160.5 | 160.2 | 160.3 | 160.5 | 160.5 | 160.5 | 160.5 | 161.5 |
| **Earnings (Loss) Per Share** | **0.39** | **0.47** | **0.22** | **0.21** | **1.28** | **0.13** | **0.25** | **0.45** | **0.58** | **1.41** | **1.81** |

**Margins & Expense Ratios**

|  | 1Q | 2Q | 3Q | 4Q | 2003 | 1QE | 2QE | 3QE | 4QE | 2004E | 2005E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Gross Margin On Product Sales* | *70.5%* | *92.8%* | *76.8%* | *77.0%* | *78.0%* | *75.0%* | *75.0%* | *78.5%* | *79.0%* | *77.2%* | *77.5%* |
| *Research & Development* | *9.4%* | *10.0%* | *9.6%* | *13.1%* | *10.5%* | *10.8%* | *10.2%* | *7.8%* | *7.5%* | *8.9%* | *10.5%* |
| *Selling, General & Administrative* | *24.1%* | *26.2%* | *34.2%* | *33.2%* | *29.5%* | *38.3%* | *34.9%* | *32.1%* | *29.0%* | *33.0%* | *31.1%* |
| *Operating Margin* | *38.7%* | *37.4%* | *24.5%* | *15.2%* | *29.0%* | *16.8%* | *22.6%* | *33.0%* | *37.7%* | *28.8%* | *31.2%* |
| *Net Margin* | *32.9%* | *34.4%* | *16.0%* | *16.7%* | *25.0%* | *11.9%* | *18.6%* | *29.2%* | *34.1%* | *24.8%* | *27.1%* |

**EPS Growth Analysis %**

|  | 1Q | 2Q | 3Q | 4Q | 2003 | 1QE | 2QE | 3QE | 4QE | 2004E | 2005E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Revenue Growth* | *23.3%* | *17.4%* | *3.0%* | *(16.3%)* | *4.5%* | *(7.9%)* | *(1.2%)* | *13.7%* | *37.1%* | *10.4%* | *18.3%* |
| *Gross Margin* | *(4.4%)* | *39.2%* | *5.9%* | *(9.6%)* | *6.6%* | *10.1%* | *(44.9%)* | *7.6%* | *17.4%* | *(2.9%)* | *1.3%* |
| *Selling, General & Administrative* | *4.1%* | *(14.7%)* | *(30.5%)* | *(27.8%)* | *(20.9%)* | *(33.8%)* | *(23.0%)* | *9.7%* | *37.6%* | *(13.5%)* | *7.8%* |
| *Research & Development* | *(8.9%)* | *(6.3%)* | *(6.2%)* | *(14.1%)* | *(9.6%)* | *(3.3%)* | *(0.5%)* | *8.4%* | *50.5%* | *6.3%* | *(6.6%)* |
| *Other* | *15.3%* | *(29.1%)* | *(13.2%)* | *(4.9%)* | *(9.2%)* | *25.1%* | *29.3%* | *13.5%* | *97.6%* | *9.6%* | *7.3%* |
| *Operating Income Growth* | *29.4%* | *6.4%* | *(41.0%)* | *(72.6%)* | *(28.6%)* | *(60.0%)* | *(40.3%)* | *52.9%* | *240.1%* | *9.9%* | *28.0%* |
| *Tax Rate, Other* | *(5.5%)* | *13.9%* | *(13.7%)* | *6.9%* | *1.0%* | *(6.8%)* | *(6.4%)* | *53.9%* | *(59.2%)* | *(0.3%)* | *0.3%* |
| *Year-Over-Year EPS Growth* | *23.9%* | *20.4%* | *(54.6%)* | *(65.7%)* | *(27.5%)* | *(66.8%)* | *(46.7%)* | *106.9%* | *180.9%* | *9.6%* | *28.4%* |

Source: Company reports and CIBC World Markets Corp.



CIBC World Markets

3

CIBC
CIBC
World Markets

# Our EPS estimates are shown below:

| | 1 Qtr. | 2 Qtr. | 3 Qtr. | 4 Qtr. | Yearly |
|---|---|---|---|---|---|
| 2003 Actual | $0.39A | $0.47A | $0.22A | $0.21A | $1.28A |
| 2004 Prior | $0.31E | $0.36E | $0.67E | $0.78E | $2.07E |
| 2004 Current | $0.13E | $0.25E | $0.45E | $0.58E | $1.41E |
| 2005 Prior | -- | -- | -- | -- | $2.49E |
| 2005 Current | -- | -- | -- | -- | $1.81E |

CIBC
World Markets

# Companies Mentioned in this Report that Are Covered by CIBC World Markets:

# Companies Mentioned in this Report that Are Not Covered by CIBC World Markets:

**Key to Important Disclosure Footnotes:**

1) CIBC World Markets Corp. makes a market in the securities of this company.

2) CIBC World Markets Corp., or one of its affiliated companies, has received compensation for investment banking services from this company in the past 12 months.

2a) CIBC World Markets Inc. has received compensation for investment banking services from this company in the past 12 months.

3) CIBC World Markets Corp., has managed or co-managed a public offering of securities for this company in the past 12 months.

3a) CIBC World Markets Inc. has managed or co-managed a public offering of securities for this company in the past 12 months.

4) This company has a convertible included in the CIBC World Markets convertible universe.

5) An employee of CIBC World Markets is an officer, director or an advisory board member of this company.

6) The CIBC World Markets Corp. analyst(s) who covers this company also has a long position in its common equity securities.

7) The CIBC World Markets Inc. analyst(s) who covers this company also has a long position in its common equity securities.

8) CIBC World Markets does not cover the underlying equity security into which the security is convertible and expresses no opinion with regard to this company.

9) CIBC World Markets Corp. expects to receive or intends to seek compensation for investment banking services from this company in the next 3 months.

9a) CIBC World Markets Inc., expects to receive or intends to seek compensation for investment banking services from this company in the next 3 months.

10) A member of the household of a CIBC World Markets research analyst that covers this company is an officer, director or an advisory board member of this company.

11) CIBC World Markets Corp. and its affiliates, in the aggregate, beneficially own 1% or more of a class of equity securities issued by this company.

12) A member of the household of a CIBC World Markets research analyst that covers this company has a long position in the common equity securities of this company.

13) A member of the family of a Director of the Equity Research Department of CIBC World Markets Corp. is an officer of this company.

14) CIBC World Markets Inc., its partners, affiliates, officers or directors, or any analyst involved in the preparation of the research report has provided services to this company for remuneration in the past 12 months.

15) A senior executive member or director of Canadian Imperial Bank of Commerce, or a member of his/her household is an officer, director or advisory board member of this company and/or one of its subsidiaries.

16) Restricted Voting shares

17) Subordinate Voting shares

18) Non-Voting shares

19) Limited Voting shares



## CIBCWM Price Chart



HISTORICAL PERFORMANCE OF CIBC WM RECOMMENDATIONS FOR BVF (NYSE)

LEGEND: — Closing Price ▲ Price Target ● Rating Change ▨ Coverage Change
Currency: USD
Historical stock price data and corresponding CIBC WM price targets in this graph may have been adjusted to account for subsequent stock splits.

Market Data Provided By **REUTERS**

### HISTORICAL PERFORMANCE OF CIBC WM RECOMMENDATIONS FOR BVF (NYSE)

| Date | Change Type | Closing Price | Rating | Price Target | Coverage |
|------|-------------|---------------|--------|--------------|----------|
| 11/05/2001 | ▲● | 47.00 | UR | None | Elliot Wilbur, CFA |
| 11/26/2001 | ▲● | 53.10 | SB | 53.00 | Elliot Wilbur, CFA |
| 03/18/2002 | ▲ | 51.60 | SB | 65.00 | Elliot Wilbur, CFA |
| 07/25/2002 | ▲ | 23.12 | SB | 45.00 | Elliot Wilbur, CFA |
| 08/26/2002 | ▲● | 29.47 | SO | 35.00 | Elliot Wilbur, CFA |
| 10/29/2002 | ▲ | 30.82 | SO | 45.00 | Elliot Wilbur, CFA |
| 06/02/2003 | ▲ | 48.27 | SO | 56.00 | Elliot Wilbur, CFA |
| 10/03/2003 | ▲● | 31.10 | SP | None | Elliot Wilbur, CFA |

**CIBC World Markets**

# CIBCWM Stock Rating System

| Abbreviation | Rating | Description |
|---|---|---|
| **Company Ratings** | | |
| SO | Sector Outperformer | Stock is expected to outperform the sector during the next 12-18 months. |
| SP | Sector Performer | Stock is expected to perform in line with the sector during the next 12-18 months. |
| SU | Sector Underperformer | Stock is expected to underperform the sector during the next 12-18 months. |
| NR | Not Rated | CIBC does not maintain an investment recommendation on the stock. |
| R | Restricted | CIBCWM is restricted*** from rating the stock. |
| **Company Ratings Prior To August 26th 2002** | | |
| SB | Strong Buy | Expected total return over 12 months of at least 25%. |
| B | Buy | Expected total return over 12 months of at least 15%. |
| H | Hold | Expected total return over 12 months of at least 0%-15%. |
| UP | Underperform | Expected negative total return over 12 months. |
| S | Suspended | Stock coverage is temporarily halted. |
| DR | Dropped | Stock coverage is discontinued. |
| R | Restricted | Restricted |
| UR | Under Review | Under Review |
| **Sector Weightings**** | | |
| O | Overweight | Sector is expected to outperform the broader market averages. |
| M | Market Weight | Sector is expected to equal the performance of the broader market averages. |
| U | Underweight | Sector is expected to underperform the broader market averages. |
| NA | None | Sector rating is not applicable. |

**Broader market averages refer to the S&P 500 in the U.S. and S&P/TSX Composite in Canada.

"-S" indicates Speculative.  An investment in this security involves a high amount of risk due to volatility and/or liquidity issues.

***Restricted due to a potential conflict of interest.

"CC" indicates Commencement of Coverage. The analyst named started covering the security on the date specified.

### Ratings Distribution: CIBC World Markets Coverage Universe

| (as of 03 Mar 2004) | Count | Percent | Inv. Banking Relationships | Count | Percent |
|---|---|---|---|---|---|
| Sector Outperformer (Buy) | 279 | 32.6% | Sector Outperformer (Buy) | 172 | 61.6% |
| Sector Performer (Hold/Neutral) | 384 | 44.9% | Sector Performer (Hold/Neutral) | 240 | 62.5% |
| Sector Underperformer (Sell) | 192 | 22.5% | Sector Underperformer (Sell) | 98 | 51.0% |
| Restricted | 0 | 0.0% | Restricted | 0 | 0.0% |

### Ratings Distribution:  Specialty Pharmaceuticals Coverage Universe

| (as of 03 Mar 2004) | Count | Percent | Inv. Banking Relationships | Count | Percent |
|---|---|---|---|---|---|
| Sector Outperformer (Buy) | 4 | 23.5% | Sector Outperformer (Buy) | 4 | 100.0% |
| Sector Performer (Hold/Neutral) | 7 | 41.2% | Sector Performer (Hold/Neutral) | 5 | 71.4% |
| Sector Underperformer (Sell) | 6 | 35.3% | Sector Underperformer (Sell) | 6 | 100.0% |
| Restricted | 0 | 0.0% | Restricted | 0 | 0.0% |

Specialty Pharmaceuticals Sector includes the following tickers:  AAII, ADRX, AGN, ALO, APPX, BRL, BVF, CNCT, ELAB, FRX, GALN, IVX, KG, KV.A, MYL, PRX, TARO, TEVA, WPI.

# Important Disclosure Footnotes for BVF

2a   CIBC World Markets Inc. has received compensation for investment banking services from Biovail Corporation in the past 12 months.

7   The CIBC World Markets Inc. analyst(s) who covers Biovail Corporation also has a long position in its common equity securities.

9   CIBC World Markets Corp. expects to receive or intends to seek compensation for investment banking services from Biovail Corporation in the next 3 months.

# Legal Disclaimer

Analyst Certification:  Each CIBC World Markets research analyst named on the front page of this research report, or at the beginning of any subsection hereof, hereby certifies that (i) the recommendations and opinions expressed herein accurately reflect such research analyst's personal views about the company and securities that are the subject of this report and all other companies and securities mentioned in this report that are covered by such research analyst and (ii) no part of the research analyst's compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed by such research analyst in this report.

Conflicts of Interest: CIBC World Markets' equity research analysts are compensated from revenues generated by various CIBC World Markets businesses, including CIBC World Markets' Investment Banking Department. CIBC World Markets may have a long or short position or deal as principal in the securities discussed herein, related securities or in options, futures or other derivative instruments based thereon.  The reader should not rely solely on this report in evaluating whether or not to buy or sell the securities of the subject company.

Legal Matters: This report is issued and approved for distribution by (i) in the U.S., CIBC World Markets Corp., a member of the NYSE and SIPC, (ii) in Canada, CIBC World Markets Inc., a member of the IDA and CIPF, (iii) in the UK, CIBC World Markets plc, which is regulated by the FSA, and (iv) in Australia, CIBC World Markets Australia Limited, a member of the Australian Stock Exchange and regulated by the ASIC (collectively, "CIBC World Markets"). This document and any of the products and information contained herein are not intended for the use of private investors in the UK.  Such investors will not be able to enter into agreements or purchase products mentioned herein from CIBC World Markets plc.  The comments and views expressed in this document are meant for the general interests of clients of CIBC World Markets Australia Limited.  This report is provided for informational purposes only, and does not constitute an offer or solicitation to buy or sell any securities discussed herein in any jurisdiction where such offer or solicitation would be prohibited.

The securities mentioned in this report may not be suitable for all types of investors; their prices, value and/or income they produce may fluctuate and/or be adversely affected by exchange rates.  This report does not take into account the investment objectives, financial situation or specific needs of any particular client of CIBC World Markets.  Before making an investment decision on the basis of any recommendation made in this report, the recipient should consider whether such recommendation is appropriate given the recipient's particular investment needs, objectives and financial circumstances.  CIBC World Markets suggests that, prior to acting on any of the recommendations herein, you contact one of our client advisers in your jurisdiction to discuss your particular circumstances. Since the levels and bases of taxation can change, any reference in this report to the impact of taxation should not be construed as offering tax advice; as with any transaction having potential tax implications, clients should consult with their own tax advisors.  Past performance is not a guarantee of future results.

This report may contain statistical data cited from third-party sources believed to be reliable, but CIBC World Markets does not represent that any such third-party statistical information is accurate or complete, and it should not be relied upon as such.  All estimates, opinions and recommendations expressed herein constitute judgments as of the date of this report and are subject to change without notice.

Although each company issuing this report is a wholly owned subsidiary of Canadian Imperial Bank of Commerce ("CIBC"), each is solely responsible for its contractual obligations and commitments, and any securities products offered or recommended to or purchased or sold in any client accounts (i) will not be insured by the Federal Deposit Insurance Corporation ("FDIC"), the Canada Deposit Insurance Corporation or other similar deposit insurance, (ii) will not be deposits or other obligations of CIBC, (iii) will not be endorsed or guaranteed by CIBC, and (iv) will be subject to investment risks, including possible loss of the principal invested.  The CIBC trademark is used under license.
© 2004 CIBC World Markets Corp. and CIBC World Markets Inc.  All rights reserved.  Unauthorized use, distribution, duplication or disclosure without the prior written permission of CIBC World Markets is prohibited by law and may result in prosecution.



9