UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                                        Plaintiff,

                        -against-

BIOVAIL CORPORATION, EUGENE MELNYK, BRIAN
CROMBIE, JOHN MISZUK AND KENNETH HOWLING,

                                        Defendants.

08-CV-02979 (LAK)

**DEFENDANT JOHN MISZUK'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT
AND STRIKE THE REQUEST FOR DISGORGEMENT
OF THE SECURITIES AND EXCHANGE COMMISSION**

CADWALADER WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
212-504-6000 (tel.)
212-504-6666 (fax)

Attorneys for Defendants

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................................. ii

SUMMARY ...................................................................................................... 1

ARGUMENT ................................................................................................... 6

I.    THE COMPLAINT DOES NOT SATISFY RULE 9(b)................................. 6

    A.    The Complaint's Fraud Claims Are Subject To Rule 9(b) ................................. 6

    B.    The Sec Has Failed To Allege Facts Raising A Strong Inference Of Scienter ...... 6

        1.    The Complaint Fails to Allege Motive to Commit Fraud ......................... 8

        2.    The Complaint Fails to Allege Scienter on the Bill and Hold Transaction ........................................................................................ 10

            a.    Lack of Particularized Factual Allegations................................. 10

            b.    The SEC's Allegations Do Not Support the Required Inference ................................................................................ 18

        3.    The Complaint Fails to Allege Scienter on the Foreign Exchange Issue ............................................................................................... 22

            a.    The Allegations ........................................................................ 22

            b.    The July 2003 Emails ............................................................... 25

II.   THE COMPLAINT FAILS TO ADEQUATELY PLEAD MATERIALITY ................. 27

    A.    The Bill And Hold Revenue Was Immaterial...................................... 28

    B.    The Foreign Exchange Error Was Immaterial .................................... 28

III.  THE COMPLAINT FAILS TO STATE CLAIMS UNDER SECTION 13(b)................ 30

    A.    The Complaint Fails To State A Claim Under Section 13(b)(5) ......................... 30

    B.    The Complaint Fails To State A Claim Under Exchange Act Rule 13b2-1 ........ 31

    C.    The Complaint Fails To State A Claim Under Exchange Act Rule 13b2-2 ........ 32

IV.   THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING ..................................................................................... 33

CONCLUSION ............................................................................................... 35

# TABLE OF AUTHORITIES

PAGE(S)

CASES:

*Abbad v. Amman*,
    285 F. Supp. 2d  411 (S.D.N.Y. 2003), *aff'd* 112 Fed.Appx. (2d Cir. 2004), ........................ 8

*Basic v. Levinson*,
    485 U.S. 224 (1988)..........................................................................................................27

*Caiafa* v. *Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007) ...............................................................................11

*Chambers  v. Time Warner*,
    282 F.3d 147 (2d Cir. 2002)................................................................................................ 2

*Chill v. G. E. Co.*,
    101 F. 3d 263 (2d Cir. 1996)...................................................................................6, 8, 11

*City of Brockton Ret. Sys. v. The Shaw Grp. Inc.*,
    540 F. Supp. 2d  464 (S.D.N.Y. 2008) ..............................................................................19

*Denny* v. *Barber*,
    576 F.2d. 465 (2d Cir. 1978)............................................................................................11

*Double Alpha, Inc.* v. *Mako Partners, LP*,
    No. 99 Civ 11541, 2000 WL 1036034 (S.D.N.Y.  July 27, 2000). ...................................... 6

*Druskin* v. *Answerthink, Inc.*,
    299 F. Supp. 2d 1307 (S.D. Fla. 2004) ..................................................................12, 21, 22

*Edwards & Hanly* v. *Wells Fargo Sec. Clearance Corp.*,
    602 F.2d 478 (2d Cir. 1979)..............................................................................................35

*Ganino* v. *Citizens Utility Co.*,
    228 F.3d 154 (2d Cir. 2000)..............................................................................................27

*Goplen v. 51job, Inc.*,
    453 F. Supp. 2d 759 (S.D.N.Y. 2006) ...............................................................................11

*Greebel  v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) .......................................................................................18, 28

*Honeyman* v. *Hoyt (In re Carter-Wallace Sec. Litig.)*,
    220 F.3d 36 (2d. Cir. 2000)...............................................................................................22

PAGE(S)

*In re Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N. D. Cal. Aug. 14, 2002)................................................ 24

*In re Alamosa Hldgs., Inc. Secs. Litig.*,
    382 F. Supp. 2d 832 (N.D. Tex. 2005) .............................................................. 21

*In re Allscripts, Inc. Sec. Litig.*,
    No. 00-C-6796, 2001 WL 743411 (N.D. Ill. June 29, 2001)........................................... 27-28

*In re Arthur Andersen & Co.*,
    47 S.E.C. 565 (1981) ........................................................................... 16

*In re Astea In'l  Sec. Litig.*,
    No. Civ. 06-1467, 2007 WL 2306586 (E.D. Pa., August 9, 2007) ...................................... 24

*In re Bally Total Fitness Sec. Litig.*
    No. 04 C 3530, 2006 WL 3714708, at *8-9 (N.D. Ill. 2006)........................................... 25

*In re BISYS Sec. Litig.,*
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) (Kaplan. J.) ........................................... 7, 11

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d  549 (S.D.N.Y. 2004) ............................................................ 9, 11

*In re Carter-Wallace Sec. Litig.*,
    220 F.3d 36 (2d. Cir. 2000)...................................................................... 22

*In re ICN Pharm., Inc. Sec. Litig.*,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ........................................................... 24

*In re Interpool Sec. Litig.*,
    No. Civ. 04-321, 2005 WL 2000237 (D.N.J. Aug. 17, 2005)........................................... 25

*In re Laser Photonics Inc.*,
    SEC Rel. Nos. 33-7463, 34-39166, 1997 WL 600684 (Sep. 30, 1997) ................................. 17

*In re Miller Industries, Inc.*,
    120 F. Supp. 2d 1371 (N.D.Ga. 2000).............................................................. 30

*In re Northern Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) ............................................................. 9

*In re NTL Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) (Kaplan, J.) ................................................. 19

*In Re NYSE Specialists Sec. Litig.*
    503 F.3d 89 (2d Cir. 2007), *cert. denied sub nom.,* 128 S. Ct. 1707 (2008)........................ 24

PAGE(S)

*In re Parness,*
    SEC Rel. No. 34-23507, 1986 WL 712572 (Aug. 5, 1986)................................................. 16

*In re Phillips,*
    SEC Rel. No. ID-55, 1994 WL 485042 (Aug. 26, 1994) ................................................... 26

*In re Pitts,*
    SEC Rel. No. 34-42569, 2000 WL 297884 (Mar. 23, 2000) ................................................ 16

*In re Tower Auto. Sec. Litig.,*
    483 F. Supp. 2d 327 (S.D.N.Y. 2007) ................................................................................... 2

*In re SCB Computer Tech., Inc.,*
    149 F. Supp. 2d 334, (W.D. Tenn. 2001)............................................................................. 24

*In re Yukos Oil Co. Sec. Litig.,*
    No. 04 Civ. 5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)........................................ 23

*JP Morgan Chase Bank* v. *Winnick,*
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) ................................................................................. 26

*Johnson* v. *NYFIX,*
    399 F. Supp. 2d 105 (D. Conn. 2005)...........................................................................11, 12

*Kalnit* v. *Eichler,*
    264 F.3d 131 (2d Cir. 2001).........................................................................................7, 8, 9, 10

*Kramer v. Time Warner Inc.,*
    937 F.2d 767 (2d Cir. 1991)................................................................................................. 26

*Lentell* v. *Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir.), *cert. denied,* 546 U.S. 935 (2005).................................................. 6

*Lovelace* v. *Software Spectrum Inc.*
    78 F.3d 1015 (5th Cir. 1996)............................................................................................... 18

*Malin* v. *XL Capital Ltd.,*
    499 F. Supp. 2d 117 (D. Conn. 2007).................................................................................. 11

*Merzin v. Provident Fin. Grp., Inc.,*
    311 F. Supp. 2d 674 (S.D. Ohio 2004) ............................................................................... 18

*Novak* v. *Kasaks,*
    216 F.3d 300 (2d Cir.), *cert. denied,* 531 U.S. 1012 (2000).......................................7, 11, 22

*P.R. Diamonds, Inc.* v. *Chandler,*
    364 F.3d 671 (6th Cir. 2004)............................................................................................... 24

PAGE(S)

*Rombach* v. *Chang,*
   355 F.3d 164 (2d Cir. 2004) ................................................................................. 6, 8, 30

*San Leandro Emer. Med. Grp Profit Sharing Plan* v. *Philip Morris Cos.,*
   75 F.3d 801 (2d Cir. 1996) .................................................................................. 7

*SEC* v. *ABS Indus., Inc.,*
   No. 99 CV 2600, 1999 WL 977370 (Oct. 28, 1999) ........................................... 17

*SEC* v. *Caserta,*
   75 F. Supp. 2d 79 (E.D.N.Y. 1999) ..................................................................... 18

*SEC* v. *Cedric Kushner Promotions, Inc.,*
   417 F. Supp. 2d 326 (S.D.N.Y. 2006) ................................................................. 34

*SEC* v. *Cohen,*
   No. 05CV371, 2007 WL 1192438 (E.D. Mo., Apr. 19, 2007) ............................ 30

*SEC* v. *Coffman,*
   No. 06 CV 00088, 2007 WL 2412808 (D. Colo. Aug. 21, 2007) ....................... 34

*SEC* v. *Collins & Aikman Corp.,*
   524 F. Supp. 2d 477 (S.D.N.Y. 2007) ............................................................. 6, 11

*SEC* v. *First Jersey Sec., Inc.*
   101 F.3d 1450 (2d Cir. 1996) .............................................................................. 9

*SEC* v. *Gane,*
   No. 03-61553-CIV, 2005 WL 90154 (S.D. Fla. 2005) ........................................ 9

*SEC* v. *Goldsworthy,*
   *No.* 06 cv 10012, 2007 WL 4730345 (D. Mass. Dec. 4, 2007) ........................... 7

*SEC* v. *Guenthner,*
   395 F. Supp. 2d 835 (D. Neb. 2005) ................................................................ 9, 28

*SEC* v. *Kahn,*
   No. 99 C 6343, 2002 WL 1163723 (N.D. Ill. May 31, 2002) ............................. 31

*SEC* v. *KPMG LLP,*
   412 F. Supp. 2d 349 (S.D.N.Y. 2006) ................................................................. 34

*SEC* v. *McCaskey,*
   No. 98 CIV 6153, 2002 WL 850001 (S.D.N.Y. Mar. 26, 2002) ......................... 9

*SEC* v. *McNulty,*
   137 F.3d 732 (2d Cir.), *cert. denied, sub nom.*, 525 U.S. 931 (1998) .................... 7

PAGE(S)

*SEC* v. *Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999)..................................................................... 6

*SEC* v. *Morris*,
    No 04-3096, 2005 WL 200665, at *9 (S.D. Tex. Aug. 18, 2005)......................................... 34

*SEC* v. *Patel*,
    No. 07-cv-39-SM, 2008 WL 781912 (D.N.H., Mar. 24, 2008) ..............................28, 29, 31

*SEC* v. *Republic Nat'l Life Ins. Co.*,
    378 F. Supp. 430 (S.D.N.Y. 1974) ................................................................... 6

*SEC* v. *Sandifur*,
    No. 05-1631, 2006 WL 538210 (W.D. Wash. Mar. 2, 2006) ......................................... 34-35

*SEC* v. *Solow*,
    No. 06-81041-Civ., 2007 WL 917269 (S.D. Fla. Mar. 23, 2007) ....................................... 34

*SEC* v. *Terry's Tips, Inc.*,
    409 F. Supp. 2d 526 (D. Vt. 2006) ................................................................. 26

*SEC* v. *Todd*,
    No. 03 CV 2230, 2007 WL 1574756 (S.D. Cal. May 30, 2007)................................9, 24, 32

*Shields* v. *Citytrust Bancorp Inc.*,
    25 F.3d 1124 (2d Cir. 1994)..................................................................6, 8, 11

*Stevelman* v. *Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)......................................................................... 11

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)..................................................................2, 7, 21, 27

*Thor Power Tool Co.* v. *Comm.*,
    439 U.S. 522 (1979)................................................................................ 18

STATUTES & OTHER AUTHORITIES:

17 C.F.R.:
    § 240.13b2-1............................................................................... 31
    § 240.13b2-2............................................................................... 32

PAGE(S)

15 U.S.C.:
  § 78j-1(b)(1) ............................................................................................... 21
  § 78m(b)(5) ................................................................................................ 30
  § 78m(b)(2)(A) ........................................................................................... 31
  § 78m(b)(3) ................................................................................................ 21

*Progress Report of the SEC Advisory Committee on Improvements to Financial
  Reporting*, SEC Rel. Nos. 33-8896, 34-57331, 2008 WL 441528, at *47 (Feb. 14,
  2008) ............................................................................................................ 28

*Revenue Recognition in Financial Statements,* SEC Staff Acct. Bull. No. 101 (December
  3, 1999), http://www.sec.gov/interps/account/sab101.html (last visited 6/20/08) ................. 14

Comm'r Paul S. Atkins, *Remarks Before the American Institute of Certified Public
  Accountants* (Dec. 5, 2005), http:// www.sec.gov/news/speech/spch120505psa.htm
  (last visited 6/20/08) ......................................................................................... 15

Comm'r Paul S. Atkins, *SEC Speaks in 2008, Program at the Practicing Law Institute*
  (Feb. 8, 2008), http://www.sec.gov/news/speech/spch020808psa.htm (last visited
  6/20/08) ........................................................................................................ 15

*Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in
  Finance Statements of Business Enterprises,* Finance Accounting Standards Board
  (Dec. 1984), http://www.fabs.org/pdf/con5.pdf (last visited 6/20/08) ................................ 15

Biovail 20-F 2003 Annual Report, available at
  http://sec.gov/Archives/edgar/data/885590/000104746904017429/a2136694z20-f.htm
  (last visited 6/20/08) ......................................................................................... 21

Biovail 20-F 2004 Annual Report, available at
  http://sec.gov/Archives/edgar/data/885590/000104746905018555/a2160202z20-f.htm
  (last visited 6/20/08) ......................................................................................... 21

Biovail 20-F 2005 Annual Report, available at
  http://sec.gov/Archives/edgar/data/885590/000104746906004403/a2168876z20-f.htm
  (last visited 6/20/08) ......................................................................................... 21

Biovail 20-F 2006 Annual Report, available at
  http://sec.gov/Archives/edgar/data/885590/000104746907002027/a2176789z20-f.htm
  (last visited 6/20/08) ......................................................................................... 21

Biovail 20-F 2007 Annual Report, available at
  http://sec.gov/Archives/edgar/data/885590/000104746908002964/a2182900z20-f.htm
  (last visited 6/20/08) ......................................................................................... 21

PAGE(S)

Biovail Corp. Form 6-K/A, (quarterly period ending 3/31/03), filed May 14, 2004,
    http://www.sec.gov/Archives/edgar/data/885590/000104746904017434/a2130705z6-
    ka.htm (last visited 6/20/08)..................................................................................... 23

Biovail Corp. Form 6-K/A, (quarterly period ending 6/30/03), filed May 14, 2004,
    http://www.sec.gov/Archives/edgar/data/885590/000104746904017437/a2130832z6-
    ka.htm (last visited 6/20/08)..................................................................................... 23

Biovail Corp. Form 6-K/A, (quarterly period ending 9/30/03), filed May 14, 2004,
    http://www.sec.gov/Archives/edgar/data/885590/000104746904017436/a2130932z6-
    ka.htm......................................................................................................................... 23

## SUMMARY

The SEC brings this action against John Miszuk alleging that, in his position as Controller of Biovail Corporation ("Biovail" or the "Company"), he "knowingly or recklessly" was responsible for Biovail's alleged misreporting of two items in its 2003 financial statements. As discussed in this Memorandum, the Complaint fails to meet the threshold requirements of Fed. R. Civ. P. 9(b), and otherwise fails to state a claim, and should be dismissed in its entirety.

**The "Bill and Hold" Transaction.**    The first item alleged as to Mr. Miszuk in the Complaint was a transaction in which Biovail recognized $8 million of revenue in its second quarter, ended June 30, 2003. The transaction involved an order for 27.1 million pills of Wellbutrin ("WBLX"), a new product manufactured by Biovail specifically for the customer (referred to in the Complaint as the "Distributor"). According to the SEC's own allegations, the Distributor did in fact order the pills in June 2003 (SEC Complaint ¶ 95) ("Compl."), and there is no allegation that the pills were not eventually paid for at the agreed upon price. The SEC also alleges that the Distributor "agreed to let Biovail hold the product awaiting FDA approval," which would later be packaged according to final FDA requirements, to sell as "trade" product. (*Id.*) This is referred to as a "bill and hold" transaction in the Complaint (the "Bill and Hold"). Biovail recorded that transaction as of its June 30, 2003 quarter as a sale, immediately recognizing revenue from it. The SEC alleges that at some point, Mr. Miszuk was involved in a decision to "replace" the pills that it was holding for the Distributor, with newly manufactured pills (*id.* ¶ 102), so that the original pills ordered could be shipped to fill orders for sample pills to the very same Distributor. The essence of the SEC's Complaint is that this so-called "Pills Switch" caused the recognition of revenue on the transaction in Biovail's June 2003 quarter to violate U.S. Generally Accepted Accounting Principles ("GAAP") (Compl. ¶¶ 107, 116, 117).

As discussed herein, the allegations that the "Pills Switch" caused Biovail's accounting to violate GAAP are based on unspecified references to GAAP and, primarily, to a 1999 Staff Accounting Bulletin, in which SEC staff outlined their views on so-called "Bill and Hold" accounting criteria (Compl. ¶¶ 97-99). As explained below, the Staff Accounting Bulletin is neither authoritative nor clear on the issue of a situation like the planned "Pills Switch."

1

Having insufficient facts to demonstrate that Mr. Miszuk "knowingly or recklessly disregarded" GAAP in connection with the Bill and Hold transaction, the SEC reverts to a *res ipsa loquitor*-type argument:  In its view, the accounting did not comply with the Staff Accounting Bulletin, and Mr. Miszuk, aware of the planed pill swap, must also have had that view.  But the SEC has failed to allege any specific conversation or communication evidencing that Mr. Miszuk, or indeed, any one else at Biovail, ever came to such a view, let alone disregarded clear accounting guidance on the issue. The SEC also has not alleged that Biovail has restated or plans to restate its financials to correct this alleged improper accounting, and it is a matter of public record that Biovail has not done so.  Biovail's auditors have not withdrawn their opinion on those financials.

The SEC attempts to bolster its pleading argument by (1) characterizing the June order as "phony;" and (2) describing the pill swap as a "scheme," purportedly clearly in violation of GAAP.  But, as discussed herein, the Complaint is devoid of facts to support those characterizations and, indeed, on its face contains allegation that either directly support a contrary conclusion or allow a more reasonable, innocent inference.[1] (*See infra* pp. 13, 19, 21, 26-27).

Among other things, there are no allegations that the Distributor did not indeed place an order in June 2003 for 27.1 million pills and eventually receive and pay the amount recorded by Biovail for that order.  Indeed, the allegations are to the contrary or support the contrary inference.  (*See infra*, at pp. 16-20).  The allegations concerning the "Pills Switch" are only that

---

[1]   The Court may consider documents incorporated by reference in the complaint, filed with the SEC or subject to judicial notice.  S*ee Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007); *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 334 (S.D.N.Y. 2007).  In particular, the Court in deciding a motion to dismiss under 12(b)(6) may consider "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in the defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Chambers* v. *Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002).  Copies of documents this Court may consider on Defendant's Motion to Dismiss are provided as Exhibits to this accompanying Declaration of Bruce A. Hiler ("Hiler Decl.").

the pills ordered in June 2003 for ultimate use as trade product were "designated" (not alleging the specifics of this) at some point to fill the Distributor's orders for sample, and that at the time they were so "designated," Biovail did not have enough manufactured pills to replace the initially segregated pills.  It is never alleged that newly manufactured pills were not in fact available and used to replace the "designated" pills at Biovail by the time the designated pills were shipped.  At any rate, the SEC does not allege that Mr. Miszuk was aware the "designated" pills were not wholly replaced, if that were in fact the case.  There also are no communications or documents alleged in which there is even any discussion, by anyone, that the accounting for the June order is wrong.  There is nothing in the Complaint alleging or to indicate that Mr. Miszuk directed or acquiesced in the accounting in the face of anyone even raising an issue about the correct accounting, let alone in the face of clear impropriety.  Further, as discussed below, John Miszuk did not trade in Biovail stock or otherwise benefit from the alleged fraud, and the facts alleged demonstrate no discernible motive on his part to commit fraud.

For these reasons, and as further discussed below, the Complaint must be dismissed because it fails to particularize in any way facts that establish the required "strong inference" of fraudulent intent.[2]  The aiding and abetting allegations similarly fail, and, as discussed in Sections III, the allegations that Mr. Miszuk "knowingly" falsified, or in any way prepared or allowed a "false" record to be created about the Bill and Hold, or was involved with misrepresentations to Biovail's auditors, are unsupported and do not allow the inferences for which the SEC searches.  Indeed, the allegations admit of other, stronger, innocent inferences.

**The Foreign Exchange Transaction:**  The second item raised in the Complaint as to Mr. Miszuk is the failure of Biovail to "mark-to-market" a debt held on the books of one of its

_____

[2] Mr. Miszuk also moves to dismiss the Complaint on the Bill and Hold transaction due to the immateriality of the alleged misstatement.

subsidiaries located in the Barbados, Biovail Laboratories, Inc. ("BLI"). BLI had purchased certain intangible assets, trademarks and product rights from the Distributor in 2002. (Compl. ¶ 126). Part of the purchase terms included a loan from the Distributor to BLI in Canadian dollars. The functional currency of BLI is the U.S. dollar, and recording the loan on BLI's and Biovail's books thus involved converting the debt obligation into U.S. dollars using the prevailing exchange rate as of the date of the transaction. (*Id.* ¶¶ 126-27). Because the Distributor loan to BLI was required to be repaid in Canadian dollars, Biovail could incur either a gain or loss based on the change in the exchange rate between U.S. and Canadian dollars. (*Id.* ¶ 128). But such a gain or loss would *only* be incurred and *realized* at the time the debt was actually repaid, based on the existing currency exchange rate at the time of payment. The SEC alleges that, in the interim, Biovail was required by GAAP to "mark-to-market" the amount carried on BLI's books representing the debt, by applying current exchange rates to value the outstanding loan balance each quarter, and recording any resulting, *unrealized* foreign exchange gain or loss in its income statement. (*Id.* ¶ 127). Mr. Miszuk does not dispute that this is the correct accounting under U.S. GAAP.

The entirety of the SEC's alleged case against Mr. Miszuk on this item rests on its conclusory allegation that on July 8, 2003, Biovail's Senior Director of Legal Accounting and BLI's Controller "told" him that the accounting was in error. (Compl. ¶130). The SEC does not allege how or what information about the alleged error was communicated to Mr. Miszuk, and does not set out the full extent of the supposed communication. There is no allegation as to whether or how Mr. Miszuk responded to this information. The SEC simply alleges that Biovail and Mr. Miszuk "did not record" the proper amount in the second quarter and that the "problem continued into the third quarter." (Compl. ¶¶ 131 & 134). Based solely on these allegations, the SEC asserts that Mr. Miszuk committed fraud. More is needed before the elements of an action for fraud can be pled.

However, the Complaint then falls completely silent as to what Mr. Miszuk or any one else at Biovail did concerning this issue, except for alleging that the debt remained translated at the exchange rate as of the initial date of the transaction, and was not marked-to-market in the

second quarter financials.  Among other things, the SEC does not allege a single fact attributing a motive to Mr. Miszuk for failing to correct the alleged error.  There are no allegations as to what, if any, further communications Mr. Miszuk, the Senior Director of Legal Accounting or the BLI Controller had, either among themselves or with any other individuals, about the foreign exchange accounting.  There also are no facts alleged to the effect that Mr. Miszuk actually was involved in any communications at all about the issue after July 8, 2003.  The Complaint offers no information (*e.g.* emails, memoranda or allegations of secretive conversations or agreements) showing that  Mr. Miszuk reached a definitive decision as to the proper accounting treatment and then deliberately ignored it.  Indeed, there are no facts alleged showing why and under what circumstances the possible need for an adjustment was not made.  Finally, the SEC does not allege either that the Senior Director of Legal Accounting or the Controller of BLI were directed by anyone, let alone Mr. Miszuk, not to correct the alleged error, and they are not charged with any wrongdoing in connection with the issue.

There is a July 8, 2003 email communication to which we assume the SEC is referring in paragraph 130 of the Complaint, which is discussed in Section I.B.2.b. of this Memorandum. However, in that communication Biovail's Senior Director of Legal Accounting simply raised the issue with the Controller of BLI in an email of July 8, on which he copied Mr. Miszuk. Although the Controller of BLI later responded with her initial view that an error existed, the email chain shows that, later the same day, Mr. Miszuk replied to the email, requesting additional information and analysis, and that the issue was not finally resolved at that time. (Hiler Decl. Exs. 2A and 2B).[3]  With or without the July 8 email, the allegations of the Complaint support nothing more than an inference that when an error was identified at BLI, Mr. Miszuk lost sight of the issue, or could assume that the appropriate accounting personnel were dealing with it or would revisit it if necessary.  For these and other reasons discussed in this Memorandum, including the immateriality of the alleged error, all of the allegations against Mr.

---

[3]    If this is not the communication to which the SEC refers in ¶ 130, then we request that they be required to specify the type of communication, all of the participants and exactly what Mr. Miszuk supposedly was "told" about the issue.

Miszuk concerning the foreign exchange issue should be dismissed.

## ARGUMENT

### I.     THE COMPLAINT DOES NOT SATISFY RULE 9(b)

#### A.     The Complaint's Fraud Claims Are Subject To Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure demands that "the circumstances constituting fraud . . . shall be stated with particularity." This Rule is designed to "'safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of an [unfounded] lawsuit.'" *Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (citations omitted). The particularity requirement of Rule 9(b) is stringent, and is "applied assiduously" to securities fraud claims in the Second Circuit. *Lentell* v. *Merrill Lynch & Co.,* 396 F.3d 161, 168 (2d Cir.), *cert. denied*, 546 U.S. 935 (2005). Rule 9(b) requires that a complaint alleging fraud specify (1) the statements that the plaintiff believes were fraudulent, (2) the speaker, (3) where and when the statements were made, and (4) *why* the plaintiff believes they were *fraudulent*. *Rombach*, 355 F.3d at 170; *Chill* v. *G.E. Co.*, 101 F. 3d 263, 267 (2d Cir. 1996). Moreover, where, as here, "fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant." *Double Alpha, Inc.* v. *Mako Partners, LP*, No. 99 Civ 11541, 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000).

#### B.     The Sec Has Failed To Allege Facts Raising A Strong Inference Of Scienter

To support its claims under Section 10(b) and Rule 10b-5, the SEC must plead with particularity facts supporting a strong inference that Mr. Miszuk acted with scienter. *Lentell*, 396 F.3d at 168; *SEC* v. *Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *SEC* v. *Republic Nat'l Life Ins. Co.*, 378 F. Supp. 430, 439 (S.D.N.Y. 1974). The Second Circuit demands that a plaintiff allege scienter with particularized facts that raise a "strong" inference of fraudulent intent. *Shields* v. *Citytrust Bancorp Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). This standard applies to cases brought by the SEC, as well as to cases brought by private plaintiffs. *SEC* v. *Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 488 (S.D.N.Y. 2007) ("[T]he SEC is subject to Rule 9(b) and must therefore plead a 'strong inference' of scienter").

A strong inference of fraudulent intent can only be established by either (a) particularized allegations giving rise to strong circumstantial evidence of "conscious misbehavior" or "recklessness," or (b) detailed factual assertions that demonstrate the defendant "had both motive and opportunity to commit fraud." *Kalnit* v. *Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001). Moreover, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Tellabs,* 127 S. Ct. at 2510;[4] *see also San Leandro Emer. Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.,* 75 F.3d 801, 813 (2d Cir. 1996) ("Plaintiffs do not . . . enjoy a 'license to base claims of fraud on speculation and conclusory allegations'") (citations omitted).

Under the first alternative for pleading scienter, allegations of Mr. Miszuk's behavior can satisfy the standard only if those accusations, if true, show that he "deliberately or recklessly engaged in *illegal conduct.*" *In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) (Kaplan, J.) (emphasis added). Absent specific factual allegations that Mr. Miszuk *knew* he engaged in illegality, the SEC must plead facts to show that his behavior was "an extreme departure from the standards of ordinary care" that was so severe that it "approximat[ed] actual intent . . . .'" *Novak* v. *Kasaks,* 216 F.3d 300, 308, 312 (2d Cir. 2000) (citations omitted) *cert. denied*, 531 U.S. 1012 (2000); *SEC* v. *McNulty,* 137 F.3d 732, 741 (2d Cir.) *cert. denied*, *sub nom.*, 525 U.S. 931 (1998). Furthermore, where plaintiffs fail to plead any specific motive to defraud "the strength of the circumstantial allegations [of knowledge or recklessness] must be correspondingly greater." *Kalnit,* 264 F.3d at 142.

As discussed below, the SEC has not pled any facts to demonstrate that Mr. Miszuk had any motive to commit the alleged frauds. Nor does the Complaint raise any specific factual allegations that can support a strong inference that Mr. Miszuk had knowledge of fraud or was

---

[4]    Although the Supreme Court's decision in *Tellabs* was rendered in the context of cases brought under the PLSRA, the Supreme Court's guidance in how to interpret inferences logically extends beyond the specific context of the PSLRA. *See id.* at 2510 ("The strength of an inference cannot be decided in a vacuum."). The Second Circuit applies the strong inference standard to PSLRA and SEC actions, and this analysis on 9(b) should be guided by the Supreme Court's explanation of how competing inferences are to be weighed in determining whether a particular inference is "strong." *See SEC* v. *Goldsworthy,* 06 cv 10012, 2007 WL 4730345, at *15 (D. Mass. Dec. 4, 2007) (applying *Tellabs'* interpretation of "strong inference standards" to SEC enforcement action).

"reckless," as defined above, in his actions in connection with either of the accounting transactions alleged against him.

### 1.    The Complaint Fails to Allege Motive to Commit Fraud

In order to establish scienter based on motive and opportunity, plaintiffs must allege the presence of "concrete benefits that could be realized by one or more of the [alleged] false statements and wrongful nondisclosures," as well as "the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130; *see also Rombach*, 355 F.3d at 177. The Second Circuit repeatedly has held that the "strong inference of fraudulent intent" required to plead scienter cannot be drawn from general motives that are shared by "virtually every company in the United States" or "most corporate directors and officers." *Kalnit*, 264 F.3d at 138-140; *see also Rombach*, 355 F.3d at 177. In this regard, the SEC cannot premise motive allegations on a desire to "meet analysts' expectations," *Abbad* v. *Amman*, 285 F. Supp. 2d 411, 419 (S.D.N.Y. 2003) (citations omitted), *aff'd*. 112 Fed. Appx. 97 (2d Cir. 2004), or on an alleged desire to "keep stock prices high to increase officer compensation." *Kalnit*, 264 F.3d at 139-40 (collecting cases). Such desires can be imputed to all corporate officers. *Id*.

The Complaint is devoid of *any* allegation that would lead to the inference that Mr. Miszuk, as opposed to any other executive at any other company, had a motive to commit the purported frauds. Rather, the SEC merely adds unsupported, inflammatory characterizations to the type of clichéd averments of supposed "motive" that courts in this Circuit and elsewhere consistently reject as a matter of law. For example, the allegations that "Biovail executives" were "[o]bsessed with meeting quarterly and annual earnings guidance" (Compl. ¶ 1), that the Company was "in danger of missing earnings expectations for the first time in history" (*id*. ¶ 83), and that the defendants were motivated to commit fraud "to meet [the Company's] second quarter earnings projections" (*id*. ¶ 88) are the same sorts of allegations that the Second Circuit repeatedly has deemed insufficient to sustain claims of accounting fraud. *See, e.g., Chill*, 101 F.3d at 268 (desire to advance "the appearance of corporate profitability, or of the success of an investment," insufficient); *Shields*, 25 F.3d at 1130 ("Incentive compensation can hardly be the

basis on which an allegation of fraud is predicated.") (citation omitted).[5]

Nor does the complaint allege how Mr. Miszuk might have benefited from the alleged fraud. The SEC does not claim that Mr. Miszuk was paid bonuses tied to the alleged Bill and Hold or foreign exchange accounting errors, or that he personally profited from the sale of Biovail stock.[6] As this Court has recognized: "The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders." *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000); *see also SEC* v. *Guenthner*, 395 F. Supp. 2d 835, 848 (D. Neb. 2005) (no inference of scienter where CFO did not "make any money" from the purported fraud). Thus, the SEC fails to pled scienter based on motive and opportunity.

As a result of the failure to pled any facts demonstrating that Mr. Miszuk had a particularized motive to commit the alleged frauds, "the strength of the circumstantial allegations must be correspondingly greater," under the "knowing or reckless" alternative method of pleading scienter. *Kalnit,* 264 F.3d at 142. As discussed below, the SEC has failed in its allegations to meet the knowing or reckless alternative for pleading scienter, as to both the Bill and Hold transaction and the foreign exchange error.

---

[5]    *See also SEC* v. *Todd*, No. 03 CV 2230, 2007 WL 1574756, at *12 (S.D. Cal. May 30, 2007) ("the desire of a corporate officer to generate revenue and meet analyst expectations" is not indicative of scienter); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 560 (S.D.N.Y. 2004). In *Bristol-Myers*, the Court rejected allegations of motive that defendants engaged in accounting fraud to "make it appear that the future of the Company was more promising." *Id.*

[6]    The SEC requests "disgorge[ment] [of] any ill-gotten gains" from Mr. Miszuk. (Compl. ¶ 7a, p. 54). Disgorgement is an equitable remedy, designed to "deprive violators of their ill-gotten gains" and promote deterrence through prevention of unjust enrichment on the part of the violator. *SEC* v. *First Jersey Sec., Inc.* 101 F.3d 1450, 1474-75 (2d Cir. 1996). Disgorgement must be "causally connected to the violation." *SEC* v. *McCaskey*, No. 98 CIV 6153, 2002 WL 850001, at *4, (S.D.N.Y. March 26, 2002); *see, also SEC* v. *Gane*, No. 03 CIV 61553, 2005 WL 90154, at * 19 (S.D.Fla. 2005) (denying SEC's request for disgorgement where "there [was] no record evidence of any causal connection" between illegality and purported ill-gotten gains). Here, there is no basis for the SEC's disgorgement request because the Complaint does not assert *any* predicate allegation of unjust enrichment or illicit monetary gain obtained by Mr. Miszuk, much less any enrichment or gain that is "causally connected to the alleged wrongdoing." Because the SEC has failed to allege (any) facts sufficient to support a claim of disgorgement, this Court should strike that portion of the SEC's Prayer for Relief that requests a disgorgement order against Mr. Miszuk.

2.    **The Complaint Fails to Allege Scienter on the Bill and Hold Transaction**

a.    <u>Lack of Particularized Factual Allegations</u>

Among the 31 paragraphs of allegations in the Complaint concerning the Bill and Hold transaction, the SEC fails to plead any specific, fact-based allegations that provide "strong circumstantial evidence" that Mr. Miszuk engaged in "conscious misbehavior or recklessness" in connection with that transaction. *Kalnit*, 264 F.3d at 142. Instead, the Complaint relies on the conclusory assertion that Mr. Miszuk, a non-accountant, is liable for securities fraud because he "knew, or recklessly disregarded," that the requirements under GAAP for revenue recognition for a bill and hold transaction allegedly were not satisfied. (Compl. ¶¶ 107, 112, 114, 116, 117).

Indeed, the SEC has failed to assert a single, identifiable fact allegation that shows how or why Mr. Miszuk knew or was reckless in not knowing that bill and hold accounting for the June 2003 transaction supposedly contravened GAAP:

- There are no allegations that the Distributor did not in fact place an order in June 2003 for 27.1 million pills and eventually receive and pay the amount recorded by Biovail for such order. Indeed the allegations are to the contrary or support the contrary inference. (*See infra*, at pp. 16-20).

- The allegations concerning the "Pills Switch" are only (a) that the pills ordered in June 2003 for ultimate use as trade product were "designated" (without alleging the specifics of this "designation") at some point to fill the Distributor's orders for samples, and (b) that at that time those pills were so "designated," Biovail did not then have enough newly manufactured pills to replace them. It is never alleged that newly manufactured pills were in fact not replaced, or that Mr. Miszuk was aware they were not wholly replaced, if that were the case.

- There are no allegations that the Distributor did not receive and pay the agreed prices for all the pills it ordered, either for use as trade product or for use as sample product.

- There are no communications or documents alleged in which anyone, let alone Mr. Miszuk, even discusses the possibility that the accounting was improper, let alone conclude that it was in fact improper.

- There are no communications or documents alleged to indicate that Mr. Miszuk directed or acquiesced in the accounting in the face of anyone even raising an issue about the accounting, let alone in the face of clear impropriety.

Rather than alleging facts, which presumably could have been gleaned from its multi-year investigation if they were to exist, the SEC relies on a *res ipsa loquitor*-type argument:

based on certain alleged attributes of the transaction and certain language of an SEC Staff Accounting Bulletin, Mr. Miszuk "must have" known that Biovail's accounting for the June 2003 order was improper. This Circuit has rejected such reasoning as insufficient for fraud claims. *Collins & Aikman*, 524 F. Supp. 2d at 487; *Shields*, 25 F.3d at 1129 ("We have rejected the legitimacy of 'alleging fraud by hindsight'") (*quoting Denny* v. *Barber*, 576 F.2d 465, 470 (2d Cir. 1978)).[7] There is good reason to reject this attempted syllogism in the case at hand, especially given that Mr. Miszuk is not an accountant and there has been no restatement.

First, it is well-settled that, standing alone, even clear "[GAAP violations] do not establish that the [i]ndividual [d]efendant[] issued those [results] with the requisite fraudulent intent." *In re BISYS,* 397 F. Supp. 2d at 448; *Stevelman* v. *Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (allegations of accounting irregularities insufficient to show conscious misbehavior or recklessness); *Chill*, 101 F.3d at 270 ("Allegations of a violation of GAAP provisions . . . without corresponding fraudulent intent, are not sufficient to state a securities fraud claim"); *Johnson* v. *NYFIX*, 399 F. Supp. 2d 105, 115, 117-18 (D. Conn. 2005) (same effect).

Second, the SEC is required to plead that Mr. Miszuk had access to "information contradicting [Biovail's] public statements," and to specifically identify the documents or statements that revealed the contrary information to him. *Novak*, 216 F.3d at 308, 309; *In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 566-68 (dismissing §10(b) claim for failure to allege scienter where plaintiffs did not identify specific reports or information showing how defendant knew the nature of the subject transactions required deferred recognition of revenue); *Goplen* v. *51job, Inc.*, 453 F. Supp. 2d 759, 770 (S.D.N.Y. 2006) (boilerplate allegations of recklessness insufficient where plaintiffs "fail to identify any documents . . . or reports that show[ed] that the defendants knew or should have known" of information contrary to their public statements); *see,*

---

[7]     *See also Caiafa* v. *Sea Containers Ltd.*, 525 F. Supp. 2d 398, 413 (S.D.N.Y 2007) (no scienter where complaint lacked any allegations suggesting defendants knew or had reason to believe that the "failure to take an impairment charge earlier was an incorrect application of accounting principles"); *Malin* v. *XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007) (despite allegations that accounting problems at company were "well known to [] management," no scienter was found where plaintiffs failed to allege any connection between the accounting improprieties and defendant's knowledge of them).

*e.g., Johnson,* 399 F. Supp. 2d at 115 (refusing to find scienter, despite numerous GAAP violations and restatement revealing "drastic overstatement of financial results" where complaint did not point to any specific source "from which defendants received knowledge of flaws in [corporation's] accounting") (internal quotation marks and citations omitted).  The Complaint is barren of such allegations.

Indeed, it is neither obvious nor strongly inferential from the SEC's pleading of the applicable accounting principles that the recording of the transaction was not in accord with GAAP.  To begin with, there has been no restatement of the Bill and Hold.  Where there has been no restatement, it would seem that the Court must first consider whether the SEC adequately has alleged that GAAP was violated.[8]

Moreover, this is not a case in which the SEC has alleged a transaction from which one might intuitively infer some purposeful or even reckless disregard for GAAP.  Rather, as to the Bill and Hold, the SEC asserts a technical interpretation of certain alleged GAAP revenue recognition requirements, and attempts to bootstrap that technical interpretation into actionable fraud by way of conclusory assertions and inflammatory characterizations.  To cover the inadequacy of the pleading, the SEC attempts an intellectual sleight of hand in two regards, by which this Court should not be fooled.

Specifically, prior to actually alleging the supposed defects in the accounting for the transaction of which Mr. Miszuk supposedly was aware (Compl. ¶ 107), the SEC attempts to make it appear that some defect was obvious by (1) asserting variously that the transaction was "a sham" "phony" and "not genuine" (*id.* ¶¶ 83, 100), and (2) asserting that one alleged GAAP requirement that was "plainly and deliberately flouted was the requirement that the ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders" (*id.* ¶ 100).  On close examination, either (1) there are no factual bases for these

---

[8]    *See, e.g., Druskin* v. *Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1324 n.27, 1326 (S.D. Fla. 2004) (fact that auditors gave a clean opinion at the end of the year, when the purported fraud was still allegedly occurring, raises an inference that defendants were properly accounting for reserves at year end).  This inquiry would seem to be somewhat bound up with the inquiry into whether scienter has been pled adequately, or at least should affect the Court's consideration of the strength of the inference of fraud that the SEC asks the Court to draw, under any facts alleged.

assertions; (2) there are other allegations that counter these assertions; and/or (3) the assertions are in fact not part of what the SEC ultimately alleges Mr. Miszuk "knew, or recklessly disregarded," was wrong with the accounting treatment (Compl. ¶ 107).

First, the characterization of the transaction as phony or a sham is unsupported by facts and is contradicted by the SEC's own allegations. The SEC admits that "the Distributor acquiesced in Crombie's demand for a June order," (*id.* ¶ 94) and that "[o]n June 20, 2003, the Distributor *placed an order* for 27.1 million tablets," (*id.* ¶ 95) (emphasis added).[9] Nowhere does the SEC explain how such an order was "phony" or not "genuine." The SEC has not charged the Distributor with assisting Biovail in the alleged fraud by entering into a "phony" transaction. There also is no allegation that any of the pills ordered by the Distributor, whether sample or trade, were not eventually shipped or paid for. Finally, there is no allegation that the transaction has been restated, or that the auditors have objected to it as "phony" or a "sham." (*Id.* ¶¶ 100, 113). The SEC should be required to support its scurrilous characterization of this transaction, which publicly impugns the reputation and integrity of Mr. Miszuk without foundation. This Court should reject the SEC's characterizations.

Second, the SEC attempts to obscure the lack of factual allegations demonstrating fraud on the part of Mr. Miszuk, by its assertion that in recording the June 2003 order under bill and hold accounting, Biovail "plainly and deliberately flouted" the alleged requirement in Staff Accounting Bulletin 101 ("SAB 101") that "the ordered goods must have been segregated ... and not subject to being used to fill other orders." (Compl. ¶ 100). But the SEC does not in fact claim that pills covering the June 30 purchase order were not segregated as of June 20, 2003. Rather, the SEC alleges that "the goods supposedly sold ... and segregated in the warehouse on June 30, were very soon thereafter *designated* by Miszuk and Crombie to fill *the Distributor's pending orders* for sample product and *were shipped* with new invoices at ... sample prices." (*id.*

---

[9]     Although the SEC attempts to make this "demand" from Crombie sound nefarious, it in fact is nothing more on its face than a responsible request for a firm order when Biovail obviously had incurred costs in beginning the production of the product for the Distributor and reasonably would seek assurance that it would recoup some of this cost through orders under the 2001 agreement, regardless of the timing or event of FDA approval. Biovail's shareholders should expect nothing less from Biovail management in their business dealings.

¶¶ 100, emphasis added; and ¶ 95).  The SEC also does not allege that additional, newly manufactured pills were not eventually shipped and paid for at the trade price under the June 30 order: that is, there is no allegation that Biovail and the Distributor did not eventually satisfy their obligations under the June 20 purchase order.

Indeed, it is the alleged "Pills Switch" that is at the core of the SEC's allegations that the bill and hold accounting was not proper for the June 2003 purchase order (Compl. ¶¶ 101 - 103). The SEC alleges that at some unspecified point, Messrs. Crombie and Miszuk "decided to replace the pills," referring to the ones the SEC alleges Biovail "supposedly had designated and segregated" for the June order. (Id. ¶¶ 101, 102).  Parsing through all of the SEC's strum and dram and ambiguity, the only potential issue in fact raised in the Complaint on the Bill and Hold accounting is whether an alleged decision to ship the originally segregated pills to the Distributor at sample price, and to "replace" those pills with newly segregated, newly manufactured pills, eventually shipped and paid for as trade product under the June 2003 purchase order, affects the accounting treatment for that June order.[10]

The SEC no doubt hopes that SAB 101 will influence the Court to conclude that Mr. Miszuk must have known that the answer was that a pill swap would affect that accounting, because of language in SAB 101 that for bill and hold accounting the "ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders."[11]  However, there are a number of reasons that this language does not require the conclusion that bill and hold accounting is not allowed because of a pill replacement or swap, such as the one the SEC alleges was planned, let alone provide a strong inference that Mr.

---

[10]    Although the SEC does not allege that newly manufactured pills were in fact segregated at the time the originally segregated pills were shipped as sample, it does not allege that this did not occur, and it does allege that such was the plan: Crombie and Miszuk "decided to replace the pills that would now be shipped as sample pills at the lower sample prices with newer pills that would now become the subject of the June 30 sale."  (Compl. ¶ 102) The SEC attempts to demonize this alleged decision, and asserts that the "scheme" to replace the pills was promptly implemented, but then can only allege that by July 18 (several weeks after the June 30 quarter end) the Distributor received various "schedules" showing that Biovail planned to shipped the segregated product under the sample orders.  This shows only that the designation of the pills to be swapped out was still nothing more than a designation by July 18, and that the Distributor was informed of the decision.

[11]    Compl. ¶ 99; Revenue Recognition in Financial Statements, SEC Staff Acct. Bull. No. 101 (Dec. 3, 1999), http://www.sec.gov/interps/account/sab101.htm (last visited 6/23/08).

Miszuk must have been aware that such an interpretation was required.

First, Staff Accounting Bulletins are not binding and do not have the force of law.  As one Commissioner has stated, "The Commission never voted on the views espoused within any SAB, so it does not and cannot represent the views of the SEC."[12]  It is stated at the outset in SAB 101:

> "The statements in staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's approval.  They represent interpretations and practices followed by the Division of Corporation Finance and the Office of Chief Accountant in administering the disclosure requirements of the Federal securities laws."[13]

Indeed, what constitutes GAAP is described in AICPA's Statement on Accounting Standards No. 69, which lists five levels of authority, none of which includes or refers to Staff Accounting Bulletins.[14]  There is nothing cited in the Complaint, SAB 101 or GAAP that would obviously lead to the conclusion that is advanced in this case: that at the time of the transaction at issue Mr. Miszuk knew or was reckless in not knowing that allowing a pill substitution would destroy the bill and hold accounting for the June 20 order.[15]

Second, the language of SAB 101, that the product be segregated and "not be subject to

---

[12]    Comm'r Paul S. Atkins, Remarks to the 'SEC Speaks in 2008' Program at the Practicing Law Institute, (Feb. 8, 2008), http://www.sec.gov/news/speech/2008/spch020808psa.htm (last visited 6/20/08).  In a December 2005 speech, then-Commissioner Atkins cautioned: "Enforcement actions should not be built around Staff pronouncements." Comm'r Paul S. Atkins, Remarks Before the American Institute of Certified Public Accountants, (Dec. 5, 2005)**,** http://www.sec.gov/news/speech/spch120505psa.htm. (last visited 6/20/08).

[13]    SAB 101, *supra* n.11.

[14]    Statement of Accounting Standards: The Meaning of 'Present Fairly in Conformity with Generally Accepted Accounting Principles' in the Independent Auditors Report, AICPA (CCH), No. 69 (Jan. 1992) ("SAS 69").  This is not to say that issuers do not try to follow SEC staff guidance, and , indeed, the authority to which the SEC staff cites in SAB 101 for the specific "criteria" listed therein for bill and hold accounting, is exclusively SEC enforcement actions.  But, this demonstrates the difficulty in asserting that GAAP is only what the SEC alleges in SAB 101, and brings into question whether Mr. Miszuk can reasonably be held to know and be able to interpret the way the SEC now thinks he should have, criteria developed by the SEC staff in settled enforcement actions.  See note 12, *supra*.

[15]    The authoritative literature establishing GAAP for revenue recognition, and applicable to the Bill and Hold transaction here, is FASB Concepts Statement No. 5. Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Finance Statements of Business Enterprises, Finance Accounting Standards Board (Dec. 1984) (www.fasb.org/pdf/aop_CON5.pdf) (last visited 6/20/08) ("FASB Con. 5").  FASB Con. 5 reflects FASB's pronouncement of GAAP as to revenue recognition criteria generally; it contains no specific parameters or criteria for when "bill and hold" treatment is or is not appropriate.

being used for other orders," does not indicate that substituting product segregated of a particular customer under one order, to be used for another existing order by *the same* customer would present an obvious problem, where newly manufactured goods of the *same* type are segregated for the *same* customer, at the *same* time the original product is shipped. If a substitution takes place at the time the original pills are shipped, then it is clear that each set of pills is only sold once and each is used for only one order.

The SEC does not allege that Biovail did not segregate newly manufactured pills at the time the originally segregated pills were shipped to the Distributor at sample prices. Rather, the SEC only alleges that Biovail did not have sufficient pills to replace that product "*as of June 30,*" and at the time of the alleged "*designation*" of the segregated pills to be shipped some time in the future, as sample. (*See* Compl. ¶¶ 100 - 102). Alleging simply that there was not enough product available to replace the segregated pills at the time they were *designated* for delivery under the sample orders, is not the same as alleging that those pills were in fact not replaced at the time of their *shipment*, or that they were "used" for two different orders.

Although, the SEC alleges that Mr. Miszuk anticipated a pill exchange (Compl. ¶¶102-103), the SEC *does not* allege facts indicating that Mr. Miszuk knew or recklessly disregarded that such an accommodation to a customer would adversely affect the previous recording of revenue from the June purchase order. There is no accounting guidance whatsoever on whether making an item-for-item replacement of product for the same customer, in order to fill the same customer's orders will nullify bill and hold treatment. There also are no settled or litigated SEC cases providing an analogous situation.[16]

---

[16]    Most of the bill and hold cases brought by the SEC involve allegations that there was no real obligation by the buyer to pay or no delivery of the product neither of which is the case here. *Cf., e.g., In re Arthur Andersen & Co.*, 47 SEC. 565, 568 (1981) (in a settled action, the SEC said that certain "bill and hold" transactions were "riskless" to the purchaser and therefore did not meet revenue recognition criteria, because among other things, "The customer could cancel the order without penalty at any time . . . The risks of ownership remained with [the seller] . . . [and] the invoices were prepared without prior consultation with, or participation by, the customer as to the content of the order; the SEC alleged that the seller's customers "merely received the equivalent of an option to purchase the merchandise included on bill and hold invoices. In short, no sale had taken place"); *In re Pitts*, SEC Rel. No. 34-42569, 2000 WL 297884, at *1 (Mar. 23, 2000) (in a settled action, the SEC said that the purported "bill and hold" transactions not properly recorded where "the customers had not requested that the transactions be on a bill and hold basis ... [and the customer] had no fixed commitment to purchase the goods"); *In re Parness*, SEC Rel. No. 34-23507, 1986 WL 712572, at *6 (Aug. 5, 1986) (in a settled action, the SEC alleged that the seller agreed to sell

Even if the SEC could allege that sufficient new pills were not segregated when the originally segregated pills were shipped, the SEC does not and cannot allege truthfully that Mr. Miszuk *knew* that newly manufactured pills were not segregated at the time that the previously segregated pills were shipped to the Distributor.[17]

Stripped of its unfounded characterization of the Distributor's June 2003 order as "phony," and of the attempt to give a Staff Accounting Bulletin binding authority it does not have on a situation it does not even cover, the SEC is left with asserting that Mr. Miszuk, a non-accountant controller of a Canadian company, knew or recklessly disregarded that it was clear under U.S. GAAP that bill and hold accounting would not apply in the unique circumstances pled in the Complaint. At most, the SEC Complaint raises an issue of interpretation under unclear accounting guidance. This cannot substitute for the fact-based allegations required to raise a strong inference that Mr. Miszuk committed fraud when revenue from the transaction was recorded as of June 30.

The complexity of accounting principles and their application to specific facts has been recognized by many courts, including the Supreme Court, which has noted that "generally accepted accounting principles" are not a "canonical" set of rules requiring identical treatment of identical transactions; rather they "tolerate a range of 'reasonable' treatments, leaving the choice

---

or lease the equipment on the purchaser's behalf); *see also, e.g.*, *SEC* v. *ABS Indus., Inc.*, No. 99 CV 2600, 1999 WL 977370, at *1 (Oct. 28, 1999) (the SEC alleged that "sales recorded as 'bill and hold' sales were for goods that were neither billed nor shipped to the customers . . ."); *In re Laser Photonics Inc.*, SEC Rel. Nos. 33-7463, 34-39166, 1997 WL 600684, at *4 (Sept. 30, 1997) (in a settled action, the SEC alleged that the "ship-in-place" transaction was "false" because the product was never delivered to the purported customer). Even in *Parness*, however, the SEC recognized that the failure of a buyer to take delivery does not vitiate bill and hold treatment. In other words, a breach of contract by the buyer does not mean that the bill and hold contract and the consequent accounting are not valid.

[17]   The SEC attempts to make the swap sound nefarious. Although in paragraph 101 the SEC alleges, without basis, that the pills segregated in June were "already too old for trade use" and that the swap was effected so that Biovail could "avoid *potential returns,* there is no conversation, document or other information alleged to support this assertion. Indeed, as discussed below in Section I.B.2.b., under *Tellabs,* a more likely inference is that Biovail agreed to the swap to accommodate the Distributor's order for sample, and what would be an obvious desire for newer product to fill the June order at the trade price. In fact, the SEC itself alleges that the Distributor was aware that pills already manufactured and aging were segregated at June 30, because it alleges that "the Distributor agreed to allow Biovail to hold the product awaiting FDA approval." (Compl. ¶ 84). Thus, the SEC, in essence, alleges that in June 2003, the Distributor placed a non contingent order for 27.1 million pills at trade price that it knew would be held, aging, in a warehouse, until the FDA approved the product for sale as trade. Under *Tellabs,* the more reasonable explanation for the pill swap is that Biovail, having spent money and time manufacturing pills for the Distributor, simply accommodated the Distributor and sent the older pills to be used as sample.

among alternatives to management." *Thor* v. *Commissioner*, 439 U.S. 522, 544 (1979); *SEC* v. *Caserta*, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999) (*citing Thor Power Tool, 439 U.S. at 544*); *Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999); *Lovelace* v. *Software Spectrum Inc.,* 78 F.3d 1015, 1021 (5th Cir. 1996); *Merzin* v. *Provident Fin. Grp., Inc.*, 311 F. Supp. 2d 674, 682-83 (S.D. Ohio 2004) (no inference of scienter from GAAP errors where accounting was complex, despite large resulting errors).

> b.    <u>The SEC's Allegations Do Not Support the Required Inference</u>

The SEC's actual allegations of what Mr. Miszuk supposedly "knew or recklessly disregarded" come in paragraph 107, in which the SEC alleges that Mr. Miszuk "knew or recklessly disregarded, among other things,[18] that:

> (a) as of June 30, 2003, there was no fixed schedule for delivery of the goods;
>
> (b) the Distributor had not agreed to pay the higher prices for trade product if it was shipped and used as sample product;
>
> (c) the pills supposedly segregated for the June 30, 2003 trade sale comprised all of Biovail's Wellbutrin XL tablets as of June 30, 2003; and
>
> (e) [sic] no, or insufficient quantities of, other pills were existing, manufactured, and available as of June 30 or when Biovail's second quarter books were closed in July to replace the supposedly segregated pills once Crombie and Miszuk designated them for shipment to the Distributor to fill the Distributor's other pending orders for sample product at the lower sample prices.

(Compl. ¶ 107). However, this recitation of how the SEC believes the *transaction* supposedly failed to qualify for revenue recognition under GAAP as of June 30, 2003 says nothing about Mr. Miszuk's supposed fraudulent intent, or how he, a non-accountant, was reckless in not concluding that the transaction failed to meet GAAP.[19] This Court has faced similarly insufficient allegations in much the same circumstances, and dismissed the complaint.

---

[18] There are no "other things" specified in previous paragraphs, which only contain characterizations and discussion of the transaction and the supposed GAAP requirements. Subsequent allegations are discussed below.

[19] Indeed, the SEC alleges that Biovail's auditors were aware that the transaction was booked as a bill and hold transaction at least by January 2004. (Compl. ¶ 123). Nevertheless, there has not been a restatement of the transaction and there is no allegation that the auditors ever objected to the transaction on any grounds.

In *City of Brockton Ret. Sys.* v. *Shaw Grp Inc*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008), the court dismissed a complaint for failure to offer information to infer that "defendants knew or had reason to know anything about the mistaken application of FASB interpretation." *Id.* at 473 (citing *In re NTL Sec. Litig.*, 347 F. Supp. 2d 15, 33 (S.D.N.Y. 2004) (Kaplan, J.)). Just as in *Brockton*, the Complaint here is silent as to how, why or when Mr. Miszuk knew or had reason to know of any misapplied accounting interpretation relating to the Bill and Hold.

As to the items alleged in paragraph 107 of the Complaint, it is neither obvious nor explained how the "facts" asserted in (c.) and (e.) above affect the accounting for the transaction, let alone how knowledge of those facts would evidence an intent by Mr. Miszuk to commit fraud in connection with recording of the transaction. As discussed above, even if sufficient replacement pills had not been manufactured at the time Biovail closed its books for the quarter ended June 30, 2003 or at the time the segregated pills were "designated" to be shipped as sample, such a fact would do nothing to demonstrate that the accounting was incorrect or, more importantly, that Mr. Miszuk engaged in fraud.

As to the "facts" asserted in (a.) and (b.), there simply are no allegations in the Complaint that reveal whether or how Mr. Miszuk was even apprised that such facts even existed, let alone, why or how he should have concluded that such facts would lead to a violation of GAAP if revenue from the transaction were recorded in the second quarter 2003. Although the Staff Accounting Bulletin to which the SEC points in this case required a "fixed" schedule for delivery, the SEC's assertion that the "parties did not agree [] on a fixed schedule for delivery of the product *because* the date of FDA approval was not yet known" (Compl. ¶ 96) is another argumentative attempt at sleight of hand. In fact, based on the SEC's allegations the timing of delivery was indeed fixed: delivery was due upon FDA approval. (*See id.* ¶ 95 ("the Distributor agreed to let Biovail hold the product awaiting FDA approval and packaging.")). The SEC cites to no specific facts suggesting whether, why, or how Mr. Miszuk concluded or clearly should have known that a mutual agreement between parties to set delivery based on FDA approval would not satisfy the "fixed" delivery item in SAB 101. There are no documents, conversations, or emails, referred to in the Complaint even suggesting that Mr. Miszuk came to or was made

aware of such a conclusion.

Finally, although the Complaint contains the allegation that "the Distributor did not agree to pay the trade prices if it used the pills as sample product" (Compl ¶ 121), it contains no allegations as to Mr. Miszuk's purported knowledge of or recklessness as to this supposed fact, or as to its significance for bill and hold accounting. An allegation that something *was not agreed to* is meaningless in this context. The SEC has not alleged that as of the date of the June order, or anytime thereafter, the parties agreed or knew that the Distributor would *not* pay if the pills were used as samples. And, contrary to this assertion, the very allegations in the Complaint are that the Distributor agreed to pay a fixed price for pills which it knew had not been FDA approved and had not been packaged for sale as trade product. As alleged by the SEC, Biovail invoiced the Distributor for $8 million for the pills, and Biovail held them pending FDA approval. (*Id.* ¶ 96). There is no allegation that the product ordered in June was not delivered to the Distributor, or that the Distributor did not pay the $8 million due to Biovail.

At most, the Complaint alleges that some time after this non-contingent purchase order was submitted by the Distributor, Biovail allowed a pill swap and allowed the Distributor to pay the sample price for product that originally was segregated under the June purchase order. As discussed above, the fact that Biovail allowed this to occur and shipped the pills originally segregated for use as samples (instead of as trade product) is not indicative of accounting impropriety, let alone of fraud by Mr. Miszuk.

The SEC also alleges, without any factual basis, that Mr. Miszuk knew or recklessly disregarded, "that during August the Distributor had refused to process the June 30 invoices for the trade product sale because Biovail was shipping the same pills under sample invoices at the lower sample prices." (*Id.* ¶ 112). The allegations do not provide any facts suggesting how or from whom Mr. Miszuk received information concerning the Distributor's alleged refusal "to process" the June 30 invoices or why it was doing so. Also, the allegation is meaningless: the SEC does not allege that the invoice issue was not rectified and does not allege nonpayment, but rather only alleges a "refusal to process" the June 30 invoices at one point in time. In fact, the more likely explanation of this, on its face, is that the Distributor was temporarily reacting to

erroneously receiving two sets of invoices for product with one lot number. (*Id.* ¶ 124). *See Tellabs*, 127 S. Ct. at 2510 ("a court must consider plausible nonculpable explanations for the defendant's conduct"). All that would be required to rectify the situation would be to reissue the invoice for the June order with a lot number for newly segregated, swapped, pills.

As noted above, Biovail has not restated the Bill and Hold transaction, a fact strongly negating an inference of fraudulent intent (and, we believe, raising serious questions about the SEC's asserted interpretation of GAAP). *See, e.g., Druskin,* 299 F. Supp. 2d at 1324, 1326 (fact that company issued no accounting restatements refutes inference that defendants acted with requisite intent); *In re Alamosa Hldgs., Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 854 (N.D. Tex. 2005) (dismissing securities fraud action where the company had "never been required to restate its financial statements" during the period in question and plaintiffs did not "allege facts to contradict the approval of the financial statements by [the company's] outside auditor who approved the statements without qualification").

Moreover, notwithstanding the allegations of fraud in the Complaint, and despite the fact that the SEC's investigation into alleged fraud at Biovail has been ongoing for over four years, Biovail's outside auditors have issued unqualified audit opinions on Biovail's annual financial statements for 2003 through 2007.[20] They have not resigned or retracted their opinion on the applicable accounting treatment. The auditors, if they believe there is fraud, are required to bring that to the attention of company management, and if it is not rectified, the auditors must either resign or notify the SEC by report.[21] Neither of these things has been alleged to have occurred.

---

[20]    See 20-F 2003 Annual Report, available at
http://sec.gov/Archives/edgar/data/885590/000104746904017429/a2136694z20-f.htm; 20-F 2004 Annual Report,
available at http://sec.gov/Archives/edgar/data/885590/000104746905018555/a2160202z20-f.htm; 20-F 2005
Annual Report available at http://sec.gov/Archives/edgar/data/885590/000104746906004403/a2168876z20-f.htm;
20-F 2006 Annual Report available at
http://sec.gov/Archives/edgar/data/885590/000104746907002027/a2176789z20-f.htm; 20-F 2007 Annual Report
available at http://sec.gov/Archives/edgar/data/885590/000104746908002964/a2182900z20-f.htm.

[21]    Section 10A of the 1934 Exchange Act requires auditors who "detect [] or otherwise become [] aware of
information indicating that an illegal act (whether or not perceived to have a material effect on the financial
statements of the issuer) has or may have occurred," to "as soon as practicable, inform the appropriate level of
management . . . and assure the audit committee . . . or the board of directors . . . is adequately informed with respect
to the illegal acts." 15 U.S.C. § 78j-1(b)(1) (1999 & Supp. 2008)**.** If after such disclosure, an auditor concludes that
management has not taken adequate remedial measures with respect to the illegal act, that auditor must directly

*See Druskin,* 299 F. Supp. 2d at 1324 n.27, 1326 (fact that no auditors resigned during or after the relevant period weakens any inference that defendants acted with scienter).

The SEC has leveled serious charges against Mr. Miszuk that obviously jeopardize his career and impugn his integrity.  Even the SEC should not be allowed to bring the types of charges it has alleged in this case without being able to point clearly to some evidence, literature or actions that demonstrate, first, that the accounting for the Bill and Hold was improper, and, second, either that Mr. Miszuk knew of that impropriety or that it was so obvious he must have been aware of it.  This requires, as the Second Circuit has put it, that facts be alleged demonstrating that Mr. Miszuk's conduct was "an extreme departure from the standards of ordinary care" so severe that it approximates "actual intent."  *Honeyman* v. *Hoyt* (*In re Carter-Wallace Sec. Litig.,*) 220 F.3d 36, 39 (2d. Cir. 2000) (internal quotation marks and citations omitted); *see also Novak, 216* F.3d at 308, 312**.**  If these words mean anything, they mean that the asserted action on the Bill and Hold transaction must be dismissed.

### 3.    The Complaint Fails to Allege Scienter on the Foreign Exchange Issue

#### a.    The Allegations

The Complaint's allegations concerning the foreign exchange loss similarly do not withstand scrutiny under Rule 9(b).  The SEC alleges that Mr. Miszuk knowingly permitted BLI, a Biovail subsidiary located in Barbados, to fail on a quarterly basis to apply the U.S.-to-Canadian-dollar exchange rate to a debt on BLI's books and consolidated on Biovail's books. (Compl. ¶¶ 126, 128).  This quarterly adjustment allegedly was necessary in order to reflect the difference between the recorded amount, which was shown as U.S. dollars (because that was the currency in which Biovail reported its financial results) and the amount that would have to be repaid, which was in Canadian dollars.[22]  The SEC admits that the failure to apply the current exchange rate to the foreign debt was, at least initially, an inadvertent error (*id.* ¶ 129).  There is

---

report this conclusion to the board of directors, who are then required to "inform the Commission" of the reported illegal act. *Id.*, § 78j-1(b)(3).

[22]    Mr. Miszuk does not contest that this is the appropriate accounting.

no allegation that Mr. Miszuk was involved with the transaction at its inception or had anything to do with the initial decision on how to record the debt. There is no allegation that Mr. Miszuk was aware of the failure to use the current exchange rate when the debt was first updated at the old exchange rate in the first quarter of 2003.

It is only when we come to the second and third quarters of 2003 that the SEC alleges that the failure to apply the then-current rate was an "intentional misstatement," intended to understate losses and "conceal" Biovail's "weak . . . performance" in the second quarter 2003 and, incongruously, to fraudulently "*understate*[] quarterly net income" in the third quarter 2003 (*id.* ¶¶ 2, 125-29, 131, 134) (emphasis added). When the failure to apply the current exchange rate was discovered (*id.* ¶ 135), the Company dutifully restated its earnings for the first through third quarters of 2003, decreasing net income by approximately $6.2 million for the first two quarters—and actually increasing net income by approximately $3.1 million for the third quarter.[23]

On its face, the SEC's Complaint and the allegations on this issue pleads, only, and without specificity, that Mr. Miszuk "was told" of an error that was not corrected. There is no allegation as to whether or how Mr. Miszuk responded to this information. Consider: (1) the SEC admits that when the error was first made and recorded on the books of Biovail's Barbados subsidiary, it was in fact, simply an inadvertent error (*id.* ¶ 129) and the SEC does not allege that it was done fraudulently and has not brought charges against those who initially made the error; (2) the SEC's allegations of fraud against Mr. Miszuk on this item are contained in a single paragraph in the Complaint that simply states that he was "told" of the error (Compl. ¶ 130)[24]; and (3) the SEC relies on, in effect, the *absence* of any further communication, discussion or evidence of a decision being made on the issue thereafter. The rest is mere conjecture and

---

[23]  *See* Biovail Corp. Form 6-K/A, filed May 14, 2004, *available at*
http://www.sec.gov/Archives/edgar/data/885590/000104746904017437/a2130832z6-ka.htm;
http://www.sec.gov/Archives/edgar/data/885590/000104746904017434/a2130705z6-ka.htm;
http://www.sec.gov/Archives/edgar/data/885590/000104746904017436/a2130932z6-ka.htm.

[24]  The court need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice. *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006).

speculation about Mr. Miszuk's supposed intent.  No inference of scienter, let alone the requisite strong inference, is established by the allegations in the Complaint. *See In re ICN Pharm., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004) (dismissing complaint for failing to "provide detailed evidence of the contemporaneous decision-making behind the alleged accounting errors that would combine to show the requisite scienter"); *In re Astea Int'l Sec. Litig.*, No. Civ. 06-1467, 2007 WL 2306586, at *18 (E.D. Pa. Aug. 9, 2007) ("If anything, defendants' failure to apply [GAAP] properly may constitute negligence or 'little more than corporate mismanagement'" but [such] claims . . . are not cognizable under [the] federal [securities] law[s]" (citations omitted)).[25]

The Complaint falls utterly silent as to Mr. Miszuk's actions after the supposed July 8 communication.  Rather, the Complaint alleges merely that "Miszuk and Biovail did not record the additional foreign exchange loss . . ." (Compl. ¶ 131), and conclusorily asserts that this was done with fraudulent intent.[26]  Indeed:

- There are no allegations as to what, if any, further communications Mr. Miszuk, the Senior Director of Legal Accounting or the BLI Controller had, either among themselves or with any other individuals, about the foreign exchange accounting, and no facts alleged showing why and under what circumstances the alleged need for an adjustment was not made.

- There are no facts alleged to the effect that Mr. Miszuk actually was involved in any conversations at all about the issue after July 8.

---

[25]    Courts have recognized that even the existence of "red flags," or information suggesting the possible falsity of a company's financial statements does not necessarily translate into knowing and intentional fraud. *SEC* v. *Todd*, No. 03 CV 2230, 2007 WL 1574756, at **13-14 (S.D. Cal. May 30, 2007) (court held that information suggesting a possible "red flag" was not substantial evidence to support a finding of scienter); *see In re Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1075 n.7 (N.D. Cal. Aug. 14, 2002) (scienter not found for defendant CFO in receipt of employee's letter informing him of "specific incident of improper accounting;" Court held "this single allegation that Defendant[] had knowledge of a single improper revenue recognition decision fails to state sufficient facts from which a strong inference of scienter can be drawn").  Rather, courts look for "multiple, obvious red flags before drawing an inference that a defendant acted intentionally or recklessly." *P.R. Diamonds, Inc.* v. *Chandler*, 364 F.3d 671, 686-87 (6th Cir. 2004); *In re SCB Computer Tech., Inc.*, 149 F. Supp. 2d 334, 363 (W.D. Tenn. 2001) (justifying a strong inference of scienter requires that "'red flags' must be closer to "smoking guns" than to mere warning signs").  As discussed above, even the July email exchange does not rise to the level of a "red flag" of possible fraud.

[26]    On a motion to dismiss, the court "need not accord legal conclusions, deductions or opinions couched as factual allegations a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007), *cert. denied sub nom.*, 128 S. Ct. 1707 (2008).

-24-

- The Complaint offers no information (*e.g.* emails, memoranda or allegations of secretive conversations or agreements) showing that Mr. Miszuk or anyone else at Biovail reached a final, definitive decision as to the proper accounting treatment and then deliberately ignored it.

- The SEC does not allege that the Senior Director of Legal Accounting or the Controller of BLI were directed by anyone, let alone Mr. Miszuk, not to correct the alleged error, and they are not charged with any wrongdoing in connection with the issue.

- There are no allegations that Mr. Miszuk, or anyone at Biovail, took any steps to conceal the error by adjusting any books, records or references to it.

Finally, as the SEC recognizes, the supposed foreign exchange accounting fraud led Biovail to *understate* its revenue in the third quarter when it again failed to apply the then-current foreign exchange rate. (Compl. ¶ 134). The fact that revenue was understated is inconsistent with the SEC's theory that the Company was trying to conceal losses. As other courts have recognized, an understatement of revenue gives rise to a "compelling" and "cogent" inference that defendants were simply mistaken about the correct accounting treatment and weakens an inference of scienter.[27] *See, e.g., In re Bally Total Fitness Sec. Litig.,* No. 04 C 3530, 2006 WL 3714708, at *8 (N.D. Ill. July 12, 2006) (inference of scienter was undercut by fact that "revenues for some quarters was at times understated"); *In re Interpool Sec. Litig.,* No. Civ. 04-321, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) (fact that restated figures "in fact resulted in an increase to reported income . . . negate[d] an inference that Defendants acted with intent to perpetrate a fraud . . . via misleading financial statements"). Indeed, the alleged overstatement of $0.02 per share in the second quarter was entirely offset for the full year by the understatement of $0.02 in the third quarter. In short, nothing in the SEC's Complaint supports an inference that Mr. Miszuk was involved in any purposeful, fraudulent decision to not correct the alleged error.

**b.    The July 2003 Emails**

As noted in the Summary, *supra,* there is a communication about the currency exchange

---

[27]    In fact, Bioivail's earnings for the third quarter were so dismal, missing their initial projections by $0.23 per share, (Hiler Decl, Ex. 3, Biovail Inc.'s Press Release, "*Biovail Provides Guidance on Third Quarter Results,*" Oct. 3, 2003) that in logic, had anyone at Biovail recalled the foreign exchange issue, that would have been the quarter to correct it, and the prior periods, to make a clean slate, and then continue forward, hedging the exposure in the currency markets.

rate error on July 8, 2003 to which we assume the SEC is referring, and thus we submit as an exhibit to this motion. (Hiler Decl. Exs. 2A & 2B.) Even if it is not the communication referred to in paragraph 130 of the Complaint, then the SEC Complaint still should be dismissed for the reasons cited above. But, as discussed below, this email communication contradicts any inference of fraud the SEC might hope to get from its singular assertion that on July 8, 2003 Mr. Miszuk was "told" of the error.

As the July 8, 2003 email exchange makes clear, (Hiler. Decl. Ex. 2A),[28] during the closing of BLI's books for the second quarter 2003, Biovail's Senior Director of Legal Accounting questioned BLI's Controller, who was located in Barbados, about the proper accounting treatment relating to a foreign debt obligation that had been carried on BLI's books since December 2002. Mr. Miszuk was copied on the email. The Senior Director of Legal Accounting asked:

> shouldn't the remaining loan balance be adjusted to reflect the FX rate in effect at June 30th? I believe it should (even though this was missed at March 31st) which would result in an additional FX loss of approx. $9.2 million in Q2 – something tells me the boys are not going to like that.

(Hiler Decl., Ex. 2). In an email later that day, Mr. Miszuk requested to "see some analysis on this." He also asked for a meeting on the coming Thursday to discuss the issue with the two accountants. (*Id.*). Mr. Miszuk's initial response to the Senior Director's communication is clearly inconsistent with fraudulent intent. Responses like Mr. Miszuk's have been recognized as reasonable and appropriate – not fraudulent. *See In re Phillips*, SEC Rel. No. ID-55, 1994 WL 485042, at **10-11 (Aug. 26, 1994) (finding that defendant chairman and CEO of a subsidiary at which fraud was alleged was not culpable when he did not alert the parent company immediately after learning that there "could be serious problems" with the subsidiary's financials, because he was awaiting additional analysis on the potential problem).

---

[28] The Court may consider the full text of July 8, 2003 email if this is the communication referenced in the Complaint, upon which the SEC heavily relies. (Compl. ¶¶ 130, 132, 133). *JP Morgan Chase Bank* v. *Winnick*, 406 F. Supp. 2d 247, 254 (S.D.N.Y. 2005) ("emails . . . referenced within the [c]omplaint are . . . properly considered" on motion to dismiss); *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *SEC* v. *Terry's Tips, Inc.*, 409 F. Supp. 2d 526, 529 n.1 (D. Vt. 2006) (court considered full text of emails referenced in SEC's complaint and noted that SEC did not object).

Moreover, a court is required to consider plausible non-culpable explanations for the defendant's conduct when determining whether the pleaded facts give rise to a strong inference of scienter. *Tellabs*, 127 S. Ct. at 2504. The reasonable and innocent inference is that the error was made at the Barbados subsidiary and when it was discovered, Mr. Miszuk, having asked for analysis, thought that his associates would deal with it, especially because it had been brought to the attention of the Controller of the subsidiary at which the error occurred. Alternatively, it is just as likely that Mr. Miszuk simply forgot about the issue, among all the work normally associated with being Biovail's Controller, and/or assumed it was being handled. This would be unremarkable, given that the issue clearly was being considered by Biovail's Senior Director of Legal Accounting and the Controller of the relevant subsidiary. Indeed, the chain of related emails that ends on July 10, 2003, shows the Senior Director of Legal Accounting directing how the matter should be temporarily recorded, until further discussion can be had. (Hiler Decl. Ex. 2B).

Rather than plead particularized facts showing that Mr. Miszuk knew or was severely reckless in his conduct relating to the foreign exchange rate issue, the facts as alleged and as evidenced from a review of this email chain supply a plausible inference only that a mistake was made, and nothing more.

## II.    THE COMPLAINT FAILS TO ADEQUATELY PLEAD MATERIALITY

Even setting aside the Complaint's failures under Rule 9(b), the fraud claims asserted in connection with the foreign exchange and Bill and Hold issues must be dismissed because the alleged misstatements are immaterial as a matter of law. For a securities fraud claim, a plaintiff must allege "a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Put another way, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic* v. *Levinson*, 485 U.S. 224, 231-32 (1988). Where the amount of an alleged misstatement is so small, or the impact so far removed from the key attributes of a company that it would not have altered the total mix of information available

to the market, a court should dismiss securities fraud claims. *See, e.g., In re Allscripts, Inc. Sec. Litig.*, No. 00-C-6796, 2001 WL 743411, at \*10 (N.D. Ill. June 29, 2001) (dismissing securities fraud action in part because alleged misstatements, accounting for approximately 1% to 4% of corporation's annual revenue, were immaterial as a matter of law).

### A.    The Bill And Hold Revenue Was Immaterial

According to the SEC, Biovail allegedly overstated its revenue by $8 million and its earnings by $4 million in the second quarter of 2003 in connection with the Bill and Hold transaction. (Compl. ¶¶ 83, 106, 116, 117). The alleged misstatement of $8 million in revenue in the second quarter of 2003 amounts to only a legally immaterial 3.7% of Biovail's total second quarter quarterly revenue of $217.3 million, and ***less than 1%*** of Biovail's 2003 annual revenue of $823.7 million. The impact on even quarterly revenue is patently immaterial. *See Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (Where there was an approximately 1% to 4% overstatement of revenue ($416,000 to $1.55 million on quarterly revenue of $37.1 million), the court stated that the "transactions do not support a strong inference of scienter."); *In re Allscripts,* 2001 WL 743411, at \*10.[29]

### B.    The Foreign Exchange Error Was Immaterial

Although Biovail restated its financials in May 2004 as a result of the exchange rate error, the alleged error was immaterial in a fraud action as a matter of law.[30] First, as a purely quantitative matter, the second quarter "loss" from marking the debt to market was immaterial.

---

[29]    The SEC does not explain how it arrives at the alleged $4 million *earnings* figure that it attributes to the Bill and Hold transaction. However, such amount cannot be seen as material given that Biovail reported a GAAP loss of $0.01, even if $0.02 per share (to which $4 million translates) from Bill and Hold was included in the second quarter 2003 GAAP earnings. *See, e.g., SEC* v. *Patel,* No. 39-SM, 07-CV-2008 WL 781914, at \*13 (dismissing claim where pro forma earnings would have been a loss of $0.06 instead of $0.02); *Guenthner*, 395 F. Supp. 2d at 847-48 (rejecting argument that investors would necessarily "find [an impact on] earnings and profitability important" where the company already had an operating loss). Further, even without the Bill and Hold, Biovail would have reported $0.50, well within its projected non-GAAP earnings range of $0.43 to $0.50 for the second quarter. (Compl. ¶ 87).

[30]    The fact that a company issues a restatement does ***not*** mean that the accounting error restated was material from the perspective of a reasonable investor under the law. Companies can restate immaterial errors, and often do. *See Progress Report of the SEC Advisory Committee on Improvements to Financial Reporting*, SEC Rel. Nos. 33-8896, 34-57331, 2008 WL 441528, at \*47 (Feb. 14, 2008) (*"Some have asserted that the increase in restatements is the result of an overly broad application of the concept of materiality . . . resulting in errors being deemed to be material when an investor may not consider them to be important"*) (emphasis added).

According to the restatement, the alleged error changed reported earnings from a loss of $0.01 per share to a loss of $0.03. *Patel*, 2008 WL 781914, at *13. It neither changed a gain from a loss nor resulted in Biovail otherwise making earnings targets. Moreover, it was in essence cancelled out by the $0.02 *gain* that allegedly should have been recognized in the third quarter 2003, had the correct, then-current exchange rate been applied at the end of that reporting period. Thus, for the six-moth period ended with the third quarter 2003, the net effect of the error was ***zero***.[31]

The above analysis is even more compelling when the obvious, fundamental truth about the alleged error is considered. Both "earnings" and "losses" *recognized* from exchange rate calculations had ***zero*** impact on Biovail's reported *operating results* for all three relevant quarters. The errors alleged in the Complaint involved calculation of *unrealized* foreign exchange losses or gains on the unpaid portion of a debt at a subsidiary – a non-operating item that reasonable investors would not have considered significant in making investment decisions about Biovail's prospects. Although GAAP may require marking the debt to market each quarter, thus *recognizing* a gain or loss for accounting purposes, the number is immediately meaningless, as currency exchange rates fluctuate every day. In reality, the fluctuation is only significant on the day the company repays the debt. And, once such an issue is discovered, a company can attempt to hedge this exposure in the currency markets. Thus, it is unlikely that investors would view the potential effect of a currency fluctuation at any one point in time as significant to an outstanding debt obligation, on which no such loss has actually been *realized*, and may never be.

Additionally, there was no significant reaction by the market generally that can be attributed to the restatement. On March 3, 2004, Biovail released its financial results for the fourth quarter and the full year 2003, and disclosed, among other things, that Biovail's earnings for the first, second, and third quarters of 2003 would be amended due to an error in applying the foreign exchange rate. Although Biovail's stock price dropped after the March 3, 2004 earnings

---

[31]    The SEC compares all figures with or including the amount of understatement from the first quarter 2001, which it admits was an inadvertent error.

release, to close at $18.60 from a pervious close of $20.77, the release discussed several items in addition to the exchange rate error, including missed earnings estimates, to which the decline in the stock price is realistically attributable.[32]

### III.    THE COMPLAINT FAILS TO STATE CLAIMS UNDER SECTION 13(b)

The heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure should be applied to all claims that sound in fraud even if scienter is not a required element for those claims.  *See Rombach*, 355 F.3d at 171  (the court applied Rule 9(b), particularity standard to claims under Section 11 and 12(a)(2)).  Since allegations of fraud are pervasive in the Complaint and in each of the claims asserted,[33] the particularity requirement of Rule 9(b) also applies to the SEC's claims under Section 13(b)(5) and Rules 13b-1 and 13b-2.

### A.    The Complaint Fails To State A Claim Under Section 13(b)(5)

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall *knowingly* circumvent or *knowingly* fail to implement a system of internal accounting controls" or *"knowingly falsify"* an issuer's books and records.[34]  15 U.S.C. § 78m(b)(5)  (emphasis added).

From the language of Section 13(b)(5) itself, it is clear that the SEC will be required to prove, and must now at least plead, that Mr. Miszuk had actual *knowledge* of control deficiencies or *knowingly* circumvented them, or that he knew he was "falsifying" a record of Biovail.[35]  First, as discussed in Section I above, the Complaint fails to allege facts sufficient to infer that

---

[32]    The fall in stock price following the press release can be attributed to analysts' reports raising concerns over poor sales performance and Biovail's lowered guidance, not to issues related to the foreign exchange debt valuation (*e.g.*, Deutsche Bank lowered estimates for 2004 to $1.29 from $2.10) (Hiler Decl. Ex. 4 at 1, Deutsche Bank,. *Biovail Corporation – Q4: Another EPS Shortfall – and Biovail Lowers the Bar, Again* (Mar. 4, 2004); *see also* Hiler Decl. Ex. 5, CIBC World Markets, *Biovail Corporation – 4Q03 Falls Short; Lowering Rating to Reflect Unfavorable Near-Term Reward / Risk* (March 3, 2004); *cf, In re Miller Indus., Inc.*, 120 F. Supp. 2d 1371, 1381 (N.D.Ga. 2000) (alleged misstatement held immaterial where analysts reports showed that the "market disregarded" the affected portion of the company's financial results in assessing the company's prospects).

[33]    Each of plaintiff's ten claims incorporate and restate the allegations in paragraphs 1 through 147 (*see* Compl. ¶¶ 148, 154, 159, 162, 165, 169, 172, 175, 178, 185).

[34]    The Complaint's Third Claim charges Mr. Miszuk with violating Section 13(b)(5) of the Exchange Act.

[35]    *Cf., e.g.*, *SEC* v. *Cohen*, No. 05CV371, 2007 WL 1192438, at *18 (E.D. Mo. Apr. 19, 2007) (requiring that defendant have knowledge that the underlying accounting is incorrect in order to establish liability under § 13(b)(5); finding liability under that section only where there was "evidence that the defendant knew he was falsely recording the [subject transactions] as bill-and-hold transactions").

Mr. Miszuk allowed any of Biovail's books and records to be falsified. Second, the Complaint makes no allegations about what accounting controls existed or did not exist at Biovail, much less Mr. Miszuk's knowledge or involvement in implementing or "knowingly" circumventing them. *See Patel*, 2008 WL 781914, at *14 (Section 13(b)(5) counts dismissed when the SEC failed to direct the court to "factual allegations in its complaint that might support [13(b)(5) claims]"); *see, e.g.*, *SEC* v. *Kahn*, No. 99 C 6343, 2002 WL 1163723, at *14 (N.D. Ill. May 31, 2002) (denying SEC's summary judgment motion on Section 13(b)(5) and Rule 13b2-1 claims where SEC did not specify what internal accounting controls were circumvented).

Contrary to the implication of the Complaint, Section 13(b)(5) does ***not*** establish a circumvention or lack of sufficient internal controls, or that someone "knowingly falsified" a record every time a GAAP violation occurs. The failure to plead with particularly either (1) specific findings concluding circumventions or inadequacies and Mr. Miszuk's knowledge of such issues; or (2) facts supporting that Mr. Miszuk had knowledge he falsified records, is fatal to the Complaint.

### B.    The Complaint Fails To State A Claim Under Exchange Act Rule 13b2-1

Exchange Act Rule 13b2-1 states that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to [15 U.S.C. § 78m(b)(2)(A)]." 17 C.F.R. § 240.13b2-1. Although Rule 13b2-1 does not specify a mental state, the term "falsify" itself connotes something improper. As discussed in detail in Section I, the SEC fails to plead facts supporting an inference that Mr. Miszuk engaged in any conduct that supports the conclusion that he "falsified" Biovail's books and records in connection with either the Bill and Hold transaction, or the foreign currency issue. As discussed in Section I, the SEC has not adequately alleged even that the recording of the Bill and Hold transaction contravened GAAP.

As to the foreign exchange rate error, the SEC itself does not allege that Mr. Miszuk was aware of any issue until after the error had been committed for one quarter, and only alleges facts that at most allow an inference that a possible issue was brought to his attention, which others were considering. No facts are alleged thereafter which support in any way the notion that Mr. Miszuk was even aware of whether the error was repeated in later quarters, let alone that he was

involved in "falsifying" records. (*See supra* discussion on pp. 25 – 26).

### C.  The Complaint Fails To State A Claim Under Exchange Act Rule 13b2-2

Exchange Act Rule 13b2-2 prohibits an officer or director from making false or misleading statements to auditors in connection with preparation of publicly filed financial statements. 17 C.F.R. § 240.13b2-2.  To state a claim under Rule 13b2-2, the SEC must plead that Mr. Miszuk had knowledge that the information he allegedly provided to Biovail's auditors was false.  *Todd*, 2007 WL 1574756, at *15 ("The Court has yet to find a case where a claim of Rule 13b2-2 violations was sustained without knowledge of the falsity of the statements at issue").

The SEC  alleges that Mr. Miszuk "omitted" to tell the auditors certain things about the Bill and Hold transaction: (1) that he failed to correct the auditor's reference in an unspecified communication to a "shipment" having been made under the June order (Compl. ¶ 120); and (2) that he failed to tell the auditors of an alleged refusal initially to pay the June invoices, and of the shipment of the segregated pills as sample product (not referencing any specific conversations in which these disclosures were required to have occurred under penalty of rendering what was said misleading). [36] (Compl. ¶¶ 121, 123).  First, as discussed in Section I, the allegations in the Complaint do not support how these matters would have been material, in so much as the Complaint neither adequately alleges a GAAP violation, nor sufficiently alleges how or why Mr. Miszuk should have attached importance to these matters, or that he did attach importance to them.   Indeed, the Complaint does not allege that the auditors required a restatement, even after they allegedly learned of the bill and hold treatment in January 2004, only six months after the transaction occurred.

Second, the SEC has not alleged sufficient facts as to specific communications, or the full context and substance of communications, to allow the conclusion that the alleged "omissions"

---

[36]  The SEC alleges that Mr. Miszuk purportedly withheld the "true reason" for the September 1, 2003 credit memos from the auditors and instead told them that Biovail credited out the invoices in order to issue invoices that included packaging costs. (Compl. ¶ 124).  Yet, and as discussed *supra*, pp. 21, 31-32, this allegation is insignificant.  In light of the fact that the SEC makes no allegation that the Distributor did not ultimately pay the invoices, all that would be necessary to correct the situation would be to re-issue new invoices reflecting the two different lot numbers.

indeed were material facts "necessary to make *the statements made*, not misleading." All of the alleged omissions are reasonable and unremarkable when considered in the absence of further allegations about the context and circumstances of the conversations that were supposedly misleading. Any general conversation about the transaction, or general representation that Biovail's accounting was correct in Mr. Miszuk's view, cannot be seen as containing a material omission, in light of the absence of facts supporting the SEC's claims of impropriety in the first place.

The SEC also alleges that Mr. Miszuk made affirmative materially false statements prohibited by Rule 13b2-2 when he (1) allegedly told the auditors that the price for the June order was "fixed" (Compl. ¶ 119), and (2) allegedly "made misrepresentations in a management report," circulated to auditors because the report included earnings from the transaction and a statement that the Company's financial complied with GAAP. (*Id.* ¶ 122). As discussed in Section I above, there are insufficient allegations to conclude that the price was not "fixed." Indeed, the SEC alleges it was fixed (*id.* ¶¶119, 120), but argues that it was changed because of the pill swap, but without alleging that the price that was fixed in the June order was not in fact paid by the Distributor eventually, for the swapped pills. As to any representation about compliance with GAAP, as discussed in Section I, above, there is no factual basis to indicate that Mr. Miszuk was making a misrepresentation or should have known he was, if he gave a view that the recording of the June order as a bill and hold complied with GAAP.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING

The SEC alleges that Mr. Miszuk – only in connection with the Bill and Hold transaction and the foreign exchange accounting issue – aided and abetted Biovail's alleged violations of Exchange Act (1) §10(b) and Rule 10b-5 (antifraud provisions), (2) §13(a) and various rules thereunder (issuer reporting obligations), and (3) §13(b)(2)(A) and (B) (issuer books and records and internal controls). For the same reasons as discussed in Sections I through III, above, the various claims that Mr. Miszuk aided or abetted Biovail's alleged violations of securities laws also fail.

Section 20(e) of the Exchange Act, which governs aiding and abetting claims in SEC

actions, provides for such liability only where a person "*knowingly* provides substantial assistance to another person in violation of a provision of [the Exchange Act]" (emphasis added). Courts in the Second Circuit consistently give this language its common meaning of actual knowledge – rather than constructive knowledge or recklessness. *See, e.g., SEC* v. *KPMG LLP*, 412 F. Supp. 2d 349, 382-83 (S.D.N.Y. 2006) (discussing legislative history and rejecting SEC's argument that Section 20(e) encompasses recklessness); *see also SEC* v. *Coffman*, No. 06 CV 00088, 2007 WL 241 2808, at *10 n.4 (D. Colo. Aug. 21, 2007) (aiding and abetting requires "actual knowledge"); *SEC* v. *Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006). Moreover, aiding and abetting claims must satisfy Rule 9(b) pleading requirements. *See SEC* v. *Solow*, No. 06-81041-Civ., 2007 WL 917269, at *4 (S.D. Fla. Mar. 23, 2007) (aiding and abetting claims dismissed for failure to comply with Rule 9(b)).

As to the Bill and Hold transaction, liability for aiding and abetting Biovail in allegedly violating the antifraud, books and records and internal control provisions necessarily must flow from the allegation that the Bill and Hold was misstated. The SEC, however, has failed to adequately allege that the accounting for the Bill and Hold transaction was recorded improperly. *See supra* Section I. Without a primary violation, Mr. Miszuk cannot be held liable as an aider and abettor in connection with that transaction.

Moreover, the Commission has not adequately pled that Mr. Miszuk's conduct in connection with the Bill and Hold was "reckless," much less that he had knowledge of a supposed fraud or misreported financials, or that he knew he was in engaged in any misconduct. Thus, the SEC cannot allege either "knowing" or "substantial" assistance by Mr. Miszuk of *any* of Biovial's alleged violations. *See supra* Section II.B. *See, e.g., SEC* v. *Morris*, No 04-3096, 2005 WL 200665, at *9 (S.D. Tex. Aug. 18, 2005) (no aiding and abetting liability for CFO who "reviewed, signed and was responsible for the public filings" where no other conduct was alleged to show defendant's awareness of or participation in the fraud); *Coffman*, 2007 WL 2412808, at *1 (following trial, court dismissed claims for aiding and abetting violations of §10(b) where plaintiffs failed to prove defendant's scienter with respect to primary violation); *SEC* v. *Sandifur*, No. 05-1631, 2006 WL 538210, at *12 (W.D. Wash. Mar. 2, 2006) (dismissing

aiding and abetting claims despite allegations that defendants knew that the subject transaction was "highly atypical," because there were no allegations that defendants "knew the allegedly improper or fraudulent purpose" of the subject transaction); *see also Edwards & Hanly* v. *Wells Fargo Sec. Clearance Corp.,* 602 F.2d 478, 484 (2d Cir. 1979) (a "'party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud'") (citation omitted). Without this requisite, and specifically pled, knowledge, the Complaint fails.

Similarly, as to the foreign exchange accounting issue, the SEC has not adequately pled any fraudulent action by Biovail which Mr. Miszuk could have aided and abetted. Even if the incorrect foreign exchange rates were applied, there are no allegations to support a claim that Mr. Miszuk aided and abetted any resulting inaccurate recording or misreporting by Biovail. As set out above, for aiding and abetting liability, facts must be alleged to provide a strong inference that Mr. Miszuk "knowingly and substantially assisted in the misrepresentation." As described in Section I above, there are no such facts in the Complaint, nor has the SEC sufficiently identified how Biovail's required internal controls were inadequate or circumvented. *See supra* Section I. B.3.

The absolute lack of particularized allegations as to Mr. Miszuk's actual knowledge of any impropriety in connection with the foreign exchange issue, necessarily defeats any claim that Mr. Miszuk aided and abetted Biovail's alleged antifraud, books and records or internal control violations. *See, e.g., Edwards & Hanly,* 602 F.2d at 484.

## CONCLUSION

For the foregoing reasons, Defendant John Miszuk respectfully request that the claims in the Complaint be dismissed with prejudice and, alternatively, that the request for disgorgement and prejudgment interest be stricken.

Dated:    New York, New York
          June 23, 2008

CADWALADER, WICKERSHAM & TAFT LLP

By: _____ /s/   Bruce A. Hiler _____
    Bruce A. Hiler (BH 0432)
    Jodi A. Avergun (JA 9459)
    Thomas A. Kuczajda (TK 6993)
    Mollie E. O'Rourke (MO 1165)
    One World Financial Center
    New York, NY  10281
    212-504-6000 (tel.)
    212-504-6666 (fax)

    Attorneys for Defendant John Miszuk

1