CARMEN J. LAWRENCE
MICHAEL J. RIVERA
MICHAEL B. DE LEEUW
NAZAR ALTUN
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
Michael.deLeeuw@friedfrank.com

ATTORNEYS FOR DEFENDANT
    KENNETH G. HOWLING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION,

                       Plaintiff,

              - against -

BIOVAIL CORPORATION, EUGENE N. MELNYK,
BRIAN CROMBIE, JOHN MISZUK and KENNETH G.
HOWLING,

                    Defendants.

----------------------------------------------------------------- x

08 Civ. 02979 (LAK)
ECF CASE

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT KENNETH G. HOWLING'S
## MOTION TO DISMISS THE
## SECOND CLAIM IN THE AMENDED COMPLAINT

---

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

ARGUMENT .....................................................................................................................12

I.   MR. HOWLING'S ACTIONS, AS ALLEGED, DO NOT CONSTITUTE
     A PRIMARY VIOLATION OF SECTION 10(b) AND RULE 10b-5 ............................13

     A.   The SEC's Allegations Fail to Satisfy the Bright Line Test...................................13

     B.   The October 3rd Press Release is Not Attributable to Mr. Howling.....................15

     C.   None of the Statements Allegedly Made During the October 3rd Analyst Call are
          Attributable to Mr. Howling ................................................................................18

     D.   The October 8th Press Release is Not Attributable to Mr. Howling.....................19

     E.   None of the Statements Allegedly Made During the October Road Show are
          Attributable to Mr. Howling ................................................................................20

II.  THE AMENDED COMPLAINT DOES NOT MEET THE PARTICULARITY
     REQUIREMENT OF RULE 9(b)................................................................................21

III. THE SEC HAS FAILED TO PLEAD SPECIFIC FACTS THAT GIVE RISE
     TO A STRONG INFERENCE THAT MR. HOWLING ACTED WITH SCIENTER ....23

     A.   Conclusory Allegations Regarding Scienter do Not Raise a Strong Inference of
          Scienter................................................................................................................24

     B.   The SEC Does Not Allege that Mr. Howling had the Motive and Opportunity
          to Commit Fraud ................................................................................................24

     C.   There is No Factual Basis Alleged to Support a Strong Inference of
          Conscious Misbehavior or Recklessness .............................................................25

     D.   The Crombie Draft Does Not Raise a Strong Inference of Scienter......................26

     E.   The Alleged Communication from Biovail's Warehouse Supervisor does Not Raise
          a Strong Inference of Scienter..............................................................................27

     F.   Mr. Howling's Calculation of the Value of the Shipment does Not Raise a Strong
          Inference of Scienter ...........................................................................................28

     G.   The Analyst Report and Distributor Email do Not Raise a Strong Inference of
          Scienter................................................................................................................29

IV.  THE SEC'S TAG-ALONG AIDING AND ABETTING CLAIM ALSO FAILS ............31

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ...................................................................................................25

*In re AES Corp. Sec. Litig.*,
    825 F. Supp. 578 (S.D.N.Y. 1993) .......................................................................................5

*ATSI Committee, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ................................................................................................23

*Atkins v. Apollo Real Estate Advisors, LP*,
    No. 05 Civ. 4365, 2008 WL 1926684 (E.D.N.Y. April 30, 2008).......................................22

*In re Bayou Hedge Fund Litig.*,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007) ...............................................................................12

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) ...............................................................................................12, 21

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
    754 F.2d 57 (2d Cir. 1985) ................................................................................................33

*Borochoff v. GlaxoSmithKline, PLC*,
    No. 07 Civ. 5574, 2008 WL 2073421, 5-7 (S.D.N.Y. May 9, 2008) ....................................19

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ...............................................................................31

*In re Carter-Wallace, Inc. Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000) ..........................................................................................25, 31

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164, 114 S. Ct. 1439 (1994) ...............................................................................13

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ...............................................................................................5

*City of Philadelphia v. Fleming Companies, Inc.*,
    264 F.3d 1245 (10th Cir. 2001) .........................................................................................30

*Copland v. Grumet*,
    88 F. Supp. 2d 326 (D.N.J. 1999) .....................................................................................16

*Davidoff v. Farina*,
   No. 04 Civ. 7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)..........................................22

*Decker v. Massey-Ferguson, Ltd.*,
   681 F.2d 111 (2d Cir. 1982) ...................................................................................................34

*Ferber v. Travelers, Corp.*,
   785 F. Supp. 1101 (D. Conn. 1991) ........................................................................................25

*Filler v. Hanvit Bank*,
   156 Fed. Appx. 413 (2d Cir. 2005) .........................................................................................13

*In re Global Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004) .....................................................................................17

*Grandon v. Merrill Lynch & Co.*,
   147 F.3d 184 (2d Cir. 1998) ...................................................................................................12

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ..............................................................................................12, 25

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) .....................................................................................................4

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ...................................................................................................23

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005) .....................................................................................14

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ..............................................................................................12, 22

*Ross v. Bolton*,
   904 F.2d 819 (2d Cir. 1990) ...................................................................................................22

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801 (2d Cir. 1996)..............................................................................5

*SEC v. Boling*,
   No. 06 Civ. 1329, 2007 WL 2059744 (D.D.C. July 13, 2007) ...............................................23

*SEC v. Cedric Kushner Promotions, Inc.*,
   417 F. Supp. 2d 326 (S.D.N.Y. 2006) .......................................................................... *passim*

*SEC v. Collins & Aikman Corp.*,
   524 F. Supp. 2d 477 (S.D.N.Y. 2007) .....................................................................................23

*SEC v. Goldsworthy*,
    No. 06 Civ. 10012, 2007 WL 4730345 (D. Mass. Dec. 4, 2007)............................................23

*SEC v. KPMG LLP*,
    412 F. Supp. 2d 349 (S.D.N.Y. 2006) .............................................................................17, 23

*SEC v. Lowy*,
    396 F. Supp. 2d 225 (E.D.N.Y. 2003).........................................................................29, 30, 32

*SEC v. Lucent Technologies, Inc.*,
    363 F. Supp. 2d 708 (D.N.J. 2005).................................................................................13, 21

*SEC v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999) ......................................................................................................12

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ..................................................................................................25

*In re Scholastic Corp. Security Litigation*,
    252 F.3d 63 (2d Cir. 2001) ........................................................................................................14

*Shapiro v. Cantor*,
    123 F.3d 717 (2d Cir. 1997) ........................................................................................13, 14, 18

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ...........................................................................24, 25, 28, 31

*In re Sotheby's Holdings, Inc.*,
    No. 00 Civ. 1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)..........................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (June 21, 2007) .......................................................................................23, 31

*Winkler v. NRD Mining, Ltd.*,
    198 F.R.D. 355 (E.D.N.Y. 2000) ............................................................................17, 19, 20

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998) .......................................................................13, 14, 18, 19, 21

## FEDERAL STATUTES

17 C.F.R. § 240.10b-5................................................................................................... *passim*

Fed. R. Civ. P. 9(b) ..................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6).............................................................................................1, 12, 35

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) .......................... *passim*

## STATE STATUTES

N.Y. Bus. Corp. Law § 715(h) (McKinney 2008) ........................................................................30

## OTHER AUTHORITIES

PRINCIPLES OF CORPORATE GOVERNANCE:  ANALYSIS AND RECOMMENDATIONS
§ 4.02 (1994) ........................................................................................................30

Defendant Kenneth G. Howling respectfully submits this memorandum of law in support of his Motion to Dismiss the second claim in the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b).

## PRELIMINARY STATEMENT

This case arises out of an over-four-year investigation by the U.S. Securities and Exchange Commission (the "SEC") into accounting practices at Biovail Corporation ("Biovail" or the "Company"), a Canadian pharmaceutical company whose stock is traded on the New York and Toronto Stock Exchanges.  Amended Complaint ("Am. Compl.") ¶ 1.  On March 24, 2008, the SEC filed its initial complaint in this action.  Mr. Howling subsequently moved to dismiss that complaint on June 23, 2008, pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b).[1] Instead of opposing Mr. Howling's motion to dismiss, the SEC filed an Amended Complaint on July 31, 2008.

In its sweeping Amended Complaint, the SEC once again claims that Biovail and the individual defendants engaged in "chronic fraudulent conduct – including financial reporting fraud and other intentional public misrepresentations" and asserts a total of ten claims for relief. Am. Compl. ¶¶ 1, 157-196.  Despite the broad scope of the Amended Complaint, and the extensive discovery that the SEC has already conducted, Kenneth G. Howling, who at all relevant times served as the head of investor relations at Biovail, is alleged only to have played a minor and peripheral role in just one set of events described in the entire Amended Complaint— alleged misstatements and omissions regarding the impact on Biovail's third quarter 2003 revenue of a shipment of the drug Wellbutrin XL (the "Shipment") that was involved in an

---

[1] Brian Crombie and John Miszuk both moved to dismiss various claims in the SEC's initial complaint on June 23, 2008.  Eugene Melnyk answered the SEC's initial complaint on June 13, 2008.

October 1, 2003, fatal truck accident (the "Accident").[2]  The Amended Complaint also includes new allegations (bereft of particularity) that Mr. Howling made misrepresentations regarding the value of the Shipment.  These alleged misstatements and omissions were allegedly made in press releases issued by Biovail on October 3, and 8, 2003 (the "October 3rd Press Release" and the "October 8th Press Release"), during a conference call with analysts on October 3, 2003 (the "October 3rd Analyst Call"), in unspecified responses to queries from analysts, investors, and the financial press on and after October 3, 2003, and during a corporate road show in mid-October (the "October Road Show").  Am. Compl. ¶¶ 27-53.  Mr. Howling is not alleged to have played a role in any of the other nine claims described in the Amended Complaint.

The SEC acknowledges that Mr. Howling—from the beginning—relied on the information given to him by Biovail's founder, Chief Executive Officer, and Chairman of the Board, Eugene Melnyk, and by Biovail's Chief Financial Officer, Brian Crombie.  Am. Compl. ¶¶ 31, 32, 34.  The allegations in the Amended Complaint are entirely consistent with Mr. Howling being a scrivener—regurgitating information that he received from others into press releases and scripts.  Indeed, the SEC's new allegation, that Mr. Howling allegedly performed his own independent calculation of the value of the Shipment demonstrates the extent to which he was "out of the loop" with respect to the alleged fraud.  Am. Compl. ¶ 42.

Under the Second Circuit's "bright line" test, the allegations against Mr. Howling regarding the alleged misstatements in the October 3rd and 8th Press Releases, the October 3rd Analyst Call and the October Road Show, taken as true, do not—as a matter of law—add up to a primary violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),

---

[2]    The Amended Complaint alleges that the relevant distribution agreement called for title to pass upon delivery to the Distributor (and not upon shipment).  Am. Compl. ¶ 22.  Consequently, the Amended Complaint alleges that the Accident could not have had any impact on Biovail's third quarter because the Shipment could not have reached the Distributor before the end of the quarter.  Am. Compl. ¶ 23.

and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[3]  The Amended Complaint does not adequately attribute the alleged misstatements (or omissions) to Mr. Howling; it does not allege that any investors, analysts or the financial press attributed any of the alleged misstatements or omissions to Mr. Howling; it does not allege that Mr. Howling had the independent authority to issue press releases on behalf of Biovail; and it does not allege that Mr. Howling had or acquired any independent knowledge about the relevant terms of the distribution agreement or its accounting or financial reporting implications at the time of the alleged misstatements or omissions.  On these allegations, Mr. Howling cannot be liable for a primary violation of the securities laws.

The Amended Complaint also fails to allege that Mr. Howling acted with the scienter necessary to support a securities fraud claim.  The SEC blithely asserts that Mr. Howling "knew or recklessly disregarded," the fact that the Accident had no impact on third quarter revenues and that the value of the product involved in the Accident was overstated.  Am. Compl. ¶¶ 38, 42, 49, 52.  But conclusory and boilerplate allegations such as these are insufficient to plead the strong inference of scienter required in this Circuit.  The SEC has failed to plead that Mr. Howling had the motive and opportunity to commit fraud and has failed to plead facts that would give rise to a strong inference of conscious misbehavior or recklessness on the part of Mr. Howling.

The SEC also fails to plead its allegations of fraud with the particularity demanded by Rule 9(b) of the Federal Rules of Civil Procedure.  This is most apparent with respect to Mr. Howling's alleged one-on-one communications with analysts, investors, and the financial press following the October 3rd Press Release and Analyst Call, Am. Compl. ¶ 41, and Mr. Howling's

---

[3]    The only allegation in the Amended Complaint that comes close to satisfying the "bright line" test concerns Mr. Howling's alleged direct communications with analysts, investors, and the financial press on and after October 3, 2003.  Am. Comp. ¶ 41.  However, even that allegation is fatally deficient because it is not pled with the particularity required by Fed. R. Civ. P. 9(b).  *See* Section II, *infra*.

alleged participation in the October Road Show, Am. Compl. ¶ 51. Both allegations fail to allege the "who, what, when, where, and how" necessary to plead a fraud claim.

Mr. Howling is nothing more than an afterthought in the Amended Complaint, and all claims against him should be dismissed.

## STATEMENT OF FACTS[4]

### Kenneth G. Howling

Mr. Howling is a United States citizen and a resident of Toronto, Ontario. At the time of the relevant events, Mr. Howling was Biovail's Vice President of Finance and Corporate Affairs. Am. Compl. ¶ 16. In this role, Mr. Howling had responsibility for Biovail's corporate communications with investors, including drafting for approval and issuing press releases. *Id.* It is not alleged that he had the authority to issue press releases on his own without approval from his superiors. It is also not alleged that Mr. Howling had *any* financial reporting or accounting responsibilities during the relevant period.

### Eugene N. Melnyk

Defendant Eugene Melnyk is a Canadian citizen and a resident of St. Philip, Barbados. Mr. Melnyk was the founder of Biovail, and during the relevant time period, he was Biovail's Chief Executive Officer and Chairman of the Company's board of directors. Am. Compl. ¶ 13. At all times during the relevant time period, Mr. Melnyk was Mr. Howling's superior.

### Brian Crombie

Defendant Brian Crombie is a Canadian citizen and a resident of Mississauga, Ontario. During the relevant time period, Mr. Crombie was Biovail's Chief Financial Officer. Am.

---

[4]     This Statement of Facts is drawn from (1) the Amended Complaint and (2) documents incorporated by reference in the Amended Complaint, which are properly considered on this motion. The documents are annexed to the accompanying declaration of Nazar Altun, dated August 22, 2008 ("Altun Decl."). All well-pleaded facts are assumed to be true only for purposes of this motion. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 165 (2d Cir. 2005).

Compl. ¶ 14.  At all times during the relevant time period, Mr. Crombie was senior to Mr.

Howling.

### The Accident

On September 30, 2003, a truck carrying a shipment of the drug Wellbutrin XL departed

a Biovail warehouse in Canada destined for a major international pharmaceutical company in

North Carolina that distributed the product (the "Distributor").  Am. Compl. ¶ 17.  On October 1,

2003, the truck was involved in a fatal multi-vehicle accident near Chicago.  *Id.*  The value of the

Shipment was approximately $5,000,000.  Am. Compl. ¶ 18.

### The October 3rd Press Release

On October 3, 2003, Biovail issued a press release that informed investors that the

Company would miss its revenue guidance for the third quarter, due, in part, to "the loss of

revenue and income associated with a significant in-transit shipment loss of Wellbutrin XL as a

result of a traffic accident."  October 3rd Press Release, Altun Decl., Ex. B.[5]  According to the

Amended Complaint, "[Mr.] Howling drafted the release based, in part, on information he

received from the others,"[6] including Messrs. Melnyk and Crombie.  Am. Compl. ¶ 31.  Mr.

---

[5]    The Second Circuit permits incorporation of documents into motions to dismiss when (1) the documents
are explicitly referred to in the complaint, (2) the documents establish essential elements of the claim, and
(3) the plaintiff has actual notice of the contents of the documents.  *See Chambers v. Time Warner, Inc.*,
282 F.3d 147, 152-55 (2d Cir. 2002); *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 584-85 (S.D.N.Y.
1993).  In this case, the Amended Complaint repeatedly quotes the October 3rd and October 8th Press
Releases, and explicitly refers to an early draft of the October 3rd Press Release prepared by Mr. Crombie.
Am. Compl. ¶¶ 27-29, 34, 47.  *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip
Morris Companies*, 75 F.3d 801, 808-09 (2d Cir. 1996) (holding that the court could consider the entire text
of press releases, wire service reports, newspaper articles, and annual company reports on a motion to
dismiss where the plaintiffs selectively quoted alleged misstatements from those documents in the
complaint).  Moreover, the SEC clearly seeks to use the incorporated documents to prove that Mr. Howling
violated Section 10(b) and Rule 10b-5.  Finally, the SEC cannot dispute that it has actual notice of the
incorporated documents because the SEC has had copies of these documents for years and has used them
throughout the course of its investigation.

[6]    It is not otherwise alleged that Mr. Howling had any independent knowledge of the relevant information
relating to the Accident.

Howling also received an initial draft of a press release prepared by Mr. Crombie (the "Crombie Draft").  Am. Compl. ¶ 34; *see also* Crombie Draft, Altun Decl., Ex. C.

The SEC alleges that the Crombie Draft set forth the actual delivery term (*i.e.*, F.O.B. Destination) and stated correctly that the revenue from the product involved in the Accident could not be recognized in the third quarter.  Am. Compl. ¶ 35.  This is a selective, incomplete, and misleading characterization.  After describing the Accident in detail, the next paragraph in the Crombie Draft, states:

> The Biovail product [involved in the Accident] was a material amount of Bupropion [the active ingredient in Wellbutrin XL] being shipped to Biovail's licensee.  This product must be returned to Biovail's manufacturing plant in Manitoba Canada to ensure it is still within specifications.  Since the supply agreement between Biovail and its licensee stipulates FOB the licensee's warehouse, the revenue on this product cannot be recognized in Q3 2003.  The product, either the existing shipment once approved, or replacement shipment will be shipped within ten days.  However, ***this replacement shipment and its associated revenue will now be recognized in Q4 not Q3***.

Am. Compl. ¶ 34; Crombie Draft, Altun Decl., Ex. C at 2 (emphasis added).

Contrary to the SEC's conclusory allegation, the Crombie Draft did not serve to inform Mr. Howling that the Shipment never could have been recognized as revenue in the third quarter.  Rather, the clear implication of the Crombie Draft is that the revenue from the Shipment was originally going to be recognized in the third quarter, not the fourth quarter.  Read in context, the language in the Crombie Draft—"[s]ince the supply agreement between Biovail and its licensee stipulates FOB the licensee's warehouse, the revenue on this product cannot be recognized in Q3, 2003"—which follows a paragraph that contains a detailed description of the Accident, implies that, because of the Accident *and* the delivery terms, the revenue from the Shipment could not be recognized in the third quarter, *i.e.*, but for the Accident it could have been recognized in the third quarter.  *Id*.  That implication is confirmed by the Crombie Draft's

concluding statement that "this replacement shipment and its associated revenue will ***now*** be recognized in Q4 ***not*** Q3." *Id*. (emphasis added).[7]

According to the Amended Complaint, Mr. Crombie also provided Mr. Howling with false information regarding the valuation of the Shipment. Am. Compl. ¶ 32. This false information was included in the October 3rd Press Release. Am. Compl. ¶¶ 32-33. The Amended Complaint further alleges that Messrs. Melnyk and Crombie (and Biovail) knew or recklessly disregarded the fact that the valuation in the October 3rd Press Release was wrong. Am. Compl. ¶ 33. The SEC, however, does not allege that Mr. Howling had any knowledge *at all* that the statements in the press release regarding the value of the Shipment were false.[8] In addition to providing Mr. Howling with the information necessary to draft the press release, Messrs. Melnyk and Crombie were themselves involved in the drafting process and reviewed and approved the final version of the press release prior to its publication. Am. Compl. ¶¶ 31, 32, 34-36. The SEC seeks to hold Mr. Howling liable for assisting in the preparation of the October 3rd Press Release when he simply took information that he received from his superiors and inserted it into the press release. Am. Compl. ¶ 31.

**The October 3rd Analyst Call**

Later on October 3, Messrs. Melnyk, Crombie, and Howling participated in a conference call with analysts to discuss the Company's third quarter financial results. Am. Compl. ¶ 37. The SEC alleges that Messrs. Melnyk and Crombie made misrepresentations during the call. Am. Compl. ¶¶ 37-39. Specifically, each separately stated that the Accident would have a negative impact on Biovail's third quarter revenues, and Mr. Crombie "referred to the value of

---

[7]     The shipping term is not even mentioned in the October 3rd Press Release.

[8]     The SEC's new allegation that on October 3, 2003, Mr. Howling attempted to calculate "the actual revenue associated with the Wellbutrin XL lost in the accident" demonstrates that Mr. Howling did not know the actual value of the Shipment at that time; otherwise, there clearly would have been no need for Mr. Howling to perform such a calculation. Am. Compl. ¶ 42.

the shipment as '$15 million to $20 million' – three to four times the actual revenue value" of the Shipment.  *Id.*

The SEC does not attribute any statements made during the October 3rd Analyst Call to Mr. Howling, but appears to allege that because he was present while statements were made by others he is liable for fraud.  *See* Am. Compl. ¶¶ 37-40.  The SEC apparently bases this claim, in part, on the allegation that Mr. Howling allegedly helped prepare a script for the October 3rd Analyst Call—despite the fact that the Amended Complaint does not allege that the script itself contained any misrepresentations or omissions.  Am. Compl. ¶ 40.

### Queries From Analysts, Investors, and the Financial Press Regarding the Accident

In its Amended Complaint, the SEC alleges for the first time that following the October 3rd Analyst Call, Mr. Howling was "inundated with numerous inquiries from investors, analysts, and the financial press seeking details regarding the effect of the accident on Biovail's third quarter revenues."  Am. Comp. ¶ 41.  In response to these queries, Mr. Howling allegedly "continued to state falsely" that Biovail could have recognized revenue in the third quarter from the Shipment, but for the Accident.  *Id.*  The Amended Complaint however does not specify the content of Mr. Howling's alleged misrepresentations, or when, where, and to whom the alleged misrepresentations were made.

The SEC further alleges that on October 3, 2003, Mr. Howling attempted to calculate independently "the actual revenue associated with the Wellbutrin XL lost in the accident" using the cost of the goods lost in the Accident (provided to him by an unidentified person).  Am. Comp. ¶ 42.  The Amended Complaint, however, does not allege that Mr. Howling had any independent knowledge of (or access to) any of the other information necessary for him to perform an accurate calculation, such as the Distribution Agreement's pricing structure, the product's gross sales price, gross to net discounts or Biovail's revenue margins for the Shipment.

In addition, the SEC does not allege that Mr. Howling could have obtained such information. Moreover, the fact that the SEC alleges that Mr. Howling had to independently perform such a calculation to try to determine the value of the Shipment indicates that he was completely "out of the loop" with respect to critical pieces of information, such as the value of the Shipment, relating to the Accident. The SEC seeks to hold Mr. Howling liable for performing a "back of the envelope" calculation, with extremely limited data, that actually confirmed Biovail's statements concerning the range of the value of the Shipment. Ironically, this new allegation demonstrates that Mr. Howling did not know the actual value of the Shipment on October 3, 2003, and that he was not "in the loop" with the other named defendants.

### The October 8th Press Release

On October 8, 2003, Biovail issued another press release announcing the recovery and saleability of the Shipment and "re-confirm[ing] that the sales value" of the Shipment was within the "previously stated guidance." Am. Compl. ¶ 47. The October 8th Press Release was drafted and dictated by Mr. Melnyk. *Id.* Mr. Howling merely "reviewed and edited" the press release. *Id.* Mr. Howling's "editing" consisted of adding four words to the press release that are unrelated to the issues in this Action. *See* Draft October 8th Press Release, Altun Decl., Ex. D (Mr. Howling added the words "which included bulk tablets" to the first sentence that confirmed Biovail's recovery of the product involved in the Accident). Indeed, the October 8th Press Release made no representations whatsoever regarding Biovail's ability or inability to recognize revenue from the Shipment. The SEC also seeks to hold Mr. Howling accountable for fraud because the October 8th Press Release was issued "by Howling's office [Biovail's investor

9

relations department that was responsible for issuing press releases], under his supervision, and his name appears on it as the contact person."[9]  Am. Compl. ¶ 47.

According to the Amended Complaint, shortly before the October 8th Press Release was issued, Mr. Howling received an email from an employee at the Distributor stating that the Distributor believed that title to the Shipment passed to the Distributor upon delivery (not upon shipment).  Am. Compl. ¶ 46.  Mr. Howling immediately forwarded the email to Messrs. Melnyk and Crombie to ensure that the issue was properly handled.  *Id.*  The SEC acknowledges that Mr. Howling never spoke with the employee at the Distributor.  *Id.*  The Amended Complaint also alleges that Mr. Howling received an analyst's report on October 8, 2003 that questioned "Biovail's valuation of the product lost due to the accident as well as the Company's assertion of when title to the product transferred."  Am. Compl. ¶ 43.  Mr. Howling forwarded the report to Messrs. Melnyk and Crombie, and suggested "that someone in finance draft responses to the issues raised."  Am. Compl. ¶ 44.

The SEC alleges that Mr. Howling engaged in a material omission by personally failing to ensure that the October 8th Press Release disclosed that the Accident had no impact on Biovail's third quarter.  Am. Compl. ¶ 48.  Given that the Amended Complaint concedes that Mr. Howling played only a minor and secondary role in reviewing and editing drafts of the October 8th Press Release, Am. Compl. ¶ 47, the SEC appears to be trying to hold Mr. Howling liable for this alleged material omission based solely on the allegation that he should have definitively concluded from the analyst's report and the Distributor's email that the Accident had no impact

---

[9]     Nearly all corporate press releases list the name of an investor relations officer as a contact person for questions from analysts and investors.  Under the theory advanced by the SEC in this case, investor relations officers could be held liable for misstatements or omissions just because they were listed as a contact person in a corporate press release.  Such a theory is wildly over-inclusive and in clear violation of the Second Circuit's "bright line" test.  *See* Section I, *infra.*

on Biovail's third quarter revenue recognition associated with Wellbutrin XL, Am. Compl. ¶¶ 43, 46, contrary to what the CEO and CFO of the Company had told him.

In addition, the SEC alleges that Mr. Howling "knew or recklessly disregarded that the statement in the October 8 press release reconfirming" the value of the Shipment was overstated. Am. Comp. ¶ 49. Apart from this conclusory allegation, the SEC does not allege that Mr. Howling had any knowledge of the true value of the Shipment beyond his own "back of the envelope" calculation. The SEC seeks to hold Mr. Howling primarily liable for the alleged misstatements in the October 8th Press Release, despite the fact that the October 8th Press Release is not attributable to Mr. Howling.

### *The October Road Show*

Between October 10 and 15, 2003, Biovail scheduled a series of presentations "in New York, Boston, and other cities" to provide investors with a full update on Biovail's product portfolio and pipeline and to quell concerns about the lingering negative rumors concerning the Accident. Am. Compl. ¶¶ 50-51. The SEC's allegations about the October Road Show lump Messrs. Melnyk, Crombie, and Howling together, making it impossible to determine exactly who allegedly did what. For example, the SEC does not allege that Mr. Howling spoke a single word during the October Road Show, nor does it allege what specific presentations Mr. Howling attended, who attended those presentations, and who said what to whom. *Id*. Rather, the SEC seeks to hold Mr. Howling liable for allegedly preparing a power point presentation that repeated that the Accident's "impact on Biovail's third quarter was $10 to $20 million" despite the fact that the power point presentation is attributable only to Biovail. Am. Compl. ¶ 52. Furthermore, the SEC fails to plead when, where, and to whom the power point presentation was shown, impermissibly leaving Mr. Howling to guess about these important details.

## ARGUMENT[10]

On July 31, 2008, the SEC filed its 61-page, ten claim Amended Complaint against Biovail, Mr. Melnyk, Mr. Crombie, John Miszuk, and Mr. Howling.  Altun Decl. Ex A.  While the vast bulk of the Amended Complaint has nothing at all to do with Mr. Howling, the SEC claims that he violated Section 10(b) and Rule 10b-5 by allegedly participating in the making of materially false and misleading disclosures stemming from the Accident.  The SEC has also charged Mr. Howling with aiding and abetting Biovail's violations of Section 10(b) and Rule 10b-5 relating to the same allegedly false and misleading statements.

In order to state a claim under Section 10(b) and Rule 10b-5, the SEC must plead that: "(1) [the defendant] made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 331 (S.D.N.Y. 2006) (*citing SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).

The SEC's securities fraud claim against Mr. Howling is fatally deficient on several grounds.  <u>First</u>, the facts, as alleged in the Amended Complaint, do not give rise to a primary violation of Section 10(b).  Section I, *infra*.  <u>Second</u>, the SEC fails to plead specific facts giving rise to a strong inference that Mr. Howling acted with scienter.  Section II, *infra*.  Likewise, the Amended Complaint fails to plead its allegations of fraud with the particularity required by Rule

---

[10]     In considering a motion to dismiss under Rule 12(b)(6), courts must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).  However, the complaint must be dismissed where the plaintiffs fail to nudge their claims across the line from conceivable to plausible.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-1965 (2007); *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405 (S.D.N.Y. 2007) ("a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal citations omitted).  When a plaintiff's allegations, however true, fail to state a claim, courts do not hesitate to dismiss such claims under Rule 12(b)(6).  *See Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations"); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 193-94 (2d Cir. 1998) ("[C]onclusory allegations that defendant's conduct was fraudulent or deceptive are not enough.").

9(b) of the Federal Rules.  Section III, *infra*.  <u>Finally</u>, the SEC's Section 10(b) aiding and abetting claim is deficient because it fails to plead facts demonstrating that Mr. Howling knew about Biovail's alleged primary violation, or that he provided substantial assistance to Biovail in connection with that violation.  Section IV, i*nfra*.  These failures require the dismissal of the fraud claim brought against Mr. Howling.

## I.    MR. HOWLING'S ACTIONS, AS ALLEGED, DO NOT CONSTITUTE A PRIMARY VIOLATION OF SECTION 10(b) AND RULE 10b-5

### A.    *The SEC's Allegations Fail to Satisfy the Bright Line Test*

In the wake of *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439 (1994), the Second Circuit adopted what has come to be called the "bright line" test for determining whether a party can be held liable for a primary violation of Section 10(b) and Rule 10(b)(5).  *See generally Wright v. Ernst & Young LLP*, 152 F.3d 169, 174-75 (2d Cir. 1998).  Under the "bright line" test, "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).  Anything short of such conduct is merely aiding and abetting . . . ."  *Id.* at 175 (quoting *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997)).[11]  *See also Filler v. Hanvit Bank*, 156 Fed. Appx. 413, 415 (2d Cir. 2005) ("[T]his Court adopted a 'bright line' test for determining when secondary actors may be held primarily liable.  Under the 'bright line' test, a defendant must actually make a false or misleading statement in order to be liable under Section 10(b).").

---

[11]    Courts in this Circuit and elsewhere have applied the "bright line" test to litigations arising out of SEC enforcement actions.  *See, e.g.*, *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006) (applying the "bright line" test, and holding that a corporate director could not be held primarily liable under Section 10(b) and Rule 10b-5 for providing back-up documentation to the company's outside auditors and reviewing certain sections of the disclosure documents that related to the back-up documentation); *SEC v. Lucent Technologies, Inc.*, 363 F. Supp. 2d 708, 724 (D.N.J. 2005) (dismissing the SEC's complaint under the "bright line" test because the alleged misstatement, Lucent's reported revenue, was not attributed to the defendant).

The "bright line" test applies with equal force regardless of whether a defendant is a company outsider or a corporate insider. *See, e.g.*, *Cedric Kushner*, 417 F. Supp. 2d at 333 ("The SEC attempts to distinguish *Wright* from the present case on the basis that *Wright* involved a company outsider—i.e., auditors, whereas, in the present case, [the defendant] was an insider, a public company director. This argument is unpersuasive. Nothing in *Wright* suggests that its holding is limited to a particular class of defendants.").[12]

All but one of the allegations regarding Mr. Howling's role in Biovail's communications with analysts, investors, and the financial press about the Accident flunk the "bright line" test.[13] The Amended Complaint is rife with allegations that charge Mr. Howling with, at most, secondary conduct.[14]  Indeed, even if the SEC could allege the requisite scienter, which it cannot,

---

[12]    Relying in part on *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001), the SEC has previously argued—to no avail—that the "bright line" test articulated in *Wright* is no longer good law. *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 513 n.203 (S.D.N.Y. 2005) (Kaplan, J.) ("The plaintiffs' attempt to avoid the bright line attribution rule do not avail. They cite *In re Scholastic Corp. Sec. Litig.* . . . but the relevant discussion in that case—which does not cite *Central Bank, Wright v. Ernst & Young LLP* . . . or *Shapiro v. Cantor*, . . . addressed only whether the complaint properly attributed relevant misrepresentations to a particular defendant. *In re Scholastic Corp.* did not question, let alone purport to set aside, the attribution rule set forth in *Wright* and *Shapiro*."); *see also Cedric Kushner*, 417 F. Supp. 2d at 333 ("Regarding the *Scholastic* decision, whatever that decision means regarding Second Circuit doctrine, the salient fact for present purposes is that there is nothing in that decision which can possibly provide grounds for holding [the defendant] primarily liable in the present case.").

In addition, *Scholastic* is readily distinguishable from the facts here on many grounds. In *Scholastic* the individual defendant, Marchuk, was alleged to have sold 80% of his stock during the class period while possessing negative non-public information about the company. *In re Scholastic Corp.*, 252 F.3d at 67. In addition, the SEC alleged that Marchuk had access to and monitored confidential internal data, and that he prepared a "Director's Book" each month that went to each director and analyzed the relevant trends in the business. *Id.* at 70-71. In stark contrast, the SEC does not allege that Mr. Howling traded in Biovail stock during the relevant period, because he did not. Nor does the SEC allege that Mr. Howling had access to confidential information that would have enabled him to independently evaluate the accuracy of the information he received from others and then incorporated into the October 3rd Press Release.

[13]    Even if the SEC's allegation concerning Mr. Howling's role in responding to queries from analysts, investors, and the financial press satisfied the "bright line test," it is clearly deficient under Fed. R. Civ. P. 9(b) because the SEC fails to plead the content of the alleged misrepresentations, or when and to whom they were made. Am. Comp. ¶ 41. *See* Section II, *infra*.

[14]    *See, e.g.*, Am. Compl. ¶¶ 37 ("Also on October 3, Melnyk, Crombie, and Howling <u>participated</u> in a

14

it could still not attribute the statements to Mr. Howling, and the allegations in the Amended Complaint would, at best, support a claim for secondary liability. The Amended Complaint simply does not adequately allege that Mr. Howling committed a primary violation of Section 10(b) and Rule 10b-5.

> B.    ***The October 3rd Press Release is Not Attributable to Mr. Howling***

According to the Amended Complaint, "Mr. Howling drafted the release based, in part, on information he received from others," including Messrs. Melnyk (Biovail's founder, CEO and Chairman of the Board) and Crombie (Biovail's CFO). Am. Compl. ¶ 31. There are absolutely no allegations that Mr. Howling had any independent knowledge of the facts allegedly misrepresented in the October 3rd Press Release. The Amended Complaint does not allege that Mr. Howling: (1) had an understanding of (or even had access to) Biovail's distribution agreement with the Distributor; (2) had an understanding of the revenue recognition consequences of the shipping term in the distribution agreement or the Accident; or (3) had an independent duty to verify information that was provided to him by Biovail's CEO and CFO. Indeed, it is not even alleged that Mr. Howling had the independent authority to issue press releases on behalf of the Company. In fact, the SEC concedes that the October 3rd Press Release was "reviewed and edited by Melnyk and Crombie" prior to being issued by the Company. Am. Compl. ¶ 36. The SEC's allegations are entirely consistent with Mr. Howling being merely a scrivener.

The SEC also does not allege that Mr. Howling had any knowledge about the misrepresentations regarding the value of the Shipment at the time Biovail issued the October 3rd Press Release. All of the allegedly false statements regarding the value of the Shipment in the

---

conference call . . . ."); 40 ("Howling <u>participated</u> in the conference call on October 3 and <u>helped prepare</u> the script for it."); 47 ("Melnyk dictated the October 8 press release, which both Crombie and Howling <u>reviewed and edited</u> prior to its issuance.") (emphasis added).

October 3rd Press Release are attributed exclusively to Biovail and to Messrs. Melnyk and Crombie.

While peripheral to the analysis of whether Mr. Howling can be held primarily liable for violating Section 10(b) and Rule 10b-5, the SEC alleges that Mr. Howling received the Crombie Draft on October 2, 2003, and that it set forth the actual delivery term (*i.e.*, F.O.B. destination) and stated correctly that the revenue from the product involved in the Accident could not be recognized in the third quarter.[15]  Am. Compl. ¶ 34.  The SEC's "spin" on the Crombie Draft is inconsistent with the document itself.  The Crombie Draft clearly implies that, but for the Accident, the revenue from the Shipment would have been recognized in the third quarter ("this replacement shipment and its associated revenue will ***now*** be recognized in Q4 ***not*** Q3").  Altun Decl., Ex. C at 2 (emphasis added).  Given this clear implication, it is more than a stretch for the SEC to imply that Mr. Howling gained independent knowledge of the accounting significance of the Accident from the Crombie Draft.[16]

Without any involvement in, or responsibility for, the relevant accounting decisions, Mr. Howling's alleged role merely involved gathering information presented to him by others and regurgitating it in press release form—actions that cannot rise to the level of a primary violation of Section 10(b).  *See Cedric Kushner*, 417 F. Supp. 2d at 334 (holding that no primary liability existed because defendant played a "background role" in the preparation of the allegedly fraudulent document); *see also Copland v. Grunet*, 88 F. Supp. 2d 326, 332 (D.N.J. 1999) (applying Second Circuit precedent and holding that an officer defendant's alleged participation

---

[15]    It is also ironic that the SEC demands that Mr. Howling should have relied on the only statement by Mr. Crombie in the entire Complaint that the SEC alleges was not fraudulent.

[16]    The SEC's new allegation that Biovail's warehouse supervisor told Mr. Howling that the Shipment left Biovail's warehouse on September 30, 2003, and that one truck from Biovail was involved in the Accident, are similarly irrelevant with respect to whether Mr. Howling can be held primarily liable under the Second Circuit's "bright line" test.  Am. Compl. ¶ 31.  Moreover, the SEC fails to allege that Mr. Howling could have used that information to determine the revenue recognition consequences of the accident.

in the making of fraudulent representations "cannot be considered the equivalent of making the false statements themselves.").

The fact that Mr. Howling's name appears on the October 3rd Press Release, Am. Compl. ¶ 30, does not convert the Company's statement into his own. *See Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355, 365 (E.D.N.Y. 2000) (dismissing a private Section 10(b) claim against a public relations company despite the fact that the public relations company's name was printed on the top of a press release that allegedly contained material misstatements). In *Winkler,* the court rejected a Section 10(b) claim against a public relations company despite the fact that the public relations company's name was printed on top of a press release that allegedly contained material misstatements (the public relations company also helped draft the press release and disseminated it to the media). *Id*. at 364-65. The court found it significant that none of the statements in the press release were attributed to the public relations company, and that the plaintiff never presented evidence showing that investors attributed the alleged misstatements in the press release to the public relations company. *Id*. at 365.

Mr. Howling's name is listed on the release as a "contact person" in typical press release boilerplate, but he is not held out to be the author of the release. Moreover, the SEC does not allege that a single investor or analyst attributed any of the statements in the October 3rd Press Release to Mr. Howling. *Id*. (dismissing plaintiff's Section 10(b) claim, in part, because the plaintiff failed to offer any evidence that anyone "ever understood the press release or annual report to constitute a statement" by the public relations company); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 374-75 (S.D.N.Y. 2006) (dismissing the SEC's primary Section 10(b) and Rule 10b-5 claims against a concurring audit partner because he could not be considered the source of KPMG's alleged misstatement because he was not primarily responsible for conducting the audit); *cf. In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 334

17

(S.D.N.Y. 2004) ("[Arthur] Andersen's role as GC's auditor was thus well known to investors, who could easily have relied on the accounting firm's involvement in making any public financial reports, even where a particular statement was not publicly attributed to it.  Moreover, Andersen's aggressive marketing of the novel accounting strategies . . . raises an inference that sophisticated investors would have known of Andersen's role in creating the reporting practices behind GC's false statements.").

The SEC has failed to allege that Mr. Howling committed a primary violation of the securities laws with regard to the October 3rd Press Release.  Mr. Howling's actions, as alleged, do not pass the "bright line" test; *i.e.*, the alleged fraudulent statements are simply not attributable to Mr. Howling.  *See Wright*, 152 F.3d at 175.

C. ***None of the Statements Allegedly Made During the October 3rd Analyst Call are Attributable to Mr. Howling***

Similarly, the allegation that on October 3, Mr. Howling "participated in a conference call with analysts," Am. Compl. ¶ 37, and "helped prepare" a script in preparation for the conference call, Am. Compl. ¶ 40, would not—if true—rise to the level of a primary violation of Section 10(b) and Rule 10b-5.  *See Shapiro*, 123 F.3d at 720 (noting that "[a]llegations of 'assisting,' 'participating in,' 'complicity in,' and similar synonyms used throughout the complaint" fail to state a cause of action for primary liability under Section 10(b) and Rule 10b-5).  The Amended Complaint does not allege that Mr. Howling spoke during this conference call nor does it allege that the allegedly fraudulent statements made by Messrs. Melnyk and Crombie were based in any way on the "script" allegedly prepared by Mr. Howling or that the script itself was misleading; like the October 3rd Press Release, Mr. Howling prepared the alleged script based on information he received from others.

D.    *The October 8th Press Release is Not Attributable to Mr. Howling*

The language in the October 8th Press Release also cannot be, and has not been, attributed to Mr. Howling. The SEC concedes that Mr. Melnyk was the primary author of the October 8th Press Release and that Mr. Howling's involvement was limited to reviewing and editing the press release prior to its issuance. Am. Compl. ¶ 47. Such limited involvement cannot amount to a primary violation of the securities laws. *See Wright*, 152 F.3d at 175-76; *Cedric Kushner*, 417 F. Supp. 2d at 333-34. The fact that Mr. Howling "reviewed and edited" the October 8th Press Release prior to its issuance—adding four words that are unrelated to the alleged misrepresentations or omissions—and the fact that his name appears on the release as a "contact person," Am. Compl. ¶ 47, are not legally sufficient to attribute the alleged misrepresentations or omissions to Mr. Howling. *Winkler*, 198 F.R.D. at 365. The SEC does not allege that Mr. Howling added the allegedly fraudulent language regarding the value of the Shipment to the release, nor does it allege that any investors or analysts attributed such language to Mr. Howling.

To the extent that the Amended Complaint implicitly charges Mr. Howling with omissions for failing to disclose that he received the email from the Distributor on October 8, 2003, Mr. Howling cannot be held primarily liable for such an omission because the October 8th Press Release was not attributed to him. W*inkler,* 198 F.R.D. at 364 (holding that defendants could not be held primarily liable for allegedly omitting material information from a press release where the press release was not attributed to the defendants). Furthermore, Mr. Howling cannot be held liable for failing to disclose that there may have been a disagreement regarding Biovail's interpretation of the distribution agreement because the information provided to him by the Distributor was not verified as being accurate. Indeed, Mr. Howling immediately forwarded the Distributor's email to Messrs. Melnyk and Crombie. Am. Compl. ¶ 46. *See Borochoff v. GlaxoSmithKline, PLC*, No. 07 Civ. 5574, 2008 WL 2073421, *5-7 (S.D.N.Y. May 9, 2008)

(dismissing plaintiffs' claim that defendants failed to disclose negative laboratory test results because such results were inconclusive and thus defendants had no duty to disclose them). Having no independent knowledge of the terms of the distribution agreement, Mr. Howling reasonably relied on his superiors, Messrs. Melnyk and Crombie, to verify the Distributor's statement and assess its impact, if any, on the Company's position on revenue recognition. The Amended Complaint does not allege that Mr. Howling received any such verification or accounting assessment. Moreover, even if Mr. Howling had reason to believe that the Distributor's interpretation of the distribution agreement was accurate, he lacked the authority to accept it as fact and include it in the October 8th Press Release.

### E.    *None of the Statements Allegedly Made During the October Road Show are Attributable to Mr. Howling*

The SEC's allegations regarding the October Road Show do not come close to pleading a primary violation of Section 10(b) and Rule 10b-5 against Mr. Howling. The SEC alleges that Messrs. Crombie, Melnyk, and Howling embarked on the October Road Show, but does not attribute any of the alleged misstatements made during the October Road Show to Mr. Howling. Indeed, the Amended Complaint is entirely silent as to which executive attended which event, and who said what to whom.

The SEC's allegation that Mr. Howling prepared a slide show presentation used during the October Road Show that contained material misrepresentations regarding the Accident's impact on Biovail's third quarter 2003 revenue is insufficient to allege a primary violation of the securities laws by Mr. Howling. The Amended Complaint fails to attribute a single misrepresentation to Mr. Howling and does not allege that a single Road Show attendee attributed the allegedly offending power point slides to Mr. Howling, and not to Biovail. *See Winkler*, 198 F.R.D. at 364-65 (dismissing a private Section 10(b) claim against a corporate director who wrote part of an allegedly fraudulent corporate press release because none of the

alleged misstatements were attributed to the director, and because the plaintiff failed to show that investors attributed the alleged misstatements to the director, rather than to the corporation). Because the Amended Complaint fails to allege that Mr. Howling made any of the alleged material misstatements, Mr. Howling cannot be held primarily liable for such misrepresentations under the "bright line" test. *See Wright*, 152 F.3d at 175; *Cedric Kushner*, 417 F. Supp. 2d at 334; *Lucent Technologies, Inc.*, 363 F. Supp. 2d at 724.

Again, to the extent the Amended Complaint implicitly charges Mr. Howling with failing to disclose that Biovail's interpretation of the distribution agreement may have been incorrect, the SEC (1) fails to attribute any of the statements or omissions made during the October Road Show to Mr. Howling and (2) fails to allege that Mr. Howling in fact had knowledge of the correct terms of the distribution agreement. The Amended Complaint does not set forth a claim that Mr. Howling committed a primary violation under Section 10(b) and Rule 10b-5, and thus the second claim must be dismissed.

## II. THE AMENDED COMPLAINT DOES NOT MEET THE PARTICULARITY REQUIREMENT OF RULE 9(b)[17]

Rule 9(b) of the Federal Rules of Civil Procedure requires that fraud be pled with particularity. *See* Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity."). In order to state a claim for fraud under Section 10(b), the SEC must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

---

[17]    In addition to failing to satisfy the requirements of Fed. R. Civ. P. 9(b), the Amended Complaint's "Second Claim for Relief" charges Mr. Howling with primary and secondary (aiding and abetting) violations of Section 10(b) without specifying the extent to which Mr. Howling is purportedly responsible for each alleged misstatement or omission. Am. Compl. ¶¶ 163-67. Consequently, it is impossible to determine whether the SEC seeks to hold Mr. Howling liable as a primary violator and/or an aider and abettor with respect to any of the alleged misstatements. *See Twombly*, 127 S. Ct. at 1964 (holding that Fed. R. Civ. P. 8(a) requires plaintiffs, at a minimum, to give defendants fair notice of the claims being asserted against them).

and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004); *see Davidoff v. Farina***,** No. 04 Civ. 7617, 2005 WL 2030501 at \*14 (S.D.N.Y. Aug. 22, 2005) (dismissing claim for lack of a particularity; "Plaintiffs provide no guidance as to what the alleged false statements were, who made them and when [or] why they were false when made").

These deficiencies are most glaring with respect to both Mr. Howling's alleged responses to queries from analysts, investors, and the financial press, and allegations regarding the October Road Show. For example, the SEC alleges that Mr. Howling misrepresented the impact of the Accident on Biovail's third quarter in a series of one-on-one communications beginning on October 3, 2003. Am. Compl. ¶ 41. This allegation fails to specify the content of Mr. Howling's alleged misstatements, or when, where, and to whom they were made. Consequently, this allegations fails to satisfy Fed. R. Civ. P. 9(b). *See Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990) (affirming the dismissal of a securities fraud claim for failure to satisfy the requirements of Fed. R. Civ. P. 9(b), which requires plaintiffs to allege "[t]he time, place, and nature of the [alleged] misrepresentations").

Moreover, the Amended Complaint alleges that "the executives at the [October] road show provided commentary reiterating the false statements in the October 3 press release." Am. Compl. ¶ 52. These allegations improperly lump all of the defendants together. *See Atkins v. Apollo Real Estate Advisors, LP*, No. 05 Civ. 4365, 2008 WL 1926684 (E.D.N.Y. April 30, 2008) ("in cases involving multiple defendants, Rule 9(b) requires that the pleading identify the nature of each defendant's participation in the alleged fraud."). Therefore, any claims regarding anything that was alleged to have been said or omitted during the October Road Show must be dismissed.

III.    **THE SEC HAS FAILED TO PLEAD SPECIFIC FACTS THAT GIVE RISE TO A STRONG INFERENCE THAT MR. HOWLING ACTED WITH SCIENTER**

To state a securities fraud claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts that give rise to a strong inference of scienter. *See ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 488 (S.D.N.Y. 2007) ("the SEC is subject to Rule 9(b) and must therefore plead a 'strong inference' of scienter.").

To plead a strong inference of scienter, the SEC must *either* allege facts that show that the defendants had the motive and opportunity to commit fraud *or* allege facts that constitute strong circumstantial evidence of conscious or reckless misbehavior. *See ATSI Comm., Inc.*, 493 F.3d at 99; *KPMG*, 412 F. Supp. 2d at 378 (applying the same factors to an SEC enforcement action). Moreover, in order to plead a "strong inference" of scienter sufficient to withstand a motion to dismiss, the inference of "scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2505-06 (June 21, 2007). This heightened pleading standard—imposed by Rule 9(b) and derived from the Second Circuit's scienter pleading standard—applies with equal force to claims brought by the SEC. [18]

---

[18]    While the Court in *Tellabs* was interpreting the pleading standard for a Section 10(b) claim specifically under the PSLRA, several district courts have applied the Court's holding to SEC enforcement actions. *See, e.g.*, *SEC v. Boling*, No. 06 Civ 1329, 2007 WL 2059744 (D.D.C. July 13, 2007); *SEC v. Goldsworthy*, No 06 Civ 10012, 2007 WL 4730345 (D. Mass. Dec. 4, 2007); *but see Collins & Aikman*, 524 F. Supp. 2d at 488 ("It is unclear whether district courts must now find that the inference of scienter raised in actions not governed by the PSLRA, but governed by Rule 9(b), be at least as compelling as any other inference. I need not reach this thorny (albeit interesting) issue, however, because I find that even under this heightened standard, the SEC has pled scienter."). Because the PSLRA did not change the heightened pleading standard for scienter in the Second Circuit and given that the pleading standard clearly applies to all plaintiffs, including the SEC, allegations of scienter by the SEC should necessarily be at least as compelling as any opposing inferences. *See Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000) ("We conclude that the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the with particularity requirement).").

A.    ***Conclusory Allegations Regarding Scienter do Not Raise a Strong Inference of Scienter***

Conclusory allegations of fraudulent intent are insufficient to give rise to a strong inference of scienter.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[plaintiff's] frequent conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b).  We have held in the context of securities fraud claims that such allegations are '*so broad and conclusory as to be meaningless*.'") (emphasis added).

Yet that is exactly what the SEC attempts to do in this case; the Amended Complaint is replete with this type of allegation:  "This statement was materially false and misleading, as Melnyk, Crombie, Howling, and Biovail *knew or recklessly disregarded.*"  Am. Compl. ¶ 28; "Melnyk, Crombie, Howling, and Biovail *knew or recklessly disregarded* that these statements by Melnyk were materially false and misleading." Am. Compl. ¶ 37; "Even though Melnyk, Crombie, Howling, and Biovail all *knew or recklessly disregarded* that the accident had no impact on third quarter revenues, the October 8 press release was silent on that subject."  Am. Compl. ¶ 48; "Howling *knew or recklessly disregarded* that the actual margin for Wellbutrin XL was substantially less that 80%."  Am. Compl. ¶ 42;  "At the time of these misstatements [during the October Road Show], Melnyk, Crombie, Howling, and Biovail all *knew or deliberately disregarded* that the statements attributing part of the third quarter revenue shortfall to the truck accident were materially false and misleading."  Am. Compl. ¶ 52.  These allegations, without more, do not raise a strong inference of scienter.

B.    ***The SEC Does Not Allege that Mr. Howling had the Motive and Opportunity to Commit Fraud***

The SEC has not even attempted to plead that Mr. Howling had the motive and opportunity to commit fraud.  There are no allegations that Mr. Howling sold any Biovail stock

24

or attempted to realize any benefit whatsoever from the alleged misstatements or omissions. Moreover, the SEC's allegation that Mr. Howling's bonus depended "on several factors, including whether the Company met certain financial targets" is wholly inadequate to prove motive in this Circuit. Am. Compl. ¶ 16. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.") (approvingly quoting *Ferber v. Travelers, Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991)); *Shields*, 25 F.3d at 1130 (same). Under the SEC's theory, Mr. Howling must have committed fraud "for the sheer joy of it." *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992).

C.  ***There is No Factual Basis Alleged to Support a Strong Inference of Conscious Misbehavior or Recklessness***

The Amended Complaint is devoid of allegations that would demonstrate circumstantial evidence of conscious misbehavior or recklessness. Reckless misbehavior is conduct that is "highly unreasonable and which represents *an extreme departure from the standards of ordinary care* to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (emphasis added) (affirming the dismissal of a complaint for failure to plead scienter through reckless disregard). Where, as here, "motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142.

The few allegations that the SEC tries to use to support its claim that Mr. Howling acted knowingly or with recklessness are clearly insufficient. The SEC's allegations appear to be: (1) the existence of the Crombie Draft, Am. Compl. ¶¶ 34-35; (2) information allegedly received by Messrs. Howling and Crombie from Biovail's warehouse supervisor stating that the Shipment left Biovail's warehouse on September 30, 2003, and that one Biovail truck was involved in the Accident, Am. Compl. ¶ 31; (3) an independent calculation of the value of the Shipment

25

performed by Mr. Howling on October 3, 2003, Am. Compl. ¶ 42; (4) an analyst report issued on

October 8, 2003 that questioned the value of the Shipment and the shipping terms in the

Distribution Agreement, Am. Compl. ¶ 43; and (5) the email from a representative of the

Distributor to Mr. Howling, Am. Compl. ¶ 46.

### D. *The Crombie Draft Does Not Raise a Strong Inference of Scienter*

The SEC alleges that Mr. Howling relied on information received from others in drafting

the October 3rd Press Release, including the Crombie Draft.  Am. Compl. ¶ 34.  The SEC further

alleges that the Crombie Draft correctly set forth the actual delivery term (*i.e.*, F.O.B.

Destination) and stated correctly that the revenue from the product involved in the Accident

could not be recognized in the third quarter.  *Id*.  The Crombie Draft clearly implies—contrary to

the SEC's allegation—that, but for the Accident, the revenues from the Shipment would have

been recognized in the third quarter, not the fourth quarter.  *See* Crombie Draft, Altun Decl., Ex

C ("this replacement shipment and its associated revenue will ***now*** be recognized in Q4 ***not*** Q3")

(emphasis added).  In the Crombie Draft, the revenue recognition timing is the key element of

the press release, not the shipping term itself.

The Crombie Draft is therefore not a "smoking gun" evidencing that Mr. Howling had

fraudulent intent—far from it.  It is a statement by the CFO of Biovail about the revenue

recognition consequences of the Accident—the same CFO who, along with the CEO, allegedly

provided Mr. Howling with the information to be inserted into the October 3rd Press Release and

ultimately approved that press release.

Furthermore, the SEC does not allege that Mr. Howling ever appreciated the significance

of the shipping term "F.O.B. Destination" or that he ever even read or focused on that language

in the Crombie Draft given the short time period in which the October 3rd Press Release was

assembled.  Nor does the SEC allege that Mr. Howling had independent access to any other information, such as the relevant distribution agreement, that would have permitted him to independently assess the description of the shipping term in the Crombie Draft or the revenue recognition accounting position taken by the CFO.  Indeed, the Amended Complaint has no allegations that support the SEC's theory that Mr. Howling had reason to know or suspect that the October 3rd Press Release contained any misrepresentations relating to the Accident.  Nor has the SEC pled any facts to support its implication that Mr. Howling should have questioned the integrity or trustworthiness of Messrs. Melnyk or Crombie, and therefore, should have questioned the information they provided as well.

The circumstantial allegations regarding the Crombie Draft are clearly insufficient to raise a strong inference of knowledge or recklessness on behalf of Mr. Howling.  *See In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601 at *7, (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their . . . executive positions are insufficient to plead scienter.").

E.    ***The Alleged Communication from Biovail's Warehouse Supervisor does Not Raise a Strong Inference of Scienter***

The SEC alleges that sometime between September 30, 2003 and October 3, 2003, Biovail's warehouse supervisor informed Messrs. Crombie and Howling that the Shipment left Biovail's warehouse on September 30, 2003, and that one truck from Biovail was involved in the Accident.[19]  Am. Compl. ¶ 31.  The allegations that Mr. Howling learned when the Shipment left Biovail's warehouse, and that one truck was involved in the Accident, without more, are

---

[19]    With respect to this allegation, it is unclear whether the SEC is alleging that Biovail's warehouse supervisor also told Mr. Howling that the Shipment "could not have reached the Distributor's North Carolina facility by the end of the quarter," or if it is commentary in the form of an explanatory parenthetical.  *See* Am. Comp. ¶ 31.

insufficient to establish that Mr. Howling understood the revenue recognition consequences of the Accident.  Indeed, the SEC does not allege that Mr. Howling had access to the relevant distribution agreement (nor can they), or that he knew that the shipping term included in the Crombie Draft was correct.  Accordingly, the alleged communication from Biovail's warehouse supervisor does not give rise to a strong inference of scienter.

F.     ***Mr. Howling's Calculation of the Value of the Shipment does Not Raise a Strong Inference of Scienter***

The SEC alleges that on or after October 3, 2003, Mr. Howling independently attempted to calculate the "actual revenue associated with the Wellbutrin XL lost in the accident."  Am. Compl. ¶ 42.  According to the Amended Complaint, Mr. Howling's calculation "demonstrated that, in order for even the low end of the valuation published by the Company - $10 million – to have been accurate, the product would have had to carry an 80% revenue margin." *Id*.  With nothing more than conclusory language, the SEC alleges that Mr. Howling "knew or recklessly disregarded that the actual margin for Wellbutrin XL was substantially less than 80%." *Id*. However, conclusory allegations such as this do not raise a strong inference of scienter. *See Shields*, 25 F.3d at 1129 (holding that conclusory allegations are inadequate to plead the necessary strong inference of scienter).  The SEC fails to plead a single fact suggesting that Mr. Howling viewed the 80% revenue margin for the Company's initial shipment of Wellbutrin XL as anything but reasonable.  The SEC does not allege that Mr. Howling had any independent knowledge of (or access to) information critical to performing an accurate calculation, such as, the Distribution Agreement's pricing structure, the product's gross sales price, gross to net discounts or Biovail's revenue margins for Wellbutrin XL.  Moreover, the fact that Mr. Howling had to perform such a calculation shows just how "out of the loop" Mr. Howling was and that he

28

did not know the actual value of the Shipment.[20]  Therefore, this allegation fails to raise a strong inference of scienter.

G.    *The Analyst Report and Distributor Email do Not Raise a Strong Inference of Scienter*

The SEC alleges that on October 8, 2003, a research analyst issued a report that questioned the value of the Shipment, and Biovail's assertion of when title to the Shipment transferred.  Am. Compl. ¶ 43.  The SEC notes that Mr. Howling "promptly forwarded to Melnyk and Crombie the portion of the Report questioning the value of the shipment."  Am. Compl. ¶ 44.  The Amended Complaint further alleges that Mr. Howling received other questions from analysts regarding the value of the Shipment.  Am. Compl. ¶ 45.  Also, according to the Amended Complaint, on October 8, 2003, an employee of the Distributor is alleged to have called and emailed Mr. Howling with the correct shipping term in the distribution agreement.  Am. Compl. ¶ 46.  The SEC acknowledges that Mr. Howling immediately forwarded this email as well to Messrs. Melnyk and Crombie.  *Id.*

These allegations, much like the allegations regarding the Crombie Draft, fail to demonstrate that Mr. Howling acted intentionally or recklessly.  *See SEC v. Lowy*, 396 F. Supp. 2d 225, 244 (E.D.N.Y. 2003) (holding that certain "red flag" documents did not constitute evidence of reckless or conscious misbehavior where the defendant shared the "red flag" documents with his superiors).  The fact that an analyst issued a report questioning some of Biovail's statements concerning the Accident is unremarkable; analysts are in the business of asking probing questions and writing reports.  Moreover, the fact that Mr. Howling immediately forwarded the report to his superiors—Messrs. Melnyk and Crombie—with the suggestion that "someone in finance draft responses to the issues raised" shows Mr. Howling's commitment to

---

[20]    In any case, the Amended Complaint concedes that Mr. Howling's alleged calculation yielded a number within the range specified in Biovail's disclosures.  Am. Comp. ¶ 42.

full disclosure and his unfamiliarity with the issues raised in the report.[21]  Am. Compl. ¶ 44.  *See Lowy* at 244.

It is, of course, reasonable for a subordinate employee to rely on the representations made by his superiors.[22]  Mr. Howling appropriately elevated the concerns expressed by the analyst and the Distributor to Messrs. Melnyk and Crombie, who had the authority to confirm the Distributor's interpretation of the agreement and to take any necessary actions.  Moreover, it is clear from the Amended Complaint that Mr. Howling did not even draft the October 8th Press Release.  He reviewed the October 8th Press Release confident that his supervisors were aware of the potential issue and were looking into it.  Am. Compl. ¶ 47.

Far from presenting circumstantial evidence sufficient to raise a "strong inference" of scienter, the Amended Complaint raises the considerably more compelling inference that Mr. Howling did not attach any significance to the mention of the shipping term in the Crombie Draft,[23] and that he relied on his superiors, Messrs. Melnyk and Crombie, for information

---

[21]   The SEC's allegation that Mr. Howling "assumed responsibility for speaking to the employee of the Distributor prior to issuing any further press releases on that subject," Am. Compl. ¶ 46, is completely irrelevant because it sheds no additional light on Mr. Howling's state of mind, and has no bearing on the accuracy of Biovail's October 8th Press Release.  Indeed, the allegation is entirely consistent with Mr. Howling acting merely as a conduit—passing information along from his superiors, Messrs. Melnyk and Crombie, to the Distributor.

[22]   *See* PRINCIPLES OF CORPORATE GOVERNANCE:  ANALYSIS AND RECOMMENDATIONS § 4.02 (1994) ("In performing his or her duties and functions, a director or officer who acts in good faith, and reasonably believes that reliance is warranted, is entitled to rely on information, opinions, reports, statements . . . prepared, presented, made or preformed by . . . one or more directors officers, or employees of the corporation . . . ."); *see also* N.Y. Bus. Corp. Law § 715(h) (McKinney 2008) ("In performing his duties, an officer shall be entitled to rely on information, opinions, reports or statements including financial statements and other financial data, in each case prepared or presented by . . . one or more other officers or employees of the corporation . . . whom the officer believes to be reliable and competent in the matters presented.").

[23]   In omissions cases like this one, courts must consider whether a defendant appreciated the materiality of the undisclosed information in deciding whether the defendant acted with scienter.  *See, e.g.*, *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1263-1264 (10th Cir. 2001) (holding that the plaintiffs' allegations were "not sufficient to imply [the defendants'] knowledge of the specific fact of materiality" of the pending litigation to investors).  "[T]he important issue in this case is *not* whether

regarding the value of the Shipment, the resolution of questions about the distribution agreement, and the proper revenue recognition decision for the third quarter. These allegations are clearly insufficient to support a strong inference of scienter under the Second Circuit's standard. *See In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d at 40*; see also Tellabs*, 127 S. Ct. at 2510. This Court should dismiss the Amended Complaint against Mr. Howling for failure to raise a "strong inference" of scienter.

## IV.    THE SEC'S TAG-ALONG AIDING AND ABETTING CLAIM ALSO FAILS

Finally, to the extent that the SEC charges Mr. Howling with aiding and abetting securities fraud, those claims must be also be dismissed. In order to state a claim for aiding and abetting a violation of Section 10(b) or Rule 10b-5, the SEC must plead: (1) a primary violation of Section 10(b) and Rule 10b-5; (2) that the secondary actor knew of the primary violation; and (3) that the secondary actor substantially assisted in that primary violation. *See Cedric Kushner*, 417 F. Supp. 2d at 334.

As noted above, the SEC fails to allege (other than through conclusory allegations) that Mr. Howling knew of the primary violation. *See id.* (dismissing the SEC's aiding and abetting claim because the SEC failed to "make the slightest showing that [the executive] was involved with any of the subject . . . which turned out to be falsely presented."); *see also Shields*, 25 F.3d at 1129 (holding that conclusory allegations of knowledge are insufficient to state a claim under Section 10(b) or Rule 10b-5).

---

Defendants knew the underlying facts [of the litigation], but whether Defendants knew that not disclosing [the litigation] posed substantial likelihood of misleading a reasonable investor." *Id.* (emphasis in original). *See also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 549 (S.D.N.Y. 2004) ("Plaintiffs must plead facts showing that the Defendants knew or were reckless in not knowing that omissions were material at the time the filings were made.…"). Even if Mr. Howling learned the correct shipping term, it is not alleged that he understood the revenue recognition consequences of the Accident and therefore understood the materiality of the alleged misstatement.

As described in detail above, the Amended Complaint fails to allege facts that would raise a strong inference that Mr. Howling knew the correct shipping term and its significance for revenue recognition purposes, nor that he knew the actual value of the Shipment. The Amended Complaint alleges that Mr. Howling relied on the information given to him by Messrs. Crombie and Melnyk in drafting the October 3rd Press Release, and does not allege that Mr. Howling had independent knowledge of the shipping term or its significance. Nor are there any facts in the Amended Complaint that show that Mr. Howling later developed an understanding of the shipping term and its impact on Biovail's revenue recognition.

Again, the SEC's reliance on the fact that Mr. Howling received the Crombie Draft does not give rise to a strong inference of knowledge or recklessness. Indeed, the Crombie Draft is consistent with the October 3rd Press Release—*i.e.*, it implies that, but for the Accident, the revenue from the Shipment would have been recognized in the third, rather than in the fourth, quarter, which is consistent with the statements contained in the October 3rd Press Release. Moreover, the Amended Complaint does not allege that Mr. Howling understood the significance of the shipping term in the Crombie Draft or that he even read it—notably, the shipping term did not end up in the final October 3rd Press Release.

The Amended Complaint also places great weight on an allegation that the Distributor's employee sent an email to Mr. Howling purporting to correct Biovail's previous statements concerning the shipping term. This allegation also falls short of sufficiently alleging knowledge because Mr. Howling, who was relying on the CEO and CFO for information, immediately elevated the information to them and had a perfect right to rely on what his superiors told him. *See Lowy*, 396 F. Supp. 2d at 244. Am. Compl. ¶ 46.

Similarly, the SEC's reliance on the alleged communication from Biovail's warehouse supervisor to Messrs. Crombie and Howling, Am. Compl. ¶31, and Mr. Howling's "back of the envelope" calculation, Am. Compl. ¶ 42, is misplaced. Without knowing the shipping term in the relevant distribution agreement, the warehouse supervisor's communication would not have impacted Mr. Howling's understanding of the revenue recognition consequences of the Accident. Likewise, the fact that Mr. Howling had to independently try to calculate the value of the Shipment (using only the cost of the goods in the Accident) confirms that Mr. Howling was "out of the loop" with respect to determining the value of the Shipment as stated in Biovail's disclosures. Indeed, the allegation that Mr. Howling had to resort to performing such a calculation shows that he did not know, or have access to, the actual value of the Shipment.

Moreover, the Amended Complaint fails to allege that Mr. Howling substantially participated in the alleged fraud. *See Cedric Kushner*, 417 F. Supp. 2d at 335-36 (dismissing the SEC's aiding and abetting claim, and holding that "[i]n alleging the requisite substantial assistance by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm on which the primary liability is predicated." (citing *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62-63 (2d Cir. 1985)). Here, the Amended Complaint alleges nothing more than a minor role by Mr. Howling. This is especially true with respect to the allegations concerning the October 8th Press Release and the October Road Show. For example, the Amended Complaint concedes that Mr. Melnyk drafted the October 8th Press Release by himself, and that Mr. Howling's involvement was limited to editing it. Am. Compl. ¶ 47. Indeed, Mr. Howling added only four words, all unrelated to the alleged misrepresentations.[24]

---

[24]    The Amended Complaint also completely fails to show how Mr. Howling substantially participated in the October Road Show. Am. Compl. ¶¶ 50-52. Instead, the Amended Complaint relies on conclusory

Because the SEC has failed to adequately plead that Mr. Howling had knowledge of the primary violation or that he substantially participated in the alleged fraud, the Amended Complaint's aiding and abetting claim against Mr. Howling should be dismissed.

---

allegations that are inadequate to plead aiding and abetting. *See Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 119 (2d Cir. 1982) (dismissing aiding and abetting claim and holding that allegations charging that "the defendants participated in, or knowingly or with reckless disregard for the truth lent material assistance . . . [or] played an active role in the preparation and dissemination of the false and misleading information" were inadequate).

34

## **CONCLUSION**

For all of the foregoing reasons, defendant Kenneth G. Howling respectfully

requests that the second claim in the Amended Complaint be dismissed pursuant to Fed. R. Civ.

P. 12(b)(6) and Fed. R. Civ. P. 9(b).

DATED :  AUGUST 22, 2008

/S/ Michael B. de Leeuw
Carmen J. Lawrence
Michael J. Rivera
Michael B. de Leeuw
Nazar Altun
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
Michael.deLeeuw@friedfrank.com

Attorneys for Defendant
   Kenneth G. Howling

7020268

35