UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

08-CV-02979 (LAK)

-against-

BIOVAIL CORPORATION, EUGENE MELNYK, BRIAN
CROMBIE, JOHN MISZUK AND KENNETH HOWLING,

Defendants.

**DEFENDANT JOHN MISZUK'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO DISMISS THE AMENDED COMPLAINT
AND STRIKE THE REQUEST FOR DISGORGEMENT
OF THE SECURITIES AND EXCHANGE COMMISSION**

CADWALADER WICKERSHAM & TAFT LLP
1201 F Street, NW
Washington, DC 20004
202-862-2200 (tel.)
202-862-2400 (fax)

One World Financial Center
New York, New York 10281
212-504-6000 (tel.)
212-504-6666 (fax)

Attorneys for Defendant John Miszuk

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. iii

SUMMARY ......................................................................................................... 1

ARGUMENT ........................................................................................................ 7

I. THE AMENDED COMPLAINT DOES NOT SATISFY RULE 9(b) ............................. 7

    A. The Amended Complaint's Fraud Claims Are Subject To Rule 9(b) ................... 7

    B. The SEC Has Failed To Allege Facts Raising A Strong Inference Of Scienter ..... 7

        1. The Amended Complaint Fails to Allege Motive to Commit Fraud .......... 9

        2. The Amended Complaint Fails to Allege Scienter on the Bill and Hold Transaction .......................................................................... 11

            a. Lack of Particularized Factual Allegations................................. 11

            b. The SEC's Allegations Do Not Support the Required Inference of Scienter ................................................................. 20

        3. The Amended Complaint Fails to Allege Scienter on the Foreign Exchange Issue ................................................................. 25

            a. The Allegations ........................................................................ 25

            b. The July 2003 Emails ............................................................... 29

II. THE AMENDED COMPLAINT FAILS TO ADEQUATELY PLEAD MATERIALITY ....................................................................................... 31

    A. The Bill And Hold Revenue Was Immaterial.................................................. 31

    B. The Foreign Exchange Error Was Immaterial ................................................ 32

III. THE COMPLAINT FAILS TO STATE CLAIMS UNDER SECTION 13(b)................. 34

    A. The Amended Complaint Fails To State A Claim Under Section 13(b)(5) ......... 34

    B. The Amended Complaint Fails To State A Claim Under Exchange Act Rule 13b2-1 ........................................................................................ 35

    C. The Amended Complaint Fails To State A Claim Under Exchange Act Rule 13b2-2 ........................................................................................ 36

**PAGE**

IV.   THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING ................................................................................................ 38

CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

**PAGE(S)**

CASES:

*Abbad v. Amman,*
    285 F. Supp. 2d 411 (S.D.N.Y. 2003), *aff'd,* 112 Fed. Appx. (2d Cir. 2004),........................ 9

*Acito v. IMCERA Group, Inc.,*
    *47 F3d 47 (2d Cir. 1995)* ................................................................... 10

*Basic v. Levinson,*
    485 U.S. 224 (1988)........................................................................ 31

*Caiafa v. Sea Containers Ltd.,*
    525 F. Supp. 2d 398 (S.D.N.Y. 2007) ................................................ 12

*Chambers  v. Time Warner,*
    282 F.3d 147 (2d Cir. 2002)............................................................. 32

*Chill v. G. E. Co.,*
    101 F. 3d 263 (2d Cir. 1996)........................................................7, 9, 12

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.,*
    540 F. Supp. 2d  464 (S.D.N.Y. 2008) ............................................. 21

*Denny v. Barber,*
    576 F.2d 465 (2d Cir. 1978).............................................................. 12

*Double Alpha, Inc. v. Mako Partners, LP,*
    No. 99 Civ 11541, 2000 WL 1036034 (S.D.N.Y.  July 27, 2000). ........................................ 7

*Druskin v. Answerthink, Inc.,*
    299 F. Supp. 2d 1307 (S.D. Fla. 2004) .........................................14, 24

*Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.,*
    602 F.2d 478 (2d Cir. 1979)...........................................................39, 40

*Ganino v. Citizens Utilities Co.,*
    228 F.3d 154 (2d Cir. 2000) ............................................................. 31

*Goplen v. 51job, Inc.,*
    453 F. Supp. 2d 759 (S.D.N.Y. 2006) .............................................. 31

*Greebel  v. FTP Software, Inc.,*
    194 F.3d 185 (1st Cir. 1999) .........................................................20, 31

*Honeyman v. Hoyt (In re Carter-Wallace Sec. Litig.),*
    220 F.3d 36 (2d. Cir. 2000)............................................................. 25

**PAGE(S)**

*In re Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N. D. Cal. Aug. 14, 2002)............................................................. 27

*In re Alamosa Hldgs., Inc. Secs. Litig.*,
    382 F. Supp. 2d 832 (N.D. Tex. 2005) ................................................................................ 24

*In re Allscripts, Inc. Sec. Litig.*,
    No. 00-C-6796, 2001 WL 743411 (N.D. Ill. June 29, 2001).............................................. 31

*In re Arthur Andersen & Co.*,
    47 S.E.C. 565 (1981) .......................................................................................................... 18

*In re Astea In'l Sec. Litig.*,
    No. Civ. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 9, 2007).......................................... 27

*In re Bally Total Fitness Sec. Litig.*
    No. 04 C 3530, 2006 WL 3714708, (N.D. Ill. July 12, 2006) ............................................ 28

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) (Kaplan. J.) ....................................................... 8, 12

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ..........................................................................10, 13

*In re Carter-Wallace Sec. Litig.*,
    220 F.3d 36 (2d. Cir. 2000)................................................................................................ 25

*In re Compuware Sec. Litig.*,
    301 F. Supp. 2d 672 (E. D. Mich. 2004)............................................................................ 32

*In re ICN Pharm., Inc. Sec. Litig.*,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ............................................................................ 26

*In re Interpool Sec. Litig.*,
    No. Civ. 04-321, 2005 WL 2000237 (D.N.J. Aug. 17, 2005)............................................ 28

*In re Laser Photonics Inc.*,
    SEC Rel. Nos. 33-7463, 34-39166, 1997 WL 600684 (Sep. 30, 1997) ............................ 19

*In re Miller Industries, Inc.*,
    120 F. Supp. 2d 1371 (N.D.Ga. 2000)............................................................................... 34

*In re Northern Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) ............................................................................... 11

*In re NTL Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) (Kaplan, J.) ............................................................. 21

**PAGE(S)**

*In re NYSE Specialists Sec. Litig.*
    503 F.3d 89 (2d Cir. 2007), *cert. denied sub nom.,* 128 S. Ct. 1707 (2008)..............13, 14, 27

*In re Parness,*
    SEC Rel. No. 34-23507, 1986 WL 712572 (Aug. 5, 1986)................................................. 19

*In re Phillips,*
    SEC Rel. No. ID-55, 1994 WL 485042 (Aug. 26, 1994) ..................................................... 30

*In re Pitts,*
    SEC Rel. No. 34-42569, 2000 WL 297884 (Mar. 23, 2000) ............................................... 18

*In re Refco, Inc. Sec. Litig.,*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................................................... 14

*In re SCB Computer Tech., Inc.,*
    149 F. Supp. 2d 334, (W.D. Tenn. 2001)........................................................................... 27

*In re Take-Two Interactive Sec. Litig.,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................................... 32

*JP Morgan Chase Bank v. Winnick,*
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) ............................................................................... 29

*Johnson v. NYFIX,*
    399 F. Supp. 2d 105 (D. Conn. 2005)...........................................................................12, 13

*Kalnit v. Eichler,*
    264 F.3d 131 (2d Cir. 2001)..........................................................................................8, 9, 11

*Kramer v. Time Warner Inc.,*
    937 F.2d 767 (2d Cir. 1991)............................................................................................... 29

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir.), *cert. denied,* 546 U.S. 935 (2005)..................................................... 7

*Lovelace v. Software Spectrum Inc.*
    78 F.3d 1015 (5th Cir. 1996)............................................................................................. 20

*Malin v. XL Capital Ltd.,*
    499 F. Supp. 2d 117 (D. Conn. 2007)................................................................................ 12

*Merzin v. Provident Fin. Grp., Inc.,*
    311 F. Supp. 2d 674 (S.D. Ohio 2004) .............................................................................. 20

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir.), *cert. denied,* 531 U.S. 1012 (2000)......................................8, 13, 25

**PAGE(S)**

*P.R. Diamonds, Inc. v. Chandler*,
 364 F.3d 671 (6th Cir. 2004) ......................................................................... 27

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004) .................................................................. 7, 9, 34

*San Leandro Emer. Med. Grp Profit Sharing Plan v. Philip Morris Cos.*,
 75 F.3d 801 (2d Cir. 1996) ............................................................................. 8

*SEC v. ABS Indus., Inc.*,
 No. 99 CV 2600, 1999 WL 977370 (Oct. 28, 1999) ...................................... 19

*SEC v. Caserta*,
 75 F. Supp. 2d 79 (E.D.N.Y. 1999) ............................................................... 20

*SEC v. Cedric Kushner Promotions, Inc.*,
 417 F. Supp. 2d 326 (S.D.N.Y. 2006) ........................................................... 38

*SEC v. Coffman*,
 No. 06 CV 00088, 2007 WL 2412808 (D. Colo. Aug. 21, 2007) ................ 38, 39

*SEC v. Cohen*,
 No. 05CV371, 2007 WL 1192438 (E.D. Mo., Apr. 19, 2007) ......................... 35

*SEC v. Collins & Aikman Corp.*,
 524 F. Supp. 2d 477 (S.D.N.Y. 2007) ......................................................... 8, 12

*SEC v. First Jersey Sec., Inc.*
 101 F.3d 1450 (2d Cir. 1996) ......................................................................... 10

*SEC v. Gane*,
 No. 03-61553-CIV, 2005 WL 90154 (S.D. Fla. 2005) ..................................... 10

*SEC v. Goldsworthy*,
 *No.* 06 cv 10012, 2007 WL 4730345 (D. Mass. Dec. 4, 2007) ......................... 8

*SEC v. Guenthner*,
 395 F. Supp. 2d 835 (D. Neb. 2005) ....................................................... 11, 32, 33

*SEC v. Kahn*,
 No. 99 C 6343, 2002 WL 1163723 (N.D. Ill. May 31, 2002) ......................... 35

*SEC v. KPMG LLP*,
 412 F. Supp. 2d 349 (S.D.N.Y. 2006) ........................................................... 38

*SEC v. McCaskey*,
 No. 98 CIV 6153, 2002 WL 850001 (S.D.N.Y. Mar. 26, 2002) ...................... 10

**PAGE(S)**

*SEC v. McNulty,*
137 F.3d 732 (2d Cir.), *cert. denied sub nom.*, 525 U.S. 931 (1998) .................................... 8

*SEC v. Monarch Funding Corp.*,
192 F.3d 295 (2d Cir. 1999) ......................................................................................... 7

*SEC v. Morris,*
No 04-3096, 2005 WL 2000665 (S.D. Tex. Aug. 18, 2005) ................................. 39

*SEC v. Patel,*
No. 07-cv-39-SM, 2008 WL 781912 (D.N.H. Mar. 24, 2008) ............................ 35

*SEC v. Republic Nat'l Life Ins. Co.*,
378 F. Supp. 430 (S.D.N.Y. 1974) ................................................................... 7

*SEC v. Sandifur,*
No. 05-1631, 2006 WL 538210 (W.D. Wash. Mar. 2, 2006) ............................. 39

*SEC v. Solow,*
No. 06-81041-Civ., 2007 WL 917269 (S.D. Fla. Mar. 23, 2007) ....................... 38

*SEC v. Terry's Tips, Inc.*,
409 F. Supp. 2d 526 (D. Vt. 2006) ................................................................. 29

*SEC v. Todd,*
No. 03 CV 2230, 2007 WL 1574756 (S.D. Cal. May 30, 2007)..............................10, 27, 36

*Shields v. Citytrust Bancorp Inc.*,
25 F.3d 1124 (2d Cir. 1994)..................................................................7, 9, 10

*Stevelman v. Alias Research Inc.*,
174 F.3d 79 (2d Cir. 1999) .......................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499 (2007)..................................................................8, 23, 30

*Thor Power Tool Co. v. Commissioner*,
439 U.S. 522 (1979)...................................................................................... 20

*United States v. Bonanno Organized Crime Family of La Cosa Nostra,*
879 F.2d 20 (2d Cir. 1989).......................................................................... 13

**STATUTES & OTHER AUTHORITIES:**

17 C.F.R.:
§ 240.13b2-1.................................................................................................... 35
§ 240.13b2-2.................................................................................................... 36

**PAGE(S)**

15 U.S.C.:
    § 78j-1(b)(1) ................................................................................................... 24
    § 78j-1(b)(3) ................................................................................................... 24
    § 78m(b)(2)(A) ............................................................................................... 35
    § 78m(b)(5) .................................................................................................... 34

*Progress Report of the SEC Advisory Committee on Improvements to Financial Reporting*, SEC Rel. Nos. 33-8896, 34-57331, 2008 WL 441528 (Feb. 14, 2008) .............. 33

*Revenue Recognition in Financial Statements,* SEC Staff Acct. Bull. No. 101 (Dec. 3, 1999), available at http://www.sec.gov/interps/account/sab101.htm (last visited 8/20/08) ................................................................................................................. 17

Comm'r Paul S. Atkins, *Remarks Before the American Institute of Certified Public Accountants* (Dec. 5, 2005), available at http:// www.sec.gov/news/speech/ spch120505psa.htm (last visited 8/20/08) ........................................................... 17

Comm'r Paul S. Atkins, *SEC Speaks in 2008, Program at the Practicing Law Institute* (Feb. 8, 2008), available at http://www.sec.gov/news/speech/2008/ spch020808psa.htm (last visited 8/20/08) ........................................................... 17

*Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Finance Statements of Business Enterprises,* Finance Accounting Standards Board (Dec. 1984), available at http://www.fasb.org/pdf/con5.pdf (last visited 8/20/08) ............... 18

Biovail 20-F 2003 Annual Report, available at http://sec.gov/Archives/edgar/data/885590/000104746904017429/a2136694z20-f.htm (last visited 8/20/08) .................................................................................................. 24

Biovail 20-F 2004 Annual Report, available at http://sec.gov/Archives/edgar/data/885590/000104746905018555/a2160202z20-f.htm (last visited 8/20/08) .................................................................................................. 24

Biovail 20-F 2005 Annual Report, available at http://sec.gov/Archives/edgar/data/885590/000104746906004403/a2168876z20-f.htm (last visited 8/20/08) .................................................................................................. 24

Biovail 20-F 2006 Annual Report, available at http://sec.gov/Archives/edgar/data/885590/000104746907002027/a2176789z20-f.htm (last visited 8/20/08) .................................................................................................. 24

Biovail 20-F 2007 Annual Report, available at http://sec.gov/Archives/edgar/data/885590/000104746908002964/a2182900z20-f.htm (last visited 8/20/08) .................................................................................................. 24

**PAGE(S)**

Biovail Corp. Form 6-K/A (quarterly period ending 3/31/03), filed May 14, 2004,
available at http://www.sec.gov/Archives/edgar/data/885590/000104746904017434/
a2130705z6- ka.htm (last visited 8/20/08) ........................................................................... 26

Biovail Corp. Form 6-K/A (quarterly period ending 6/30/03), filed May 14, 2004,
available at http://www.sec.gov/Archives/edgar/data/885590/000104746904017437/
a2130832z6-ka.htm (last visited 8/20/08) ....................................................................26, 32

Biovail Corp. Form 6-K/A (quarterly period ending 9/30/03), filed May 14, 2004,
available at http://www.sec.gov/Archives/edgar/data/885590/000104746904017436/
a2130932z6-ka.htm (last visited 8/20/08) ........................................................................... 26

## SUMMARY

In stark recognition of the frailty of its claims, the SEC, rather than directly opposing Defendant John Miszuk's June 23, 2008 Motion to Dismiss, filed an Amended Complaint. The SEC's Amended Complaint nevertheless still fails to satisfy the threshold requirements of Fed. R. Civ. P. 9(b), and still fails to state a claim against Mr. Miszuk. In the Amended Complaint, the SEC continues to make conclusory, unsupported accusations that, as Controller of Biovail Corporation ("Biovail" or the "Company"), Mr. Miszuk "knowingly or recklessly" was responsible for Biovail's alleged misreporting of two items in its 2003 financial statements. Even after a multiple-year investigation, and now with its "second bite at the apple," the SEC can only manage an Amended Complaint which is legally deficient, and which should be dismissed with prejudice in its entirety.

**The "Bill and Hold" Transaction.** The first item alleged as to Mr. Miszuk in the Amended Complaint is a transaction in which Biovail recognized $8 million of revenue in its second quarter, ended June 30, 2003. The transaction involved an order for 27.1 million pills of Wellbutrin ("WBXL"), a new product manufactured by Biovail specifically for the customer referred to in the Amended Complaint as the "Distributor." (SEC Amended Complaint ¶ 103) ("Am. Compl."). The SEC alleges that the Distributor "agreed to let Biovail hold the product awaiting FDA approval," which Biovail would later package according to final FDA requirements and then ship to the Distributor for resale as "trade" product. (*Id.*) This transaction is referred to as a "bill and hold" transaction in the Amended Complaint (the "Bill and Hold").

Although the pills had not been shipped to the Distributor by June 30, 2003, Biovail recorded the transaction as a sale, immediately recognizing revenue from it in its second quarter ending June 30, 2003. In its Amended Complaint, the SEC now admits that under some circumstances, U.S. Generally Accepted Accounting Principles ("GAAP") permit a company to "recognize revenue even before it has shipped the product." (*Id.* ¶ 106). The SEC asserts, however, that Biovail's June 30, 2003 transaction with the Distributor did not meet the allowable circumstances to recognize revenue immediately as a "bill and hold" transaction. Under these circumstances, for the SEC to allege a fraudulent violation of GAAP on the June 30 transaction,

the SEC has two main hurdles before it, both of which it has failed to overcome. First, it must allege facts demonstrating that the transaction did not satisfy bill and hold criteria under GAAP. And second, it must allege particularized facts demonstrating that Mr. Miszuk was at least "reckless" in not knowing of this supposed inability to satisfy applicable GAAP requirements.

The core of the SEC's allegations that the Bill and Hold transaction did not satisfy GAAP revenue recognition criteria is that, at some point, Mr. Miszuk was involved in a decision to "replace" WBXL pills that Biovail was holding for the Distributor, with newly manufactured pills (*id.* ¶ 112), so that the original pills, being held at Biovail's warehouse, could be shipped to fill orders for sample pills to the very same Distributor. The essence of the SEC's Amended Complaint is that this so-called "Pills Switch" caused the recognition of revenue on the transaction in Biovail's second quarter 2003 to violate GAAP. (Am. Compl. ¶¶ 117, 125, 126).

The SEC, however, provides no credible basis for this accounting conclusion. As discussed later herein, the allegations that the "Pills Switch" caused Biovail's accounting to violate GAAP are based on undefined concepts in GAAP and, primarily, by reference to a 1999 Staff Accounting Bulletin in which SEC staff outlined their views on so-called "Bill and Hold" accounting criteria. (Am. Compl. ¶¶ 105-108). As explained below, the Staff Accounting Bulletin is neither authoritative nor clear on the issue of a situation like the planned "Pills Switch." Tellingly, the SEC is unable to allege that Biovail has restated or plans to restate its financials to correct this alleged improper accounting, and it is a matter of public record that Biovail has not done so. Biovail's auditors also have not withdrawn their opinion on those financials.

The SEC also has failed to provide specific factual allegations of how, why, or when Mr. Miszuk knew or was reckless in not knowing that the accounting was supposedly erroneous. The SEC simply reverts to a *res ipsa loquitor*-type argument: In the SEC's view, the accounting did not comply with the Staff Accounting Bulletin, and Mr. Miszuk, aware of the planned Pills Switch, must also have had that view.

In the Amended Complaint, the SEC for the first time directly spells out why it thinks this "Pills Switch" caused the accounting to be inappropriate. The SEC asserts that (1) at some point after the June 30 invoicing, Biovail "designated" the pills on which it had recognized revenue at trade prices under the June 30 transaction, thus somehow earmarking them for shipment in the future to satisfy other orders for WBXL from the Distributor; and (2) *at some point later* (in August), Biovail in fact shipped those June 30 pills under the other orders, at lower, sample prices. (Am. Compl. ¶¶ 111, 120). Based on this, the SEC contends that Biovail "sold the same pills twice, at two different prices."

However, the Amended Complaint does not assert that sufficient pills were unavailable to substitute or segregate in Biovail's warehouse for the original pills at the time those original, June 30 pills were actually shipped to the Distributor. And it is not even alleged that the original June 30 WBXL pills were not in fact replaced at the time they were shipped to the Distributor under other orders for use as samples. All that is alleged is that *at the time Biovail recognized revenue on a Bill and Hold basis* for the original manufactured pills, there were not sufficient newly manufactured pills to replace those pills *if* those pills all had been shipped *at that time*. But, if in fact additional pills were available at the time the June 30 Bill and Hold pills were shipped, then the "same" pills were not sold twice. The SEC does not allege facts which negate the possibility that additional pills were available when the June 30 Bill and Hold pills were actually shipped to the Distributor. Whether the SEC has sufficiently alleged that such a pill substitution causes Biovail's initial recording of the June 30 transaction to violate GAAP is discussed below; but regardless, the SEC has not alleged any facts that justify the conclusory assertion that "the same pills" were "sold" twice. Moreover, there is no allegation that Mr. Miszuk was aware of any facts that would indicate knowledge, whenever the June 30 Bill and

Hold pills were shipped, that sufficient newly manufactured pills were not then available and in fact segregated for shipment under the Bill and Hold (June 30) order.

Further, as discussed below, the SEC is unable to allege facts, by way of specific meetings, conversations, emails, or other documentation, that are required under applicable pleading standards and usually are present in a case where the SEC alleges that company officials have engaged in "cooking the books" or falsifying transactions. There are no communications or documents alleged in which there is even any discussion, by anyone, that the accounting for the Bill and Hold transaction is incorrect. There is nothing in the Amended Complaint alleging or indicating that Mr. Miszuk directed or acquiesced in the accounting in the face of anyone raising an issue about the accounting, let alone in the face of clear impropriety. In addition, Mr. Miszuk did not trade in Biovail stock or otherwise benefit from the alleged fraud, and the facts alleged demonstrate no discernible motive on his part to commit fraud. Rather, the SEC's case relies on a technical interpretation of GAAP, an array of conclusory allegations and few unremarkable facts referenced in hope of convincing this court that Mr. Miszuk must have known of allegedly improper accounting. Further, as discussed below, the alleged error was immaterial as a matter of law.

For these reasons, and as further discussed below, the Amended Complaint must be dismissed because it fails to particularize in any way facts that establish the required "strong inference" of fraudulent intent on the Bill and Hold transaction. The aiding and abetting allegations on that transaction similarly fail. And, as discussed in Section III, the allegations that Mr. Miszuk "knowingly" falsified, or in any way prepared or allowed a "false" record to be created about the Bill and Hold, or was involved with misrepresentations to Biovail's auditors, are unsupported and do not allow the inferences for which the SEC searches. Indeed, the allegations admit of other, stronger, innocent inferences.

**The Foreign Exchange Transaction:**  The other item raised in the Amended Complaint as to Mr. Miszuk is the failure of Biovail to "mark-to-market" correctly a debt held on the books of one of its subsidiaries, Biovail Laboratories, Inc. ("BLI"), located in Barbados.  BLI had purchased certain intangible assets, trademarks, and product rights from the Distributor in 2002. (Am. Compl. ¶ 135).  Part of the purchase terms included a loan, denominated in Canadian dollars, from the Distributor to BLI.  The functional currency of BLI is the U.S. dollar, and recording the loan on BLI's and Biovail's books thus involved converting the debt obligation into U.S. dollars using the prevailing exchange rate as of the date of the transaction.  (*Id.* ¶¶ 135-36).  Because the Distributor loan to BLI was required to be repaid in Canadian dollars, Biovail could incur either a gain or loss based on the change in the exchange rate between U.S. and Canadian dollars.  (*Id.* ¶ 137).  But such a gain or loss would *only* be incurred and *realized* at the time the debt was actually repaid, based on the existing currency exchange rate at the time of payment.  The SEC alleges that, in the interim, Biovail was required by GAAP to "mark-to-market" the amount carried on BLI's books representing the debt, by applying current exchange rates to value the outstanding loan balance each quarter, and recording any resulting, *unrealized* foreign exchange gain or loss in its income statement.  (*Id.* ¶ 136).  Mr. Miszuk does not dispute that this is the correct accounting under GAAP.

The SEC's alleged case against Mr. Miszuk on this item rests on a single identifiable communication – its allegation that on July 8, 2003, Biovail's Senior Director of Legal Accounting and BLI's Controller emailed Mr. Miszuk and, as the SEC now alleges, "identif[ied] [an] issue" regarding the accounting treatment of the debt.  (Am. Compl. ¶¶ 139, 140).  The SEC also now acknowledges in its Amended Complaint that Mr. Miszuk initially responded by requesting "some analysis" on the issue.  The Amended Complaint makes no specific allegations as to what happened thereafter.  The SEC simply alleges that  Biovail and Mr. Miszuk "did not record" the proper amount in the second quarter, and newly claims, vaguely, that during the third quarter "the foreign exchange issue" was discussed and that Mr. Miszuk "acknowledged a loss in previous quarters and sought a hedging strategy."  (*Id.* ¶¶ 140 & 143).  Based solely on these allegations, the SEC asserts that Mr. Miszuk committed fraud.  More is needed before the

elements of an action for fraud can be established.

The Amended Complaint is completely silent as to what Mr. Miszuk or any one else at Biovail did concerning this issue, except for alleging that the debt remained translated at the exchange rate as of the initial date of the transaction, and was not marked-to-market in the second or third quarter financials. As discussed herein, it is clear under applicable case law, and in logic, that the mere "identification of [an] issue" (*id.* ¶ 140) is not a sufficient basis for a fraud allegation. Among other things, the SEC does not allege a single fact that can support an inference that Mr. Miszuk had a motive for failing to correct the alleged error.

Indeed, there are no specific facts alleged to the effect that Mr. Miszuk actually was involved in any communications at all about the issue after July 8, 2003.[1] Notwithstanding the vast resources already expended on investigating the matter, the SEC offers no information (*e.g.* emails, memoranda, or allegations of secretive conversations or agreements) showing that Mr. Miszuk reached a definitive decision as to the proper accounting treatment and then deliberately ignored it. There are no facts alleged showing why and under what circumstances the adjustment was not made. There are no allegations as to what, if any, further communications Mr. Miszuk, the Senior Director of Legal Accounting, or the BLI Controller had, either among themselves or with any other individuals, about the foreign exchange accounting. Finally, the SEC does not allege either that the Senior Director of Legal Accounting or the Controller of BLI were directed by anyone, let alone Mr. Miszuk, not to correct the alleged error, and they are not charged with any wrongdoing in connection with the issue. The mere innuendo of fraud suggested by the Amended Complaint is exactly the type of imprecise and factually vague pleadings that Rule 9(b) was designed to preclude.

The allegation that an issue as to a specific foreign exchange calculation was identified, and that the calculation thereafter remained unaltered, supports nothing more than an inference that when the issue was identified at BLI, Mr. Miszuk lost sight of the issue, or could assume that the appropriate accounting personnel were dealing with it or would revisit it if necessary.

---

[1] As discussed, *infra* pages 28-29, the SEC's reference to communications about a hedging strategy fails to make any rational connection between any such alleged communication and the BLI debt at issue.

For these and other reasons discussed in this Memorandum, including the immateriality of the alleged error, all of the allegations against Mr. Miszuk concerning the foreign exchange issue should be dismissed.

## ARGUMENT

### I.    THE AMENDED COMPLAINT DOES NOT SATISFY RULE 9(b)

#### A.    The Amended Complaint's Fraud Claims Are Subject To Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure demands that "the circumstances constituting fraud . . . shall be stated with particularity." This Rule is designed to "safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of an [unfounded] lawsuit." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (citations omitted). The particularity requirement of Rule 9(b) is stringent and is "applied assiduously" to securities fraud claims in the Second Circuit. *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 168 (2d Cir.), *cert. denied*, 546 U.S. 935 (2005). Rule 9(b) requires that a complaint alleging fraud specify (1) the statements that the plaintiff believes were fraudulent, (2) the speaker, (3) where and when the statements were made, and (4) *why* the plaintiff believes they were *fraudulent*. *Rombach*, 355 F.3d at 170; *Chill v. G.E. Co.*, 101 F. 3d 263, 267 (2d Cir. 1996). Moreover, where, as here, "fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant." *Double Alpha, Inc. v. Mako Partners, LP*, No. 99 Civ 11541, 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000).

#### B.    The SEC Has Failed To Allege Facts Raising A Strong Inference Of Scienter

To support its claims under Section 10(b) and Rule 10b-5, the SEC must plead with particularity facts supporting a strong inference that Mr. Miszuk acted with scienter. *Lentell*, 396 F.3d at 168; *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. Republic Nat'l Life Ins. Co.*, 378 F. Supp. 430, 439 (S.D.N.Y. 1974). The Second Circuit demands that a plaintiff allege scienter with particularized facts that raise a "strong" inference of fraudulent intent. *Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). This standard applies to cases brought by the SEC, as well as to cases brought by private plaintiffs. *SEC v.*

*Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 488 (S.D.N.Y. 2007) ("[T]he SEC is subject to Rule 9(b) and must therefore plead a 'strong inference' of scienter.").

A strong inference of fraudulent intent can only be established by either (a) particularized allegations giving rise to strong circumstantial evidence of "conscious misbehavior" or "recklessness," or (b) detailed factual assertions that demonstrate the defendant "had both motive and opportunity to commit fraud." *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001). Moreover, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007);[2] *see also San Leandro Emer. Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813 (2d Cir. 1996) ("Plaintiffs do not . . . enjoy a license to base claims of fraud on speculation and conclusory allegations") (citations and internal quotations omitted).

Under the first alternative for pleading scienter, allegations of Mr. Miszuk's behavior can satisfy the standard only if those accusations, if true, show that he "deliberately or recklessly engaged in *illegal conduct.*" *In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) (Kaplan, J.) (emphasis added). Absent specific factual allegations that Mr. Miszuk *knew* he engaged in illegality, the SEC must plead facts to show that his behavior was "an extreme departure from the standards of ordinary care" that was so severe that it 'approximat[ed] actual intent . . . .'" *Novak v. Kasaks,* 216 F.3d 300, 308, 312 (2d Cir.) (citations omitted), *cert. denied*, 531 U.S. 1012 (2000); *SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir.), *cert. denied sub nom.*, 525 U.S. 931 (1998). Furthermore, where plaintiffs fail to plead any specific motive to defraud, "the strength of the circumstantial allegations [of knowledge or recklessness] must be correspondingly greater." *Kalnit,* 264 F.3d at 142.

---

[2]     Although the Supreme Court's decision in *Tellabs* was rendered in the context of cases brought under the PSLRA, the Supreme Court's guidance in how to interpret inferences logically extends beyond the specific context of the PSLRA. *See id.* at 2510 ("The strength of an inference cannot be decided in a vacuum."). The Second Circuit applies the strong inference standard to PSLRA and SEC actions, and this analysis on 9(b) should be guided by the Supreme Court's explanation of how competing inferences are to be weighed in determining whether a particular inference is "strong." *See SEC v. Goldsworthy,* 06 cv 10012, 2007 WL 4730345, at *15 (D. Mass. Dec. 4, 2007) (applying *Tellabs'* interpretation of "strong inference standards" to SEC enforcement action).

As discussed below, the SEC has not pled any facts to demonstrate that Mr. Miszuk had any motive to commit the alleged frauds. Nor does the Amended Complaint raise any specific factual allegations that can support a strong inference that Mr. Miszuk had knowledge of fraud or was "reckless," as defined above, in his actions in connection with either of the accounting transactions alleged against him.

### 1. The Amended Complaint Fails to Allege Motive to Commit Fraud

In order to establish scienter based on motive and opportunity, plaintiffs must allege the presence of "concrete benefits that could be realized by one or more of the [alleged] false statements and wrongful nondisclosures," as well as "the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130; *see also Rombach*, 355 F.3d at 177. The Second Circuit repeatedly has held that the "strong inference of fraudulent intent" required to plead scienter cannot be drawn from general motives that are shared by "virtually every company in the United States" or "most corporate directors and officers." *Kalnit*, 264 F.3d at 138-140; *see also Rombach*, 355 F.3d at 177. In this regard, the SEC cannot premise motive allegations on a desire to "meet analysts' expectations," *Abbad v. Amman*, 285 F. Supp. 2d 411, 419 (S.D.N.Y. 2003) (citations omitted), *aff'd*, 112 Fed. Appx. 97 (2d Cir. 2004), or on an alleged desire to "keep stock prices high to increase officer compensation." *Kalnit*, 264 F.3d at 139-40 (collecting cases). Such desires can be imputed to all corporate officers. *Id*.

Under this clear standard, the Amended Complaint is devoid of *any* legally cognizable allegation that would lead to the inference that Mr. Miszuk had a motive to commit the purported frauds. Rather, the SEC merely adds unsupported, inflammatory characterizations to the type of clichéd averments of supposed "motive" that courts in this Circuit and elsewhere consistently reject as a matter of law. For example, the allegations that "Biovail executives" were "[o]bsessed with meeting quarterly and annual earnings guidance" (Am. Compl. ¶ 1), that the Company was "in danger of missing earnings expectations for the first time in history" (*id*. ¶ 90), and that the defendants were motivated to commit fraud "to meet [the Company's] second quarter earnings projections" (*id*. ¶ 96) are the same sorts of allegations that the Second Circuit repeatedly has deemed insufficient to sustain claims of accounting fraud. *See, e.g., Chill*, 101

F.3d at 268 (desire to advance "the appearance of corporate profitability, or of the success of an investment," insufficient).[3]

Nor does the complaint allege how Mr. Miszuk might have benefited from the alleged fraud. Tellingly, the SEC does not claim that Mr. Miszuk was paid bonuses tied to the alleged Bill and Hold or foreign exchange accounting, or that he personally profited from the sale of Biovail stock.[4] Rather, in its Amended Complaint, the SEC simply makes a generic allegation that Mr. Miszuk's bonus was "dependent on several factors, including whether the Company met certain financial targets." (Am. Compl. ¶ 15). However, the SEC does not even allege any connection between Mr. Miszuk's bonus and the accounting transactions at issue. Moreover, scienter cannot be pled by simply alleging that "defendants had compensation plans tied to the Company's performance, [as] [s]uch plans are typical of nearly every corporation" and are insufficient to establish motive as a matter of law. *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 561-62; *see Acito v. IMCERA Group, Inc.* 47 F.3d 47, 54 (2d Cir. 1995) ("[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter."); *Shields*, 25 F.3d at 1130 ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.") (citation omitted). More definitively, as this Court has recognized: "The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an

---

[3]    *See also SEC v. Todd*, No. 03 CV 2230, 2007 WL 1574756, at *12 (S.D. Cal. May 30, 2007) ("the desire of a corporate officer to generate revenue and meet analyst expectations" is not indicative of scienter); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 560 (S.D.N.Y. 2004) (allegation that defendants engaged in accounting fraud to "make it appear that the future of the Company was more promising" held insufficient to show motive).

[4]    The SEC requests "disgorge[ment] [of] any ill-gotten gains" from Mr. Miszuk. (Am. Compl. ¶ 7a). Disgorgement is an equitable remedy, designed to "deprive violators of their ill-gotten gains" and promote deterrence through prevention of unjust enrichment on the part of the violator. *SEC v. First Jersey Sec., Inc.* 101 F.3d 1450, 1474-75 (2d Cir. 1996). Disgorgement must be "causally connected to the violation." *SEC v. McCaskey*, No. 98 CIV 6153, 2002 WL 850001, at *4, (S.D.N.Y. March 26, 2002); *see also SEC v. Gane*, No. 03 CIV 61553, 2005 WL 90154, at * 19 (S.D.Fla. 2005) (denying SEC's request for disgorgement where "there [was] no record evidence of any causal connection" between illegality and purported ill-gotten gains). Here, there is no basis for the SEC's disgorgement request because the Amended Complaint does not assert *any* predicate allegation of unjust enrichment or illicit monetary gain obtained by Mr. Miszuk, much less any enrichment or gain that is "causally connected to the alleged wrongdoing." Because the SEC has failed to allege any facts sufficient to support a claim of disgorgement, this Court should strike that portion of the SEC's Prayer for Relief that requests a disgorgement order against Mr. Miszuk.

intent to defraud shareholders." *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000); *see also SEC v. Guenthner*, 395 F. Supp. 2d 835, 848 (D. Neb. 2005) (no inference of scienter where CFO did not "make any money" from the purported fraud). Thus, the SEC fails to plead scienter based on motive and opportunity.

As a result of the failure to plead any facts demonstrating that Mr. Miszuk had a particularized motive to commit the alleged frauds, "the strength of the circumstantial allegations must be correspondingly greater," under the "knowing or reckless" alternative method of pleading scienter. *Kalnit,* 264 F.3d at 142. As discussed below, the SEC has failed in its allegations to meet the knowing or reckless alternative for pleading scienter as to both the Bill and Hold transaction and the foreign exchange error.

### 2.    The Amended Complaint Fails to Allege Scienter on the Bill and Hold Transaction

#### a.    Lack of Particularized Factual Allegations

Among the 44 paragraphs of allegations in the Amended Complaint concerning the Bill and Hold transaction, the SEC fails to plead any specific, fact-based allegations that provide "strong circumstantial evidence" that Mr. Miszuk engaged in "conscious misbehavior or recklessness" in connection with that transaction. *Kalnit*, 264 F.3d at 142. Instead, the Amended Complaint relies on the conclusory assertion that Mr. Miszuk, a non-accountant, is liable for securities fraud because he "knew, or recklessly disregarded," that the requirements under GAAP for revenue recognition for a bill and hold transaction allegedly were not satisfied. (Am. Compl. ¶¶ 117, 121, 123, 125, 126).

Indeed, the SEC has failed to assert a single, identifiable factual allegation that shows how or why Mr. Miszuk knew or was reckless in not knowing that the accounting for the Bill and Hold transaction supposedly contravened GAAP:

- There are no allegations that the Distributor did not in fact place an order in June 2003 for 27.1 million pills, eventually receive pills to fill that order, and pay the amount recorded by Biovail for such order. Indeed, the allegations are to the contrary or support the contrary inference. (*See infra*, at pp. 15-20, 22).

- The allegations concerning the "Pills Switch" are only (a) that the pills ordered in June 2003 for ultimate use as trade product were "designated" (without alleging the specifics

of this "designation") at some point to fill the Distributor's orders for samples, and (b) that at that time those pills were so "designated," Biovail did not then have enough newly manufactured pills to replace them.  It is never alleged that newly manufactured pills were in fact not replaced, or that Mr. Miszuk was aware they were not wholly replaced, if that was the case.

- There are no communications or documents alleged in which anyone, let alone Mr. Miszuk, even discusses the possibility that the accounting was improper, let alone conclude that it was in fact improper.

- There are no communications or documents alleged to indicate that Mr. Miszuk directed or acquiesced in the accounting in the face of anyone raising an issue about the accounting, let alone in the face of clear impropriety.

Rather than alleging facts, which presumably could have been gleaned from its multi-year investigation if they had existed, the SEC relies on a *res ipsa loquitor*-type argument:  based on certain alleged attributes of the transaction and certain language of an SEC Staff Accounting Bulletin ("SAB"), Mr. Miszuk "must have" known that Biovail's accounting for the June 2003 order was improper.  This Circuit has rejected such reasoning as insufficient for fraud claims. *Collins & Aikman*, 524 F. Supp. 2d at 487; *Shields*, 25 F.3d at 1129 ("We have rejected the legitimacy of 'alleging fraud by hindsight'") (*quoting Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)).[5]  There is good reason to reject this attempted syllogism in the case at hand, especially given that Mr. Miszuk is not an accountant and there has been no restatement.

First, it is well-settled that, standing alone, even clear "[GAAP violations] do not establish that the [i]ndividual [d]efendant[] issued those [results] with the requisite fraudulent intent."  *In re BISYS,* 397 F. Supp. 2d at 448; *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (allegations of accounting irregularities insufficient to show conscious misbehavior or recklessness); *Chill*, 101 F.3d at 270 ("Allegations of a violation of GAAP provisions . . . without corresponding fraudulent intent, are not sufficient to state a securities fraud claim"); *Johnson v. NYFIX*, 399 F. Supp. 2d 105, 115, 117-18 (D. Conn. 2005) (same

---

[5]    *See also Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 413 (S.D.N.Y 2007) (no scienter where complaint lacked any allegations suggesting defendants knew or had reason to believe that the "failure to take an impairment charge earlier was an incorrect application of accounting principles"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007) (despite allegations that accounting problems at company were "well known to [] management," no scienter was found where plaintiffs failed to allege any connection between the accounting improprieties and defendant's knowledge of them).

effect).

Second, the SEC is required to plead that Mr. Miszuk had access to "information contradicting [Biovail's] public statements," and to specifically identify the documents or statements that revealed the contrary information to him. *Novak*, 216 F.3d at 308, 309; *In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 566-68 (dismissing §10(b) claim for failure to allege scienter where plaintiffs did not identify specific reports or information showing how defendant knew the nature of the subject transactions required deferred recognition of revenue); *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 770 (S.D.N.Y. 2006) (boilerplate allegations of recklessness insufficient where plaintiffs "fail to identify any documents . . . or reports that show[ed] that the defendants knew or should have known" of information contrary to their public statements); *Johnson,* 399 F. Supp. 2d at 115 (refusing to find scienter, despite numerous GAAP violations and restatement revealing "drastic overstatement of financial results" where complaint did not point to any specific source "from which defendants received knowledge of flaws in [the corporation's] accounting") (internal quotations and citations omitted).    The Amended Complaint is barren of such allegations.

Indeed, it is neither obvious nor strongly inferential from the SEC's pleading of the applicable accounting principles that the recording of the transaction contravened GAAP.  To begin with, there has been no restatement of the revenue recognized from the Bill and Hold. Where there has been no restatement, the Court should first consider whether the SEC has alleged adequately that the transaction was accounted for incorrectly, and not simply accept this bare conclusion.[6] *In re NYSE Specialists Sec. Litig*., 503 F.3d 89, 95 (2d Cir. 2007) (on a motion to dismiss the court "need not accord '[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness'"), *cert. denied*, *sub num.*, 128 S. Ct. 1707 (2008) (quoting *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d

---

[6]    This inquiry would seem to be somewhat bound up with the inquiry into whether scienter has been pled adequately, or at least should affect the Court's consideration of the strength of the inference of fraud that the SEC asks the Court to draw, under any facts alleged.

20, 27 (2d Cir. 1989));[7] *see, e.g.*, *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1324 n.27, 1326 (S.D. Fla. 2004) (fact that auditors gave a clean opinion at the end of the year, when the purported fraud was still allegedly occurring, raises an inference that defendants were properly accounting for reserves at year end).

Moreover, this is not a case in which the SEC has alleged a transaction from which one might intuitively infer some purposeful or even reckless disregard of GAAP. Rather, as to the Bill and Hold, the SEC asserts a technical interpretation of certain alleged GAAP revenue recognition requirements, and attempts to bootstrap that technical and novel interpretation into actionable fraud by way of conclusory assertions and inflammatory characterizations. To cover the inadequacy of the pleading, the SEC attempts an intellectual sleight of hand in two regards, by which this Court should not be fooled.

Specifically, prior to actually alleging the supposed defects in the accounting for the transaction of which Mr. Miszuk supposedly was aware (Am. Compl. ¶ 117), the SEC attempts to make it appear that some defect was obvious by (1) asserting variously that the transaction was "a sham" and "phony" (*id.* ¶¶ 91, 110), and (2) asserting that one alleged GAAP requirement that was "plainly and deliberately flouted was the requirement that the ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders" (Am. Compl. ¶ 100). On close examination, either (i) there are no factual bases for these assertions; (ii) there are other allegations that counter these assertions; and/or (iii) the assertions are in fact not part of what the SEC ultimately alleges Mr. Miszuk "knew, or recklessly disregarded," was wrong with the accounting treatment. (*Id.* ¶ 117).

First, the characterization of the transaction as phony or a sham is unsupported by facts

---

[7]     There exist some district court opinions that could be read to suggest that an allegation that an accounting practice was contrary to GAAP need not be questioned on a motion to dismiss. *See, e.g., In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 656-58 (S.D.N.Y. 2007). However, such an interpretation or application here would be inapposite, and contrary to Second Circuit precedent. To the extent a complaint, like the one here, concludes that GAAP was violated and then uses that conclusion to bootstrap an otherwise barren claim of fraud, the accounting conclusion amounts to nothing more than a legal assertion of liability – which need not be accepted as true. Even if allegations of which practices or parameters constitute GAAP are given deference on a motion to dismiss, the *assertion* that the facts and circumstances alleged actually contradicted such practices and resulted in an error is nothing more than an "opinion[] couched as [a] factual allegation[]" – and thus worthy of no presumption of truth. *NYSE Specialists*, 503 F.3d at 95.

and is contradicted by the SEC's own allegations. The SEC admits that "[o]n June 20, 2003, the Distributor *placed an order* for 27.1 million tablets." (Am. Compl. ¶ 103) (emphasis added).[8] Nowhere does the SEC explain how such an order was "phony" or not "genuine." The SEC has not charged the Distributor with assisting Biovail in the alleged fraud by entering into a "phony" transaction. There also is no allegation that any of the pills ordered by the Distributor, whether sample or trade, were not eventually shipped by Biovail and paid for by the Distributor at a price at least equal to the amount which Biovail recorded as revenue. Finally, there is no allegation that the transaction has been restated, or that the auditors have objected to it as "phony" or a "sham." (*Id.* ¶¶ 110, 122). The SEC is required to support its scurrilous characterization of this transaction, which publicly impugns the reputation and integrity of Mr. Miszuk without foundation. Because the SEC has not provided such support, this Court should reject these characterizations.

Second, the SEC attempts to obscure the lack of factual allegations demonstrating fraud on the part of Mr. Miszuk by its assertion that in recording the June 2003 order under bill and hold accounting, Biovail "plainly and deliberately flouted" the alleged requirement in Staff Accounting Bulletin 101 ("SAB 101") that "the ordered goods be segregated." (*Id.* ¶ 110). However, the SEC does not in fact claim that pills covering the June purchase order were not physically segregated as of June 30, 2003. Rather, it alleges that because the pills sold in the Bill and Hold transaction constituted all of Biovail's inventory as of the end of the quarter, there was "no real segregation." (*Id.*) The Amended Complaint however fails to refer to any accounting literature that purports to define segregation for bill and hold purposes. There is nothing cited or alleged to indicate that Mr. Miszuk ever believed or was reckless in not knowing that the relevant product was not "really" segregated because it was all of Biovial's then-existing

---

[8]    Although the SEC attempts to make this "demand" from Crombie sound nefarious, it in fact is nothing more on its face than a responsible request for a firm order when Biovail obviously had incurred costs in beginning the production of the product for the Distributor and reasonably would seek assurance that it would recoup some of this cost through orders under the 2001 agreement, regardless of the timing or event of FDA approval. Biovail's shareholders should expect nothing less from Biovail management in their business dealings.

product. Indeed, the distinction the SEC attempts to make does not exist in GAAP.[9]

The SEC newly alleges that this segregation requirement is designed to prevent selling the same product twice. (Am. Compl. at ¶¶ 108, 111). The SEC's goes on to assert, again for the first time in the Amended Complaint, that in fact Biovail "sold the same pills twice." The SEC's allegations, however, do not support an inference, let alone a conclusion, that the pills segregated under the June Bill and Hold transaction were ever "sold twice."

To support its "sold twice" theory, the SEC alleges that the goods "supposedly designated and segregated" for the June 30 order from the Distributor were later "*designated* for shipment to the Distributor as sample product." (*Id.* at ¶111, emphasis added). The SEC adds the allegation that, at some point thereafter, the pills set aside for the Bill and Hold were shipped to fill sample orders, rather than the Bill and Hold order. (*Id.* at ¶¶ 111, 120 (referencing the receipt of sample shipments in *August*)). But there is no allegation that GAAP prohibits a manufacturer from recognizing revenue on segregated, ordered product, and then "thereafter" shipping that product to the same customer under different orders, if the shipped pills are replaced by newly manufactured, segregated pills at the time of shipment. Indeed, the SEC does not allege that Biovail recognized any revenue from the sample orders during the second quarter 2003. Thus, even at the time of the alleged "designation" (whatever that means) of the Bill and Hold pills to be shipped, *in the future,* to fill the sample orders, there is no indication that Biovail had recognized revenue from any of the orders other than the Bill and Hold order. And, the SEC does not allege that additional, newly manufactured pills were not in fact substituted for the original pills and segregated prior to the original pills actually being shipped as sample.

In other words, even taking the SEC's allegations as true, the allegations do not support the conclusion that GAAP, even as cited by the SEC, prevented Biovail from (1) recognizing revenue on the pills it segregated for delivery under the Bill and Hold transaction; and (2) later, though not required by any of the orders or agreements, substituting newly manufactured pills

---

[9] There is nothing alleged in GAAP, or indeed existing in accounting literature, to support the conclusion that product is not properly segregated simply by designating it as being held for a particular client, either in the inventory system, or by some physical method in the warehouse, regardless of whether it is all or only a portion of the manufacturer's existing inventory.

into the segregated area, only then removing the existing pills for shipment as sample. In such a case, the same pills are in no way "sold twice." Indeed, there is no allegation that the Distributor did not in fact eventually receive shipment of and pay for both the June 30 order and the sample orders.

The SEC no doubt hopes that SAB 101 will influence the Court to conclude that Mr. Miszuk must have known that a pills switch would invalidate revenue recognition, because of language in SAB 101 that the "ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders."[10] However, there are a number of reasons that the quoted language does not support the allegation that the pills switch disallowed revenue recognition, let alone that Mr. Miszuk would have been aware of such a result. As an initial matter, Staff Accounting Bulletins are not binding and do not have the force of law. As one Commissioner has stated, "The Commission never voted on the views espoused within any SAB, so it does not and cannot represent the views of the SEC."[11] It is stated at the outset in SAB 101:

> The statements in staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of Chief Accountant in administering the disclosure requirements of the Federal securities laws.[12]

Indeed, AICPA's Statement on Accounting Standards No. 69 defines the parameters of GAAP and lists five levels of accounting authority, none of which includes or refers to Staff Accounting Bulletins.[13] There is nothing cited in the Amended Complaint that would lead to the conclusion

---

[10]    Am. Compl. ¶ 107; Revenue Recognition in Financial Statements, SEC Staff Acct. Bull. No. 101 (Dec. 3, 1999), available at http://www.sec.gov/interps/account/sab101.htm (last visited 8/23/08).

[11]    Comm'r Paul S. Atkins, Remarks to the 'SEC Speaks in 2008' Program at the Practicing Law Institute, (Feb. 8, 2008), available at http://www.sec.gov/news/speech/2008/spch020808psa.htm (last visited 8/20/08). In a December 2005 speech, then-Commissioner Atkins cautioned: "Enforcement actions should not be built around Staff pronouncements." Comm'r Paul S. Atkins, Remarks Before the American Institute of Certified Public Accountants, (Dec. 5, 2005), available at http://www.sec.gov/news/speech/spch120505psa.htm. (last visited 8/20/08).

[12]    SAB 101, *supra* n.10.

[13]    Statement of Accounting Standards: The Meaning of 'Present Fairly in Conformity with Generally Accepted Accounting Principles' in the Independent Auditors Report, AICPA (CCH), No. 69 (Jan. 1992) ("SAS 69"). This is

that is advanced in this case: that at the time of the transaction at issue Mr. Miszuk knew or was reckless in not knowing that under GAAP a pill substitution would render invalid the accounting for the Bill and Hold transaction.[14]  Although the SEC alleges that Mr. Miszuk anticipated a pills switch (Am. Compl. ¶¶ 112-113), the SEC does not allege *facts* indicating that Mr. Miszuk knew or recklessly disregarded that such an accommodation to a customer would adversely affect the recording of revenue from the June purchase order.

Second, even if SAB 101 provided guidance on the appropriate accounting treatment, it does not support the conclusion the SEC so desperately tries to squeeze from it.  The language of SAB 101, that the product be segregated and "not be subject to being used for other orders," does not indicate that substituting product segregated for a particular customer under one order, to be used for another existing order by *the same* customer would present an obvious problem, where newly manufactured goods of the *same* type are segregated for the *same* customer, at the *same* time the original product is shipped, and where the *same* customer pays the recognized amounts for *both* shipments.  There is no accounting guidance whatsoever on whether making an item-for-item replacement of product for the same customer, in order to fill the same customer's additional orders will invalidate revenue recognition under bill and hold accounting.  There also are no settled or litigated SEC cases providing an analogous situation.[15]

---

not to say that issuers do not try to follow SEC staff guidance, and, indeed, the authority to which the SEC staff cites in SAB 101 for the specific "criteria" listed therein for bill and hold accounting, is exclusively SEC enforcement actions.  But, this demonstrates the difficulty in asserting that GAAP is only what the SEC alleges in SAB 101, and brings into question whether Mr. Miszuk can reasonably be held to know and be able to interpret criteria developed by the SEC staff in settled enforcement actions the way the SEC now thinks he should have.  *See* note 11, *supra*.

[14]    The authoritative literature establishing GAAP for revenue recognition, and applicable to the Bill and Hold transaction here, is FASB Concepts Statement No. 5. Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Finance Statements of Business Enterprises, Finance Accounting Standards Board (Dec. 1984), available at http://www.fasb.org/pdf/con5.pdf (last visited 8/20/08) ("FASB Con. 5").  FASB Con. 5 reflects FASB's pronouncement of GAAP as to revenue recognition criteria generally; it contains no specific parameters or criteria for when "bill and hold" treatment is or is not appropriate.

[15]    Most of the bill and hold cases brought by the SEC involve allegations that there was no real obligation by the buyer to pay or no delivery of the product – neither of which is the case here.  *Cf., e.g., In re Arthur Andersen & Co.*, 47 SEC 565, 568 (1981) (in a settled action, the SEC said that certain "bill and hold" transactions were "riskless" to the purchaser and therefore did not meet revenue recognition criteria, because among other things, "The customer could cancel the order without penalty at any time . . . [and] [t]he risks of ownership remained with [the seller]"; the SEC alleged that the seller's customers "merely received the equivalent of an option to purchase the merchandise included on bill and hold invoices.  In short, no sale had taken place"); *In re Pitts,* SEC Rel. No. 34-42569, 2000 WL 297884, at *1 (Mar. 23, 2000) (in a settled action, the SEC said that the purported "bill and hold" transactions were not properly recorded where "the customers had not requested that the transactions be on a bill and hold basis

Indeed, the SEC's new, though conclusory, allegation in the Amended Complaint that Mr. Miszuk knew or was recklessly unaware that a pill-for-pill swap had not occurred, (Am. Compl. ¶ 114), is a study in artful avoidance of making a direct, supported allegation that there was in fact no pill-for-pill swap at the time the original pills were shipped.  The SEC alleges only that "[a]s of mid-July," Mr. Miszuk knew that "Biovail had not yet manufactured [all] the additional pills needed to replace the pills" segregated for the Bill and Hold transaction, and that "[a]ccordingly, Biovail never *really* implemented a pill-for-pill substitution to replace the purportedly segregated pills with newly manufactured ones."  (*Id.* ¶ 114 (emphasis added)).  This allegation is a *non sequitur*.  Even if somehow meaningful, the allegation only speaks as to mid-July and does not allege that Mr. Miszuk had any role in not "really" implementing a pill-for-pill swap.  Nor does the SEC allege that a pill-for-pill switch did not in fact occur prior to shipment of the original pills.  The SEC does not allege that Mr. Miszuk knew that newly manufactured pills were not segregated at the time that the previously segregated pills were shipped to the Distributor, or even that he intended or planned that they not be segregated.

Stripped of its unfounded characterization of the Distributor's June 2003 order as "phony," and of the attempt to give a Staff Accounting Bulletin binding authority it does not have on a situation it does not even cover, the SEC is left with asserting that Mr. Miszuk, a non-accountant controller of a Canadian company, knew or recklessly disregarded that it was clear under GAAP that bill and hold accounting would not apply in the unique circumstances pled in the Amended Complaint.  The complexity of accounting principles and their application to specific facts has been recognized by many courts, including the Supreme Court, which has noted that "generally accepted accounting principles" are not a "canonical" set of rules requiring identical treatment of identical transactions; rather they "tolerate a range of 'reasonable'

---

... [and the customer] had no fixed commitment to purchase the goods"); *In re Parness*, SEC Rel. No. 34-23507, 1986 WL 712572, at *6 (Aug. 5, 1986) (in a settled action, the SEC alleged that the seller agreed to sell or lease the equipment on the purchaser's behalf); *see also, e.g.*, *SEC v. ABS Indus., Inc.*, No. 99 CV 2600, 1999 WL 977370, at *1 (Oct. 28, 1999) (the SEC alleged that "sales recorded as 'bill and hold' sales were for goods that were neither billed nor shipped to the customers . . ."); *In re Laser Photonics Inc.*, SEC Rel. Nos. 33-7463, 34-39166, 1997 WL 600684, at *4 (Sept. 30, 1997) (in a settled action, the SEC alleged that the "ship-in-place" transaction was "false" because the product was never delivered to the purported customer).  Even in *Parness*, however, the SEC recognized that the failure of a buyer to take delivery does not vitiate bill and hold treatment.  In other words, a breach of contract by the buyer does not mean that the bill and hold contract and the consequent accounting are not valid.

treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544 (1979); *SEC v. Caserta*, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999) (*citing Thor*, 439 U.S. at 544); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996); *Merzin v. Provident Fin. Grp., Inc.*, 311 F. Supp. 2d 674, 682-83 (S.D. Ohio 2004) (no inference of scienter from GAAP errors where accounting was complex, despite large resulting errors). At most, the SEC's Amended Complaint raises an issue of interpretation under unclear accounting guidance. This cannot substitute for the fact-based allegations required to raise a strong inference that Mr. Miszuk committed fraud when revenue from the transaction was recorded as of June 30.

### b.    The SEC's Allegations Do Not Support the Required Inference of Scienter

To attempt to fulfill the scienter requirement of pleading fraud, the SEC alleges that Mr. Miszuk "knew or recklessly disregarded" that:

> (a) as of June 30, 2003, there was no fixed schedule for delivery of the goods because FDA approval for Wellbutrin XL still had not occurred;
>
> (b) the Distributor had not agreed to pay the higher price trade price for product it used as sample product;
>
> (c) the pills supposedly segregated for the June 30, 2003 trade sale comprised all of Biovail's Wellbutrin XL tablets as of June 30, 2003; and
>
> (d) Biovail had not manufactured any – or enough – other pills as of June 30 or as of the date when Biovail's second quarter books were closed in July to replace the supposedly segregated pills that Crombie and Miszuk designated for shipment to the Distributor to fill the Distributor's other pending orders for sample product, at the lower sample prices.

(Am. Compl. ¶ 117). However, this recitation of how the SEC believes the *transaction* supposedly failed to qualify for revenue recognition under GAAP as of June 30, 2003 says nothing about Mr. Miszuk's supposed fraudulent intent or how he was reckless in not concluding

that the transaction failed to meet GAAP.[16]

This Court has faced similarly insufficient allegations in much the same circumstances, and dismissed the complaint.  In *City of Brockton Retirement Systems v. Shaw Group Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008), the court dismissed a complaint for failure to offer information to infer that "defendants knew or had reason to know anything about the mistaken application of FASB interpretation."  *Id.* at 473 (*citing In re NTL Sec. Litig.*, 347 F. Supp. 2d 15, 33 (S.D.N.Y. 2004) (Kaplan, J.)).  Just as in *Brockton*, the Amended Complaint here is silent as to how, why, or when Mr. Miszuk knew or had reason to know of any misapplied accounting interpretation relating to the Bill and Hold.

Additionally, as to the allegations in paragraph 117 of the Amended Complaint, it is neither obvious nor explained how the "facts" asserted in (c) and (d) above affect the accounting for the transaction, let alone how knowledge of those facts would evidence an intent by Mr. Miszuk to commit fraud in connection with recording of the transaction.  As discussed above, even if sufficient replacement pills had not been manufactured at the time Biovail closed its books for the quarter ended June 30, 2003 or at the time the segregated pills were "designated" to be shipped as sample, such a fact would do nothing to demonstrate that the accounting was incorrect or, more importantly, that Mr. Miszuk engaged in fraud.

As to the "facts" asserted in (a) and (b), there simply are no allegations in the Amended Complaint that reveal whether or how Mr. Miszuk was apprised of such alleged facts, let alone, why or how he should have concluded that such facts would lead to a violation of GAAP if revenue from the transaction were recorded in the second quarter 2003.  Although the Staff Accounting Bulletin to which the SEC points in this case requires a "fixed" schedule for delivery, the SEC's assertion that the "parties did not agree [] on a fixed schedule for delivery of the product *because* the date of FDA approval was not yet known" (Am. Compl. ¶ 104) is another argumentative sleight of hand.  In fact, based on the SEC's allegations, the timing of

---

[16]    Indeed, the SEC alleges that Biovail's auditors were aware that the transaction was booked as a bill and hold transaction at least by January 2004.  (Am. Compl. ¶ 132).  Nevertheless, there has not been a restatement of the transaction and there is no allegation that the auditors ever objected to the transaction on any grounds.

delivery was indeed fixed: delivery was due upon FDA approval. (*See id.* ¶ 103 ("the Distributor agreed to let Biovail hold the product awaiting FDA approval and packaging.")). The SEC cites to no specific facts suggesting whether, why, or how Mr. Miszuk concluded or clearly should have known that a mutual agreement between parties to set delivery based on FDA approval would not satisfy the "fixed" delivery item in SAB 101. There are no documents, conversations, or emails, referred to in the Amended Complaint even suggesting that Mr. Miszuk came to or was made aware of such a conclusion.

Finally, although the Amended Complaint contains the allegation that "the Distributor did not agree to pay the trade prices if it used the pills as sample product" (*id.* ¶ 130), it contains no allegations as to Mr. Miszuk's purported knowledge of or recklessness as to this supposed fact, or as to its significance for bill and hold accounting. An allegation that something *was not agreed to* is meaningless in this context. The SEC has not alleged that as of the date of the June order, or anytime thereafter, the parties agreed or knew that the Distributor would *not* pay if the pills were used by the Distributor as samples. And, contrary to this assertion, the very allegations in the Amended Complaint are that the Distributor agreed to pay a fixed price for pills which it knew had not been FDA approved and had not been packaged for sale as trade product. As alleged by the SEC, Biovail invoiced the Distributor for $8 million for the pills, and Biovail held them pending FDA approval. (*Id.* ¶ 104). There is no allegation, and can be none, that the Distributor had an option to pay anything but the agreed-upon *trade* price for the originally manufactured pills, despite their earlier manufactured date.

Indeed, the Amended Complaint states that the Distributor had agreed to pay $8 million for those pills. (*Id.* ¶¶ 103 & 104). There also is no allegation that the Distributor did not pay the $8 million due to Biovail for pills shipped to fill the Bill and Hold order. At most, the Amended Complaint alleges that some time after the non-contingent June purchase order was submitted by the Distributor, Biovail planned a pill swap and *allowed* the Distributor to pay the sample price for product that originally was segregated under the June purchase order. This was at most an efficient accommodation to a customer.

The SEC also alleges, without any factual basis, that Mr. Miszuk knew or recklessly

disregarded, "that during August the Distributor had refused to process the June 30 invoices for the trade product sale because Biovail was shipping the same pills under sample invoices at the lower sample prices." (Am. Compl. ¶ 121). The allegations do not provide any facts suggesting how or from whom Mr. Miszuk received information concerning the Distributor's alleged refusal "to process" the June 30 invoices or why it was doing so. The SEC does not allege that the invoice issue was not rectified and does not allege that the Distributor never paid for either the sample shipments or for the Bill and Hold pills. Allegations regarding administrative invoicing issues – the Distributor's alleged "refusal to process" the original June 30 invoices – is a far cry from a substantive failure to receive or pay for product. In fact, the more likely explanation of this is that the Distributor was temporarily reacting to erroneously receiving two sets of invoices for product with one lot number. (*Id.* ¶ 133). *See Tellabs*, 127 S. Ct. at 2510 ("a court must consider plausible nonculpable explanations for the defendant's conduct"). All that would be required to rectify the situation would be to reissue the invoice for the June order with a lot number for newly segregated, swapped, pills. The allegation that credit memos were issued in September to "cancel" the June 30 invoices (Am. Compl. ¶ 124) truly puts form over function – as the ministerial invoicing of the Distributor's orders is not alleged to have altered what the Distributor in fact paid for.

In an attempt to try to imply scienter and skirt its pleading requirements, the SEC in its Amended Complaint now alleges that Mr. Miszuk and the then-CFO, having reviewed certain accounting literature concerning bill and hold transactions, failed to consult with other accounting personnel or Biovail's outside auditors. (Am. Compl. ¶¶ 109, 115). This is another meaningless allegation. There is no requirement in GAAP or under any law or regulation that the CFO and Controller engage in such consultations, even if the issue is one of first impression for them, and does nothing to suggest that Mr. Miszuk knew or believed that the accounting for the Bill and Hold was incorrect. Judging by the assertions in the SEC's Amended Complaint, it appears that the SEC believes that GAAP is clear on bill and hold accounting. Perhaps Mr. Miszuk and the CFO simply also believed that the accounting was clear.

Finally, notwithstanding the allegations of fraud in the Amended Complaint, and despite

the fact that the SEC's investigation into alleged fraud at Biovail has been ongoing for over four years, Biovail has not restated the Bill and Hold transaction. This fact strongly negates an inference of fraudulent intent (and, we believe, raises serious questions about the SEC's asserted interpretation of GAAP). *See, e.g., Druskin,* 299 F. Supp. 2d at 1324, 1326 (fact that company issued no accounting restatements refutes inference that defendants acted with requisite intent); *In re Alamosa Hldgs., Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 854 (N.D. Tex. 2005) (dismissing securities fraud action where the company had "never been required to restate its financial statements" during the period in question and plaintiffs did not "allege facts to contradict the approval of the financial statements by [the company's] outside auditor who approved the statements without qualification"). Moreover, Biovail's outside auditors have issued unqualified audit opinions on Biovail's annual financial statements for 2003 through 2007.[17] They have not resigned or retracted their opinion on the applicable accounting treatment. The auditors, if they believe there is fraud, are required to bring that to the attention of company management, and if it is not rectified, the auditors must either resign or notify the SEC by report.[18] Neither of these things has been alleged to have occurred. *See Druskin,* 299 F. Supp. 2d at 1324 n.27, 1326 (fact that no auditors resigned during or after the relevant period weakens any inference that defendants acted with scienter).

The SEC has leveled serious charges against Mr. Miszuk that obviously jeopardize his career and impugn his integrity. Even the SEC is not legally permitted to bring the types of

---

[17]    See 20-F 2003 Annual Report, available at
http://sec.gov/Archives/edgar/data/885590/000104746904017429/a2136694z20-f.htm (last visited 8/20/08), 20-F 2004 Annual Report, available at http://sec.gov/Archives/edgar/data/885590/000104746905018555/a2160202z20-f.htm (last visited 8/20/08), 20-F 2005 Annual Report available at
http://sec.gov/Archives/edgar/data/885590/000104746906004403/a2168876z20-f.htm (last visited 8/20/08), 20-F 2006 Annual Report available at http://sec.gov/Archives/edgar/data/885590/000104746907002027/a2176789z20-f.htm (last visited 8/20/08), 20-F 2007 Annual Report available at
http://sec.gov/Archives/edgar/data/885590/000104746908002964/a2182900z20-f.htm (last visited 8/20/08).

[18]    Section 10A of the 1934 Exchange Act requires auditors who "detect [] or otherwise become [] aware of information indicating that an illegal act (whether or not perceived to have a material effect on the financial statements of the issuer) has or may have occurred," to "as soon as practicable, inform the appropriate level of management . . . and assure the audit committee . . . or the board of directors . . . is adequately informed with respect to the illegal acts." 15 U.S.C. § 78j-1(b)(1). If after such disclosure, an auditor concludes that management has not taken adequate remedial measures with respect to the illegal act, that auditor must directly report this conclusion to the board of directors, who are then required to "inform the Commission" of the reported illegal act. *Id.*, § 78j-1(b)(3).

charges it has alleged in this case without being able to point clearly to some evidence, literature, or actions that demonstrate, first, that the accounting for the Bill and Hold was improper, and, second, either that Mr. Miszuk knew of that impropriety or that it was so obvious he must have been aware of it. This requires, as the Second Circuit has put it, that facts be alleged demonstrating that Mr. Miszuk's conduct was "an extreme departure from the standards of ordinary care" so severe that it approximates "actual intent." *Honeyman v. Hoyt* (*In re Carter-Wallace Sec. Litig.*,) 220 F.3d 36, 39 (2d. Cir. 2000) (internal quotation marks and citations omitted); *see also Novak, 216* F.3d at 308, 312. If these words mean anything, they mean that the asserted action on the Bill and Hold transaction must be dismissed with prejudice.

### 3. The Amended Complaint Fails to Allege Scienter on the Foreign Exchange Issue

#### a. The Allegations

The Amended Complaint's allegations concerning the foreign exchange loss similarly do not withstand scrutiny under Rule 9(b). The SEC alleges that Mr. Miszuk knowingly permitted BLI, a Biovail subsidiary located in Barbados, to fail on a quarterly basis to apply the U.S.-to-Canadian-dollar exchange rate to a debt on BLI's books and consolidated on Biovail's books. (Am. Compl. ¶¶ 135, 137). This quarterly adjustment allegedly was necessary in order to reflect the difference between the recorded amount, which was shown as U.S. dollars (because that was the currency in which Biovail reported its financial results) and the amount that would have to be repaid, which was in Canadian dollars.[19] The SEC acknowledges that the failure to apply the current exchange rate to the foreign debt was, at least initially, an inadvertent error. (*Id.* ¶ 138). There is no allegation that Mr. Miszuk was involved with the transaction at its inception or had anything to do with the initial decision on how to record the debt. There is no allegation that Mr. Miszuk was aware of the failure to use the current exchange rate when the debt was recorded in the first quarter of 2003.

It is only with respect to the second and third quarters of 2003 that the SEC alleges that

---

[19]    Mr. Miszuk does not contest that this is the appropriate accounting.

the failure to apply the then-current rate was an "intentional misstatement," intended to understate losses and "conceal" Biovail's "weak . . . performance" in the second quarter 2003 and, incongruously, to fraudulently "*understate*[] its quarterly net income" in the third quarter 2003. (*Id.* ¶¶ 2, 134-38, 140, 143) (emphasis added). When the failure to apply the current exchange rate was discovered (*id.* ¶ 144), the Company dutifully restated its earnings for the first through third quarters of 2003, decreasing net income by approximately $6.2 million for the first two quarters – and actually increasing net income by approximately $3.1 million for the third quarter.[20]

On its face, the SEC's Amended Complaint and the allegations on this issue pleads, only, and without specificity, that Mr. Miszuk was told of a possible error, that he asked for further analysis, and that the error was not corrected. There is no allegation as to how Mr. Miszuk's response to this information supports the causes of action against him. Consider:

> (1) the SEC admits that when the error was first made and recorded on the books of Biovail's Barbados subsidiary, it was in fact, simply an inadvertent error (Am. Compl. ¶ 138); the SEC does not allege that the error was fraudulent and has not brought charges against those who initially made the error;

> (2) the SEC sets forth its allegations of fraud against Mr. Miszuk in two paragraphs in the Amended Complaint, which simply state that there was "identification" of an "issue" regarding the calculation in July 2003 (*Id.* ¶ 140), and that, thereafter, Mr. Miszuk allegedly "discussed" the foreign exchange issue with others at Biovail (*Id.* ¶ 143), but does not provide further specificity as to what was discussed, how or with whom; and

> (3) the SEC relies on, in effect, the *absence* of any further communication, discussion or evidence of a decision being made on the issue to claim that fraud was committed.

Rule 9(b) precludes the SEC's attempt to rest its claims on mere conjecture and speculation about Mr. Miszuk's supposed intent. No inference of scienter, let alone the requisite strong inference, is established by the allegations in the Amended Complaint. *See In re ICN Pharm., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004) (dismissing complaint for failing to "provide detailed evidence of the contemporaneous decision-making behind the alleged

---

[20] *See* Biovail Corp. Form 6-K/A, filed May 14, 2004, available at
http://www.sec.gov/Archives/edgar/data/885590/000104746904017437/a2130832z6-ka.htm (last visited 8/20/08),
http://www.sec.gov/Archives/edgar/data/885590/000104746904017434/a2130705z6-ka.htm (last visited 8/20/08),
http://www.sec.gov/Archives/edgar/data/885590/000104746904017436/a2130932z6-ka.htm (last visited 8/20/08).

accounting errors that would combine to show the requisite scienter"); *In re Astea Int'l Sec. Litig.*, No. Civ. 06-1467, 2007 WL 2306586, at *18 (E.D. Pa. Aug. 9, 2007) ("If anything, defendants' failure to apply [GAAP] properly may constitute negligence or 'little more than corporate mismanagement'" but [such] claims . . . are not cognizable under [the] federal [securities] law[s]" (citations omitted)). Courts have recognized that even the existence of "red flags," or information suggesting the possible falsity of a company's financial statements does not necessarily translate into knowing and intentional fraud. *Todd*, 2007 WL 1574756, at **13-14 (holding that information suggesting a possible "red flag" was not substantial evidence to support a finding of scienter).[21]

The Amended Complaint falls silent as to Mr. Miszuk's actions in connection with any decision-making on the foreign exchange issue after "identification" of the issue on July 8. The Amended Complaint alleges merely that "Miszuk and Biovail did not record this additional foreign exchange loss . . ." (Am. Compl. ¶ 140), conclusorily asserting that this was done with fraudulent intent.[22] The SEC makes a vague additional allegation, only added in the Amended Complaint, that Mr. Miszuk "discussed the foreign exchange issue with others . . . during the third quarter," prior to the filing of Biovail's second quarter Form 6-K with the SEC. (*Id.* ¶ 143).

However, there are no allegations as to what, if any, further communications Mr. Miszuk, the Senior Director of Legal Accounting, or the BLI Controller had, either among themselves or with any other individuals, about how to calculate or record the foreign exchange debt, and no facts alleged showing why and under what circumstances the allegedly needed adjustment was not made. There is no allegation of whether Mr. Miszuk ever received the analysis he requested.

---

[21]    S*ee also In re Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1075 n.7 (N.D. Cal. Aug. 14, 2002) (scienter not found for defendant CFO in receipt of employee's letter informing him of "specific incident of improper accounting;" Court held "this single allegation that Defendant[] had knowledge of a single improper revenue recognition decision fails to state sufficient facts from which a strong inference of scienter can be drawn."). Rather, courts look for "multiple, obvious red flags before drawing an inference that a defendant acted intentionally or recklessly." *P.R. Diamonds, Inc. v. Chandler*, 364 F.3d 671, 686-87 (6th Cir. 2004); *In re SCB Computer Tech., Inc.*, 149 F. Supp. 2d 334, 363 (W.D. Tenn. 2001) (justifying a strong inference of scienter requires that "'red flags' must be closer to 'smoking guns' than to mere warning signs"). As discussed above, even the July email exchange does not rise to the level of a "red flag" of possible fraud.

[22]    On a motion to dismiss, the court "need not accord legal conclusions, deductions or opinions couched as factual allegations a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.,* 503 F.3d at 95.

Allegations added in the Amended Complaint do not cure this. The vague allegation referencing discussions in the third quarter (*id.* ¶ 143) fail to specify who the alleged communications were with or how those alleged discussions about a supposed "hedging strategy" had anything to do with any decision on the previously *unrealized* foreign exchange losses associated with the BLI debt.

The Amended Complaint offers no information (*e.g.* emails, memoranda or allegations of secretive conversations or agreements) showing that Mr. Miszuk or anyone else at Biovail reached a final, definitive decision as to the proper accounting treatment or that they deliberately ignored the issue. The SEC does not allege that the Senior Director of Legal Accounting or the Controller of BLI were directed by anyone, let alone Mr. Miszuk, not to correct the alleged error, and they are not charged with any wrongdoing in connection with the issue. And there are no allegations that Mr. Miszuk, or anyone at Biovail, took any steps to conceal the error by adjusting any books, records or references to it.

Finally, the SEC's own allegations are inconsistent with fraud. The SEC alleges that the foreign exchange accounting led Biovail to *understate* its net income in the third quarter when it again failed to apply the then-current foreign exchange rate. (Am. Compl. ¶ 143). The fact that net income was understated is inconsistent with the SEC's theory that the Company was trying to conceal losses. As other courts have recognized, an understatement of income gives rise to a "compelling" and "cogent" inference that defendants were simply mistaken about the correct accounting treatment and weakens an inference of scienter.[23] *See, e.g., In re Bally Total Fitness Sec. Litig.,* No. 04 C 3530, 2006 WL 3714708, at *8 (N.D. Ill. July 12, 2006) (inference of scienter was undercut by fact that "revenues for some quarters was at times understated"); *In re Interpool Sec. Litig.*, No. Civ. 04-321, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) (fact that restated figures "in fact resulted in an increase to reported income . . . negate[d] an inference

---

[23]    In fact, Biovail's earnings for the third quarter were so dismal, missing their initial projections by $0.23 per share, (Avergun Decl, Ex. 3, Biovail Inc.'s Press Release, "*Biovail Provides Guidance on Third Quarter Results,*" Oct. 3, 2003) that had anyone at Biovail recalled the foreign exchange issue, logic would dictate that that would have been the quarter to correct it and the prior periods, to make a clean slate, and then continue forward with accurate currency calculations.

that Defendants acted with intent to perpetrate a fraud . . . via misleading financial statements"). Indeed, the alleged overstatement of $0.02 per share in the second quarter was entirely offset for the full year by the understatement of $0.02 in the third quarter. In short, nothing in the SEC's Amended Complaint supports an inference that Mr. Miszuk was involved in any purposeful, fraudulent decision to not correct the alleged error.

### b.    The July 2003 Emails

In its Amended Complaint, the SEC now makes specific reference to an email communication about the currency exchange rate error on July 8, 2003. This email was not identified in the original Complaint, but Mr. Miszuk brought it to this Court's attention in his motion to dismiss the original Complaint. (*See* Avergun Decl. Exs. 2A & 2B.)[24] The SEC correctly characterizes this email as merely containing "identification of ... the issue" for Mr. Miszuk. (Am. Compl. ¶ 140). As discussed below, the full body of this email and of the subsequent chain contradict any inference of fraud.

As the July 8, 2003 email exchange makes clear,[25] during the closing of BLI's books for the second quarter 2003, Biovail's Senior Director of Legal Accounting questioned BLI's Controller, who was located in Barbados, about the proper accounting treatment relating to a foreign debt obligation that had been carried on BLI's books since December 2002. Mr. Miszuk was copied on the email. The Senior Director of Legal Accounting asked:

> [S]houldn't the remaining loan balance be adjusted to reflect the FX rate in effect at June 30th? I believe it should (even though this was missed at March 31st) which would result in an additional FX loss of approx. $9.2 million in Q2 – something tells me the boys are not going to like that.

(Avergun Decl., Ex. 2A). In an email later that day, Mr. Miszuk requested to "see some analysis

---

[24]    The SEC has not attached this email to its Amended Complaint, but it appears to be the same one which was submitted with Mr. Miszuk's original motion, and which we attach to this Motion as Exs. 2A & 2B.

[25]    The Court may consider the full text of July 8, 2003 email if this is the communication referenced in the Amended Complaint, upon which the SEC heavily relies. (Am. Compl. ¶¶ 139, 141, 142). *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 254 (S.D.N.Y. 2005) ("emails . . . referenced within the [c]omplaint are . . . properly considered" on motion to dismiss); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *SEC v. Terry's Tips, Inc.*, 409 F. Supp. 2d 526, 529 n.1 (D. Vt. 2006) (court considered full text of emails referenced in SEC's complaint and noted that SEC did not object).

on this." He also asked for a meeting on the coming Thursday to discuss the issue with the two accountants. (*Id.*). Mr. Miszuk's initial response to the Senior Director's communication is clearly inconsistent with fraudulent intent. Responses like Mr. Miszuk's have been recognized as reasonable and appropriate – not fraudulent. *See In re Phillips*, SEC Rel. No. ID-55, 1994 WL 485042, at **10-11 (Aug. 26, 1994) (finding that defendant chairman and CEO of a subsidiary at which fraud was alleged was not culpable when he did not alert the parent company immediately after learning that there "could be serious problems" with the subsidiary's financials, because he was awaiting additional analysis on the potential problem); *cf.,* note 21, *supra*, and accompanying text.

Moreover, a court is required to consider plausible non-culpable explanations for the defendant's conduct when determining whether the pleaded facts give rise to a strong inference of scienter. *Tellabs*, 127 S. Ct. at 2504. The reasonable and innocent inference is that the error was made at the Barbados subsidiary and when it was discovered, Mr. Miszuk, having asked for analysis, thought that his associates would deal with it, especially because it had been brought to the attention of the Controller of the subsidiary at which the error occurred. Alternatively, it is just as likely that Mr. Miszuk simply forgot about the issue, among all the work normally associated with being Biovail's Controller, and/or assumed it had already been handled. This would be unremarkable, given that the issue clearly was being considered by Biovail's Senior Director of Legal Accounting and the Controller of the relevant subsidiary. Indeed, the chain of related emails that ends on July 10, 2003, shows the Senior Director of Legal Accounting directing how the matter should be temporarily recorded, until further discussion can be had. (Avergun Decl. Ex. 2B).

Rather than plead particularized facts showing that Mr. Miszuk knew or was severely reckless in his conduct relating to the foreign exchange rate issue, the facts as alleged and as evidenced from a review of this email chain supply a plausible inference only that a mistake was made and nothing more.

## II.    THE AMENDED COMPLAINT FAILS TO ADEQUATELY PLEAD MATERIALITY

Even setting aside the Amended Complaint's failures under Rule 9(b), the fraud claims asserted in connection with the Bill and Hold and foreign exchange issues must be dismissed because the alleged misstatements are immaterial as a matter of law.  For a securities fraud claim, a plaintiff must allege "a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).  Put another way, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988).  Where the amount of an alleged misstatement is so small, or the impact so far removed from the key attributes of a company that it would not have altered the total mix of information available to the market, a court should dismiss securities fraud claims.  *See, e.g.*, *In re Allscripts, Inc. Sec. Litig.*, No. 00-C-6796, 2001 WL 743411, at *10 (N.D. Ill. June 29, 2001) (dismissing securities fraud action in part because alleged misstatements, accounting for approximately 1% to 4% of corporation's annual revenue, were immaterial as a matter of law).

### A.    The Bill And Hold Revenue Was Immaterial

According to the SEC, Biovail allegedly overstated its revenue by $8 million and its earnings by $4 million in the second quarter of 2003 in connection with the Bill and Hold transaction.  (Compl. ¶¶ 91, 116, 125, 126).  The alleged misstatement of $8 million in revenue in the second quarter of 2003 amounts to only a legally immaterial 3.7% of Biovail's total second quarter revenue of $217.3 million, and *less than 1%* of Biovail's 2003 annual revenue of $823.7 million.  The impact on even quarterly revenue is patently immaterial.  *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (Where there was an approximately 1% to 4% overstatement of revenue ($416,000 to $1.55 million on quarterly revenue of $37.1 million), the court stated that the "transactions do not support a strong inference of scienter."); *In re*

*Allscripts,* 2001 WL 743411, at *10.[26]

The Amended Complaint's new allegation that the Bill and Hold revenue permitted Biovail to avoid reporting a decrease in overall product revenue relative to 2002 is not an accurate reflection of publicly filed documents, and does nothing to further a materiality argument. Even with revenue from the Bill and Hold transaction, Biovail's reported product revenue for the second quarter 2003 was still below its product revenue for the same period as reported in 2002, and thus the alleged error did not alter any trends.[27] Moreover, even with the inclusion of the WBXL revenue, Biovail's overall product revenue for the second quarter 2003 missed the Company's own guidance by 7-19% ($12.3 – 37.3 million), and missed analysts' expectations as well; thus, with or without the Bill and Hold revenue, analysts would have and did see Biovail's product revenue as poor.[28]

### B.    The Foreign Exchange Error Was Immaterial

Although Biovail restated its financials in May 2004 as a result of the exchange rate

---

[26] The SEC does not explain how it arrives at the alleged $4 million *earnings* figure that it attributes to the Bill and Hold transaction. However, such amount cannot be seen as material. Even if one were to assume that the Bill and Hold reflected $0.02 per share earnings (to which the alleged $4 million earnings figure would translate), Biovail still reported a GAAP loss of $0.01. *See, e.g., Guenthner,* 395 F. Supp. 2d at 847-48 (rejecting argument that investors would necessarily "find [an impact on] earnings and profitability important" where the company already had an operating loss). Further, even without the Bill and Hold revenue, Biovail would have reported EPS within its projected non-GAAP earnings range of $0.43 to $0.50 for the second quarter. (Compl. ¶ 95).

[27] *See* Biovail Corp. Form 6-K/A (quarterly period ending 6/30/03), at 2, filed May 14, 2004, available at http://www.sec.gov/Archives/edgar/data/885590/000104746904017437/a2130832z6-ka.htm (last visited 8/20/08) (reporting a decrease in overall "Product sales" from 2002 versus 2003 ($157.8 million vs. $157.7 million)); *see also* Avergun Decl. Ex. 4, Biovail Inc.'s Press Release, "*Biovail Reports Record Second Quarter 2003 Financial Results,*" Jul. 29, 2003.

[28] *See, e.g.,* Avergun Decl. Ex. 5, Biovail Inc.'s Press Release, "*Biovail Provides 2003 Guidance,*" Feb. 7, 2003 (estimating product revenue of $170 – 195 million for the second quarter 2003); Avergun Decl. Ex. 6, Credit Suisse First Boston, *Biovail Corporation – Downgrading to Neutral on Weaker-Than-Expected Core Pharma Operations* (Jul. 29, 2003) (estimated product revenue of $199 million); Avergun Decl. Ex. 7, CIBC World Markets, *Biovail Corporation – In Line 2Q03 With Mixed Signals; Maintaining '03 EPS* (Jul. 29, 2003) (forecasted product sales of $194 million); Avergun Decl. Ex. 8, RBC Capital Markets Analyst Report, *Biovail Corporation – Reports Mixed Q2/03 Results – Downgrading To Outperform* (Jul. 30, 2003) (projected product sales of $185.5 million). Courts may take judicial notice of analyst reports when offered not for the truth of their contents, but to establish whether certain information was provided to, or affected, the market. *See, e.g., Chambers* v. *Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) (on a motion to dismiss, judicial notice appropriate if consistent with Fed. R. Evid. 201(b)); *In re Take-Two Interactive Sec. Litig.*, 551 F.Supp. 2d 247, 290 fn. 23 (S.D.N.Y. 2008) (taking judicial notice of analyst reports that were neither referenced in or relied upon in drafting the complaint as "evidence of how the investing public understood" disclosures made by defendant corporation); *see also In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 682 (E. D. Mich. 2004) ("on a motion to dismiss ... courts may consider the full text of SEC filings, prospectuses [and] analyst reports").

error, the alleged error was immaterial as a matter of law.[29]  First, as a purely quantitative matter, the second quarter "loss" from marking the debt to market was immaterial.  According to the restatement, the alleged error changed reported earnings from a loss of $0.01 per share to a loss of $0.03.  *See, e.g., Guenthner*, 395 F. Supp. 2d at 847-48.  It neither changed a gain from a loss nor resulted in Biovail otherwise making earnings targets**.**  Moreover, it was in essence cancelled out by the $0.02 *gain* that allegedly should have been recognized in the third quarter 2003, had the correct, then-current exchange rate been applied at the end of that reporting period.  Thus, for the six-month period ended with the third quarter 2003, the net effect of the error was **zero.**[30]

   The above analysis is even more compelling when the obvious, fundamental truth about the alleged error is considered.  Both "earnings" and "losses" *recognized* from exchange rate calculations had **zero** impact on Biovail's reported *operating results* for all three relevant quarters.  The errors alleged in the Amended Complaint involved calculation of *unrealized* foreign exchange losses or gains on the unpaid portion of a debt at a subsidiary – a non-operating item that reasonable investors would not have considered significant in making investment decisions about Biovail's prospects.  Although GAAP may require marking the debt to market each quarter, thus *recognizing* a gain or loss for accounting purposes, the number is immediately meaningless, as currency exchange rates fluctuate every day.  In reality, the fluctuation is only significant on the day the company repays the debt.  Thus, it is unlikely that investors would view the potential effect of a currency fluctuation at any one point in time as significant to an outstanding debt obligation, on which no such loss has actually been *realized*, and may never be.

   Additionally, there was no significant reaction by the market that can be attributed to the restatement.  On March 3, 2004, Biovail released its financial results for the fourth quarter and

---

[29]   The fact that a company issues a restatement does ***not*** mean that the accounting error restated was material from the perspective of a reasonable investor.  Companies can restate immaterial errors, and often do.  *See Progress Report of the SEC Advisory Committee on Improvements to Financial Reporting*, SEC Rel. Nos. 33-8896, 34-57331, 2008 WL 441528, at *47 (Feb. 14, 2008) (*"Some have asserted that the increase in restatements is the result of an overly broad application of the concept of materiality . . .* resulting in errors being deemed to be material when an investor may not consider them to be important") (emphasis added).

[30]   Notably, the net result of all three quarters affected by this error was a restatement of $6.1 million ($0.04 per share), of which approximately $5.4 million ($0.03 per share) was attributable to the first quarter of 2003, which the SEC concedes was due to an inadvertent error.  (Am. Compl. ¶ 138).

the full year 2003, and disclosed, among other things, that Biovail's earnings for the first, second, and third quarters of 2003 would be amended due to an error in applying the foreign exchange rate. Although Biovail's stock price dropped after the March 3, 2004 earnings release, to close at $18.60 from a previous close of $20.77, the release discussed several items in addition to the exchange rate error, including missed earnings estimates, to which the decline in the stock price is more realistically attributable.[31]

## III.    THE AMENDED COMPLAINT FAILS TO STATE CLAIMS UNDER § 13(b)

The heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure should be applied to all claims that sound in fraud even if scienter is not a required element for those claims. *See Rombach*, 355 F.3d at 171 (the court applied Rule 9(b), particularity standard to claims under Section 11 and 12(a)(2)). Since allegations of fraud are pervasive in the Amended Complaint and in each of the claims asserted,[32] the particularity requirement of Rule 9(b) also applies to the SEC's claims under Section 13(b)(5) and Rules 13b2-1 and 13b2-2.

### A.    The Amended Complaint Fails To State A Claim Under § 13(b)(5)

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall *knowingly* circumvent or *knowingly* fail to implement a system of internal accounting controls" or "*knowingly falsify*" an issuer's books and records.[33]  15 U.S.C. § 78m(b)(5) (emphasis added).

From the language of Section 13(b)(5) itself, it is clear that the SEC will be required to prove, and must now at least plead, that Mr. Miszuk had actual *knowledge* of control deficiencies

---

[31]    The fall in stock price following the press release can be attributed to analysts' reports raising concerns over poor sales performance and Biovail's lowered guidance, not to issues related to the foreign exchange debt valuation (*e.g.*, Deutsche Bank lowered estimates for 2004 to $1.29 from $2.10) (Avergun Decl. Ex. 9 at 1, Deutsche Bank, *Biovail Corporation – Q4: Another EPS Shortfall – and Biovail Lowers the Bar, Again* (Mar. 4, 2004); *see also* Avergun Decl. Ex. 10, CIBC World Markets, *Biovail Corporation – 4Q03 Falls Short; Lowering Rating to Reflect Unfavorable Near-Term Reward / Risk* (March 3, 2004); *cf., In re Miller Indus., Inc.*, 120 F. Supp. 2d 1371, 1381 (N.D.Ga. 2000) (alleged misstatement held immaterial where analysts reports showed that the "market disregarded" the affected portion of the company's financial results in assessing the company's prospects).

[32]    Each of plaintiff's ten claims incorporate and restate the allegations in paragraphs 1 through 167 (*see* Am. Compl. ¶¶ 168, 171, 174, 178, 181, 184, 187, 194).

[33]    The Amended Complaint's Third Claim charges Mr. Miszuk with violating Section 13(b)(5) of the Exchange Act.

or *knowingly* circumvented them, or that he knew he was "falsifying" a record of Biovail.[34] First, as discussed in Section I above, the Amended Complaint fails to allege facts sufficient to infer that Mr. Miszuk knowingly allowed any of Biovail's books and records to be falsified. Second, the Amended Complaint makes no allegations about what accounting controls existed or did not exist at Biovail, much less Mr. Miszuk's knowledge or involvement in implementing or "knowingly" circumventing them. *See SEC v. Patel*, No. 07-cv-39-SM, 2008 WL 781912, at *14 (D.N.H. Mar. 24, 2008) (Section 13(b)(5) counts dismissed when the SEC failed to direct the court to "factual allegations in its complaint that might support [13(b)(5) claims]"); *see, e.g.*, *SEC v. Kahn,* No. 99 C 6343, 2002 WL 1163723, at *14 (N.D. Ill. May 31, 2002) (denying SEC's summary judgment motion on Section 13(b)(5) and Rule 13b2-1 claims where SEC did not specify what internal accounting controls were circumvented).

Contrary to the implication of the Amended Complaint, Section 13(b)(5) does ***not*** establish, that every time a GAAP violation occurs, sufficient internal controls were either lacking or were circumvented, or that someone "knowingly falsified" a record. The failure to plead with particularly either (1) specific findings concluding circumventions or inadequacies and Mr. Miszuk's knowledge of such issues; or (2) facts supporting that Mr. Miszuk had knowledge he falsified records, is fatal to the Amended Complaint.

### B.    The Amended Complaint Fails To State A Claim Under Exchange Act Rule 13b2-1

Exchange Act Rule 13b2-1 states that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to [15 U.S.C. § 78m(b)(2)(A)]." 17 C.F.R. § 240.13b2-1. Although Rule 13b2-1 does not specify a mental state, the term "falsify" itself connotes intentional misconduct. As discussed in detail in Section I, the SEC fails to plead facts supporting an inference that Mr. Miszuk engaged in any conduct that supports the conclusion that he "falsified" Biovail's books and records in connection with either the Bill and

---

[34]    *Cf., e.g., SEC v. Cohen*, No. 05CV371, 2007 WL 1192438, at *18 (E.D. Mo. Apr. 19, 2007) (defendant must have knowledge that the underlying accounting is incorrect in order to establish liability under § 13(b)(5); finding liability under that section only where there was "evidence that the defendant knew he was falsely recording the [subject transactions] as bill-and-hold transactions").

Hold transaction or the foreign currency issue.  As discussed in Section I, the SEC has not adequately alleged even that the recording of the Bill and Hold transaction contravened GAAP.

As to the foreign exchange rate error, the SEC does not allege that Mr. Miszuk was aware of any issue until after the error had been committed for one quarter, and only alleges facts that at most allow an inference that a possible issue was brought to his attention, which others were considering.  The SEC alleges no specific facts which support in any way the notion that Mr. Miszuk was even aware of whether the error was repeated in later quarters, let alone that he was involved in "falsifying" records.  The vague allegations of discussions about foreign exchange continuing in the third quarter, and about a hedging strategy which is never linked to the foreign exchange issue in the Amended Complaint, are legally insufficient.  (*See supra* discussion on pp. 29-30).

### C.     The Amended Complaint Fails To State A Claim Under Exchange Act Rule 13b2-2

Exchange Act Rule 13b2-2 prohibits an officer or director from making false or misleading statements to auditors in connection with preparation of publicly filed financial statements.  17 C.F.R. § 240.13b2-2.  To state a claim under Rule 13b2-2, the SEC must plead that Mr. Miszuk had knowledge that the information he allegedly provided to Biovail's auditors was false.  *Todd*, 2007 WL 1574756, at \*15 ("The Court has yet to find a case where a claim of Rule 13b2-2 violations was sustained without knowledge of the falsity of the statements at issue.").

The SEC alleges that Mr. Miszuk "omitted" necessary information about the Bill and Hold in discussions with the auditors; claiming vaguely that he (1) "led the auditors to believe that a shipment of trade product had actually occurred" by failing to correct the auditor's reference in an unspecified communication to a "shipment" having been made under the June order (Am. Compl. ¶¶ 115, 129); and (2) failed to tell the auditors of the Distributor's alleged refusal initially to pay the June invoices, and of the shipment of the segregated pills as sample

product.[35] (Am. Compl. ¶¶ 130, 132). These allegations do not state a valid claim and are pled with mere generalities that must be rejected by this Court.

First, as discussed in Section I, the allegations in the Amended Complaint do not suggest how these matters would have been material, in so much as the Amended Complaint neither adequately alleges a GAAP violation, nor sufficiently alleges how or why Mr. Miszuk should have attached, or did attach, importance to these matters. Indeed, the Amended Complaint does not allege that the auditors ever requested that the Bill and Hold transaction be restated.

Second, the SEC has not alleged sufficient facts of any specific communications, or the full context and substance of communications, to allow the conclusion that the alleged "omissions" indeed were material facts "necessary to make *the statements made*, not misleading."[36] All of the alleged omissions are reasonable and unremarkable when considered in the absence of further allegations about the context and circumstances of the conversations that were supposedly misleading. Any general conversation about the transaction, or general representation that Biovail's accounting was correct in Mr. Miszuk's view, cannot be seen as containing a material omission, in light of the absence of facts supporting the SEC's claims of impropriety in the first place.

The SEC also alleges that Mr. Miszuk made affirmative materially false statements prohibited by Rule 13b2-2 when he (1) allegedly told the auditors that the price for the Bill and Hold transaction was "fixed" (Am. Compl. ¶ 128) and (2) allegedly "made . . . misrepresentations in a management report," circulated to auditors because the report included earnings from the transaction and a statement that the Company's financial statements complied with GAAP. (*Id.* ¶ 131). As discussed in Section I, there are insufficient allegations to conclude

---

[35] The SEC alleges that Mr. Miszuk purportedly withheld the "true reason" for the September 1, 2003 credit memos from the auditors and instead told them that Biovail credited out the invoices in order to issue invoices that included packaging costs. (Am. Compl. ¶ 133). Yet, and as discussed *supra*, pp. 21, 31-32, this allegation is insignificant. In light of the fact that the SEC makes no allegation that the Distributor did not ultimately pay the invoices, all that would be necessary to correct the situation would be to re-issue new invoices reflecting the two different lot numbers.

[36] The Amended Complaint's additional reference to meetings on two dates during which Mr. Miszuk allegedly mislead Biovail's auditors does not shore up the inadequacies of the original complaint. (Am. Compl. ¶¶ 115, 129). There is still no factually specific allegation of what Mr. Miszuk said or did during these supposed meetings to mislead the auditors.

that the price was not "fixed." Indeed, the SEC alleges it was fixed (*id.* ¶¶ 128, 129), but argues that it was changed because of the pill swap. As to any representation about compliance with GAAP, as discussed in Section I, above, there is no factual basis to indicate that Mr. Miszuk was making a misrepresentation or should have known he was, if he gave a view that the recording of the Bill and Hold transaction complied with GAAP.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING

The SEC alleges that Mr. Miszuk – only in connection with the Bill and Hold transaction and the foreign exchange accounting issue – aided and abetted Biovail's alleged violations of Exchange Act: (1) §10(b) and Rule 10b-5 (antifraud provisions), (2) §13(a) and various rules thereunder (issuer reporting obligations), and (3) §13(b)(2)(A) and (B) (issuer books and records and internal controls). For the same reasons as discussed in Sections I through III, above, the various claims that Mr. Miszuk aided or abetted Biovail's alleged violations of securities laws also fail.

Section 20(e) of the Exchange Act, which governs aiding and abetting claims in SEC actions, provides for such liability only where a person "***knowingly*** provides substantial assistance to another person in violation of a provision of [the Exchange Act]" (emphasis added). Courts in the Second Circuit consistently give this language its common meaning of actual knowledge – rather than constructive knowledge or recklessness. *See, e.g., SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 382-83 (S.D.N.Y. 2006) (discussing legislative history and rejecting SEC's argument that Section 20(e) encompasses recklessness); *see also SEC v. Coffman*, No. 06 CV 00088, 2007 WL 241 2808, at *10 n.4 (D. Colo. Aug. 21, 2007) (aiding and abetting Exchange Act violations require "actual knowledge"); *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006). Moreover, aiding and abetting claims must satisfy Rule 9(b) pleading requirements. *See SEC v. Solow*, No. 06-81041-Civ., 2007 WL 917269, at *4 (S.D. Fla. Mar. 23, 2007) (aiding and abetting claims dismissed for failure to comply with Rule 9(b)).

As to the Bill and Hold transaction, liability for aiding and abetting Biovail in allegedly violating the antifraud, books and records, and internal control provisions necessarily must flow

from the allegation that the Bill and Hold was misstated. The SEC, however, has failed to adequately allege that the accounting for the Bill and Hold transaction was recorded improperly. *See supra* Section I. Without a primary violation, Mr. Miszuk cannot be held liable as an aider and abettor in connection with that transaction.

Moreover, the Commission has not adequately pled that Mr. Miszuk's conduct in connection with the Bill and Hold was "reckless," much less that he had knowledge of a supposed fraud or misreported financials, or that he knew he was in engaged in any misconduct. Thus, the SEC cannot allege either "knowing" or "substantial" assistance by Mr. Miszuk of *any* of Biovail's alleged violations. *See supra* Section I.B. *See, e.g., SEC v. Morris*, No 04-3096, 2005 WL 200665, at *9 (S.D. Tex. Aug. 18, 2005) (no aiding and abetting liability for CFO who "reviewed, signed and was responsible for the public filings" where no other conduct was alleged to show defendant's awareness of or participation in the fraud); *Coffman*, 2007 WL 2412808, at *1 (following trial, court dismissed claims for aiding and abetting violations of §10(b) where plaintiffs failed to prove defendant's scienter with respect to primary violation); *SEC v. Sandifur*, No. 05-1631, 2006 WL 538210, at *12 (W.D. Wash. Mar. 2, 2006) (dismissing aiding and abetting claims despite allegations that defendants knew that the subject transaction was "highly atypical," because there were no allegations that defendants "knew the allegedly improper or fraudulent purpose" of the subject transaction); *see also Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.,* 602 F.2d 478, 484 (2d Cir. 1979) (a "'party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud'") (citation omitted). Without this requisite and specifically pled knowledge, the Amended Complaint fails.

Similarly, as to the foreign exchange accounting issue, the SEC has not adequately pled any fraudulent action by Biovail which Mr. Miszuk could have aided and abetted. Even if the incorrect foreign exchange rates were applied, there are no allegations to support a claim that Mr. Miszuk aided and abetted any resulting inaccurate recording or misreporting by Biovail. As set out above, for aiding and abetting liability, facts must be alleged to provide a strong inference that Mr. Miszuk "knowingly and substantially assisted in the misrepresentation." As described

in Section I, there are no such facts in the Amended Complaint, nor has the SEC sufficiently identified how Biovail's required internal controls were inadequate or circumvented. *See supra* Section I.B.3.

The absolute lack of particularized allegations as to Mr. Miszuk's actual knowledge of any impropriety in connection with the foreign exchange issue, necessarily defeats any claim that Mr. Miszuk aided and abetted Biovail's alleged antifraud, books and records, or internal control violations. *See, e.g., Edwards & Hanly,* 602 F.2d at 484.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant John Miszuk respectfully request that the claims in the Amended Complaint be dismissed with prejudice and, alternatively, that the request for disgorgement and prejudgment interest be stricken.


Dated:      Washington, DC
            August 22, 2008


                              CADWALADER, WICKERSHAM & TAFT
                              LLP

                    By:_____/s/_____Jodi L. Avergun_____
                        Bruce A. Hiler (BH 0432)
                        Jodi L. Avergun (JA 2109)
                        Thomas A. Kuczajda (TK 6993)
                        Mollie E. O'Rourke (MO 1165)

                        1201 F Street NW, Suite 1100
                        Washington DC, 20004
                        202-862-2200 (tel.)
                        202-862-2400 (fax)

                        One World Financial Center
                        New York, New York 10281
                        212-504-6000 (tel.)
                        212-504-6666 (fax)

                        Attorneys for Defendant John Miszuk